## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated, | Case No. ___4:20-cv-794___ |
| | Judge _____ |
| *Petitioners*, | **Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief** |
| v. | |
| | **Class Action** |
| MARK WILLIAMS, warden of Elkton Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities, | |
| | **IMMEDIATE RELIEF SOUGHT[1]** |
| *Respondents*. | |

### INTRODUCTION

1.      As a tragic combination of infectious and deadly, COVID-19 poses a once-in-a-lifetime threat on a worldwide scale. Every state and territory in the United States has now been impacted, with nearly half a million cases and over 20,000 deaths reported to the Centers for Disease Control and Prevention (CDC). Even under ordinary conditions, each person who contracts this illness can be expected to infect between 2 and 3 others.

2.      Cramped, overcrowded prisons amplify this threat. With thousands of people literally stacked on top of each other and unable to move around without rubbing shoulders, such environments are fundamentally incompatible with medically-indicated social distancing and hygiene protocols. As a result, they present a grave threat not only to prisoners and staff, but also

---

[1] In addition to service of process, counsel for Petitioners have contacted attorneys for the United States, and will provide a courtesy copy of this Petition and all attachments hereto by email in order to provide actual notice on an expedited basis.

1

to the broader community by enabling the spread of COVID-19 both inside and outside the prison walls.

3.      This danger is playing out with disastrous consequences in Elkton Federal Correctional Institution ("FCI Elkton"), a low-security federal correctional institution with an adjacent low security satellite prison ("FSL Elkton"), collectively described as "Elkton." As of April 12, 2020, at least 3 prisoners have died, and scores of prisoners and staff have reportedly been hospitalized, including more than a dozen who have needed ventilators to stay alive. These numbers will continue to grow exponentially. Despite knowing the risks to prisoners, staff, and the community, Elkton has failed to provide meaningful protection against the spread of the disease. Prisoners are still clustered together in confined spaces with limited access to hygiene and inadequate ventilation.

4.      But even were Respondents to take basic measures to allow for cleaning and hygiene, the threat would remain. In fact, there is *no* set of internal protocols or practices that, in light of the current conditions and population levels, Elkton can use that will prevent further disease and death inside the prison. Declaration of Dr. Meghan Novisky ¶ 16 (attached as Exhibit A); Declaration of Dr. Joe Goldenson ¶ 25 (attached as Exhibit B). The only effective option is to begin immediately releasing[2] Elkton residents based on broadly defined categories, such as membership in a high-risk class based on medical conditions, or proximity to release dates.

---

[2] The term "release," as used throughout this Petition, refers to discharge of incarcerated persons from the physical confines of Elkton, not necessarily release from custody. Release options may include, but are not limited to: release to parole or community supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to Elkton once the pandemic is over and the viral health threat is abated. Any releases would include requirements for testing, care, and social distancing, as informed by a public health expert.

Novisky Decl. ¶ 17 ("Significantly reducing the prison population at Elkton as rapidly as possible is the best line of defense to maintain the public health interests of persons incarcerated at Elkton, correctional staff who work at Elkton, and the Ohio community"); Goldenson Decl. ¶ 33 ("It is my public health recommendation that everyone who is medically-vulnerable to severe symptoms and death from COVID-19 … be released from FCI Elkton and FCL Elkton immediately.").

5.      The Constitutional prohibition on cruel and unusual punishment requires Respondents to provide safe living quarters, including protection from dangerous infectious diseases. *E.g.*, *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). Yet Respondents are unable to comply with this Constitutional command without swift and sufficient releases. Because "[t]he situation at FCI Elkton in particular is alarming," and the BOP "cannot adequately protect [the prisoner] from infection, especially in light of his vulnerability and the presence of COVID-19 in FCI Elkton," at least one federal court has already ordered a prisoner to be released from Elkton. *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331 (E.D. Pa., Apr. 1, 2020).

6.      Time is of the essence. Delay can mean further death or serious illness. Accordingly, Petitioners—a class and subclass of persons incarcerated at Elkton now and in the future—bring this action and request expedited consideration and immediate release of categories of all Petitioners and Class Members, coupled with appropriate support and conditions upon release, as informed by public health expertise.

## I.      JURISDICTION AND VENUE

7.      Petitioners bring this putative class action pursuant to 28 U.S.C. § 2241 for relief from detention that violates their Eighth Amendment rights under the U.S. Constitution.

8.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1651 (All Writs Act); Article I, § 9, cl. 2 of the U.S.

Constitution (Suspension Clause); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1346 (United States as a defendant).

9.      Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Petitioners and all other class members are in custody in this judicial district and venue. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Petitioners' claims occurred in this district.

## II.      PARTIES

10.      Petitioner Craig Wilson, BOP Register Number 13730-025, has suffered from chronic asthma since childhood, and uses a rescue inhaler and medication for breathing problems, placing him in a high risk category for COVID-19. He is incarcerated at FCI Elkton for a nonviolent offense, and now resides in a dorm with 150 bunks, in a cube of 8 by 9 feet that houses 2-3 prisoners. Social distancing is impossible in his environment, and he knows that if he contracts the disease, he may die. He receives a weekly ration of soap but always runs out, and is unable to purchase more because the commissary is closed. He asked for a grievance form in light of the COVID-19 situation but was told there were no forms available. If he were released to home detention, he has a stable home environment and an evidence-based recovery plan in place.

11.      Petitioner Eric Bellamy, BOP Register Number 15061-088, is 52 years old, and has a history of heart problems, including one enlarged heart valve and two valves that are regurgitating. He is housed in a cell at FCI Elkton with 2 other men in a 6 by 8 foot area, with 150 people in the unit. He is constantly and unavoidably within 1-2 feet of other prisoners. He was friends with Woodrow Taylor, a fellow prisoner who died from COVID-19. He was convicted of possession of narcotics and of a firearm, and has served 16 months of a 75 month sentence. He has no history of violence, and has a stable home environment if he is released.

4

12.     Petitioner Kendal Nelson, BOP Register Number 64823-060, has asthma, uses a CPAP machine, has had a heart attack, has active coronary artery disease and a stent in an artery, and suffers from stage 4 kidney disease. He has served 3 years of a 9 year sentence for a drug offense and possession of a firearm. He has 170 men living in his pod at FSL Elkton, the low-security satellite camp, in sets of 3 men living in cells designed for single occupancy. Because many people around him are sick, he stays in his cell under the blankets as much as possible out of fear of COVID-19. He has a stable residence available immediately upon release.

13.     Petitioner Maximino Nieves, BOP Register Number 27537-050, resides at FSL Elkton with 170 people in his unit in an open dormitory. He is about 2 feet away from other residents when he sleeps, and it is impossible to keep 6 feet away from other prisoners during the day. He has only about 11 months left of his sentence for conspiracy to distribute drugs. He has no history of violence, and has a stable residence available immediately upon release.

14.     Respondent Mark Williams is the warden of Elkton and currently has immediate custody over Petitioners and all other putative Class members.

15.     Respondent Michael Carvajal is the Director of the United States Bureau of Prisons and is responsible for all people, including Petitioners, housed at Bureau of Prisons facilities, including all structures at Elkton.

