**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **CRAIG WILSON**, *et al.*, | **CASE NO. 4:20-CV-00794** |
| Petitioners, | **JUDGE JAMES S. GWIN** |
| v. | |
| **WARDEN MARK WILLIAMS**, *et al.*, | |
| Respondents. | |

**BRIEF OF AMICUS CURIAE DISABILITY RIGHTS OHIO IN SUPPORT OF PETITIONERS' EMERGENCY PETITION FOR WRIT OF HABEAS CORPUS, INJUNCTIVE, AND DECLARATORY RELIEF**

**I.     INTRODUCTION**

People with disabilities face unique and frightening challenges during the COVID-19 pandemic. COVID-19 could be a death sentence for many people with disabilities, as they face not only a higher risk of contracting the virus, but also a higher risk for serious, or even fatal, complications resulting from the virus. This public health crisis has caused upheaval in the lives of many people with disabilities who were already vulnerable, and sadly is likely to worsen in the hours, days, and weeks ahead.

Ohio prisons are already experiencing COVID-19 outbreaks. In fact, Elkton is amongst the deadliest of prison outbreaks in the country. The response to the crisis at Elkton has not been enough to mitigate the imminent dangers facing Elkton's vulnerable population, which will impact individuals with disabilities at a higher rate. Drastic measures, such as a reduction in the prison population, must be taken expeditiously in order to protect individuals who are at a higher risk for not only contracting COVID-19, but also developing more serious illnesses as a result.

## II. STATEMENT OF INTEREST

Disability Rights Ohio ("DRO") is a not-for-profit organization designated by the Ohio Governor as the protection and advocacy system under federal law for people with disabilities in Ohio. *See* 42 U.S.C. § 15001, *et seq.*, Ohio Rev. Code § 5123.60. The mission of DRO is to advocate for the human, civil, and legal rights of people with disabilities in Ohio. As the protection and advocacy system for Ohio, DRO investigates abuse, neglect, and rights violations affecting people with disabilities; pursues administrative, legal, and policy remedies to address identified violations; and advocates for individuals in many areas of disability rights, including prisoners' rights, voting, housing, employment, government benefits and services, and special education.

Prisoners' rights are an important aspect of DRO's work, and are reflected in the organization's priorities. This work includes education and outreach to individuals with disabilities who are incarcerated, investigations of allegations of abuse and neglect within the prison system, as well as direct and systemic advocacy on issues affecting prisoner's rights.

## III. STATEMENT OF FACTS

The Federal Correctional Institution, Elkton ("Elkton") is one of the deadliest prison outbreaks of COVID-19 in the country. Elkton is a low-security federal correctional institution ("FCI") with an adjacent low security satellite prison ("FSL").[1] The facility is a Level 2 Medical Care facility, housing individuals with chronic medical and mental health conditions that can, typically, be managed through routine, regularly scheduled appointments with clinicians for monitoring.[2] At the time Petitioners' Emergency Petition was filed on April 13, 2020, the

---

[1] Bureau of Prisons, *FCI Elkton*, https://www.bop.gov/locations/institutions/elk/ (last visited Apr. 16, 2020, 10:26 a.m.). There are approximately 2,003 inmates at the FCI and 418 at the FSL, for a total of about 2,421 inmates. *Id.*
[2] Example conditions found in Level 2 Medical Care facilities include medication-controlled diabetes, epilepsy, or emphysema. Bureau of Prisons, *Care Level Classifications for Medical and Mental Health Conditions or*

Federal Bureau of Prisons ("BOP") reported Elkton had 24 positive COVID-19 cases amongst inmates and 15 amongst staff.[3] As of April 14, 2020, four inmates had died.[4] The number of positive cases is disputed by Elkton prison union president, Joseph Mayle, who insists that the number of infected inmates is much higher. According to Mr. Mayle, as of April 10, 2020, 60 inmates are in isolation with either a positive test or symptoms, 42 have been hospitalized, and 18 are on respirators.[5] In fact, as of this filing, BOP reported 39 positive COVID-19 cases amongst inmates and 34 amongst staff, with five inmates dead.[6] This number does not include an additional death not yet reported by the BOP.[7]

According to Petitioners, the current health conditions at Elkton coupled with its structure and operations prevent any set of protocols from realistically preventing the spread of COVID-19.[8] Elkton currently houses three individuals in cells designed for single occupancy, which means inmates are living and sleeping in close proximity to people who are sick and whom they believe to be dying.[9] Inmates report that people are being kept in the general population even

