# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated, | ) ) ) ) | CASE NO.: 4:20cv794 |
| | ) | |
| Petitioners, | ) | JUDGE: JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| MARK WILLIAMS, Warden of Elkton Federal Correctional Institution; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities, | ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

---

### ANSWER, RETURN OF WRIT, AND RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS, INJUNCTIVE AND DECLARATORY RELIEF

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. III

STATEMENT OF THE ISSUES.......................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 1

INTRODUCTION  ................................................................................................ 5

STATEMENT OF FACTS .................................................................................... 6

    I.   THE COVID-19 PANDEMIC AND THE BOP'S RESPONSE ................................. 6

    II.  STEPS BEING TAKEN AT ELKTON TO PREVENT COVID-19'S SPREAD ...... 7

        A.  Screening............................................................................................ 8

        B.  Isolation and Quarantine Procedures ................................................ 9

        C.  Testing................................................................................................ 9

        D.   Screening and Excluding Staff and Vistors ...................................... 10

        E.   Cleaning............................................................................................ 11

        F.   Supplies............................................................................................ 11

        G.  Inmate and Staff Education.............................................................. 11

    III.   HOME CONFINEMENT AND COMPASSIONATE RELEASE  ...................... 12

        A.  Compassionate Release.................................................................... 12

        B.  Home Confinement  .......................................................................... 13

LAW AND ARGUMENT ................................................................................... 15

I.    PETITIONERS ARE NOT ENTITLED TO HABEAS RELIEF .................................... 15

        A.  Habeas Relief is Unavailable to Challenge Conditions of Confinement........ 15

        B.  PLRA Precludes the Relief Requested........................................... 16

        C.  The BOP has not Violated the Constitution .................................... 19

1. Standard ................................................................................................. 19

2. Petitioners are not being Subject to an Unreasonable Risk
    of Harm ............................................................................................... 20

3. The BOP has not shown Deliberate Indifference but has
    Taken Appropriate Measures to Protect the Health of Inmates
    at Elkton and the Public ....................................................................... 22

II.   PETITIONERS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING
      ORDER OR ANY INJUNCTIVE RELIEF .................................................. 25

      A.    Standard ......................................................................................... 25

      B.    Petitioners Unlikely to Succeed on the Merits ............................... 26

            1. The Conditions at Elkton are Different than Portraryed in the
               Petition ..................................................................................... 27

            2.  Release is Unlikely to Redress the Alleged Harm ................... 28

            3. Petitioners are not Entitled to Divest BOP of its Discretion to Place
               Inmates in Home Confinement in Appropriate Circumstances or
               to have the Court Amend Criminal Sentences of Inmates ........... 29

      C.    Petitioners Fail to Establish Imminent Irreparable Harm
32

      D.    Granting the Requested Relief Would Cause Substantial Harm to
            Others ............................................................................................ 33

      E.    Public Health and Safety Would Not Be Served by Granting the Requested
            Relief............................................................................................... 34

III.   PETITIONERS HAVE NOT PROVIDED A SUFFICIENT BASIS FOR
       CLASS CERTIFICATION, AND CLASS-WIDE RELIEF WOULD LIKELY
       HARM MANY INMATES TABLE.................................................................. 35

CONCLUSION.......................................................................................................... 37

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006) ................................................................... 32

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636 (6th Cir. 2015) ....... 26

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ................................................. 22

*Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) .................................................................. 17

*Bragdon v. Abbot*, 524 U.S. 624 (1998) ..................................................................................... 25

*Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561 (D.D.C. 2018) ............................ 28

*Brown v. Plata*, 563 U.S. 493 (2011) ......................................................................................... 18

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................................................................... 35

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .............................................................. 28

Dawson v. Asher, No. C20-0409 JRL-MAT, 2020 WL 1304557
   (W.D. Wash March 19, 2020) .............................................................................................. 24

*Farmer v. Brennan*, 511 U.S. 825 (1994) ......................................................................... 2, 20, 22

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .................................................... 26, 27, 28

*Gilmore v. People of the State of Cal.*, 220 F.3d 987 (9th Cir. 2000) ................................... 17, 18

*Helling v. McKinney*, 509 U.S. 25 (1993) .............................................................................. 22, 23

*Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016) .............................................................. 25

Hines v. Youssef, No. 1:13-cv-00357-AWI-JL, 2015 WL 164215
   (E.D. Cal. Jan. 13, 2015) .......................................................................................... 21-22, 22

*Hodges v. Bell*, 170 F. App'x 389 (6th Cir. 2006) ..................................................................... 16

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ........................................................ 35, 37

*Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649 (1st Cir. 1997) ........................................... 17

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ......................................................... 25

*Luedtke v. Berkebile*, 704 F.3d 465 (6th Cir. 2013) ................................................... 2, 15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................... 28

*Lutz v. Hemingway*, 476 F.Supp.2d 715 (E.D. Mich. 2007) ....................................................... 16

*Martin v. Overton*, 391 F.3d 710 (6th Cir. 2004) ....................................................... 16

*Money v. Pritzker*, ___ F. Supp. 3d ___ Nos. 20-cv-2093 & 20-cv-2094,
    2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), ...................................................... 19, 23, 24, 36

*Muhammad v. Close*, 540 U.S. 749 (2004) ................................................................. 16

*Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v.  Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ..................................................................... 26

*Nelson v. Campbell*, 541 U.S. 637 (2004)  ............................................................... 2, 15

 *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273 (1987) .................................................... 25

*Scott v. Benson*, 742 F.3d 335 (8th Cir. 2014) ........................................................... 24

*Spectrum Five LLC v. FCC*, 758 F.3d 254 (D.C. Cir. 2014)  ...................................................... 28

*State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*,
    812 F.2d 288 (6th Cir. 1987) .................................................................. 32

*Sullivan v. United States*, 90 F. App'x 862 (6th Cir. 2004) ......................................................... 15

*United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789 (E.D.N.Y. 1963) ............................... 25

*United States v. Gileno, No. 3:19-cr-161*, 2020 WL 1307108
(D. Conn. Mar. 19, 2020) ......................................................................................... 20

*United States v. Hamilton, No. 19-CR-54-01*, 2020 WL 1323036
(E.D.N.Y. Mar. 20, 2020) ......................................................................................... 20

*United States v. Jefferson, No. CCB 19-487*, 2020 WL 1332011
(D. Md. Mar. 23, 2020) ............................................................................................. 20

*United States v. Martin, No. PWG-19-140-13*, 2020 WL 1274857
(D. Md. Mar. 17, 2020) ............................................................................................. 20

*United States v. Steward, No. S1:20-cr-0052* (DCL), 2020 WL 1468005
(S.D.N.Y. Mar. 25, 2020) .......................................................................................... 33

*United States v. Taylor, No. 5:19-CR-192-KKC-MAS*, 2020 WL 1501997
(E.D. Ky. Mar. 26, 2020) .......................................................................................... 33

*United States, v. Rollins, Nos. 19-CR-34S, 11-CR-251S*, 2020 WL 1482323
(W.D.N.Y. Mar. 27, 2020) ................................................................................... 20, 21

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ............................ 28

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................... 35, 36

*Wilson v. Seiter*, 501 U.S. 294 (1991) ........................................................................................ 20

*Winter v. NRDC*, 555 U.S. 7 (2008) ................................................................................... 26, 32

## STATUTES

18 U.S.C. § 3582 ........................................................................................................... 12, 31, 33

18 U.S.C. § 3582(c)(1)(A) ........................................................................................... 12, 13, 31

.

18 U.S.C. § 3621(b) ................................................................................................ 30

18 U.S.C. § 3624(c) ................................................................................................. 33

18 U.S.C. § 3624(c)(2) ...................................................................................... 14, 30

18 U.S.C. § 3626 ................................................................................. 2, 16, 17, 18, 19

18 U.S.C. § 3626(a)(3)(A)(i)(ii). ...................................................................... 17, 18, 19

18 U.S.C. § 4205(g) ......................................................................................... 12, 31

28 U.S.C. § 2241 ................................................................................................. 2, 15

U.S. CONSTITUTION

U.S. Const. amend. VIII ........................................................................................ 20

RULES

Fed. R. Civ. P. 23 ...................................................................... 4, 5, 6, 7, 8, 9, 10, 11, 35, 36

OTHER

U.S. Dep't of Justice Fed. Bureau of Prisons, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050.50 (Jan. 17, 2019), http://www.bop.gov/policy/progstat/5050_050_EN.pdf.

