GOVERNMENT EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| WILSON, ET AL, | * |
| | * |
| Petitioners | * |
| | * |
| v. | * CASE NO. 4:20-CV-00794 |
| | * |
| WILLIAMS, ET AL, | * JUDGE GWIN |
| | * |
| Respondents | * |

## DECLARATION OF SARAH A. DEES

I, Sarah A. Dees, do hereby declare, certify and state as follows:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons (BOP). I currently work as the Health Services Administrator at Federal Correctional Institution (FCI) Elkton in Lisbon, Ohio. I have held this position since January 5, 2020. I also serve as the Northeast Regional Paramedic, a position I have held since 2016. I have been employed by BOP since 2013. Throughout this declaration, when I refer to "FCI Elkton" generally, I am referring to both of the FCI Elkton institutions, the Federal Correctional Institution (FCI) and the Federal Satellite Low (FSL).

2. In my position as Health Services Administrator at FCI Elkton, I am responsible for coordinating comprehensive medical, dental, and mental health services of the highest quality while maintaining a clean, safe, and secure environment for nearly 2500 low security inmates and in addition to staff. The Health Services Department is staffed by a comprehensive team of BOP and Public Health Service health care workers, accompanied by professional contract staff committed to providing the highest standards of professionalism and dedication to the inmate population. FCI Elkton offers comprehensive ambulatory care addressing primary care, chronic

1

care, emergent care and acute care. Additionally, minor office-based procedures, diagnostic testing, specialty consultations and office based dental procedures are provided in house.

3. The FCI Elkton Clinical Staff consist of two Physicians, five Mid-level Providers, five Registered Nurses, one Infection Control/Improving Performance Nurse and two Medication Technicians, as well as one Pharmacists, two Dentists, and a Dental Hygienist. Currently medical coverage is offered 24 hours daily during the COVID-19 Pandemic. The Health Services Department is accredited by the American Correctional Association (ACA) and the Accreditation Association for Ambulatory Health Care (AAAHC).

4. With respect to COVID-19, specifically, I am involved on a daily basis in the identification, planning, and implementation of all Bureau directives for preventing the spread of COVID-19 at FCI Elkton, including FSL Elkton. Through this role, I have knowledge of both the Bureau's national directives relating to COVID-19 and the additional steps that FCI Elkton, specifically, has taken to combat COVID-19 within the facility. Accordingly, through the course of my official duties, I have personal knowledge regarding the numerous measures, discussed below, that have been implemented both Bureau-wide and at FCI Elkton in order to prevent and manage the spread of COVID-19.

I. **NATIONAL STEPS TAKEN BY BUREAU TO ADDRESS COVID-19**[1]

5. Before discussing the steps being taken at FCI Elkton, specifically, I will first

---

[1] As illustrated below, the Bureau's national guidance has undergone a number of changes in response to the evolving threat. The Bureau has established a COVID-19 resource section on its public webpage which is available at: https://www.bop.gov/coronavirus/. This webpage includes updates on the Bureau's response to COVID-19 and positive COVID-19 tests among inmates and staff at Bureau institutions nationwide.

discuss the phases of the BOP's national response to the COVID-19 pandemic, which apply generally across all BOP institutions. As set forth below, the Bureau has taken—and is continuing to take—significant measures in response to the COVID-19 pandemic in order to protect the safety and security of all staff and inmates, as well as members of the public.

6. In January 2020, the Bureau became aware of the first identified COVID-19 cases in the United States and quickly took steps to prevent its introduction and spread in Bureau institutions. The Bureau's response, detailed below, has occurred over six distinct "phases" to date. The Bureau will continue to modify and adjust its response as circumstances change, and at the guidance and direction of worldwide health authorities.

**A.     Action Plan for COVID-19 – Phase One**

7. In January 2020, the Bureau began Phase One of its Action Plan for COVID-19. Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission. *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp. In addition, an agency task force was established to begin strategic planning for COVID-19 Bureau-wide. This strategic planning included building on the Bureau's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan. From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the Office of the Vice President. *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp.