## III.       FACTUAL ALLEGATIONS

### A.  COVID-19 Poses a Significant Risk of Illness, Injury, or Death

16.     The novel coronavirus that causes COVID-19 has led to a global pandemic,[3] and The United States has more confirmed cases of COVID-19 than any other country in the world. As of April 12, 2020, there were more than 1.6 million reported COVID-19 cases throughout the world and more than 20,000 deaths in the United States.[4] Projections indicate that hundreds of thousands of people in the United States may die from COVID-19, accounting for existing interventions.[5]

17.     "COVID-19 is twice as contagious as the flu, and 20 times more deadly."[6] The virus is "highly infectious,"[7] and can be spread "easily and sustainably" from person-to-person.[8] The virus can live on plastic and steel surfaces for up to 72 hours,[9] and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[10]

---

[3] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

[4] *See* Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.

[5] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, WASH. POST. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.

[6] Governor Mike DeWine (@GovMikeDeWine), Twitter (Mar. 14, 2020, 2:19PM), https://twitter.com/GovMikeDeWine/status/1238892579262992384?s=20

[7] Goldenson Decl. ¶ 14 (noting that "only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity").

[8] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[9] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at https://doi.org/10.1056/NEJMc2004973 (accessed Apr 2, 2020).

[10] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA  (2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (accessed Apr 2, 2020).

18.     Because the coronavirus spreads even among people who do not show symptoms, staying away from people is the best way to prevent infection.[11] In other words, *everyone*— including officials at Elkton—has to act as if *everyone* has the disease.

19.     There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection. Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading the illness[12]—supplemented by a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, is the only known effective measure for protecting against transmission of COVID-19.[13]

20.     As a result, the only assured way to curb the pandemic is through dramatically reducing contact for all.[14] Consequently, every American institution—from schools[15] to places of worship,[16] from businesses[17] to legislatures[18]—has been exhorted or ordered to reduce the number of people in close quarters, if not to empty entirely.[19] The State of Ohio has issued an extraordinary

---

[11] Novisky Decl. ¶ 6; *see also, e.g.*, Ruiyun Li et al., *Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2)*, SCIENCE (2020), available at https://cutt.ly/AtNrCxH.

[12] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.

[13] Goldenson Dec. ¶ 15.

[14] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* WASH. POST, (Mar. 14, 2020), https://cutt.ly/etYRnkz.

[15] Centers for Disease Control and Prevention, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[16] Centers for Disease Control and Prevention, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

[17] Centers for Disease Control and Prevention, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

[18] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a

[19] As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus.

series of orders suspending elections, closing private businesses, cancelling sporting events, shuttering schools, and ordering people to stay at home.[20] People also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces, using products with particular alcohol contents, and closing off any areas used by a sick person.[21]

21.     Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including the heart and liver.[22] Even if a person survives COVID-19, the virus can permanently damage lungs, heart, and other organs.[23]

22.     Approximately 1 out of 5 people who are infected with COVID-19 will need to be hospitalized, and many of those will need intensive care.[24] Such intensive care often requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care

---

*See* Sarah Mervosh, Denise Lu, Vanessa Swales, *Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (last updated Apr. 3, 2020), available at https://cutt.ly/CtDMZY0.
[20] *E.g.*, Amy Acton, Amended Director's Stay at Home Order (Apr. 2, 2020), available at https://cutt.ly/VtB5Vam.
[21] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.
[22] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl.
[23] Melissa Healy, *Coronavirus infection may cause lasting damage throughout the body, doctors fear*, LA TIMES (Apr. 10, 2020), available at https://cutt.ly/htNrJ77; *see also* Di Wu et al., *Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19*, MEDRXIV 2020.04.05.20053819 (2020). For high-risk patients who survive, the effect of contracting this virus can be permanent and debilitating, and can include "profound deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity." Declaration of Dr. Jonathan Golob, *Dawson v. Asher*, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at https://cutt.ly/AtNrFOl.
[24] Goldenson Decl. ¶¶ 7, 10; see also Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020) available at https://cutt.ly/stERiXk

providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.[25]

23. COVID-19 can also mean death. Worldwide, more than 100,000 people have already died from COVID-19, and that number grows each day.[26] Between 0.3 and 3.5% of people infected will ultimately die from the disease.[27] This percentage jumps for people in certain high-risk categories.[28]

24. People over the age of fifty face a greater risk of serious illness or death from COVID-19.[29] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%: 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[30] However, people of all ages can get seriously ill or die. In fact, over half of the people hospitalized for COVID-19 have been under 65 years old.[31]

25. People of any age who suffer from the following also have an elevated risk: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a

---

[25] Kevin McCoy and Katie Wedell, *'On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), available at https://bit.ly/2V7rLsS.

[26] World Health Organization, *COVID-19 Dashboard*, https://who.sprinklr.com/

[27] Goldenson Decl. ¶ 7.

[28] Goldenson Decl. ¶ 8.

[29] Goldenson Decl. ¶ 8; Xianxian Zhao, et al., *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis*, MEDRXIV (Mar. 20, 2020), https://cutt.ly/etRAkmt.

[30] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report and Chinese CCDC report published in the Chinese Journal of Epidemiology).

[31] Centers for Disease Control and Prevention *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16,* 2020 (updated Mar. 26, 2020), https://cutt.ly/ztB53U1; *see also* Robin McKie, *Why do some young people die of coronavirus?*, THE GUARDIAN (Apr. 5, 2020), available at https://bit.ly/2x5dghp.

person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.[32] Early reports estimate that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[33] Because COVID-19 affects the respiratory tract, people with moderate to severe asthma are also at a higher risk of getting very sick.[34]

## B. The Dangers of COVID-19 are Heightened in Prisons

26.     The imperatives of social distancing and hygiene apply with special force to prisons, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation. Yet persons who live or work in prisons face a particularly acute threat of illness, permanent injury, and death, beyond that faced by the general public.[35]

27.     As Professor Novisky, PhD, an expert on prisons and prisoner health, notes in her attached declaration, "prisons, by their very nature, are high risk sites for the spread of infectious

---

[32] Goldenson Decl. ¶ 8; Centers for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://bit.ly/3dYDrqI; World Health Organization, *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").
[33] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, (Feb. 28, 2020), at 12 https://cutt.ly/KtD3ALr (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").
[34] Goldenson Decl. ¶ 9.
[35] Novisky Decl. ¶ 8.

disease."[36] Dr. Goldenson, MD, a physician with decades of experience in correctional health, agrees: "The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community."[37] And as one federal court has already noted, in a case dealing specifically with the ongoing crisis at Elkton: "Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities."[38]

28. People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19,[39] as already evidenced by the rapid spread of the virus in even *less* crowded environments than prisons, such as cruise ships[40] and nursing homes.[41]

29. Because they are forced to exist in close, shared spaces for eating, sleeping, and bathing, it is impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing required to mitigate the risk of transmission.[42] High

---

[36] Novisky Decl. ¶¶ 15-23.
[37] Goldenson Decl. ¶ 21.
[38] *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331, (E.D. Pa., Apr. 1, 2020).
[39] Novisky Decl. ¶¶ 9-10.
[40] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." Centers for Disease Control and Prevention, *COVID-19 and Cruise Ship Travel*, https://cutt.ly/7tEEQvT.
[41] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. Centers for Disease Control and Prevention, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, https://cutt.ly/7tEEITH.
[42] Novisky Decl. ¶ 10; Goldenson Decl. ¶ 20 (noting it is "extremely difficult, if not impossible" to implement recommended social distancing and hygiene procedures in detention settings).