---

*Disabilities* (May 2019) https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last visited Ap. 13, 2020).
[3] Bureau of Prisons, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Apr. 13, 2020, 12:10 a.m.).
[4] Shane Hoover, *Fourth Elkton Prison Inmate Dies from Coronavirus*, THE COLUMBUS DISPATCH, Apr. 14, 2020, *available at* https://www.dispatch.com/news/20200414/fourth-inmate-at-ohio-federal-prison-in-elkton-dies-from-coronavirus.
[5] WKBN Staff, *Elkton union disagrees with Bureau of Prisons on COVID-19 numbers*, Apr. 10, 2020, *available at* https://www.wkbn.com/news/coronavirus/elkton-union-disagrees-with-bureau-of-prisons-on-covid-19-numbers/; *see also* Shane Hoover, *Elkton prison union chief talks coronavirus affect on staff*, TIMES REPORTER, Apr. 9, 2020, *available at* https://www.timesreporter.com/news/20200409/elkton-prison-union-chief-talks-coronavirus-affect-on-staff.
[6] Bureau of Prisons, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Apr. 16, 2020, 10:51 a.m.).
[7] Shane Hoover, *Sixth inmate death at Elkton federal prison*, THE COLUMBUS DISPATCH, Apr. 15, 2020, *available at* https://www.dispatch.com/news/20200415/sixth-inmate-death-at-elkton-federal-prison/1.
[8] Doc. 1-3, Petitioners' Exhibit A at ¶ 16.
[9] Doc. 1-5, Petitioners' Exhibit C at ¶ 4; Doc. 1-6, Petitioners' Exhibit D at ¶ 6; Doc. 1-8, Petitioners' Exhibit F at ¶ 3; Doc. 1-9, Petitioners' Exhibit G at ¶ 4; Doc. 1-10, Petitioners' Exhibit H at ¶ 6; Sam Allard, *At Ohio's Elkton Federal Prison "Fucking Everybody Just Fucking Dying" From COVID-19*, SCENE, Apr. 14, 2020, *available at* https://www.clevescene.com/scene-and-heard/archives/2020/04/06/at-ohios-elkton-federal-prison-fucking-everybody-just-fucking-dying (one inmate reported that he believes he is going to die because he is trapped); Sam Allard, *The Latest out of Elkton Federal Prison, Where Horror Show Continues Apace*, SCENE, Apr. 10, 2020,

after they begin to show symptoms.[10] People are also reporting that inmates will return to the general population after being seen at medical, where it is likely they have been exposed to the virus if they had not been already.[11]

Even outside of their cells, inmates are forced into close contact with each other. Hundreds of inmates are sharing a limited number of sinks, toilets, and showers.[12] Inmates also report being surrounded by others when using TVs, phones, and computers.[13] Both experts and inmates believe it is "impossible" to social distance while at Elkton.[14] Furthermore, inmates have inadequate supplies with which to protect themselves from the virus, such as soap, clean water, and hand sanitizer.[15] Not only are inmates unable to social distance while using sinks and showers, they are also unable to freely access the limited number of utilities in order to wash their hands.[16]

At least one federal court has found that the BOP has not taken adequate measures to reduce the population at Elkton in an effort to protect the inmates. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *9 (E.D. Pa. Apr. 1, 2020) ("The BOP's containment measures have already proven insufficient to prevent the spread of COVID-19.") Without more action, inmates at Elkton, particularly those with disabilities, are at higher risk for serious illness or death–likely, a risk not contemplated at sentencing or in proportion to their crimes. *See*, *id.* at 1, 12 (The judge reached the "inescapable conclusion" to grant motion for

---

*available at* https://www.clevescene.com/scene-and-heard/archives/2020/04/10/the-latest-out-of-elkton-federal-prison-where-horror-show-continues-apace.

[10] Doc. 1-6 at ¶ 2; Doc. 1-8 at ¶ 6; Doc. 1-9 at ¶ 3; Doc. 1-11, Petitioners' Exhibit I at ¶ 10; Allard, *supra* note 9.
[11] Doc. 1-4 at ¶ 8; Doc. 1-11 at ¶¶ 3, 10.
[12] Doc. 1-6 at ¶ 7; Doc. 1-7, Petitioners' Exhibit E at ¶ 8 (150 inmates are sharing six sinks and twelve showers); Doc. 1-8 at ¶ 3; Doc. 1-10 at ¶ 6; Doc. 1-11 at ¶¶ 4-5.
[13] Doc. 1-6 at ¶ 6; Doc. 1-7 at ¶ 4; Doc. 1-8 at ¶ 3; Doc. 1-9 at ¶ 4; Doc. 1-10 at ¶¶ 6, 9; Doc. 1-11 at ¶ 6.
[14] Doc. 1-3 at ¶ 9; Doc. 1-4, Petitioners' Exhibit B at ¶ 32; Doc. 1-5 at ¶ 3; Doc. 1-6 at ¶ 7.
[15] Doc. 1-5 at ¶ 10; Doc. 1-10 at ¶ 10; Doc. 1-11 at ¶ 7.
[16] *Id.*