STATEMENT OF ISSUES

1.    Whether habeas relief is available to challenge conditions of confinement.

2.    Whether the Prison Litigation Reform Act of 1995 prohibits the release of inmates.

3.    Whether Petitioners are being subject to an unreasonable risk of harm.

4.    Whether Respondents can be found deliberately indifferent despite taking measures to protect and care for the health of the inmates at Elkton.

5.    Whether Petitioners are likely to succeed on the merits of their claims.

6.    Whether Petitioners can establish imminent irreparable harm.

7.    Whether granting hundreds of inmates an immediate release would cause harm to some of them or others.

8.    Whether the public health and safety would be served by immediately releasing hundreds of prisoners from incarceration.

9.    Whether Petitioners are entitled to class certification in this case.

SUMMARY OF ARGUMENT

The Federal Bureau of Prisons ("BOP") has been monitoring and tracking the spread of COVID-19 since January 2020 when the first cases of the virus appeared in the United States. BOP staff have taken measures at FCI-Elkton to prevent and treat COVID-19 among inmates, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; restricting inmates to their residential area with only one pod moving at a time for meals, and taking a number of other preventative measures.

The gravamen of the Petition is that Petitioners are entitled to habeas relief and release

1

from Elkton pursuant to 28 U.S.C. § 2241 based on "unconstitutional conditions of confinement." (Pet. ECF No. 1 PageID # 35.)  However, it is well-settled that a habeas petition under 28 U.S.C. § 2241, "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013); s*ee also Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  Further, the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, places strict limits on courts' ability to order the release of inmates "in any civil action in Federal court with respect to prison conditions…" and precludes a single district judge from doing so.  18 U.S.C. § 3626(a)(3)(B).

In order to establish their claims that their confinement is unconstitutional, Petitioners must establish that "the deprivation alleged must be, objectively, 'sufficiently serious'…" and that it is "the unnecessary and wanton infliction of pain…." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Petitioners can establish neither prong.  First, Petitioners cannot establish that they have suffered a "sufficiently serious" deprivation, because the BOP has taken appropriate steps to mitigate the risks of COVID-19 throughout its inmate population including with respect to the inmate population at Elkton.  Those  measures include providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.  Second, Petitioners cannot establish that the BOP is deliberately indifferent to their health needs because BOP has worked very hard to prevent the spread of COVID-19 among the inmate population and has cared for and treated inmates who have gotten sick.

In addition to habeas relief, Petitioners also seek a temporary restraining order and injunctive relief.  A district court must balance four factors in determining whether to grant

injunctive relief: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.  None of these factors favor relief.

First, Petitioners are unlikely to succeed on the merits because the conditions at Elkton are different than portrayed in the Petition.  Instead, staff at Elkton have numerous measures in place in compliance with CDC and BOP guidelines to prevent the spread of COVID-19.  Further, Petitioners cannot show that the immediate release of a substantial number of Elkton inmates or themselves would lessen their risk of them contracting COVID-19.  The also cannot show legal authority for the Court to release prisoners.

Second, Petitioners cannot show irreparable injury absent the requested relief.   As discussed, the BOP have put in place a myriad of protections within Elkton reduce the risk that persons with COVID-19 enter Elkton in the first place and prevent the spread of COVID-19 within Elkton.  Moreover, Petitioners fail to address in any meaningful way how, if released, they will be safer from the risk of infection or have access to adequate care if infected.  Every person in the United States, whether in a prison or not, faces the risk of COVID-19 exposure. Thus, Petitioners cannot show irreparable injury.

Third, Petitioners demand for the immediate release and removal of a substantial portion of the population at Elkton would cause substantial damage to others.  Petitioners can provide no assurances that these hundreds of inmates who they propose to be immediately released would be able to provide food, shelter, and medical care for themselves.  It is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is impacting the entire nation.

3

Finally, the public interest would not be served by granting relief.  The immediate release of hundreds of inmates would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.  Our over-burdened police and safety services should not be forced to deal with the indiscriminate release of hundreds of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they will have a safe place to go where they will not be mingling with their former criminal associates, and that they will not return to their formerways as soon as they walk through the prison gates.

In addition to relief, Petitioners seek class certification of every current and future inmate at Elkton.  To certify a class under Fed. R. Civ. P. 23, a plaintiff must show that the proposed class satisfies all four requirements of Fed R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation.  Here there is no commonality and typicality because Petitioners' proposed class would combine inmates that have different crimes, sentences, outdates, disciplinary histories, ages, medical histories, proximities to infected inmates, availabilities of a home landing spot, likelihoods of transmitting the virus to someone at home detention, likelihoods of violation or recidivism, and dangers to the community.  Moreover, class members likely have different means to provide for themselves upon release and different access to medical care upon release.  Petitioners even lump together inmates who are currently sick with COVID-19 with asymptomatic inmates and inmates who were previously sick and made a full recovery.  There simply is no comomonality and typicality among proposed class members other than incarceration at Elkton.

Likewise, Petitioners cannot show adequacy of representation because they demand a dramatic remedy that would have a profound effect on members of the class without considering the impact on the class members.  It is quite likely that the sudden removal of so many inmates

would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is having a substantial impact on the nation.  Petitioners' failure to consider or account for such concerns in the immediate and sweeping relief that they seek demonstrates that they are not fit to represent the members of their proposed class.

## INTRODUCTION

Respondents Mark Williams, Warden of Elkton Federal Correctional Institution and Michael Carvajal, Director of Federal Bureau of Prisons, in their official capacities ("Respondents"), submit the following Answer, Return of Writ, and response in opposition to Petitioners' Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief. Except as expressly admitted herein, Respondents deny each and every allegation contained in the Emergency Petition and deny Petitioners are entitled to any relief.[1]

Petitioners Craig Wilson, Eric Bellamy, Kendal Nelson, and Maximino Nieves are  inmates at the Federal Correctional Institution-Elkton ("Elkton") in Lisbon, Ohio, and bring this action on behalf of themselves and, purportedly, on behalf of all current and future inmates of Elkton. Petitioners claim that Respondents have failed to take adequate measures to protect them against the dangers posed by COVID-19. (See generally ECF No. 1.) They seek certification of the Petition as a class action; a temporary restraining order, preliminary injunction, permanent injunction and/or a writ of habeas corpus requiring Respondents to release all Medically-Vulnerable Subclass Members *Id*. at 36, submission of a plan for mitigation of COVID-19 and to provide housing for

---

[1] Because this filing is an Answer, Return of Writ and Response in Opposition to the Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief, undersigned counsel do not believe that the page limit restrictions contained in Loc. R. 7.1(f) apply.  However, if the Court determines that Loc. R. 7.1(f) applies to Respondents' filing, then Respondents hereby respectfully move instanter for an enlargement of the page limits to 38 pages (exclusive of the cover sheet, table of contents, and table of authorities) due to the complexity of the issues involved and the volume of information necessary to give the Court an accurate description of all of the pertinent facts.  Further, Respondents note that their filing is shorter than Petitioners' Emergency Petition.

self-isolation of exposed/infected Subclass or Class members for the CDC recommended period *Id*. at 37; release of as many Class Members as is necessary to allow for inmates to maintain six feet of distance between them *Id*.; and a declaration the Elkton's policies and practices violate the Eighth Amendment *Id*.

As explained below, the Bureau of Prisons staff and officials ("BOP") are taking substantial measures at Elkton to address COVID-19, including screening, testing, isolating, and quarantining. The BOP has also taken numerous other steps to prevent spread of COVID-19 in the facility and is assessing inmates for home confinement and/or to recommend compassionate release as directed by the Attorney General.  Therefore, Respondents urge this Court to deny the relief requested by Petitioners.