3

### B.     Action Plan for COVID-19 – Phase Two

8. On March 13, 2020, the Bureau implemented Phase Two of its Action Plan. Phase Two put into place a number of restrictions across all Bureau facilities over a 30-day period, to be reevaluated upon the conclusion of that time period. Specifically, the Bureau suspended the following activities for an initial period of 30 days, with certain limited exceptions: social visits; legal visits; inmate facility transfers; official staff travel; staff training; contractor access; Volunteer visits; and tours. *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

9. During Phase Two, inmates were subjected to new screening requirements. Specifically, all newly arriving Bureau inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any high-risk COVID-19 locations (as determined by the CDC), or had had close contact with anyone testing positive for COVID-19. Asymptomatic inmates with exposure risk factors were quarantined, and symptomatic inmates with exposure risk factors were isolated and evaluated for possible COVID-19 testing by local Bureau medical providers.[2]

10. Staff were also subjected to enhanced health screening in areas of "sustained community transmission," as determined by the CDC, and at medical referral centers. On March 22, 2020, FCI Elkton implemented this enhanced screening for staff and contractors at that time. The enhanced screening measures required all staff to self-report any symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure, and further required all staff to have their temperature taken upon entry into any Bureau facility.

11. Finally, in addition to the measures listed above, the Bureau implemented national

---

2 Throughout this declaration, "isolation" refers to a symptomatic inmate being confined to the FCI Visiting Room and FSL G-A Housing Unit. "Quarantine," on the other hand, refers to asymptomatic inmates who are confined to four areas at FCI Elkton: the gym, chapel, SHU, or FSL visiting room.

4

"modified operations" in order to maximize social distancing within Bureau facilities. These modifications included staggered meal and recreation times in order to limit congregate gatherings. Additionally, the Bureau established a set of quarantine and isolation procedures for known or potential cases of COVID-19.

12. FCI Elkton implemented this "modified operations" directive in a number of ways. For example, and among other things, FCI Elkton: (1) instituted "grab and go" meals for inmates, meaning that inmates were permitted to pick up pre-packaged meals at designated times, but had to return to their housing units in order to eat; scheduled staggered mealtimes, so that only a single housing unit (approximately 150 inmates) are moving within the facility at any particular time; and (2) Health Services pill line (controlled medication dispensing) and (3) commissary are accomplished during these times as well.

### C. Action Plan for COVID-19 – Phase Three

13. On March 18, 2020, the Bureau implemented Phase Three of the COVID-19 Action Plan for Bureau locations that perform administrative services (i.e., non-prison locations), which followed DOJ, Office of Management and Budget, and OPM guidance for maximizing telework. In this phase, individuals who had the ability to telework and whose job functions did not require them to be physically present were directed to begin teleworking.

14. Additionally, as part of this phase, and in accordance with the Pandemic Influenza contingency plan, all cleaning, sanitation, and medical supplies were inventoried. *See* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

5

### D. Action Plan for COVID-19 – Phase Four

15. On March 26, 2020, the Bureau implemented Phase Four of its Action Plan. In Phase Four, the Bureau revised its preventative measures for all institutions. Specifically, the agency updated its quarantine and isolation procedures to require all newly admitted inmates to The Bureau, whether in areas of sustained community transmission or not, to be assessed using a screening tool and temperature check (further explained below). This screening tool and temperature check applied to all new intakes, detainees, commitments, prisoners returned on writ from judicial proceedings, and parole violators, regardless of their method of arrival. Thus, all new arrivals to any Bureau institution—even those who were asymptomatic—were placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.

### E. Action Plan for COVID-19 – Phase Five

16. On March 31, 2020, the Director of the Bureau ordered the implementation of Phase 5 of its COVID-19 Action Plan, which took effect on April 1, 2020. Specifically, the Director ordered the following steps to be taken:

   A. For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

   B. During this time, to the extent practicable, inmates should still have access to programs and services offered under normal operating procedures, such as mental health treatment and education.

   C. In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

6

D. After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

E. Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Computer System (TRULINCS[3]) access.