numbers of shared contact surfaces, limited access to medical care, and high numbers of people

with chronic, often untreated, illnesses living in close proximity with each other exacerbate the

dangers in detention settings.[43]

30.   In addition to Professor Novisky and Dr. Goldenson, whose declarations are

attached to this petition, numerous public health experts have publicly warned that people held in

correctional facilities are likely to face serious, even grave, harm due to the outbreak of COVID-

19. Such experts include:

- Dr. Gregg Gonsalves, a professor at Yale School of Public Health;[44]
- Dr. Ross MacDonald, Chief Medical Officer for Correctional Health Services;[45]
- Dr. Marc Stern, an affiliate faculty member at the University of Washington School of Public Health and a correctional health care consultant,[46]
- Dr. Oluwadamilola T. Oladeru, a resident physician in the Harvard Radiation Oncology Program at Massachusetts General Hospital, and Adam Beckman, a student at Harvard Medical School,[47]
- Dr. Homer Venters, former chief medical officer of the New York; [48]

---

[43] Novisky Decl. ¶ 4 (prisons have "factors that aggravate the spread of COVID-19, including lack of social distancing, concentrations of immunocompromised, vulnerable adults, and lack of access to proper sanitation"); Goldenson Decl. ¶ 24; Letter from Johns Hopkins Faculty at 1, https://cutt.ly/DtB6tkA ("The close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely. Soap and hand sanitizers are not freely available in some facilities.").

[44] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* CONNECTICUT MIRROR (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[45] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020, 11:29 a.m.), https://cutt.ly/ptRSnVo.

[46] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

[47] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HEALTH AFFAIRS (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[48] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk

- the faculty at Johns Hopkins schools of nursing, medicine, and public health,[49] and
- Dr. Josiah Rich, a Professor of Medicine and Epidemiology at Brown University.[50]

31.     For example, as of February 29, 2020, at the peak of the outbreak in Wuhan, China—the city where COVID-19 originated—over half of all new infection cases were incarcerated people.[51] On Rikers Island, the rate of infection among incarcerated people is over eight times the rate of infection in New York City generally, and 45 times higher than the rate in Wuhan.[52] Fourteen prisoners have died of COVID-19 in Bucks County, Pennsylvania.[53] Six incarcerated people have already died of the disease at FCI Oakdale, a similar facility in Louisiana.[54] An Ohio corrections officer has also passed away.[55]

### C. Existing Procedures and Protocols at Elkton Expose Class Members, Staff, and the General Public to an Unacceptable Risk of Infection, Suffering, and Death

32.     People at Elkton are dying. The situation is particularly dire, even compared to other corrections facilities. Elkton has proven that it is incapable of preventing the spread of

---

[49] *JHU Faculty Express Urgent Concern about Covid-19 Spread in Prison*, Johns Hopkins Berman Institute of Bioethics, (Mar. 25, 2020) https://bioethics.jhu.edu/news-events/news/jhu-faculty-express-urgent-concern-about-covid-19-spread-in-prison/

[50] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, THE GUARDIAN (Mar. 13, 2020) https://cutt.ly/itRSDNH.

[51] Zi Yang, Cracks in the System: COVID-19 in Chinese Prisons, THE DIPLOMAT (March 9, 2020), available at https://cutt.ly/ctB6ieT.

[52] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. *See* Legal Aid Society, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited Apr. 5, 2020, 3:00 p.m.), available at https://cutt.ly/RtYTbWd.

[53] Press Release, Bucks County, PA, Larry R. King, *Bucks County COVID-19 Deaths Reach 14; Four Cases Confirmed at Prison* (Apr. 4, 2020), *available at* https://cutt.ly/utD6u5F.

[54] *Sixth inmate death from COVID-19 reported at FCI Oakdale I*, KALB (Apr. 10, 2020, 2:22 pm), https://cutt.ly/htB6ahx

[55] Ohio Dep't of Rehabilitation and Correction, *COVID-19 Information* (updated Apr. 11, 2020), available at https://cutt.ly/ZtB6hMN.

COVID-19—and indeed, any internal steps necessary to protect further infection will be ineffective under the current crowded conditions there.[56]

33. "It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as FCI Elkton."[57] As of April 9, 2020, three prisoners have died in Elkton. "The medically established progression of COVID-19, combined with the pre-existing health conditions of all 3 men, makes it likely these individuals suffered tremendously leading up to their deaths."[58] "Given the way the disease has progressed elsewhere, we can expect the death toll to mount rapidly."[59]

34. According to the President of the America Federation of Government Employees Local 607, a union that includes most of the staff at Elkton, as of April 8, 2020, 43 prisoners have been hospitalized outside the prison after testing positive for COVID-19 or showing symptoms of the disease, and 13 of them were on ventilators.[60] An additional 8 staff members have confirmed COVID-19 diagnoses, with 2 of them on ventilators.[61] These numbers can be expected to grow dramatically every day, threatening the health and lives of prisoners, staff, and the surrounding community.

35. As one federal court recently noted: "COVID-19 is now inside FCI Elkton. Many of the recommended measures to prevent infection are impossible or unfeasible in prison. The

---

[56] Novisky Decl. ¶¶ 15-16.
[57] Goldenson Decl. ¶ 28.
[58] Novisky Decl. ¶ 7.
[59] Goldenson Decl. ¶ 29.
[60] Shane Hoover, *Elkton prison union chief talks coronavirus affect on staff*, TIMES REPORTER (Apr. 9, 2020), available at https://cutt.ly/JtB6Wy6.
[61] Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited April 13, 2020, 12:10 a.m); Hoover, *supra* note 60.

government's assurances that the BOP's 'extraordinary actions' can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease" at Elkton.[62]

36.    Based on her expertise, including her knowledge and study of prisons such as Elkton, Dr. Novisky writes: "Given the structure, operations, and current conditions at Elkton, there is no realistic set of internal conditions or practices that FBOP can use that will prevent additional infection of prisoners and staff given the current number of prisoners living at Elkton."[63]

37.    Both experts note that social distancing is "impossible" at Elkton, putting everyone at risk.[64] Those incarcerated agree: "It's impossible to keep 6 feet of distance from others" at Elkton.[65] As Petitioner Bellamy avers, in any given moment "I'm no more than 1-2 feet away from someone else, and there's no way to keep more of a distance … I'm bumping up against people" in every aspect of daily life.[66]

38.    "Low security Federal Correctional Institutions (FCIs) have … mostly dormitory or cubicle housing."[67] This means people residing at Elkton live in crowded quarters. Their beds

---

[62] *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331(E.D. Pa., Apr. 1, 2020).

[63] Novisky Decl. ¶ 16; *see also* Goldenson Decl. ¶ 25 ("While every effort should be made to reduce exposure in detention facilities through internal mitigation efforts, this may be extremely difficult to achieve and sustain quickly enough.")

[64] Novisky Decl. ¶ 9 ("With continued functioning of shared spaces for bathing, eating, and sleeping, quarantine and social distancing would be impossible to implement at Elkton."); Goldenson Decl. ¶ 32 ("Adequate social distancing would be impossible to maintain.")