after they begin to show symptoms.[10] People are also reporting that inmates will return to the general population after being seen at medical, where it is likely they have been exposed to the virus if they had not been already.[11]

Even outside of their cells, inmates are forced into close contact with each other. Hundreds of inmates are sharing a limited number of sinks, toilets, and showers.[12] Inmates also report being surrounded by others when using TVs, phones, and computers.[13] Both experts and inmates believe it is "impossible" to social distance while at Elkton.[14] Furthermore, inmates have inadequate supplies with which to protect themselves from the virus, such as soap, clean water, and hand sanitizer.[15] Not only are inmates unable to social distance while using sinks and showers, they are also unable to freely access the limited number of utilities in order to wash their hands.[16]

At least one federal court has found that the BOP has not taken adequate measures to reduce the population at Elkton in an effort to protect the inmates. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *9 (E.D. Pa. Apr. 1, 2020) ("The BOP's containment measures have already proven insufficient to prevent the spread of COVID-19.") Without more action, inmates at Elkton, particularly those with disabilities, are at higher risk for serious illness or death–likely, a risk not contemplated at sentencing or in proportion to their crimes. *See*, *id.* at 1, 12 (The judge reached the "inescapable conclusion" to grant motion for

---

*available at* https://www.clevescene.com/scene-and-heard/archives/2020/04/10/the-latest-out-of-elkton-federal-prison-where-horror-show-continues-apace.

[10] Doc. 1-6 at ¶ 2; Doc. 1-8 at ¶ 6; Doc. 1-9 at ¶ 3; Doc. 1-11, Petitioners' Exhibit I at ¶ 10; Allard, *supra* note 9.
[11] Doc. 1-4 at ¶ 8; Doc. 1-11 at ¶¶ 3, 10.
[12] Doc. 1-6 at ¶ 7; Doc. 1-7, Petitioners' Exhibit E at ¶ 8 (150 inmates are sharing six sinks and twelve showers); Doc. 1-8 at ¶ 3; Doc. 1-10 at ¶ 6; Doc. 1-11 at ¶¶ 4-5.
[13] Doc. 1-6 at ¶ 6; Doc. 1-7 at ¶ 4; Doc. 1-8 at ¶ 3; Doc. 1-9 at ¶ 4; Doc. 1-10 at ¶¶ 6, 9; Doc. 1-11 at ¶ 6.
[14] Doc. 1-3 at ¶ 9; Doc. 1-4, Petitioners' Exhibit B at ¶ 32; Doc. 1-5 at ¶ 3; Doc. 1-6 at ¶ 7.
[15] Doc. 1-5 at ¶ 10; Doc. 1-10 at ¶ 10; Doc. 1-11 at ¶ 7.
[16] *Id.*

sentence reduction amid the COVID-19 pandemic because "[Mr. Rodriguez's] sentence did not include incurring a great and unforeseen risk of severe illness or death.").

IV. **ARGUMENT**

    A. **People with disabilities, who are disproportionately represented in the prison setting, are more likely to contract COVID-19, and more likely to develop more serious illnesses as a result.**

People with disabilities are disproportionately represented in the prison setting. In contrast to the 11% of the general U.S. population who report having a disability, 32% of state and federal prison inmates report having at least one disability.[17] And, more than half of prisoners (54%) with a disability reported a co-occurring chronic condition.[18] Additionally, 49% of all prison inmates report having symptoms of a psychiatric disability.[19]

According to the Centers for Disease Control and Prevention ("CDC"), persons with disabilities are at a higher risk for serious illness resulting from COVID-19.[20] This includes individuals with impaired lung function, immunocompromising disorders, including individuals taking immunocompromising drugs, high blood pressure, diabetes, and heart disease.[21]