<u>STATEMENT OF FACTS</u>

I.      <u>THE COVID-19 PANDEMIC AND THE BOP'S RESPONSE</u>

The Federal Bureau of Prisons ("BOP") has been monitoring and tracking the spread of COVID-19 since January 2020 when the first cases of the virus appeared in the United States. (*See* Exhibit A, Declaration of Sarah Dees ("Dees Decl.") at ¶ 6.)  Recognizing the threat that this virus could pose to its inmate population, the BOP began quickly organizing its national pandemic response into a multiphase "Action Plan," implementing a variety of protocols in response to the rapidly shifting landscape of this pandemic across the United States.[2]  (*Id*. at ¶7.)  Among other things, the BOP has, on a nationwide basis: implemented screening requirements for inmates and staff; temporarily suspended social visits, legal visits, inmate transfers, official travel, and contractor access; updated its quarantine and isolation procedures; and instituted a "modified

---

[2] These protocols are discussed at length in the accompanying Declaration of Sarah Dees, Ex. 1.

operations" plan, which directs BOP facilities to adjust their daily operations in a manner that permits inmates to engage in physical distancing while in common areas, such as during mealtimes and recreation.  (*Id*. at ¶¶ 8-15.)

On April 1, 2020, the BOP ordered all inmates to remain "secured in their assigned cells" for a period of 14 days (to be reevaluated at the conclusion of that time period), in order to decrease the spread of the virus.  (*Id*. at ¶ 16.)  On April 13, 2020, the BOP ordered an extension of the April 1, 2020 modified operations order through May 18, 2020.  (*Id*. at ¶ 17.)

II.    STEPS BEING TAKEN AT ELKTON TO PREVENT COVID-19'S SPREAD

Elkton is a low security facility designed to house approximately 2,000 inmates at the main facility (FCI) and approximately 500 inmates at the Federal Satellite Low (FSL). (See Exhibit B, Declaration of Kristy Cole ("Cole Decl.") at ¶ 3.)  The FCI facility and the FSL are separate facilities and the inmate populations do not interact.  (*Id.*)  The FCI consists of 3 buildings containing 12 dorm-style housing units of each. (*Id.*)  There are approximately 300 inmates in each housing unit.  (*Id.* at ¶ 22.)  Each housing unit is divided into an A side and a B side.  (*Id.*)  The A and B sides are separated and the inmates do not intermingle.  (*Id.*)  The FSL is one building with two dorm-style housing units.  (*Id.*)  Each housing unit is divided into an A side and a B side.  (*Id.*) There are approximately 250 inmates in each FSL unit.  (*Id.*)

Elkton has implemented each of the steps described above in compliance with BOP's national directives, and has also taken numerous other measures to fight the introduction and spread of COVID-19 within its facilities.  (Dees Decl. at ¶ 19.)  As explained below, those measures include providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other

preventative measures.  (*Id*. at ¶ 19.)  Additionally, Elkton implemented the "modified operations" directive in a number of ways, including: (1) "grab and go" meals for inmates, meaning that inmates are permitted to pick up pre-packaged meals at designated times, but had to return to their housing units in order to eat; scheduled staggered mealtimes, so that only a single housing unit (approximately 150 inmates) are moving within the facility at any particular time; and (2) Health Services pill line (controlled medication dispensing) and (3) commissary are accomplished during these times as well.  (*Id*. at ¶ 12.)

A.     Screening

Elkton has implemented extensive measures to screen inmates for COVID-19, both for newly arriving inmates and for its resident inmate population.  Newly arriving inmates are both screened and quarantined.  (Dees Decl. at ¶¶ 23-24.)  All incoming Elkton inmates are screened by Health Services medical  providers in a single, controlled area separate from other complex staff and inmates.  (*Id*. at ¶¶ 23-24, 26.)  Inmates are evaluated for any symptoms of illness, as well as for "exposure risk factors" such as recent exposure to known or suspected COVID-19 cases. (*Id.*)  Whether or not inmates display symptoms or exposure risk factors, they are automatically quarantined for a period of 14 days to ensure that they do not develop any symptoms consistent with COVID-19, and are only released into the general population at the expiration of those 14 days and upon medical clearance.  (*Id*. at ¶¶ 24-25.)  All staff in any such quarantine or isolation units must wear Personal Protective Equipment.  (*Id.* at ¶ 24.)

Additionally, Elkton has put into place screening measures to identify and manage any COVID-19 infections within the complex's existing inmate population. First, Health Services reviewed inmate medical records to identify "high-risk" individuals pursuant to CDC guidelines. (*Id.* at ¶ 30.)  Specifically, staff identified (1) all individuals over age 65; and (2) individuals

diagnosed with certain medical conditions, identified by the CDC as "high risk". (*Id*. at ¶¶ 30-31.) These individuals continue to be screened for symptoms and temperature. (*Id*. at ¶ 31.) Second, Elkton is actively monitoring its general inmate population for illness. Inmates are actively encouraged to self-report symptoms of illness to unit staff either orally or via a written request to staff. (*Id*. at ¶ 33.) Any inmate who presents with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health Services Department. (*Id*. at ¶ 34.) Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate. (*Id.*) Elkton has also implemented enhanced screening measures for inmates with ongoing work details, whose functions have been determined to be "essential" to the institution. (*Id*. at ¶ 32.) These inmates are screened for symptoms of illness and are required to have their temperatures taken, both before their shifts begin and once again before returning to their housing units. (*Id.*)

B.    <u>Isolation and Quarantine Procedures</u>

Any inmate who presents with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health Services Department. Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate. (Dees Decl. at ¶ 34.) Elkton medical providers are prioritizing immediate medical care for anyone who claims symptoms indicative of a COVID-19 infection. (*Id*. at ¶ 35.)

In addition to the areas designated for quarantine and isolation, Elkton has a "bridge-unit" staffed by the Ohio National Guard medical unit. (*Id.* at ¶ 53.) The bridge-unit acts as a step down unit for inmates returning from hospitalization for COVID-19 symptoms. (*Id.*) The bridge unit has had a range of patients from 2-15 at any one time. (*Id.*)

C.    <u>Testing</u>

Elkton is conducting testing in accordance with CDC guidelines. The CDC has explained

that "[n]ot everyone needs to be tested for COVID-19," and "decisions about testing are at the discretion of state and local health departments and/or individual clinicians." (See cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html (last visited on Apr. 16, 2020).) At Elkton, there are currently not enough tests to test every inmate. (Dees Decl. at ¶ 41.) Consequently, the decision whether to test an inmate for COVID-19 is made by Health Services staff based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk," and (4) whether the inmate is on a work detail, such as food service, that requires the inmate to interact with other inmates or staff. (*Id*. at ¶ 41.)

Elkton received 55 swabs and medical supplies to test inmates for COVID-19. (*Id*. at ¶ 43.) As of April 15, 2020 Elkton has 18 swabs remaining. (*Id.*) Elkton continues to work diligently to obtain as many COVID-19 tests as possible. (*Id.*) In addition, Elkton has 25 Abbott rapid screening cassettes, and anticipates receiving 25 additional Abbott cassettes per week. (*Id.*)

As of April 15, 2020, 39 Elkton inmates have tested positive for COVID-19. (*Id*. at ¶ 42.) There are 34 staff members who have tested positive for COVID-19. (*Id*.) There have been 5 inmate deaths. (*Id*.)

D.    Screening and Excluding Staff and Visitors

All individuals entering Elkton (including staff, delivery drivers, or any other visitors) must undergo a health screening prior to entry and the screening occurs while the individual is in their vehicle outside the facility. (Dees Decl. at ¶ 36.) This includes having their temperature taken and being asked a number of questions to evaluate their risk of exposure, as well as whether they have been experiencing any symptoms of illness. (*Id.*) The individuals conducting this screening have authority to deny entry to anyone with a temperature above 99 degrees Fahrenheit, or who

report COVID-19 symptoms or exposure risk factors.  (*Id*. at ¶ 37.)