F. Provided inmates access to programs and services offered under normal operating procedures, such as mental health treatment and education.

G. In addition, the Bureau coordinated with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

*See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

### F. Action Plan for COVID-19 – Phase Six

17. On April 13, 2020, the Director of the Bureau ordered the implementation of Phase 6 of its COVID-19 Action Plan. Specifically, the Director ordered an extension of the nationwide action in Phase 5, which applies to medical screening, limited inmate gathering, daily rounds, limited external movement, and fit testing, until May 18, 2020. *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf

18. Phase Six has been implemented at FCI Elkton.

## II. STEPS TAKEN AT FCI ELKTON TO ADDRESS COVID-19

19. In addition to the steps taken at the national level, FCI Elkton itself has also taken a number of additional measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing,

---

[3] TRULINCS is the internal Bureau computer and electronic message platform that inmates use to communicate with staff in the institutions and individuals in the community. Through this platform, inmates receive updates, notices, and can read inmate bulletins posted on the system by Bureau staff.

7

quarantine, and isolation procedures in accordance with Bureau policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.

### A. Inmate and Staff Education relating to COVID-19

20. From the outset of the COVID-19 pandemic, FCI Elkton officials have provided regular updates to inmates and staff regarding the virus and the Bureau's response, and have educated inmates and staff regarding measures that they themselves should take to stay healthy.

21. For example, in late February-Early March, Frequently Asked Questions bulletins were created from CDC and WHO guidelines to educate inmates and staff regarding the symptoms of COVID-19, instructing them to self-monitor for COVID-19 symptoms, and to immediately report such symptoms to sick call. The inmate population and staff members have been told best practices regarding personal hygiene to prevent the spread of COVID-19. The bulletins are posted in numerous locations around FCI Elkton.

22. Staff have also been trained to appropriately "don" and "doff" (off) Personal Protective Equipment (PPE) utilizing CDC guidelines found on the BOPs intranet and trainings with Health Services Staff.

### B. Screening for COVID-19 at FCI Elkton

#### 1. Inmates

23. When new inmates arrive, they are met by medical providers from the Health Services Department, who conduct an initial screening in a designated area at FCI Elkton separate from other staff and inmates. The medical providers wear PPE during the screening process.

24. Following this initial screening, new inmates are escorted to a quarantine unit at FCI Elkton. There, they are quarantined for 14 days to ensure that they do not develop any

symptoms consistent with COVID-19. If they do have symptoms consistent with COVID-19 infection, they are placed in a separate isolation unit. The isolation unit is used for all symptomatic inmates and inmates with a positive COVID-19 test. In these quarantine and isolation units, all staff must wear PPE; inmates in quarantine or isolation are required to wear a surgical mask.

25. After the expiration of 14 days, and upon medical clearance, inmates may be released into the general population.

26. This initial screening procedure at FCI Elkton allows for screening to occur in a controlled environment, and further ensures the rest of the inmate population are not exposed to newly-arrived inmates until they are properly screened and cleared by Health Services Department medical providers.

27. In addition to screening incoming inmates, FCI Elkton is also taking a number of measures to screen its current resident inmate population.

28. FCI Elkton screened inmates for elevated temperatures daily from March 20, 2020 through April 12, 2020. This screening was discontinued in favor of inmate self-reporting.

29. Inmates who self-report COVID-19 symptoms are screened for symptoms of COVID-19 (including fever, cough, and shortness of breath), as well as for "exposure risk factors," including whether the inmate has had close contact with anyone diagnosed with COVID-19 in the past 14 days. The screening takes place in a single, controlled area separate and apart from other inmates and prison staff.

30. The Health Services Department reviewed inmate medical records in order to determine which individuals at FCI Elkton were considered "high risk" for COVID-19 pursuant to CDC guidelines. These guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Per CDC guidance, "high-risk"

9

individuals include those over 65 and those with significant underlying medical conditions, such as chronic lung disease, moderate to severe asthma, liver disease, and diabetes.