[65] Declaration of Kendal Nelson (attached as Exhibit C) ¶ 3; Declaration of Eric McReynolds (attached as Exhibit D) ¶ 7 ("All day, I'm always right by somebody no matter what I'm doing, and there's no way I can space myself off from other people. Bathroom sinks, tables in the day area, computers, they're all close together.").

[66] Declaration of Eric Bellamy (attached as Exhibit E) ¶ 4.

[67] Fed. Bureau of Prisons, *About Our Facilities* (last visited Apr. 13, 2020) https://www.bop.gov/about/facilities/federal_prisons.jsp

very close to others, within a few feet.[68] For example, Petitioner Bellamy is "housed in a cell with two other men, crowded into maybe a 6-foot by 8-foot area with a bunk bed and an extra bed." The entire prison is "overcrowded, and every bed is taken up." There is "way less" than the recommended six-foot distance between beds.[69]

39.     Each unit contains only a few sinks and showers, shared by more than a hundred people.[70] Showers and sinks are close together, making it impossible to wash yourself without coming into contact with another.[71] The few televisions, phones, and computers are shared, in constant use, and all very close to one another.[72] This further increases the risk of transmission.[73]

---

[68] Declaration of Maximino Nieves (attached as Exhibit F) ¶ 3 ("We're in 2- and 3-man cubicles, one after the other in an open dormitory… In the cubes, the person on the other side sleeps above where you read… We're about 2 feet away from each other where we sleep."); Nelson Decl. ¶ 4 ("All the beds are locked together and physically connected, so it's impossible to maintain distance in the cubes."); Declaration of Howard Jackson (attached as Exhibit G) ¶ 4 ("my bunkmate and I can never be more than 3 feet apart"); McReynolds Decl. ¶ 6 ("The racks are 2-3 to a cell. People are about 2-3 feet apart when they sleep."); Declaration of Craig Wilson (attached as Exhibit H) ¶ 6 ("Our bunks are in very close proximity to each other, definitely less than six feet in all directions.").

[69] Bellamy Decl. ¶ 3.

[70] Bellamy Decl. ¶ 8 ("The 150 or so people in my unit share 6 toilets and 12 showers, and you're right up against people the whole time."); Nieves Decl. ¶ 3 ("There are 170 people in my unit, sharing small bathrooms with 4 urinals, 10 showers, and 5 toilets, which we share."); Nelson Decl. ¶ 3 (noting there are 5 toilets and 5 sinks for 170 men); Wilson Decl. ¶ 6 ("There are 10 sinks, 18 showers, 6 toilets, and 6 urinals for all 150 people."); Declaration of Arsenio Arzola (attached as Exhibit I) ¶¶ 4-5 (12 shared showers for 165 people).

[71] Arzola Decl. ¶ 5 ("The sinks are so close to each other than when we brush our teeth or wash our hands, the splash from the next man's toothpaste hits you"); McReynolds Decl. ¶ 7 ("Bathroom sinks, tables in the day area, computers" are all close together").

[72] Nieves Decl. ¶ 3 ("In the TV rooms, the tables are right on top of each other."); Wilson Decl. ¶ 9 ("Both the phones and the computers are less than two feet apart and are all in constant use.); Arzola Decl. ¶ 6 ("Phones are about 4 inches apart, and computers are about 8 inches apart, and the lines to get to them are ridiculous, especially during the day."); McReynolds Decl. ¶ 6 (talking on the phone, "I'm right next to someone, so close that I could kick him in the ankle.")

[73] Goldenson Decl. ¶¶ 21, 31.

40.     When residents go to eat, they are forced to be very close to one another. They stand in line for their food close to each other.[74] And after receiving their food, eat close to each other as well: "There's nowhere where we can eat without bumping right up against each other."[75]

41.     The prison has "sent out memos telling [the prisoners] to keep your distance and wash your hands," but because of the constant and unavoidable proximity that is inherent to life at Elkton at its current level of crowding, it is impossible for anyone to comply.[76]

42.     People at Elkton do not have an adequate supply of hygiene products, so "it is difficult (if not impossible) for prisoners to follow recommended sanitation procedures."[77] "Soap and cleaning supplies are scarce. The commissary has been closed for a week."[78] "There are no dispensers for soap or hand sanitizer anywhere in the unit."[79] With the commissary closed, the rationed small bottle of soap given to each person has to be used for washing hair, body, and hands, so Petitioner Wilson has run out of soap, as "everyone has."[80] There is limited access to other cleaning supplies.[81]

43.     Elkton is not able to keep contagious prisoners away from others.[82] Prisoners who show enough symptoms are sent to a quarantine unit, where they are placed in close proximity to

---

[74] Bellamy Decl. ¶ 4; Wilson Decl. ¶ 6; Jackson Decl. ¶ 4 ("At meal times, they call us in unit-by-unit to go over and get our trays. Even at that time, we still can't be six feet apart, like when we're lined up."); Arzola Decl. ¶ 6 ("We have controlled movements, like when we go to eat. It's a stampede of people trying to get through a 4-6 foot wide door."); McReynolds Decl. ¶ 6 ("We walk [to get food] at our own risk, with no spacing.").
[75] Nelson Decl. ¶ 5.
[76] Jackson Decl. ¶ 7.
[77] Novisky Decl. ¶ 12; *see also* Goldenson Decl. ¶ 20.
[78] Arzola Decl. ¶ 7.
[79] Wilson Decl. ¶ 10.
[80] Wilson Decl. ¶ 10.
[81] Nelson Decl. ¶ 10.
[82] Novisky Decl. ¶ 6.

others who may be sick, increasing the likelihood that they will ultimately become infected if they aren't already.[83] Prisoners who have some symptoms but no fever are kept in the general population.[84] For example, Petitioner Nieves knew another prisoner who "was showing symptoms for a while but they left him in his bunk until finally moving him to medical."[85] That prisoner passed away a short time later.

44. Prisoners enter and exit quarantine in short order.[86] Prisoners who are known to have been directly exposed to prisoners who became ill are kept in close contact with other prisoners.[87] And people outside of quarantine clean the areas where people are sick.[88]

45. Mr. Arzola, a resident of FCI Elkton, recounts his interaction with a sick cellmate:

> My cellmate, a man named Michael Bear, got very sick. He is about 68 years old and when the coronavirus first hit, he went to Medical three times in one week but was returned to the housing unit. I had to serve as his caretaker or first responder and take care of him. He was coughing, sneezing, moaning, and defecating on himself. I had no gear, but I provided him some medication from the commissary and tried to help him get dressed, feed him, and move him around. I'm not an EMT, just a human being who has an elderly dad at home who I pray is getting the help he needs.[89]

---

[83] McReynolds Decl. ¶¶ 3-5.

[84] Jackson Decl. ¶ 3 ("[P]retty much everywhere I go, I'm standing next to someone who has symptoms."); Arzola Decl. ¶ 10 ("Some people with symptoms are being taken immediately to medical, others are left behind."); McReynolds Dec. ¶ 2 (stating that he was coughing for "about a week, and then a fever just came on all of a sudden," but he was not moved into quarantine until he had a fever).

[85] Nieves Decl. ¶ 6.

[86] Nelson Decl. ¶ 8; Arzola Decl. ¶ 10 ("Prisoners are not being quarantined for 14 days. They're being sent back to units while still showing symptoms, and housed right back with us in the cubes.").