Although not an exhaustive list, the CDC identifies the following chronic conditions as more common in individuals with disabilities: arthritis, asthma, cancer, chronic fatigue syndrome, diabetes, heart disease, limb loss, MRSA, and musculoskeletal disorders.[22] Anyone who has an underlying acute health condition is at increased risk of severe symptoms for both

---

[17] Bureau of Justice Statistics, *Disabilities Among Prison and Jail Inmates*, 2011-2012, 3 (Dec. 2015) http://www.bjs.gov/content/pub/pdf/dpji1112.pdf (last visited Apr. 14, 2020).
[18] *Id*. at 6.
[19] Office of Justice Programs, *Mental Health Problems of Prison and Jail Inmates*, 1 (Dec. 14, 2006) https://www.bjs.gov/content/pub/pdf/mhppji.pdf (last visited Apr. 14, 2020).
[20] Centers for Disease Control and Protection, *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness* (Ap. 15, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html? (last visited Apr. 15, 2020).
[21] Seth McBride, *Disability-Specific Recommendations for COVID-19*, NEW MOBILITY MAGAZINE (Apr. 3, 2020), available at https://www.newmobility.com/2020/03/disability-specific-recommendations-for-covid-19/.
[22] Centers for Disease Control and Protection, *Disability and Health Promotion: Disability and Health Related Conditions* (Sept. 9, 2019) https://www.cdc.gov/ncbddd/disabilityandhealth/relatedconditions.html (last visited Apr. 14, 2020).

illnesses because "there would be two separate issues for their immune system to fight."[23] Additionally, chronic health challenges and mental illness often co-occur.[24]

COVID-19 will have a disparate impact on inmates with disabilities at Elkton. Elkton is designated as a level 2 care facility, which means the facility is prepared to provide care for inmates with stable conditions such as medication-controlled diabetes, epilepsy, or emphysema. These inmates require evaluation by a clinician monthly to every six months.[25] These underlying conditions make these inmates more vulnerable to contracting the disease, as well as developing more serious complications.[26] The Petitioners' declarations describe current conditions and persons with disabilities who are being exposed to COVID-19 without adequate protections.[27] While a healthy individual has a high rate of recovery, the same is not true for a person with a disability.[28] Being an inmate with a disability at Elkton right now could be a death sentence. Many of these inmates are incarcerated for non-violent offenses for which death is not an appropriate or just sentence.

### B. It is unlikely Elkton is able to comply with CDC guidelines designed to mitigate the spread of COVID-19 without a reduction in the prison population.

The CDC has been leading the national response to the COVID-19 outbreak in the United States. Pursuant to its mission to protect the health and safety of Americans, the CDC has issued guiding principles for combating COVID-19, including in detention and correctional facilities.

---

[23] McBride, *supra* note 21.
[24] Mental Health America, *Co-Occurring: Mental Health and Chronic Illness* https://www.mhanational.org/conditions/co-occurring-mental-health-and-chronic-illness (last visited Apr. 15, 2020).
[25] Bureau of Prisons, *Care Level Classifications for Medical and Mental Health Conditions or Disabilities*, 2 (May 2019) https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last visited Apr. 15, 2020).
[26] Centers for Disease Control and Protection, *supra* note 20.
[27] Doc. 1-7 at ¶ 6; Doc. 1-9 at ¶ 7.
[28] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, 12 (Feb. 16-24, 2020) available at https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (stating that mortality rates for persons with comorbid conditions was "much higher" than those without; "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer" as compared to "1.4% with no comorbidities").

According to the CDC, prisons like Elkton present unique concerns during a global pandemic. The daily ingress and egress of staff offers constant and ample opportunity for the introduction of COVID-19 into a facility. Once inside a facility, COVID-19's potential for spread is heightened because inmates live, work, eat, sleep, bathe and recreate within cramped and congregate environments. Access to adequate healthcare is already strained inside facilities, where significant portions of the population require chronic care for medical conditions--medical conditions that increase their risk of severe disease from COVID-19. Moreover, facilities like Elkton have extremely limited options for medical isolation, especially for large groups of people. And access to basic hygienic and cleaning supplies are limited, if not outright prohibited.