E.     Cleaning

All common areas in inmate housing units are cleaned daily, and are typically cleaned by inmate orderlies multiple times throughout the day.  (Dees Decl. at ¶ 46.)  Elkton has also made this disinfectant available to inmates so that they may use it to clean their own cells.  (*Id*. at ¶ 47.) Common areas outside inmate living areas, including the lobby, bathrooms, cafeteria, etc., are also cleaned with the same disinfectant on a daily basis.  (*Id*. at ¶ 46.)  Correctional staff are also required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the supply room and again upon their return.  (*Id*. at ¶ 48.)  Staff also have regular, consistent access to soap and hand sanitizer.  (*Id*.)

F.     Supplies

Correctional staff have been provided PPE to be used in appropriate locations throughout Elkton such as quarantined areas, isolation units, and screening sites. Elkton has sufficient PPE on hand, including N-95 respirator masks, surgical masks, rubber gloves, gowns, and foot coverings to meet its current and anticipated needs, as well as the ability to order additional PPE should the need arise.  (*Id*. at ¶ 49.)  In addition, all inmates and staff were provided protective face masks for daily use.  (*Id*. at ¶ 50.)

All inmates have access to sinks, water, and soap at all times.  (*Id*. at ¶ 45.)  All inmates may receive new soap weekly.  (*Id*.)  Inmates will receive additional soap upon request.  (*Id*.)  For inmates without sufficient funds to purchase soap in the commissary, soap is provided at no cost to the inmate.  (*Id*.)

G.     Inmate and Staff Education

From the outset of the COVID-19 pandemic, Elkton staff and officials have provided

11

regular education to inmates and staff regarding the virus, the BOP's response, and the measures that they themselves should take to stay healthy, including washing their hands frequently with soap and water, avoiding touching their faces, and practicing physical distancing whenever possible.  (Dees Decl. at ¶¶ 20-22.)

III.    HOME CONFINEMENT AND COMPASSIONATE RELEASE

    A.    Compassionate Release

    BOP does not have the authority to provide inmates with "early release."  A reduction of an inmate's federal sentence can only be accomplished by an Article III judge, and specifically, the inmate's sentencing judge.  However, upon an inmate's request, the Director of BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A).   This process is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, C*ompassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050.50 (Jan. 17, 2019), http://www.bop.gov/policy/progstat/5050_050_EN.pdf.

    Upon information and belief, within the past 15 days, approximately 550 Elkton inmates have submitted a request for Compassionate Release to BOP.  (Cole Decl. ¶6.)  Of the four named Petitioners in this case, only Mr. Nelson has submitted a request for Compassionate Release to BOP.  (*Id*.)  That request is under consideration.  (*Id*.)  To date, 7 inmates have been denied Compassionate Release by the Warden.  (*Id*.)  Packets for another 36 inmates are currently being reviewed by Health Services to determine if they meet the criteria for Compassionate Release.  (*Id.*)  Importantly, while the BOP is processing these requests as expeditiously as possible, the statute gives the BOP thirty (30) days to evaluate compassionate release requests

before any motion may be presented in the sentencing court. 18 U.S.C. § 3582(c)(1)(A).  Further, the ultimate decision lies with the sentencing judge.  *Id.*

      B.    <u>Home Confinement</u>

At the Attorney General's direction, the BOP has also significantly increased the number of inmates on home confinement by over 40% and continues to screen all inmates to determine whether they are appropriate for home confinement.[3]  By memorandum dated March 26, 2020 and April 3, 2020, the Attorney General directed the BOP to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (See Exhibit C, Attorney General Memos dated March 26, 2020 and April 3, 2020,  BOP Memo April 15, 2020.)Then on April 15, 2020, the BOP issued additional guidance regarding home confinement  (*Id.*)  The Attorney General directed the BOP to consider the totality of the circumstances of each inmate, the statutory requirements for home confinement, and a series of factors including the age and vulnerability of the inmate, the security level of the facility holding the inmate, the inmate's conduct while incarcerated, the inmate's score under the Prisoner Assessment Tool Targeting Estimated Risk and Needs, whether the inmate has a demonstrated and verifiable reentry plan that will prevent recidivism and ensure public safety  (including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at their current facility), and the inmate's crime of conviction.[4]

---

[3] See https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 16, 2020).

[4] See https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf (last visited Apr. 16, 2020).

Generally, the BOP may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months. 18 U.S.C. § 3624(c)(2). Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement."  Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020). On April 3, 2020, the Attorney General made that finding and authorized the Director of the Bureau to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at Elkton.  (Cole Decl. at ¶ 18.)

Pursuant to the Attorney's General's direction, Elkton receives rosters of inmates to be considered for home confinement.  (*Id.* at ¶ 19.)  The factors to be considered are: the inmate's age and vulnerability to COVID-19 per CDC guidelines, the inmate's conduct in prison including violence and gang activity, the inmate's recidivism risk, the inmate's reentry plan, the inmate's danger to the community.  (*Id.*)  Some offenses, such as sex offenses, will render an inmate ineligible for home confinement.  (*Id.*)  As a result of Elkton's higher population of inmates convicted of sex offenses, many Elkton inmates are ineligible for home confinement.  (*Id.*)

To date at Elkton, six inmates have been approved for transfers to home confinement.  (*Id.* at ¶ 20.)  The inmates receiving transfers must quarantine for fourteen days prior to transfer.  (*Id.*)  Five of the six approved transfers have dates for transfer next week.  (*Id.*)  Two more inmates are currently being vetted by the Residential Reentry Manager.  (*Id.*)  Four inmates are in the process of being sent to the Residential Reentry Manager for consideration.  (*Id.*)  To date, 32 inmates have been denied home confinement as not meeting the stated criteria for a variety of reasons.  (*Id.*)

Concerning the four named Petitioners in this case, two have requested and been

14

considered for home confinement.  (*Id*. at ¶ 21.)  Mr. Bellamy was ineligible because he has active warrants from New Jersey.  (*Id*.)  Mr. Nieves was ineligible due to a history of serious violence (assault with a baseball bat). (*Id*.)  Although he has not requested home confinement, Mr. Wilson is likely not a candidate because his recidivism risk score is too high; he has a Low recidivism risk score and a Minimal risk score is required.  (*Id*.)  Additionally, although he has not requested home confinement, Mr. Nelson is likely not a candidate because he has a history of violence (unlawful discharge of a firearm) and his recidivism risk score is too high; he has a Medium recidivism risk score and a Minimal risk score is required.  (*Id*.)

## LAW AND ARGUMENT

I.     PETITIONERS ARE NOT ENTITLED TO HABEAS RELIEF

A.     Habeas Relief is Unavailable to Challenge Conditions of Confinement

The gravamen of the Petition is that Petitioners are entitled to habeas relief pursuant to 28 U.S.C. § 2241 based on "unconstitutional conditions of confinement."  (Pet. ECF No. 1 PageID # 35.)  However, it is well-settled that a habeas petition under 28 U.S.C. § 2241, "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013); s*ee also Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core" of habeas relief.); and *Sullivan v. United States*, 90 F. App'x 862, 863 (6th Cir. 2004) ("§ 2241 is [not] a vehicle [] for challenging prison conditions….").

"[W]here a prisoner is challenging the very fact or duration of his physical imprisonment and the relief that he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a petition for writ of habeas corpus."

15

*Lutz v. Hemingway*, 476 F.Supp.2d 715, 718 (E.D. Mich. 2007) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). "Complaints that involve only conditions of confinement do not relate to the legality of the petitioner's confinement, nor do they relate to the legal sufficiency of the criminal court proceedings which resulted in the incarceration of the petitioner," and should be brought as a civil rights claim. *Id*. (quoting *Maddux v. Rose*, 483 F.Supp. 661, 672 (E.D. Tenn. 1980)); *see also Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus, requests for relief turning on circumstances of confinement may be presented in a § 1983 action.") (internal citation omitted).

Where a party brings a condition of confinement claim under habeas, the court should "dismiss[] the petition without prejudice" to allow the party to "raise his potential civil rights claims properly." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004). *See also Hodges v. Bell*, 170 F. App'x 389, 393 (6th Cir. 2006) (a habeas proceeding does not "grant the district court jurisdiction to adjudicate Hodges's conditions of confinement claims, or to order injunctive relief in response thereto."). Thus, this Court does not have jurisdiction to order habeas relief for a condition of confinement claim, and the petition should be dismissed.