31. In order to identify which inmates at FCI Elkton should be considered "high risk," staff searched the Bureau's medical records for (1) all inmates aged 65 and over; and (2) all inmates who have been diagnosed with a condition identified by the CDC as being "high risk." Like all inmates at FCI Elkton these inmates continue to be screened for symptoms related to COVID-19 and temperatures.

32. FCI Elkton is also conducting enhanced screening for all inmates with ongoing work details, such as food service and cleaning orderlies. These functions are considered to be "essential" by FCI Elkton. Each of these inmates is screened for illness both before and after each of their assigned work details. This includes being screened for any symptoms of illness and having their temperature taken. Furthermore, many cleaning orderlies are currently assigned only to the units in which they already reside and thus do not interact with staff or inmates in other units during the course of performing their duties.

33. All inmates are encouraged to self-monitor and to report symptoms of illness to unit staff either orally or via a written request to staff (commonly referred to as a "cop-out" within bureau institution).

34. Any inmate who presents with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health Services Department. Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate. As noted above, certain units at FCI Elkton have been designated as the isolation unit for inmates who are symptomatic and/or test positive for COVID-19.

35. FCI Elkton medical providers are prioritizing immediate medical care for anyone

who claims symptoms indicative of a COVID-19 infection.

### 2. Staff and Visitors

36. Since March 22, 2020, all individuals entering FCI Elkton (including staff, delivery drivers, or any other visitors) must undergo a health screening prior to entry, the screening occurs while the individual is in their vehicle. This includes having their temperature taken and being asked a number of health screening questions based on the bureaus guidance to evaluate their risk of exposure, as well as whether they have been experiencing any symptoms of illness.

37. The individuals conducting this health screening are authorized to deny entry to any individual if he or she has a body temperature of 99 degrees Fahrenheit, or above, or reports other symptoms consistent with COVID-19 (although it was recommended that they consult with FCI Elkton medical providers in advance of the decision to deny entry).

38. FCI Elkton employees have also been educated regarding the importance of staying home if they are feeling ill, and are required to self-report any COVID-19 exposure (known or suspected) as well as any positive COVID-19 test. If a staff member is tested for COVID-19, they are not permitted to return to work until after receiving the results of the test.

### D. COVID-19 Testing at FCI Elkton

39. The CDC has identified four "priority levels" for testing individuals with a suspected COVID-19 infection. Priority levels one through three include hospitalized patients and healthcare workers with symptoms (Priority Level 1); symptomatic patients in long-term care facilities, individuals 65 years or older, individuals with underlying conditions, and first responders (Priority Level 2); and symptomatic critical infrastructure workers, individuals who do not meet any of the criteria in Priority Levels 1 or 2, healthcare workers and first responders, and individuals with mild symptoms in communities experiencing high numbers of COVID-19 hospitalizations

(Priority Level 3). The fourth, or non-priority level, is for individuals without symptoms.

40. The CDC has made clear that "[n]ot everyone needs to be tested for COVID-19," and "decisions about testing are at the discretion of state and local health departments and/or individual clinicians." *See* coronavirus.gov "Priorities for Testing Patients with Suspected COVID-19 Infection"

41. At FCI Elkton, there are not enough tests to test every inmate. Consequently, the decision whether to test an inmate for COVID-19 is made by Bureau medical providers based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk," and (4) whether the inmate is on a work detail, such as food service, that requires the inmate to interact with other inmates or staff.

42. As of April 15, 2020, 39 FCI Elkton inmates have tested positive for COVID-19. There are 34 staff members who have tested positive for COVID-19. There have been 5 inmate deaths.

43. FCI Elkton received 55 COVID-19 testing swabs and medical supplies at hand to test inmates for COVID-19. FCI Elkton as of April 15, 2020 has 18 COVID-19 testing swabs remaining. FCI continues to work diligently to obtain as many COVID-19 tests as possible. In addition, FCI Elkton has 25 Abbott rapid screening COVID-19 testing cassettes, and anticipates receiving 25 additional Abbott testing cassettes per week.