[87] Nieves Decl. ¶ 5 ("But for those of us like me who have been in contact but are showing no symptoms, they don't do anything at all for us."); Arzola ¶ 10 ("Nothing has been done with me or my other cellmate, even though we were so close to a sick person.").

[88] Wilson Decl. ¶ 8 ("A friend of mine who works in Medical was made to clean the cubes of those who were sick, and he ultimately got very sick and was put on life support.").

[89] Arzola Decl. ¶ 3.

46.    Even if Elkton provided effective isolation for people with symptoms, asymptomatic people can still spread the disease and yet remain in close contact with other prisoners.[90]

47.    Elkton also does nothing to protect high-risk prisoners—such as those over the age of 50, or those who, like Petitioners Bellamy, Nelson, and Wilson, have medical histories or conditions that place them at greater risk—from exposure.[91]

48.    After speaking with the Warden at Elkton and other BOP officials, U.S. Representative Bill Johnson described a desperate situation within the prison:

> We've got to protect the staff and inmates at Elkton from the COVID-19 outbreak, and right now that facility is like a petri dish, a breeding ground for the virus. Staff members are coming home to their families and communities after their shifts, and inmates are in close proximity to each other with limited means to isolate or quarantine. And, the hospitals in the region run the risk of being overwhelmed if the outbreak isn't stopped in its tracks. These hospitals, some of them very small rural community hospitals, need to be ready in case there is a sudden outbreak in their own local communities; and, they must have the capability and capacity perform their regular duties.[92]

49.    The risk of infection is not limited to Elkton's prisoners. "Correctional staff must be in close contact with prisoners in the course of their regular jobs to enforce security protocols, escort prisoners across cell blocks and units, administer medications, and supervise meal distribution, for example."[93] Staff members do not have access to appropriate protective

---

[90] Novisky Decl. ¶ 6; see also McReynolds Decl. ¶ 7 (noting that there remain "people who might be carriers" but are showing no symptoms).
[91] Bellamy Decl. ¶ 6; Jackson Decl. ¶ 7.
[92] Rep. Bill Johnson, Statement on FCI Elkton (Apr. 6, 2010), available at https://billjohnson.house.gov/news/documentsingle.aspx?DocumentID=402824
[93] Novisky Dec. ¶ 11.

equipment, or do not wear it.[94] In fact, several staff members at Elkton have already tested positive for COVID-19.

50.    The head of the union that represents Elkton prison employees says the situation is worse than reported. Staff are scared and believe "the Bureau of Prisons is doing nothing to help their first-line staff members."[95] Staff "have been told to presume we have all been exposed," and are concerned that their exposure will "risk our families' lives."[96] "We believe more could have been done to help stop the spread of COVID-19 at these facilities."[97]

51.    Corrections officers suing a similar federal facility in Oakdale have brought a lawsuit seeking hazard pay pointing to harrowing complaints: one "performed work in close proximity to objects, surfaces, and/or individuals infected with COVID-19."[98] Another "transported an inmate infected with COVID-19" and was given personal protective equipment only "after he had spent a significant amount of time with the inmate."[99]

52.    The Elkton staff's fears of contracting COVID-19 in the confined prison space have invariably impacted the prisoners as well. "They're clearly avoiding us."[100] "They don't come into the pods as much or walk around." "There's less of them around and they're all trying to keep their distance, which means nobody is around to help us. The counselor isn't here, and a case manager

---

[94] Nelson Decl. ¶ 9; Wilson Decl. ¶ 13.
[95] Shane Hoover, *Elkton prison union chief talks coronavirus affect on staff*, TIMES REPORTER (Apr. 9, 2020), https://cutt.ly/JtB6Wy6.
[96] Janet Rogers, *Protest outside Elkton Prison in Lisbon over treatment of sick prisoners, staff*, WFMJ (April 11, 2020; 8:08 p.m.), https://cutt.ly/2tNqkcj
[97] *Id.*
[98] Complaint, *Braswell v. United States of America*, Civil Action No. 20-cv-359C at ¶ 23 (Fed. Cl. Mar. 27, 2020), available at https://www.classaction.org/media/braswell-et-al-v-the-united-states-of-america.pdf.
[99] *Id.*
[100] Nieves Decl. ¶ 8.

didn't come in because he's sick."[101] Even those who are "sympathetic" to the prisoners are unable to help.[102]

53.     Further, Elkton is not sealed off from the community outside them. "While jails, prisons, and detention centers are often thought of as closed environments, this is not the case."[103] Indeed, the fact that Elkton is not a closed environment is how the infection made its way inside in the first place.[104] Even after BOP's lockdown, possibly-infected-but-asymptomatic employees are still going home and returning to Elkton.[105]

54.     Moreover, "Elkton's medical staffing right now is at only 50 percent of what it should be," and prisoners and staff with serious symptoms must be treated in community hospitals.[106] Yet there are limited hospitals in the region where Elkton is located, and they "run the risk of being overwhelmed if the outbreak [at Elkton] isn't stopped in its tracks."[107] Columbiana County, where FCI Elkton is located, has reported 96 cases of COVID-19 as of April 11.[108] The

---

[101] Bellamy Decl. ¶ 9.

[102] Wilson Decl. ¶ 13 (further noting that the staff are "hiding," and "we only see them during count times").

[103] Goldenson Decl. ¶ 22.

[104] Wilson Decl. ¶ 3 (a protocol to keep COVID-19 out of the prison was unsuccessful and was abandoned); Nelson Decl. ¶ 11 (a memo was circulated telling prisoners that a staff member had brought in the virus).

[105] Goldenson Decl. ¶ 23 ("Due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities."); Novisky Decl. ¶ 13 ("With institutional staff filtering in and out of Elkton on a daily basis, staff can easily carry the infection from the community to the prison and vice versa."). *Cf.* Wilson Decl. ¶ 3 (staff stated that they didn't want to cooperate with a plan to keep them on the grounds for 2-week intervals).

[106] Tom Giambroni, *National Guard sent to help Elkton prison*, THE REVIEW (Apr. 12, 2020), https://cutt.ly/atNqRkA.

[107] Rep. Bill Johnson, Statement on FCI Elkton (Apr. 6, 2010), available at https://billjohnson.house.gov/news/documentsingle.aspx?DocumentID=402824

[108] Rich Exner, *Mapping Ohio's 6,250 coronavirus cases, Saturday's update, trend graphics*, CLEVELAND.COM (Updated Apr. 12, 2020), https://cutt.ly/ttNqIyg

county has two hospitals, East Liverpool City Hospital and Salem Regional Health Center, with a combined total of 219 beds and only 20 ICU beds.[109] Neighboring Mahoning County offers an additional 61 ICU beds, but has reported nearly four times the number of cases as Columbiana County.[110] Ohio's supply of ventilators is not publicly known, but both ventilators and beds are likely to be in short supply statewide as the pandemic continues.[111]

55.     Thus, the growing concentration of infected prisoners in unsafe conditions within the Elkton is dangerous not only to the prisoners and staff, but also puts all of the surrounding community at acute risk.[112] Release of qualified prisoners to home confinement is necessary to reduce this concentration and the risks it poses to the safety of the community.[113]

56.     Ohio Governor DeWine declared "there is no doubt this prison needs help."[114] In response, the Governor sent 26 members of the National Guard to the prison to assist with ill prisoners at Elkton. The National Guard, however, are not medical professionals nor are they providing security. Their role at the prison is limited, and prisoners outside of the medical facility

---

[109] Rich Exner, *How many hospital beds are near you? Details by Ohio county*, CLEVELAND.COM (Mar. 23, 2020), https://cutt.ly/otNqAgp.