The CDC makes specific recommendations for correctional facilities that cannot be effectively implemented under current conditions at Elkton.[29] Petitioners describe conditions at Elkton that would make implementation of the guidelines impossible without drastically reducing the population. For instance, the CDC emphasizes social distancing practices, and suggests, "[i]f space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions."[30] Inmates are completely unable to social distance as they are currently housed in single occupancy cells with up to two other individuals.[31] Frequent handwashing is crucial for preventing infection, which is why the CDC implores facilities to provide no-cost soap in sufficient supplies to encourage habitual use.[32] However, not only is soap scarcely available, but also the water supply is discolored and causing rashes, according to the Petitioners.[33] The CDC guidelines also call for medical isolation. Specifically, as soon as an

---

[29] Centers for Disease Control and Protection, *Coronavirus Disease 2019: Guidance for Correctional & Detention Facilities* (Mar. 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 15, 2020).
[30] *Id.*
[31] Doc. 1-5 at ¶ 5; Doc. 1-6 at ¶ 6; Doc. 1-8 at ¶ 3; Doc. 1-9 at ¶ 4; Doc. 1-10 at ¶ 6.
[32] Centers for Disease Control and Protection, *supra* note 29.
[33] Doc. 1-11 at ¶ 7; Doc. 1-10 at ¶ 10; Doc. 1-5 at ¶ 10.

individual is presenting symptoms of COVID-19, they should wear a mask and "should be immediately placed under medical isolation in a separate environment from other individuals."[34] As demonstrated in a now viral internet video captured by an inmate at Elkton on or around April 5, 2020, not all symptomatic individuals are being isolated from their peers, which is aggravating the spread of the virus.[35]

As evidenced by the growing number of COVID-19 cases and six deaths inside Elkton, BOP has demonstrated an inability to comply with CDC recommendations to keep individuals safe inside the facility using its current procedures.

### C. Releasing individuals into the community gives persons with disabilities the greatest chance of survival.

For an inmate with a disability at Elkton, with the current population as it stands, the risk of death may be much too great. Releasing inmates into the community or transferring them to home confinement as soon as possible, provides persons with disabilities the highest chance of survival. Individuals will have an opportunity to social distance in the community, an opportunity that does not exist at Elkton and that will greatly curb the spread of the virus. People with disabilities would also have greater access to soap, clean water, hand sanitizer, and cleaning supplies including the ability to use these items at will. If an individual subsequently develops symptoms, options for self-quarantine exist in the community setting where they do not exist at Elkton. Ultimately, if removed from Elkton, which is functioning as a COVID-19 incubator, persons with disabilities would have greater control over their exposure to the virus, their responsive measures to potential exposure, and therefore, their ability to protect their lives.

---

[34] C enters for Disease Control and Protection, *supra* note 29.
[35] Gift Johnson, *FCI Elkton OHIO STATE INMATE Speaks about coronavirus*, YouTube (Apr. 5, 2020), available at https://www.youtube.com/watch?v=mRaRgQCai9c.

8

The decrease in population will allow individuals remaining at Elkton to distance from one another, have greater access to limited supplies of soap and sanitation materials, and avoid those who are experiencing symptoms. Reducing the population at Elkton will benefit not only those with disabilities who are released, but will also allow the remaining population at Elkton to better practice the guidelines issued by the CDC.

The only way to implement CDC's recommendations is to swiftly reduce Elkton's population to safe levels. BOP must identify broad categories of individuals who can be released early, released on furlough, or transitioned to home confinement in substantial numbers; numbers that would efficiently and effectively reduce the populations to safe numbers. DRO recommends that BOP prioritize the release of inmates with disabilities, and those who are aged 60 or older; however, the low security level of Elkton indicates that all inmates are eligible candidates for home confinement.[36] Measures to decrease the population are imperative in order to not only release individuals with disabilities who are at a higher risk for contracting the virus and developing more serious illnesses as a result, but also to protect high risk individuals who will remain in these facilities because they are not ideal candidates for release.

## V. CONCLUSION

For the foregoing reasons, Amicus Curiae Disability Rights Ohio respectfully requests that this Court grant the Petitioners' Emergency Petition for Writ of Habeas Corpus and the relief requested by the Petitioners'.

---

[36] On April 3, 2020, the Attorney General directed BOP to prioritize home confinement for inmates at low-level facilities, citing "significant levels of infection" at FCI Elkton. *See* Attorney General William Barr, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020) https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000 (last visited Apr. 16, 2020).

Respectfully submitted,

/s/ Laura Osseck
Laura Osseck (0082231)
losseck@disabilityrightsohio.org
Disability Rights Ohio
200 Civic Center Drive, Suite 300
Columbus, Ohio 43215
Telephone: 614-466-7264
Facsimile: 614-644-1888

*Counsel for Amicus Curiae Disability Rights Ohio*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically on April 16, 2020. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Laura Osseck
Laura Osseck (0082231)