B.    PLRA Precludes the Relief Requested

Petitioners' primary requested habeas relief is the release of hundreds of inmates from Elkton.  However, the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, places strict limits on courts' ability to order the release of inmates "in any civil action in Federal court with respect to prison conditions…" and precludes a single district judge from doing so.  18 U.S.C. § 3626(a)(3)(B). That law applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the

lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]"  18 U.S.C. § 3626(g)(2).  In such a suit, the court "may enter a temporary restraining order or an order for preliminary injunctive relief," but such injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2). Under the PLRA, a "prisoner release order"—which "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison," 18 U.S.C. § 3626(g)(4)—may "be entered only by a three-judge court," 18 U.S.C. § 3626(a)(3)(B), and then only if certain conditions have been met. Among other requirements, "no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A)(i)(ii).

Congress enacted the PLRA "to oust the federal judiciary from day-to-day prison management." *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997); *see also Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (en banc) (Calabresi, J., concurring) ("The in banc majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect. I agree."). "Congress intended the PLRA to revive the hands-off doctrine," which was "a rule of judicial quiescence derived from federalism and separation of powers concerns." *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 991, 997 (9th Cir. 2000). "Courts must be sensitive to

17

the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Section 3626 thus "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999, and, "[b]y its terms . . . restricts the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population.'" *Plata*, 563 U.S. at 511 (quoting 18 U.S.C. § 3626(g)(4)). The PLRA's "requirements ensure that the 'last remedy' of a population limit is not imposed 'as a first step.'" *Id.* at 514 (quoting *Inmates of Occoquan v. Barry*, 844 F.2d 828, 843 (D.C. Cir. 1988)). "The release of prisoners in large numbers . . . is a matter of undoubted, grave concern." *Id.* at 501.

Insofar as the Petitioners in this case are seeking release as a remedy for the allegedly unconstitutional conditions at Elkton—either for themselves or for their putative class members—the PLRA prevents this Court from granting that relief. Under the PLRA, "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court." *Id.* at 500 (citing 18 U.S.C. § 3626(a)); *see* 18 U.S.C. § 3626(a)(3)(B) ("In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court[.]"). Moreover, such an order may not be entered unless "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A). And even a three-judge court may order prisoners released to remedy unconstitutional prison conditions "only if the court finds by clear and convincing evidence" that

"(i) crowding in the primary cause of the violation" and "(ii) no other relief will remedy [it.]"  18 U.S.C. § 3626(a)(3)(E)(i)-(ii).

One court recently reached this conclusion in an identical case.  In *Money v. Pritzker*, ___ F. Supp. 3d ___, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), inmates from various Illinois Department of Correction facilities brought purported class action lawsuits seeking release of prisoners over 12,000 prisoners in light of the COVID-19 pandemic.  The Court held that the PLRA prevented it from entering the relief requested by Petitioners for the release of inmates. *Id.* at * 14.

Here, there can be no dispute that the Petitioners' lawsuit is a "civil action with respect to prison conditions" governed by the PLRA.  18 U.S.C. § 3626(g)(2).  The PLRA defines "civil action with respect to prison conditions" broadly to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but [that term] does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]"  *Id.*  Petitioners expressly admit that their action challenges the conditions of confinement.  (Pet. ECF No. 1 PageID # 31 ("Petitioner's [sic] Incarceration Amid the COVID-19 Outbreak in Elkton Violates Their Rights to Constitutional **Conditions of Confinement**")(emphasis added); PageID #35 ("FIRST CLAIM FOR RELIEF: Unconstitutional **Conditions of Confinement** in Violation of the Eighth Amendment to the U.S. Costitution")(emphasis added).)  Accordingly, the PLRA strictly limits the relief that this Court may grant and precludes the Court from releasing inmates from Elkton as requested by Petitioners.  18 U.S.C. § 3626(a)(3)(B).

    C.    <u>The BOP has not Violated the Constitution</u>

        1.    <u>Standard</u>

Petitioners allege that their conditions of confinement at Elkton constitute a violation of the Eighth Amendment.  (Pet. ECF No. 1 PageID # 35.)  The Eighth Amendment protects against the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  "[A] prison official violates the Eighth Amendment only when two requirements are met."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "First, the deprivation alleged must be, objectively, 'sufficiently serious'…."  *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  Accordingly, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities…."  *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  In claims like this, an inmate must show that he is incarcerated under conditions posing a substantial risk of harm. *Id.*  Second, "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'"  *Id.* (quoting *Wilson*, 501 U.S. at 297.)  Accordingly, "a prison official must have a 'sufficiently culpable state of mind.'"  *Id.* (quoting *Wilson*, 501 U.S. at 297). As the Supreme Court explained "[i]n prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety…."  *Id.* (quoting *Wilson*, 501 U.S. at 302-303.)  Thus, in order to establish a violation of the Eighth Amendment, the inmate must show prison officials "knows of and disregards an excessive risk to inmate health or safety…."  *Id.* at 837.   As discussed below, Petitioners cannot establish either prong

2.     Petitioners are not being Subject to an Unreasonable Risk of Harm

Petitioners cannot establish that they have suffered a "sufficiently serious" deprivation. *See Wilson*, 501 U.S. at 297. To be sure, the spread of COVID-19 in within the United States puts everyone at some degree of risk of getting sick, but the BOP has taken appropriate steps to mitigate those risks throughout its inmate population,[5] including with respect to the inmate population at

---

[5] Courts around the country have recently received challenges to detention on the grounds of COVID-19 in the

Elkton.  Those  measures include providing inmate and staff education; conducting inmate and

staff screening; putting into place testing, quarantine, and isolation procedures in accordance with

BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a

number of other preventative measures.  (Dees Decl. at ¶ 19.)  Additionally, Elkton implemented

the "modified operations" directive in a number of ways to reduce the spread of COVID-19 among

inmates, including: (1) "grab and go" meals for inmates, meaning that inmates are permitted to

pick up pre-packaged meals at designated times, but had to return to their housing units in order

to eat; scheduled staggered mealtimes, so that only a single housing unit (approximately 150

inmates) are moving within the facility at any particular time; and (2) Health Services pill line

(controlled medication dispensing) and (3) commissary are accomplished during these times as

well, which limits potential exposure.  (*Id*. at ¶ 12.)  All inmates have access to sinks, water, and

soap at all times.  (*Id*. at ¶ 45.)  In addition, all inmates and staff were provided protective face

masks for daily use.  (*Id*. at ¶ 50.)

One of Petitioners' primary arguments is that they live in units in proximity to other

prisoners and less than a six foot distance between beds. (Pet. ECF No.1 PageID # 15-17.)  What

Petitioners fail to appreciate is that this situation is also true of many unincarcerated members of

the community who live with roommates or family members. *See Hines v. Youssef*, No. 1:13-cv-

00357-AWI-JL, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something

about a prisoner's conditions of confinement that raises the risk of exposure substantially above

---

criminal bail context and have recognized the government's public health efforts, particularly the efforts of the Bureau
of Prisons, to address the COVID-19 crisis. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at
*4 (D. Md. Mar. 17, 2020); *United States v. Jefferson*, No. CCB 19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23,
2020); *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020); *United
States v. Gileno*, No. 3:19-cr-161, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020); *United States, v. Rollins*, Nos.
19-CR-34S, 11-CR-251S, 2020 WL 1482323 (W.D.N.Y. Mar. 27, 2020) (denying motion for release from custody
pending sentencing and explaining that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the
statutory detention provisions above").

the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate.").  Each unit is essentially a closed family unit and the BOP separates each unit from other units, visitors, and sick inmates.  (Dees Decl. at ¶ 54.)  BOP staff also wear masks and/or PPE and give inmates masks to wear.  (*Id.* at ¶¶ 49-50.) During movement, inmates are able to, and are encourage to, maintain social distancing while in line.  Accordingly, Petitioners are not subject to an unreasonable risk of harm.