### E. Additional Measures to Combat COVID-19

44. In addition to the above steps, FCI Elkton has taken a number of additional measures to combat COVID-19.

45. All inmates have access to sinks, water, and soap at all times. All inmates

may receive new soap weekly. Inmates will receive additional soap upon request. For inmates without sufficient funds to purchase soap in the commissary, soap is provided at no cost to the inmate.

46. All common areas in inmate housing units are cleaned daily, and are typically cleaned by inmate orderlies multiple times throughout the day, with a designated disinfectant that kills human coronavirus. FCI Elkton has made this disinfectant available to all inmates so that they may use it to clean their own cells on a regular basis. Common areas outside inmate living areas, including the FCI Elkton, lobby, bathrooms, cafeteria, etc., are also cleaned with the same disinfectant on a daily basis (and often multiple times per day).

47. Each housing unit has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean both the common areas and their cells on a daily basis.

48. Correctional staff are required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the supply room and again upon their return. Staff also have regular, consistent access to soap and hand sanitizer.

49. Correctional staff have been provided PPE to be used in appropriate locations throughout FCI Elkton such as quarantined areas, isolation units, and screening sites. FCI Elkton has sufficient PPE on hand, including N-95 respirator masks, surgical masks, medical gloves, gowns, and foot coverings to meet its current and anticipated needs, as well as the ability to order additional PPE should the need arise.

50. All inmates and staff were provided protective face masks for daily use.

51. FCI Elkton uses isolation to separate inmates who present with symptoms consistent with COVID-like illness from quarantined asymptomatic or general population inmates. Inmates have surgical masks to wear when interacting with staff or leaving the assigned

13

cell and their proximity to staff and other inmates is minimized. Medical staff determine if COVID-19 testing is necessary based on applicable guidelines and community standards. If the inmate's condition merits hospitalization, the inmate will be transported to a local hospital.

52. FCI Elkton uses quarantine to separate asymptomatic inmates who have been in contact with symptomatic inmates during the incubation period, which is up to 14 days for COVID-19. Inmates are housed together during this 14-day period with other asymptomatic inmates in a housing unit. Steps are taken to not add or introduce new inmates to a quarantine housing unit after the 14-day quarantine clock has started. At the end of the 14-day period, the inmates may be released from quarantine if no inmates develop COVID-19 symptoms or are diagnosed with COVID-19. If additional inmates present with symptoms during the incubation period, these symptomatic inmates are isolated and the 14-day quarantine period begins anew. Inmates receive twice daily temperature checks and if any symptoms are reported, they are documented. If an inmate becomes symptomatic or has a temperature of greater than or equal to 100.4 F, the inmate is placed in isolation.

53. In addition to the areas designated for quarantine and isolation, FCI Elkton has a "bridge-unit" staffed by the Ohio National Guard. The bridge-unit acts as a step down unit for inmates returning from hospitalization for COVID-19 symptoms. The bridge unit has had a range of patients from 2-15 at any one time.

54. Inmates at FCI Elkton are housed in 150-man housing units. Restrictions are in place to maintain separation between housing units. For example, only one housing unit is released to the cafeteria for "grab and go" meal service. The next unit is not released until the previous unit has returned to their housing quarters.

## III. CONCLUSION

55. In sum, the Bureau and FCI Elkton take the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population. The various phases of the Bureau's Action Plan have been designed and implemented in a systemic manner both nationally and at FCI Elkton in order to mitigate the spread of COVID-19.

56. In addition to the steps taken at the national level, FCI Elkton itself has taken a number of measures to prevent the introduction and spread of COVID-19 in the complex.

57. The Bureau and FCI Elkton remain flexible in their ability to receive guidance from the CDC and other health organizations and to modify their actions to best respond to this pandemic, according to the quickly shifting needs on the ground.

I declare that the foregoing is true and correct to the best of my knowledge and belief, and is given under penalty of perjury pursuant to 28 U.S.C. § 1746 this April 16, 2020.

RESPECTFULLY SUBMITTED,

SARAH A. DEES
Health Services Administrator
FCI Elkton