[110] *Id.*; Exner, *supra* note 108.

[111] *See* Anne Saker and Terry DeMio, *Coronavirus in Ohio: How many hospital beds, ventilators on hand? Probably not enough*, CINCINNATI ENQUIRER (Mar. 20, 2020), available at https://cutt.ly/NtNq001.

[112] Goldenson Decl. ¶¶ 22-23; Novisky Decl. ¶¶ 13-14. *See also* Yousur Al-Hlou, Kassie Bracken, Leslye Davis & Emily Rhyne, *How Coronavirus at Rikers Puts All of N.Y.C. at Risk*, N.Y. TIMES (Apr. 8, 2020), https://www.nytimes.com/video/us/100000007059873/coronavirus-rikers-island.html (at 2:04, "it's not just about who's in the jails right now, it's really about the city"; at 5:25, noting a consensus among prosecutors and public defenders that releases are not happening quickly enough).

[113] Goldenson Decl. ¶¶ 32-33; Novisky Decl. ¶¶ 16-22.

[114] *Coronavirus: Governor orders National Guard to assist at federal prison,* WHIO (April 6, 2020 3:00 PM), https://cutt.ly/EtNqMW6.

have not seen them.[115] Indeed, to the extent that National Guard personnel are entering and exiting

the facility routinely, they may provide another vector for COVID-19 to spread to the surrounding

community.[116]

57.     With these dire situations, Petitioners fear for their lives. "I feel like I've been

handed a death sentence," states Petitioner Craig Wilson.[117] Yet prisoners remain housed in

dangerous conditions, and their concerns are being ignored.[118]

### D.  Immediate Relief is Needed to Prevent Further Unnecessary Suffering and Loss of Life

58.     The growing numbers of ill and dead at Elkton "make it clear that current measures

being taken by the FBOP are not sufficient in strength nor impact to adequately protect its staff,

its prisoners, or the public."[119] "The death rate [at Elkton] will increase substantially before it starts

to diminish without major interventions."[120]

59.     Because of the severity of the threat posed by COVID-19, and its potential to

rapidly spread throughout a correctional setting, public health experts recommend the rapid release

from custody of people most vulnerable to COVID-19.[121] Dr. Novisky urges Elkton "to release as

many older incarcerated adults from the prison as possible"[122] and to make efforts to "release those

---

[115] Wilson Decl. ¶ 13; Nelson Decl. ¶ 16.
[116] *See* Goldenson Decl. ¶ 23; Novisky Decl. ¶ 13.
[117] Wilson Decl. ¶ 14.
[118] Wilson Decl. ¶ 15 ("On March 30, 2020, I filed a request for home detention with the warden, but have gotten no response. I've asked for a grievance form to file, but I've been told that there are no forms available. All concerns that I and others have raised to staff are being ignored.")
[119] Novisky Decl. ¶ 6.
[120] Goldenson Decl. ¶ 32.
[121] Goldenson Decl. ¶ 33; Novisky Decl. ¶¶ 18-19; *see also, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, Washington Post (Mar. 17, 2020), available at https://wapo.st/2JDVq7Y.
[122] Novisky Decl. ¶ 18

at the prison with pre-existing chronic health conditions, most importantly those with respiratory conditions, cancer, heart disease, diabetes, kidney disease, HIV, and blood disorders."[123] Dr. Goldenson agrees: "It is my public health recommendation that everyone who is medically-vulnerable to severe symptoms and death from COVID-19, as defined in this lawsuit, be released from FCI Elkton and FCL Elkton immediately."[124]

60.     Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a prison and the broader community.[125] Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[126]

61.     As Dr. Novisky explains: "Given the structure, operations, and current conditions at Elkton, there is no realistic set of internal conditions or practices that FBOP can use that will prevent additional infection of prisoners and staff given the current number of prisoners living at Elkton." "Significantly reducing the prison population at Elkton as rapidly as possible is the best line of defense to maintain the public health interests of persons incarcerated at Elkton, correctional staff who work at Elkton, and the Ohio community."[127] "[F]ailing to do so will have grave consequences and long-term traumatic impacts for many."[128]

---

[123] Novisky Decl. ¶ 19
[124] Goldenson Decl. ¶ 33.
[125] Novisky Decl. ¶ 13.
[126] Novisky Decl. ¶ 14.
[127] Novisky Decl. ¶ 17.
[128] Novisky Decl. ¶ 17; *see also* Goldenson Decl. ¶ 32 ("The death rate will increase substantially before it starts to diminish without major interventions.")

62. The outbreaks in corrections facilities around the country underscore the need for immediate and significant reductions in population.[129] Courts and executive branch officials elsewhere in the country have accepted this reality and begun broad-based, categorical releases.[130] Internationally, governments and jail staff have recognized the threat posed by COVID-19 and released high numbers of detained persons.[131] Domestically, jail administrators in Cuyahoga County;[132] San Francisco, California;[133] Jefferson County, Colorado;[134] and the State of New Jersey,[135] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.

63. At least one federal court has already issued an order releasing a prisoner from Elkton, citing the disturbing health conditions there.[136] The Court found "[t]he situation at FCI Elkton in particular is alarming," and the BOP "cannot adequately protect [the prisoner] from infection, especially in light of his vulnerability and the presence of COVID-19 in FCI Elkton."[137]

---

[129] *See supra* ¶ 31.

[130] *See, e.g.*, Memorandum and Order, *Thakker v. Doll*, No. 1:20-CV-0480 (M.D.Pa. Mar. 31, 2020) at Doc. No. 47 (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19).

[131] In Iran, for example, more than 85,000 people were released from jails to curb the spread of coronavirus. *US Jails Begin Releasing Prisoners to Stem COVID-19 Infections*, BBC NEWS (Mar. 19, 2020), https://cutt.ly/9tRDyb3 (noting Iran's release of over 85,000 prisoners in response to the virus).

[132] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic,* NEWS5 CLEVELAND (Mar. 20, 2020), https://cutt.ly/CtRSHkZ.

[133] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26*, SAN FRANCISCO CHRONICLE (Mar. 20, 2020), https://cutt.ly/0tRSVmG.

[134] Jenna Carroll, *Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR COLORADO (Mar. 19, 2020), https://cutt.ly/UtRS8LE.

[135] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads,* NEW JERSEY 101.5 (Mar. 23, 2020), https://cutt.ly/QtRS53w.

[136] *United States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331(E.D. Pa., Apr. 1, 2020

[137] *Id.*

Deciding that release was the only acceptable option, the Court noted that even lengthy prison sentences "did not include incurring a great and unforeseen risk of severe illness or death."[138]

64.     The United States Attorney General recognized the "significant level of infection" at Elkton and over a week ago, suggested "immediately" "mov[ing] vulnerable inmates" to home confinement.[139] This memorandum, however, lacks specificity and oversight, has not been significantly implemented, and has not led to the necessary immediate categorical release of appropriate prisoners to home confinement.