### 3. The BOP has not shown Deliberate Indifference but has Taken Appropriate Measures to Protect the Health of Inmates at Elkton and the Public

Petitioners likewise cannot satisfy the subjective element of the constitutional analysis, which requires them to prove "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Farmer*, 511 U.S at 837). The test is subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S at 837.  In order to support a claim for deliberate indifference to future health problems, the condition of confinement complained about must be "sure or very likely to cause serious illness…."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993). The condition complained of here is not the existence of COVID-19, which is not under the control of the BOP. Rather, the condition complained of is the precautions taken to reduce exposure or spread of COVID-19.

To be sure, the BOP is acutely aware of the risk that COVID-19 poses to its inmate population and to the public at large, but it can hardly be said to be indifferent, as shown by the actions to counteract the spread of COVID-19 described above.  Additionally, Health Services has reviewed inmate medical records to identify "high-risk" individuals pursuant to CDC guidelines.

22

(Dees Decl. at ¶ 30.)  Health services continues to screen these individuals for symptoms and temperature.  (*Id*. at ¶ 31.)  Further, Elkton staff are actively monitoring the general inmate population for illness.  Inmates are actively encouraged to self-report symptoms of illness to unit staff either orally or via a written request to staff.  (*Id*. at ¶ 33.)  Any inmate who presents with symptoms consistent with COVID-19 is evaluated by a medical provider in the Health Services Department.  (*Id*. at ¶ 34.)  Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate.  (*Id*.)  The decision whether to test an inmate for COVID-19 is made by Health Services staff based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk," and (4) whether the inmate is on a work detail, such as food service, that requires the inmate to interact with other inmates or staff.  (*Id*. at ¶ 41.)  Elkton medical providers are prioritizing immediate medical care for anyone who claims symptoms indicative of a COVID-19 infection.  (*Id*. at ¶ 35.)  Currently, medical coverage is offered 24 hours daily at Elkton.  (*Id.* at ¶ 3.)

Inmates who present with symptoms consistent with COVID-like illness are placed in isolation to separate them from asymptomatic quarantined inmates and general population inmates. (Dees Decl. at ¶ 51.)  If the inmate's condition merits hospitalization, they are transported to a local hospital.  (*Id.*)  In addition to isolation, Elkton has a "bridge-unit" staffed by the Ohio National Guard medical unit.  (*Id.* at ¶ 53.)  The bridge-unit acts as a step down unit for inmates returning from hospitalization for COVID-19 symptoms.  (*Id.*)

Accordingly, Petitioners cannot establish that the precautions and care at Elkton are "sure or very likely" to lead to exposure or that that Respondents have been deliberately indifferent.  The district court in *Money*, 2020 WL 1820660, reached the same conclusion on similar facts.  In that

23

case, the court found that prison officials came forward "with a length list of the actions they have taken to protect…inmates." *Id.* at *18.  The court recognized that prison officials in that case (like BOP staff here) "are trying, very hard, to protect inmates against the virus and to treat those who have contracted it." *Id.*  There was no evidence to "support any suggestion that [prison officials] have turned a kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare." *Id.* (quoting *Rosario v. Brown*, 670 F.3d 816, 821 (7th Cir. 2012).)  Accordingly, the actions of prison officials were not deliberately indifferent but, instead, "easily pass constitutional muster." *Id.*   This Court should find likewise.

Further, in denying a request for release from immigration detention in the Western District of Washington earlier this month, when Seattle was the epicenter of the COVID-19 outbreak, the court noted that "Plaintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak — even one as serious as COVID-19." *Dawson v. Asher*, No. C20-0409 JRL-MAT, 2020 WL 1304557, at *2 (W.D. Wash March 19, 2020).  More importantly, the BOP has not been deliberately indifferent to the COVID-19 outbreak, but is taking aggressive measures to combat its spread and care for inmate who contract the disease.

While Petitioners may ultimately disagree with the measures taken by the BOP to protect and treat inmate health and safety while also carrying out its mission to effectuate criminal sentences imposed by federal courts, deliberate indifference is not shown simply by a difference of medical judgment.  *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (holding that a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation"). Further, in the midst of this extraordinary emergency, "[i]t is no part of the function of a court or a jury to determine which one of two modes

was likely to be the most effective for the protection of the public against disease." *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). Rather, public health officials are entitled to heightened deference when exercising science-based public health judgment during a public health emergency. *See, e.g.*, *United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963) (explaining in a habeas matter that "the judgment required is that of a public health officer and not of a lawyer used to insist on positive evidence to support action; their task is to measure risk to the public . . . . They deal in a terrible context and the consequences of mistaken indulgence can be irretrievably tragic."); *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016) ("To permit these constitutional claims to go forward . . . would be a judicial second-guessing of the discretionary judgments of public health officials acting within the soute of their (and not my) expertise."); *see also Jacobson,* 197 U.S. at 31 (upholding mandatory vaccination law and explaining that such a measure, enacted to protect public health, will not be struck down unless it "has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights…" secured by the Constitution); *Bragdon v. Abbot*, 524 U.S. 624, 650 (1998) (noting that "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (recognizing that "courts normally should defer to the reasonable medical judgments of public health officials").  Thus, this Court should deny the Petition.

II.    PETITIONERS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER
       OR ANY INJUNCTIVE RELIEF

       A.    Standard

In addition to habeas relief, Petitioners also seek a temporary restraining order and injunctive relief.  (Pet. ECF No. 1 PageID #36-37.)  The standard for determining whether to issue a

temporary restraining order is the same as for a preliminary injunction. *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "[P]reliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015)(quoting *Platt v. Bd. Of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 454 (6th Cir. 2014).

A district court must balance four factors in determining whether to grant injunctive relief: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Id*. The party seeking a preliminary injunction bears the burden of justifying such relief. *Id*.  As discussed below, Petitioners have failed to meet their heavy burden of establishing that they are entitled to extraordinary relief in the form of a temporary restraining order.

B.    Petitioners Unlikely to Succeed on the Merits

Likelihood of success on the merits is a threshold issue: "[W]hen a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three *Winters* [*v. NRDC,* 555 U.S. 7 (2008)] elements." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)(internal quotation omitted).   Initially, Respondents note that, as discussed above, Petitioners cannot establish a violation of the Eighth Amendment and are, therefore, unlikely to succeed on the merits, Moreover, Petitioners are also unlikely to succeed on the merits because: (1) the conditions in Elkton are not as they are portrayed in the petition; (2) release is unlikely to redress the alleged harm; (3) Petitioners are not entitled relief that would divest BOP of its discretion to release inmates in appropriate circumstances, and; (4) Petitioners are not entitled to

26

unilaterally truncate judicially-imposed sentences, which can only be modified by the sentencing court.

1. <u>The Conditions at Elkton are Different than Portraryed in the Petition</u>

Petitioners portray the conditions at Elkton as particularly dire and that Elkton is incapable of preventing the spread of COVID-19. (Pet. ECF No. 1 PageID # 13-14.) Petitioners go so far as to allege that soap and cleaning supplies are scarce, that the commissary is closed, and that contagious prisoners are not kept away from others. (*Id.* at PageID # 17.) This is simply not an accurate description of the conditions at Elkton. As described in more detail in Respondents' statement of facts, the current situation at Elkton includes:

1. <u>Screening</u>: All incoming inmates, staff and visitors are screened prior to admission to Elkton for signs and symptoms of COVID-19 exposure and deny entry to anyone with a temperature or other symptoms of COVID-19. (Dees Decl. at ¶¶ 23-38.) Further, Elkton is taking a number of measures to screen current inmates. (*Id.* at ¶¶ 27-35.)

2. <u>Quarantine Procedures</u>: Asymptomatic inmates who have been in contact with symptomatic inmates for a 14 day period before being release to general population. Efforts are made to not add or introduce new inmates to a quarantine housing unit after the clock has started. Further, all new inmates or inmates being transferred to home confinement are also placed in a 14 day quarantine separate from general population. (*Id.* at ¶¶ 24, 52.)