65.     Although the Attorney General's April 3 Memo directs Respondent Carvajal to implement the review process "immediately" and "immediately maximize appropriate transfers to home confinement," Elkton's response has been slow, piecemeal, and inadequate to mitigate the spread of COVID-19. Critical decisions are left entirely to the discretion of BOP personnel, who have already demonstrated that they lack the expertise and resources to implement Attorney General Barr's directives and otherwise deal with the COVID-19 outbreak at Elkton.[140] Even before President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Respondent Carvajal had the authority to release vulnerable prisoners in light of the

---

[138] *Id.*
[139] Memorandum from Attorney General William Barr to Director of Bureau of Prisons, The Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), available at https://politi.co/2UV3JBi; *see also* CARES Act, P.L. 116-136, § 12003(b)(2) (2020) (expanding home confinement authorization)
[140] Goldenson Decl. 32 ("[L]eaving implementation in the hands of local officials alone, who lack the expertise and resources and were incapable of preventing the outbreak in the first place or treating those who eventually died, is insufficient.")

pandemic.[141] He did not. Indeed, even while noting that prisoner concerns are "understandable," Government attorneys continue to oppose release in individual cases for Elkton prisoners.[142]

66.     It has now been several days since Attorney General Barr's April 3 Memo "directing" Respondent Carvajal to "move with dispatch in using home confinement" for vulnerable prisoners. Respondents have not moved with dispatch. People will suffer and die while the process plays out. Given this track record, it defies reality that Elkton could now miraculously implement AG Barr's directives on its own, in line with CDC guidelines[143] and with the combination of speed and care for human life that the moment requires.[144]

67.     Reports from prisoners confirm that the painstakingly slow, case-by-case approach is inadequate and certainly is not being implemented with dispatch. Petitioner Nieves, for example, resides in FSL Elkton, the even lower-security satellite camp of what is already a low-security prison. He is a nonviolent first-time offender, has only about 6 percent—approximately 11 months—of his sentence remaining, and has a stable residence awaiting him upon release. Around the time of the Attorney General's April 3 Memo, he was among 15 prisoners who were told that they would be released after a short quarantine. Four days later, he and 4 others of that group were

---

[141] 18 U.S.C. § 3582.

[142] *See, e.g.*, United States' Opposition to Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), *United States v. Jeremy Rodriguez*, No. 03-271 (E.D. Pa. Mar. 27, 2020).

[143] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[144] *Id.; see also* Novisky Decl. ¶¶ 18-21.

abruptly put back into the regular population, with no explanation why. It is unclear whether any of the others have been released.[145]

68.    A case-by-case review of prisoners is both unnecessary and inadequate to the moment, in which time is of the essence. A prisoner placed by BOP in a low security prison such as Elkton means that BOP has determined the prisoner presents "no public safety factors," for whom there is no "relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that require[] additional security measures be employed to ensure the safety and protection of the public."[146] Instead, categorical movement of prisoners away from Elkton based on their vulnerability to COVID-19 is the only effective approach.[147]

69.    Delay has already likely cost lives and led to needless suffering from COVID-19 at Elkton, but it is not too late to act. "Although the FBOP delay has already meant numerous prisoners and staff at Elkton have been infected (some of whom have died), it is not too late to take these steps, which can help prevent the situation from further deteriorating and causing unnecessary suffering to those who remain."[148] Without significant action, the conditions at Elkton "will escalate further," and "many more incarcerated individuals and staff will become infected and will face elevated risks for medical complications and mortality."[149]

---

[145] Nieves Decl. ¶¶ 1, 9; *see also* Nelson Decl. ¶ 17 (confirming that a group of people was gathered for release, but many were later put back into the regular population).
[146] BOP Program Statement P5100.08 (9/12/06) available at https://www.bop.gov/policy/progstat/5100_008.pdf.
[147] See Goldenson Decl. ¶ 33; Novisky Decl. ¶ 18.
[148] Novisky Decl. ¶ 23. *See also* Novisky Decl. ¶ 8 ("Based on my expertise on the health related risks associated with incarceration, it is my belief that if serious action is not taken swiftly, prisons under the jurisdiction of the FBOP, including Elkton, will escalate further"); Goldenson Decl. ¶ 32 ("The death rate will increase substantially before it starts to diminish without major interventions").
[149] Novisky Decl. ¶ 6.

70.     Because the Respondent have failed to act, immediate judicial intervention is necessary to prevent the continued unconstitutional exposure of prisoners at Elkton to serious illness and death.

71.     Accordingly, expedited release—with social distancing, testing, and other expert-guided measures as necessary—is needed not only to prevent irreparable harm to members of the medically-vulnerable subclass, but also to reduce the incarcerated population at Elkton sufficiently to ensure proper social distancing to reduce transmission for all class members, staff, and the wider public.

## IV.     CLASS ACTION ALLEGATIONS

72.     Petitioners bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

73.     Petitioners each seek to represent a class of all current and future people in post-conviction custody at Elkton ("Class"), including a subclass of persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass").

74.     The Medically-Vulnerable Subclass is defined as all current and future persons incarcerated at Elkton over the age of 50, as well as all current and future persons incarcerated at Elkton of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, or prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.

75.     Each Petitioner can represent the Class because each Petitioner is currently housed at Elkton. Petitioners Bellamy, Nelson, and Wilson can also represent the Medically-Vulnerable Subclass because each Petitioner is over the age of 50 and/or has one of the conditions listed in the definition of the Subclass above.

76.     This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

77.     Joinder is impracticable because (1) the classes are numerous; (2) the classes include future members, and (3) the class members are incarcerated, rendering their ability to institute individual lawsuits limited, particularly in light of the BOP's current 14-day lockdown and generally reduced legal visitation and court closures in the Northern District of Ohio instituted to address COVID-19 concerns.

78.     There are approximately 2,417 people in the proposed Class, and, upon information and belief, hundreds of people in the proposed Medically-Vulnerable Subclass.[150]

79.     Common questions of law and fact exist as to all members of the proposed Class and Subclass: all have a right to receive adequate COVID-19 prevention, testing, and treatment.

80.     Named Petitioners have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Petitioners have no interests adverse to the interests of the proposed class. Petitioners retained *pro bono* counsel with experience and

---

[150] Fed. Bureau of Prisons, FCI Elkton (last visited Apr. 12, 2020), https://www.bop.gov/locations/institutions/elk/.

success in the prosecution of civil rights litigation. Counsel for Petitioners know of no conflicts among proposed class members or between counsel and proposed class members.

81.    Respondents have acted on grounds generally applicable to all proposed Class members, and this action seeks declaratory and injunctive relief. Petitioners therefore seek class certification under Rule 23(b)(2).

82.    In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## V.    ARGUMENT

### A. Petitioner's Incarceration Amid the COVID-19 Outbreak in Elkton Violates Their Rights to Constitutional Conditions of Confinement

83.    Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Indeed, under the Eighth Amendment, prison officials "must provide humane conditions of confinement; … must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation marks omitted). This obligation also requires corrections officials to address prisoners' serious medical needs—including needs far less dire than those at stake here. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011); *Flanory v. Bonn*, 604 F.3d 249, 255 (6th Cir. 2010) (prison officials violated Eighth Amendment for failure to provide prisoner with toothpaste for 337 days, creating future health risk). Thus, for example, the Sixth Circuit has found Constitutional issues with exposing a prisoner to environmental tobacco smoke when that exposure "causes [plaintiff] sinus problems and dizziness," *Talal v. White*, 403 F.3d 423, 427 (6th

31

Cir. 2005); *see also Helling v. McKinney*, 509 U.S. 25, 28, 35 (1993) (prisoner stated a valid Eighth Amendment claim against prison officials who required him to share cell with a prisoner who exposed him to high levels of second-hand smoke); *Palacio v. Hofbauer*, 106 F. App'x 1002, 1005 (6th Cir. 2004) (exposure to smoke violates Eighth Amendment when a prisoner has "a medical condition that is exacerbated by" second-hand smoke and the smoke "bothers" other prisoners).