3. <u>Isolation</u>: Inmates who test positive for, or have symptoms consistent with, COVID-19 are placed in a separate isolation unit where all staff wear PPE and all inmates are required to wear a surgical mask. (*Id.* at ¶¶ 24, 34.) In addition to the areas designated for quarantine and isolation, Elkton has a "bridge-unit" staffed by the Ohio National Guard medical unit that acts as a step down unit for inmates returning from hospitalization with COVID-19 symptoms. (*Id.* at ¶ 53.)

4. <u>Cleaning and Hygiene</u>: All common areas in inmate housing units are cleaned daily, and are typically cleaned by inmate orderlies multiple times throughout the day. (Dees Decl. at ¶ 46.) Elkton has also made this disinfectant available to inmates so that they may use it to clean their own cells. (*Id.* at ¶ 47.) Common Areas outside inmate living areas, including the lobby, bathrooms, cafeteria, etc., are also cleaned with the same disinfectant on a daily basis. (*Id.* at ¶ 46.) All inmates and staff were provided protective face masks for daily use. (*Id.* at ¶ 50.) All inmates have access to sinks, water, and soap at all times. (*Id.* at ¶ 45.) All

27

inmates may receive new soap weekly.  (*Id.*)  Inmates will receive additional soap upon request.  (*Id.*)  For inmates without sufficient funds to purchase soap in the commissary, soap is provided at no cost to the inmate.  (*Id.*)

5.  <u>Inmate Separation Efforts</u>:  In addition to quarantine and isolation of inmates, the general population is further separated into small units of no more than    (*Id.* at ¶ 54.)

Clearly, BOP is trying, very hard to protect inmates against COVID-19 and to treat those who have contracted it.  Therefore, Petitioners are unlikely to succeed on the merits.

2.  <u>Release is Unlikely to Redress the Alleged Harm</u>

Petitioners are unlikely to succeed on the merits because the primary relief that they seek from the BOP—the release from custody of a substantial number of Elkton inmates (or themselves)—is unlikely to redress the alleged harm that they or the members of the alleged class purportedly suffer—a risk of contracting COVID-19. To bring a claim in federal court, a plaintiff must satisfy the requirements for Article III standing: injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The redressability requirement limits Article III jurisdiction to those cases in which the relief sought will remedy the injury alleged. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). Although certainty is not required, "the [plaintiff] must demonstrate 'that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision of the court.'" *Spectrum Five LLC v. FCC*, 758 F.3d 254, 260 (D.C. Cir. 2014) (citation omitted). A plaintiff must demonstrate standing (including the redressability element) for each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[I]f a favorable judicial decision is unlikely to correct the alleged wrong, there is no case or controversy within the meaning of Article III." *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 566 (D.D.C. 2018).

28

Petitioners cannot show that the immediate release of a substantial number of Elkton inmates or themselves would lessen their risk of them contracting COVID-19. It cannot be denied that COVID-19 is spreading throughout the nation generally and the State of Ohio specifically. Some inmates and staff at Elkton have contracted COVID-19.  As noted, the BOP has taken measures to protect the staff and inmates at Elkton, including the ability to come and go from the facility, screening new arrivals for symptoms, taking measures to allow greater social distancing during meals and in groups, cleaning high-traffic areas more frequently, and isolating anyone showing symptoms of COVID-19. Unlike many in the community, inmates at Elkton do not need to leave the facility to purchase groceries, toiletries, or cleaning supplies. By contrast, Petitioners have not (and cannot) provided any assurances that the places that that released inmates would reside or the lifestyles they would have to maintain upon release would offer similar protections. For example, while Petitioners complain that they are required to share a living space with a limited number of other inmates, it is not clear that they would not be subject to the same arrangement outside the facility.  It is not even clear that all inmates that Petitioners request be released even have a home to go to or financial resources to provide for themselves; it is likely many would be homeless and penniless if released within 24-hours of the issuance of an order by this court as Petitioners request.  (Pet. ECF No. 2 PageID # 36.)  These inmates would certainly see their risk of contracting COVID-19 dramatically increased, not reduced, if, in the middle of a pandemic, they were released from Elkton with no viable means to obtain food, shelter and medical care on 24-hours' notice.

3.    <u>Petitioners are not Entitled to Divest BOP of its Discretion to Place Inmates in Home Confinement in Appropriate Circumstances or to have the Court Amend Criminal Sentences of Inmates</u>

Petitioners are not entitled to have this Court release inmates from Elkton. There are specific legal avenues for the release or transfer of post-conviction inmates. Those include home confinement or compassionate release. Petitioners do not even attempt that this court has authority to release prisoners based on the avenues for release and, as discussed below, Petitioners are not likely to succeed on the merits if they did so argue,

Regarding home confinement, the BOP may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months. 18 U.S.C. § 3624(c)(2). Under the CARES Act, signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020). On April 3, 2020, the Attorney General made that finding and authorized the Director of the Bureau to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at Elkton. (Cole Decl. at ¶ 18.)

Importantly, the determination of whether to place a prisoner in home confinement is solely in the discretion of the BOP and "not reviewable by any court." 18 U.S.C. § 3621(b). The factors to be considered are: the inmate's age and vulnerability to COVID-19 per CDC guidelines, the inmate's conduct in prison including violence and gang activity, the inmate's recidivism risk, the inmate's reentry plan, the inmate's danger to the community. (Cole Decl. at ¶ 18.) Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. *Id*. As a result of Elkton's higher population of inmates convicted of sex offenses, many Elkton inmates are ineligible for home confinement. *Id*.

It should be noted that, regarding the four named Petitioners in this case, two have

requested and been considered for home confinement. *Id.* at ¶ 21. Mr. Bellamy is ineligible because he has active warrants from New Jersey. *Id.* Mr. Nieves is ineligible due to a history of serious violence (assault with a baseball bat). *Id.* Although he has not requested home confinement, Mr. Wilson likely is not a candidate because his recidivism risk is too high; he has a Low recidivism rate and a Minimal rate is required. *Id.* Additionally, although he has not requested home confinement, Mr. Nelson is likely not a candidate because he has a history of violence (unlawful discharge of a firearm) and his recidivism risk is too high; he has a Medium recidivism rate and a Minimal rate is required. *Id.*

Regarding compassionate release, neither BOP nor this Court have the authority to provide inmates with "early release." A reduction of an inmate's federal sentence can only be accomplished by an Article III judge, and specifically, the inmate's sentencing judge. However, upon an inmate's request, the Director of BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A). This process is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050 (Jan. 17, 2019), http://www.bop.gov/policy/progstat/5050_050_EN.pdf.

Importantly, while the BOP is processing these requests as expeditiously as possible, the statute gives the BOP thirty (30) days to evaluate compassionate release requests before any motion may be presented in the sentencing court. 18 U.S.C. § 3582(c)(1)(A). Further, the ultimate decision lies with the sentencing judge. *Id.*

By seeking release the way they do, Petitioners are essentially seeking to divest the BOP of its statutory and regulatory discretion as to which inmates should be placed in home confinement

and to divest sentencing judges their ability (within the requirements of law) to determine the sentence of individuals convicted in their court. Petitioners should not be granted such sweeping and unprecedented relief when existing administrative and statutory proceedings can grant them the relief they seek, if appropriate. For all these reasons, Petitioners have not shown that they are likely to succeed on the merits

### C.     Petitioners Fail to Establish Imminent Irreparable Harm

Petitioners cannot show irreparable harm such that an injunction or TRO should issue. To the contrary, as discussed above, the BOP has taken significant steps to ensure the health and safety of inmates, and the minimization of risk of exposure to all inmates and staff. The BOP also has instituted necessary precautions and procedures to ensure that any inmates who become ill will be well-cared for.