84.     This obligation requires corrections officials to protect incarcerated people from infectious diseases like COVID-19; officials may not wait until someone tests positive for the virus and an outbreak begins. *McKinney*, 509 U.S. at 33-34 ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition … It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (the proposition that "the Eighth Amendment protects against future harm to inmates is not a novel proposition."); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."). By then it is too late. That one individual would have almost certainly infected untold numbers of people before displaying symptoms.

85.     Prison officials violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm. *Farmer*, 511 U.S. at 828. "Deliberate indifference has two components to it: objective and subjective." *Villegas v. Metro. Govt. of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). "[T]he objective component … is met upon a showing that a detainee faced a substantial risk of serious harm and that such a risk is one that society chooses not to tolerate." *Id.* at 569. The subjective component is satisfied when an official has "(1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in

fact draw the inference, and (3) then disregarded that risk." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir.2013) (citations and internal quotation marks omitted). Such indifference may be "infer[red] from circumstantial evidence, including 'the very fact that the risk was obvious,' that a prison official knew of a substantial risk." *Id.* (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009))

86.     With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33, 36 (holding that a prisoner "states a cause of action … by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health"); *see also Hutto v. Finney*, 437 U.S. 678, 682-685 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

87.     Here, COVID-19 is "sure or very likely to cause serious illness," and even waiting until "next week" to attempt internal mitigation efforts may be too long. Respondents are aware of the risk, which is obvious, significant, and severe.

88.     As noted above, there are no mitigation efforts that Elkton could undertake that would prevent the risk of contraction—and possible later spread to the non-prison community—to any acceptable degree, other than immediate release of the Medically-Vulnerable Subclass and potentially more, such as those who are approaching the conclusions of their sentences. Respondents are aware that they are unable to control the spread of COVID-19 in Elkton, yet have failed to take effective action to protect prisoners or staff from further infection.

89.     Accordingly, Elkton's failure to take medically-required steps to prevent disease and death constitutes deliberate indifference. Their nominal gestures—as by sending directives to the prisoners to engage in social distancing where it is flatly impossible to do so—do not suffice. *See, e.g.*, *Helling*, 509 U.S. at 33, 36; *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003) (denying qualified immunity for official that placed "a prisoner in need of urgent medical attention to a facility that the official knows is unable to provide the required treatment").

**B.  This Petition is an Appropriate Vehicle to Remedy these Violations**

90.     Section 2241(c)(3) allows this court to order the release of prisoners like Petitioners who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately[.]").

91.     "[A]n attack upon the execution of a sentence [as opposed to an attack on the validity of the conviction itself] is properly cognizable in a 28 U.S.C. § 2241(a) habeas petition." *United States v. Jalili*, 925 F.2d 889, 893–94 (6th Cir. 1991); *see also Solano-Moreta v. Fed. Bureau of Prisons*, No. 17-1019, 2018 WL 6982510, at *1 (6th Cir. Sept. 24, 2018) (complaint

about being improperly confined at a particular facility "arguably constitutes an attack upon the execution of Solano-Moreta's sentence that is properly brought under § 2241").

## VI.    CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the
Eighth Amendment to the U.S. Constitution**
*Class including Medically-Vulnerable Subclass versus All Respondents*
28 U.S.C. §§ 1651, 2241 & United States Constitution, Art. I, § 9

92.     Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must protect incarcerated persons from a substantial risk of serious harm to their health and safety. *See, e.g., Farmer,* 511 U.S. at 828; *Estelle*, 429 U.S. at 104. Petitioners and Class Members face a substantial risk of serious harm from COVID-19. Respondents are aware of the serious risk COVID-19 poses to members of the Class—and particularly to members of the Medically-Vulnerable Subclass—yet have failed to take meaningful action to reduce the population of Elkton and mitigate the risk of harm to the Class members. Respondents are therefore deliberately indifferent to that risk and violate Class members' constitutional rights.

93.     Elkton has neither the capacity nor the ability to comply with public health guidelines to manage the outbreak of COVID-19 currently ravaging the facility and absent relief measures requested herein, cannot provide for the safety of the Class.

94.     Respondents' actions and inactions result in the confinement of members of the Class in a prison where Respondents have not followed and seem incapable of following public health guidance regarding social distancing and personal hygiene, and treating or preventing COVID-19 outbreaks and deaths, all of which violates Petitioners' rights to be free from deliberate

indifference to a substantial risk of serious harm—that is, to receive adequate treatment and medical care, and social distancing in the face of COVID-19.

95.     By failing to implement controls necessary to contain the COVID-19 outbreak and stop preventable deaths at Elkton, Respondents have violated the Eighth Amendment rights of the Class and especially of the Medically-Vulnerable Subclass.

## VII.     REQUEST FOR RELIEF

96.     Petitioners and Class Members respectfully request that the Court order the following:

a)      Certification of this petition as a class action, for the reasons stated herein;

b)      Pursuant to 28 U.S.C. § 2243 and issued "forthwith," either:

1.  A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Respondents to identify within six (6) hours of the Court's order, and submit to the Court a list of, all Medically-Vulnerable Subclass Members, and release all such persons within twenty-four (24) hours, with such release to include supports to ensure social distancing and other expert-recommended measures to prevent the spread of coronavirus; or

2.  In the alternative, an order that Respondents show cause <u>within, at most, three days</u> why such a writ should not issue.

c)      Following immediate release of all Medically-Vulnerable Subclass Members, a plan, to be immediately submitted to the Court and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

      i.    Specific mitigation efforts, in line with CDC guidelines, to prevent, to the degree possible, contraction of COVID-19 by every Class Member not immediately released;

      ii.    A housing and/or public support plan for any released Class or Subclass Members for whom testing confirms exposure to or infection with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

    d)    All further action required to release Class Members outside the Medically-Vulnerable Subclass to ensure that all remaining persons are incarcerated in Elkton under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them;

    e)    If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary;

    f)    A declaration that Elkton's policies and practices violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class;

    g)    Award Petitioners costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

    h)    Any further relief this Court deems just, necessary, or appropriate.

Dated: April 13, 2020

Respectfully submitted,

/s/ David J. Carey

David J. Carey          (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Ste. 203
Columbus, OH 43206
Phone: (614) 586-1972
Fax: (614) 586-1974
dcarey@acluohio.org

Joseph Mead          (0091903)
Freda J. Levenson          (0045916)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44102
Phone: (614) 586-1972
Fax: (614) 586-1974
attyjmead@gmail.com
flevenson@acluohio.org

Mark A. Vander Laan          (0013297)
David Singleton          (0074556)
Ohio Justice & Policy Center
915 East Ninth Street, Suite 601
Cincinnati, OH 45202
Phone: (513) 421-1108
mvanderlaan@ohiojpc.org
dsingleton@ohiojpc.org

*Counsel for Petitioners*