Petitioners have failed to establish irreparable harm on their constitutional claims. To establish irreparable harm, Petitioners must show that, unless their motion is granted "they will suffer 'actual and imminent' harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Moreover, "the harm alleged must be both certain and great, rather than speculative or theoretical." *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). Merely showing a "possibility" of irreparable harm is insufficient. *See Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

As discussed above, Petitioners fail to take into account the myriad protections which have been put in place to prevent spread of infection within Elkton and to reduce the risk that persons

32

with COVID-19 enter Elkton in the first place.  Moreover, Petitioners fail to address in any meaningful way how, if released, they will be safer from the risk of infection or have access to adequate care if infected.  Every person in the United States, whether in a prison or not, faces the risk of COVID-19 exposure.  *See United States v. Steward*, No. S1:20-cr-0052 (DCL), 2020 WL 1468005, at * 1(S.D.N.Y. Mar. 25, 2020)("there is also no reason to find that the defendant's release would lessen the risk to his health presented by COVID-19); *United States v. Taylor*, No. 5:19-CR-192-KKC-MAS, 2020 WL 1501997, at *5 (E.D. Ky. Mar. 26, 2020)("there is little reason to believe that [Petitioner] would be more at risk if detained versus being released").  Thus, Petitioners are far from showing irreparable harm.

Further, Petitioners have other, alternative methods for relief other than seeking a temporary restraining order, for securing early release.  *See, e.g.*, 18 U.S.C. § 3582 (compassionate release); 18 U.S.C. § 3624(c) (prerelease custody/home confinement).  Accordingly, Petitioners have not shown irreparable harm and the inability to show irreparable harm presents an independent basis for denying their requested emergency relief.

D.    Granting the Requested Relief Would Cause Substantial Harm to Others

Petitioners demand a dramatic remedy that would have a profound effect on hundreds of inmates: the immediate release and removal of a substantial portion of the population at Elkton. Petitioners purport to have homes that they could go to upon release, but they provide no assurances that they can provide for their food and medical care needs nor that they will be able to protect themselves any better against the spread of COVID-19.  More importantly, they do not (and cannot) provide any assurance regarding the hundreds of other inmates who would find themselves immediately released.  Indeed, it is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care

33

in the midst of a grave pandemic that is having a substantial impact on the nation. Thus, Petitioners requested relief would cause substantial harm to themselves and others and such relief should be denied.

E.     Public Health and Safety Would Not Be Served by Granting the Requested Relief

The public's interest is not served by short circuiting the existing administrative and judicial processes that are designed to carefully weigh freeing the individuals at issue from custody against the risk to public safety in doing so. The risk of danger to the public in granting Petitioners relief and requiring the immediate release of hundreds of inmates who have been convicted and sentenced for a myriad of crimes, outweighs the alleged need for expediency here. BOP policy requires determinations to be made as to which inmates are entitled to home confinement (*see, e.g.,* Attorney General's Memorandum,), or the other judicial avenues available to convicted prisoners. Further, the government's interest in public safety extends to protecting the public from the risk of the spread of COVID-19 and recidivism by released inmates. Indeed, the Attorney General makes clear that such release should be done in a manner that balances the safety considerations for all involved. The Attorney General recognizes that there is "an obligation to protect the public." This means that BOP "cannot simply release prison populations en masse onto the streets." Such a release "would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses." *Id.* Our over-burdened police and safety services should not be forced to deal with the "indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they will have a safe place to go where they will not be mingling with their former criminal associates, and that they will not return to their former ways as soon as they walk through the prison gates. These weighty considerations

34

cannot be adequately addressed by the Court granting Petitioners' proposed relief of immediately releasing hundreds of inmates.   Clearly, Petitioners have not shown that the balance of hardships and public interest tips in their favor.

III.   PETITIONERS HAVE NOT PROVIDED A SUFFICIENT BASIS FOR CLASS CERTIFICATION, AND CLASS-WIDE RELIEF WOULD LIKELY HARM MANY INMATES

Petitioners purport to bring the action as a class action on behalf of themselves and "all current and future people in post-conviction custody at Elkton…." (Pet. ECF No. 1 at PageID #29. The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To certify a class under Fed. R. Civ. P. 23, a plaintiff must show that the proposed class satisfies all four requirements of Fed R. Civ. P. 23(a) and one of the three Fed. R. Civ. P. 23(b) requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  As discussed below, class certification is inappropriate in this case.

There are four requirements under Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation, Fed. R. Civ. P. 23(a), and the "party seeking class certification bears the burden of proof. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)(citations omitted).  Petitioners fall short. They claim to satisfy the numerosity requirement only by lumping together "all current and future people in post-conviction custody at Elkton…." (Pet. ECF No. 1 PageID # 29 at ¶ 73.)  According to their Petition, this constitutes "approximately 2,417 people in the proposed Class, and...hundreds of people in the proposed Medically-Vulnerable Subclass."  (Id. at PageID # 30 ¶ 78.)  For purposes of this filing only, the BOP does not challenge the numerosity requirement under Rule 23(a) as constructed by Petitioners.  So construed, however, the class cannot satisfy the remaining elements.

35

A class action may not be certified unless "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This means Plaintiff is required "to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350. The Supreme Court has cautioned that the language of Rule 23(a)(2) "is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.''" *Id.* at 349 (citations omitted). The "claims must depend upon a common contention … of such a nature that it is capable of classwide resolution." *Id.* at 350. Determination of whether the contention is true or false must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also id.* at 352 (requiring "some glue holding the alleged *reasons* for all those [challenged] decisions together").

In *Money*, 2020 WL 1820660, the district court denied class action certification in identical circumstances to the case *sub judice*.  The district court explained that public interest "mandates individualized consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large.  *Id.* at *14.  This is because "[e]ach putative class member comes with a unique situation—different crimes, sentences, outdates, disciplinary histories, age, medical history, places of incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community." *Id.* at *15. The district court ruled that this resulted in a lack of commonality because the only matter "apt to drive the resolution of the litigation" was which inmates should be released.  *Id*. at *14 (quoting *Dukes*, 564 U.S. at 350.)

Here, the identical problem exists.  Petitioners' proposed class would combine inmates that have different crimes, sentences, outdates, disciplinary histories, ages, medical histories, proximities to infected inmates, availabilities of a home landing spot, likelihoods of transmitting

36

the virus to someone at home detention, likelihoods of violation or recidivism, and dangers to the community.  Moreover, class members likely have different means to provide for themselves upon release and different access to medical care upon release.  Petitioners even lump together inmates who are currently sick with COVID-19 with asymptomatic inmates and inmates who were previously sick and made a full recovery.  There simply is no comomonality and typicality among proposed class member other than being incarcerated at Elkton.

Further, Petitioners cannot show adequacy of representation. To do so, the Sixth Circuit has set forth two criteria: "'(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re American Medical Systems, Inc.*, 75 F.3d at 1083 (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  Plaintiffs here demand a dramatic remedy that would have a profound effect on members of the class: the immediate release and removal of a substantial portion of the population at Elkton. Petitioners purport to have homes that they could go to upon release, but they provide no assurances that other class members (including those that would have to be released to effectuate their requested injunction) are similarly situated. Indeed, it is quite likely that the sudden removal of so many inmates would leave some of them homeless and without access to food, shelter, or medical care in the midst of a grave pandemic that is having a substantial impact on the nation.  Petitioners' failure to consider or account for such concerns in the immediate and sweeping relief that they seek demonstrates that they are not fit to represent the members of their proposed class.

## CONCLUSION

The BOP is taking significant and ongoing steps to prevent the spread of COVID-19 in Elkton and to provide medical care and treatment for inmates who do become infected.

Accordingly, Petitioners are unable to show that BOP is deliberately indifferent to a substantial risk of harm and cannot state a constitutional claim.  Moreover, the immediate release of hundreds of prisoners by this Court is neither permitted by law nor would it serve the health and safety of the inmates or the general public.  Therefore, this Court should deny the Petition for Writ of Habeas Corpus and the requests for a temporary restraining order, injunctive relief and declaratory judgment.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ James R. Bennett II
       James R. Bennett II (OH #0071663)
       Sara DeCaro (OH #0072485)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Ave., Suite 400
       Cleveland, Ohio 44113
       216-622-3988 - Bennett
       216-522-4982 - Fax
       James.Bennett4@usdoj.gov
       Sara.DeCaro@usdoj.gov

*Attorneys for Respondents*