UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated,<br><br>            *Petitioners*,<br>  v.<br><br>MARK WILLIAMS, warden of Elkton Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities,<br><br>            *Respondents*. | Case No. 20-cv-0794<br><br>Judge James Gwin |

## PETITIONERS' REPLY MEMORANDUM IN SUPPORT OF THEIR EMERGENCY PETITION FOR A WRIT OF HABEAS CORPUS[1]

In the roughly 120 hours since Petitioners filed their emergency petition for a writ of habeas corpus, the death toll at Elkton has doubled, and the number of BOP-confirmed COVID-19 cases among prisoners has tripled. About three dozen corrections staff have tested positive for the virus, a number that has also tripled since this case was filed.[2] Elkton now accounts for more than one third of all prisoner deaths from COVID-19 in federal prisons nationwide, and over half of the COVID-19 deaths in Columbiana County, making it one of the deadliest places a person can live

---

[1] Petitioners file this reply brief by leave of Court. Petitioners reserve the right to file, if necessary, a formal traverse to the allegations in the Return of Writ. *See* 28 U.S.C. § 2248. As with Respondents' Opposition, the page-limit restrictions of Loc. R. 7.1(f) appear not to apply here, but alternatively, Petitioners respectfully move to file *instanter* additional pages, to a total of 16, in light of the complex issues at hand. Noting the short timeline for this Reply, Petitioners also request leave to file without the statement of issues, and other formal requirements of that Rule.

[2] *Compare* Kaylyn Hlavaty, *Sixth Inmate at Elkton Federal Correctional Institution Dies From COVID-19*, News 5 Cleveland (April 16, 2020), https://www.news5cleveland.com/ news/continuing-coverage/coronavirus/6th-inmate-at-elkton-federal-correctional-institution-dies-from-covid-19, *with* ECF No. 1-3 (Novisky Decl.) ¶ 7.

1

in the current pandemic.³ According to one source, 32 prisoners have been hospitalized, including 16 requiring ventilators.⁴ Meanwhile, Respondents "have yet to come up with a good, sound criteria of how they are going to actually start the testing" of prisoners,⁵ much less a plan for social distancing, release, or transfer. Two weeks after the Attorney General exhorted Respondents to "immediately review" all prisoners with COVID-19 risk factors and "immediately transfer them" after quarantine, a mere six of the 2,400 prisoners at Elkton, or 0.25%, have been approved.

Elkton has become an epicenter of COVID-19, and continued confinement will mean a sentence of death, permanently damaged organs, or unnecessary suffering for more residents. Respondents' lack of effective action constitutes deliberate indifference to serious medical need. This Court is empowered to provide a process for the necessary releases—the only means by which prisoners' Eighth Amendment rights can be vindicated. The nature of that authority, under 28 U.S.C. § 2241 or alternatively 28 U.S.C. § 1331, is explained further in Section III below.

**ARGUMENT**

I. <u>Continued Incarceration at Elkton Prison in its Current State Is Unconstitutional</u>

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*,

---

³ Zack Budryk, *DOJ watchdog to inspect federal prisons after hundreds diagnosed with coronavirus*, THE HILL (April 15, 2020), https://thehill.com/policy/healthcare/493065-doj-watchdog-to-inspect-federal-prisons-after-hundreds-diagnosed-with; Ohio Department of Health, *COVID-19 Dashboard*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards.
⁴ Shane Hoover, *Inmates seek release from Elkton amid coronavirus pandemic*, CANTON REPOSITORY (April 17, 2020), https://www.cantonrep.com/news/20200417/inmates-seek-release-from-elkton-amid-coronavirus-pandemic. One week ago, the number of prisoners on ventilators—including some who have since passed away—was 14. Sam Allard, *The Latest out of Elkton Federal Prison, Where Horror Show Continues Apace*, CLEVELAND SCENE (April 10, 2020), https://www.clevescene.com/scene-and-heard/archives/2020/04/10/the-latest-out-of-elkton-federal-prison-where-horror-show-continues-apace.
⁵ Carolyn Sistrand, *Elkton Inmate Says More Could Be Done To Sanitize, Enforce Social Distancing*, WKBN (April 16, 2020), https://www.wkbn.com/news/coronavirus/elkton-inmate-says-more-could-be-done-to-sanitize-enforce-social-distancing (accessed April 17, 2020).

509 U.S. 25, 31 (1993). It is also undisputed that recklessly exposing a prisoner to a serious infection is unconstitutional. *Id.*; *Hutto v. Finney*, 437 U.S. 678, 682 (1978). Respondents' inaction at Elkton meets both the objective and subjective prongs of deliberate indifference.

For the objective standard, a prisoner must show he was "incarcerated under conditions posing a substantial risk of serious harm." *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 916 (6th Cir. 2016) (quotation omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Incredibly, with six dead, dozens seriously ill, and both numbers continuing to rise, Respondents dispute that this standard is met. Even in mild cases, COVID-19 brings fever, cough, pained breathing, and a host of other symptoms.[6] Approximately one out of every five patients require hospitalization.[7] Fluid builds up in the lungs, making it harder for oxygen to transfer to blood.[8] Patients in advanced stages cannot breathe. This condition can last for weeks; heart or kidneys may fail,[9] or the patient may slowly choke to death.[10] Even patients who live may never fully recover.[11]

Failure to provide toothpaste for 337 days has been held in the Sixth Circuit to violate the Eighth Amendment. *Flanory v. Bonn*, 604 F.3d 249, 255 (6th Cir. 2010). *See also Talal v. White*, 403 F.3d 423, 427 (6th Cir. 2005) (conditions causing "sinus problems and dizziness"); *Dominguez*

---

[6] Abby Tang & Emmanuel Ocbazghi, *What Coronavirus Symptoms Look Like, Day by Day*, BUSINESS INSIDER (Apr. 6, 2020), https://www.businessinsider.com/novel-coronavirus-covid-19-symptoms-day-by-day-2020-3.
[7] CENTERS FOR DISEASE CONTROL & PREVENTION, *Severe Outcomes Among Patients with Coronavirus Disease 2019*, at Table: Hospitalization, intensive care unit (ICU) admission and case-fatality percentages reported COVID-10 cases, by age group (March 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm#T1_down.
[8] CLEVELAND CLINIC, *Here's the Damage Coronavirus (COVID-19) Can Do to Your Lungs*, https://health.clevelandclinic.org/heres-the-damage-coronavirus-covid-19-can-do-to-your-lungs/ (accessed Apr. 18, 2020); Tang & Ocbazghi, *supra* note 6.
[9] Goldenson Decl. ¶ 10; *see also* Tang & Ocbazghi, *supra* note 4; Jean-Louis Vincent & Fabio Taccone, *Understanding Pathways to Death in Patients with COVID-19*, THE LANCET (Apr. 6, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30165-X/fulltext.
[10] *See* Tang & Ocbazghi, *supra* note 6.
[11] *How Are the Most Serious COVID-19 Cases Treated, and Does the Coronavirus Cause Lasting Damage?*, THE CONVERSATION (Mar. 29, 2020), https://theconversation.com/how-are-the-most-serious-covid-19-cases-treated-and-does-the-coronavirus-cause-lasting-damage-134398.

*v. Corr. Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (overheating after working out in hot conditions). Elkton prisoners, meanwhile, face "physical torture or a lingering death." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Petitioners need not show that they have the disease now, or even are certain to be infected—their well-documented risk is enough. *See, e.g.*, *Brown v. Bargery*, 207 F.3d 863, 867–68 (6th Cir. 2000); *McKinney,* 509 U.S. at 33; *Farmer*, 511 U.S. at 843–44.

The subjective element is met where prison officials were deliberately indifferent to a substantial risk of harm to the prisoner's health. *Thaddeus-X v. Blatter*, 175 F.3d 378, 402 (6th Cir. 1999) (en banc). Here, the undisputed state of affairs at Elkton—six dead and counting, with vital social distancing measures rendered impossible—speaks for itself. It is not enough for Respondents to say, as they do, that they are "trying, very hard to protect inmates against COVID-19." ECF No. 10 at 28. They also know that they are failing, and things continue to get worse.

"A prisoner is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014) (cleaned up). Custodians are still deliberately indifferent if they took some action, observed that it was failing, but refused to adjust. *See, e.g*, *Richmond v. Huq*, 885 F.3d 928, 944 (6th Cir. 2018) ("It is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs"); *Darrah v. Krisher*, 865 F.3d 361, 369 (6th Cir. 2017) ("continuing to treat him with Methotrexate after Darrah had been on the drug for several months without any noticeable improvement"); *Phillips v. Roane Cty.*, Tenn., 534 F.3d 531, 541 (6th Cir. 2008) (providing observation and limited care, but failing to provide "appropriate" medical care); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (putting prisoner into protective custody but failing to protect her from a risk that persisted even then).

At least one court has already observed that Respondents are failing at Elkton, but still they refuse to adapt. *See United States v. Rodriguez*, 2020 WL 1627331, Case No. 2:03-cr-0271, ECF No. 135 (E.D. Pa., April 1, 2020) ("The government's assurances that the BOP's 'extraordinary actions' can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease[.]"); *see also* Novisky Decl. ¶ 6 (continued spread shows that FBOP's actions "are not sufficient in strength nor impact to adequately protect its staff, its prisoners, or the public."); Goldenson Decl. ¶ 29 ("we can expect the death toll to mount rapidly" at Elkton).

As the Bureau of Prisons' own daily updates illustrate, Respondents are aware that continued custody at current levels is flatly incompatible with stemming the spread of COVID-19 at Elkton. Even as the Government urges that "public health officials are entitled to heightened deference when exercising science-based public health judgment during a public health emergency," Resp. at 25, it fails to implement that judgment. Public-health officials consistently urge that immediate and significant reduction of the population levels is the *only* effective response to prevent further illness and loss of life. Novisky Decl. ¶¶ 14, 17; Goldenson Decl. ¶ 33.[12]

While Respondents dispute *some* of the details from Petitioners' declarations[13]—how much soap a prisoner may obtain, for example—what they do not dispute speaks volumes.

---

[12] Respondents do not challenge the expertise of these public-health officials, and they do not point to any scientific or medical experts or other evidence suggesting their current regime is effective. Nor can they, as casualties continue to mount. Instead, they simply offer declarations from a health administrator and a case management coordinator who describe actions that they claim the prison has taken. These officials are not health experts, and do not—indeed, cannot—state that the current protocols are effective. See Goldenson Decl. ¶ 32 ("[L]eaving implementation in the hands of local officials alone, who lack the expertise and resources and were incapable of preventing the outbreak in the first place or treating those who eventually died, is insufficient.").

[13] There are numerous disputes about whether some of these steps have actually been implemented consistently, or even at all. Petitioners have established a right to the requested relief based on the petition and the facts undisputed by Respondents. To the extent that the Court believes it necessary to resolve other factual disputes, the Court may "summarily hear and determine the facts," 28 U.S.C. § 2243, including using testimony, depositions, affidavits, and documentary evidence. 28 U.S.C. §§ 2244-46. But even resolving factual disputes in favor of the Government—the opposite of the assumption to be applied at this early stage—continued confinement at Elkton is unconstitutional.

Critically, Respondents' declarant concedes that hundreds of prisoners are placed in a single housing unit, Cole Decl. ¶ 22, consistent with Petitioners' multiple declarations describing high-risk communal living. Respondents also concede that prisoners "live in units in proximity to other prisoners and less than a six foot distance between beds." Resp. at 21. Confining more than 100 people into a single area, with limited spacing, is precisely the sort of setting that accelerates the spread of COVID-19. Novisky Decl. ¶ 10 (shared sleeping and eating spaces, bathrooms, and showers, increase risks to Elkton's population "dramatically"); Goldenson Decl. ¶ 32 (under these conditions, the spread of COVID-19 will be "magnified" at Elkton, and "[t]he death rate will increase substantially before it starts to diminish"). It is thus undisputed that medically-indicated social distancing is not being, and cannot be, observed at Elkton.

Although prisoners are being "encouraged" to keep a six-foot distance, they are simultaneously denied conditions that make that possible. Novisky Decl. ¶ 10 ("With continued functioning of shared spaces for bathing, eating, and sleeping, quarantine and social distancing would be impossible to implement at Elkton."); Goldenson Decl. ¶ 32 ("Adequate social distancing would be impossible to maintain."). This itself is deliberate indifference. *Richmond*, 885 F.3d 944. And while Respondents claim to quarantine prisoners with certain COVID-19 symptoms, they fail to acknowledge that asymptomatic people can be carriers for days, spreading infection throughout their housing unit. Novisky Decl. ¶ 6 ("Given that asymptomatic people can still be contagious, it would be impossible for institutions to definitively identify those exposed."). Respondents ignore the expertise of health experts and instead urge the Court to let them continue trying failed methods, while more people fall ill and die. That is not what the Eighth Amendment requires.

II.     All Prisoners at Elkton Have an Interest in Avoiding the High Risk of Infection There

Faced with a death toll and an infection rate among the highest in the nation, Respondents nonetheless suggest that the prisoners are better off kept locked up at Elkton rather than being allowed to go somewhere—*anywhere*—else. To support this astonishing claim, Respondents conjecture that some prisoners might not engage in social distancing upon release, that some may not have anywhere to go, or that some might end up getting the disease anyway. They use this argument to question Petitioners' underlying Eighth Amendment claims, Resp. at 21–22; the value of Petitioners' requested relief, Resp. 33–34; and the bases for aggregate litigation, Resp. 35–37.

The risks that Respondents point to are wildly speculative, at best. They offer no evidence, and Petitioners' declarations directly refute them. In contrast to Respondents' hypotheticals, the evidence definitively shows that prisons are among the worst possible environments for spread of infection, *see, e.g.*, Novisky Decl. ¶¶ 4-5, 9-16; Goldenson Decl. ¶¶ 20-32, and Elkton is one of the very most dangerous even among those, *see supra* at 1 (accounting for over one third of federal prison deaths); ECF No. 10-3, Page ID #197 (Memorandum from Attorney General describing Elkton and two others as "Institutions Most Affected by COVID-19"). The proven reality is that people are growing ill, needing hospitalization, and dying every day at Elkton. Respondents observe that there are risks outside prison walls, too, as if to suggest that some people might prefer to be incarcerated at Elkton during the outbreak. The documented, extreme risks within Elkton outweigh the mere possibility of some risk—undoubtedly a lesser one—elsewhere.

Release would give prisoners the chance to follow medically-indicated rules on social distancing that Respondents are preventing them from following. Petitioners' evidence (and Respondents' concessions) make clear that prisoners at Elkton *cannot* practice social distancing confined in a unit with 150 other people, any of whom may be infectious. Outside of those conditions, a prisoner can isolate himself; even if he shares a living space with other people, that

7

is a far cry from 150 bunkmates. Inside the prison, meanwhile, the Government restrains each prisoner's liberty and thus "renders him unable to care for himself, and at the same time fails to provide for his basic human needs," such as "reasonable safety" from infection. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). That is why Respondents have an Eighth Amendment duty to get more prisoners out of Elkton. *See id.*

### III. This Court Has the Authority to Remedy Continued Detention in Violation of the Eighth Amendment

A. *Authority Under § 2241*

Federal prisoners "seeking to challenge the execution or manner in which" their sentences are served can bring such claims under 28 U.S.C. § 2241. *Terrell v. United States*, 564 F.3d 442, 447 (6th Cir. 2009). Respondents seize on the phrase "conditions of confinement," Resp. at 22–23, 26–28, but Petitioners are not asking to alter a specific aspect of their confinement—for example, more soap. Rather, they have demonstrated that continued confinement of at least some class members at Elkton is *itself* unconstitutional in light of COVID-19.[14] Whether thought of as a challenge to the place, manner, or execution of Elkton prisoners' sentences, that kind of claim is cognizable under § 2241. *E.g.*, *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991).[15]

Moreover, Petitioners seek a path to release for at least a subset of prisoners: in other words, "immediate release or a speedier release from that confinement—the heart of habeas corpus."

---

[14] As noted in the Petition, Petitioners use the term "release" to encompass a range of potential remedies that would remove them "from the physical confines of Elkton" but not necessarily from Respondents' custody. Petition ¶ 4, n. 2. That satisfies the "quantum change in the level of custody" properly brought under habeas, *see, e.g.*, *Terrell*, 564 F.3d at 448 (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring)), and here, under § 2241.

[15] With regard to proper jurisdiction and venue, meanwhile, "courts have uniformly held that . . . claims seeking to challenge the execution or manner in which the sentence is served shall be filed in the court having jurisdiction over the prisoner's custodian under 28 U.S.C. § 2241," whereas claims under § 2255 "shall be filed in the sentencing court." *Charles v. Chandler*, 180 F.3d 753, 755–56 (6th Cir. 1999). Relatedly, as some of Respondents' citations simply concern "habeas," Petitioners note that § 2241 is broader than and not necessarily restricted by interpretations of other habeas statutes. *Bailey v. Wainwright*, 951 F.3d 343, 347 (6th Cir. 2020)

8

*Preiser*, 411 U.S. at 498. That has long been the province of the Great Writ. *Hamama v. Adducci*, 912 F.3d 869, 875 (6th Cir. 2018) ("The traditional remedy provided by habeas is 'removing the injury of unjust and illegal confinement.'" (quoting 3 William Blackstone, Commentaries on the Laws of England 137 (1768)); *Armstrong v. Cardwell*, 457 F.2d 34, 36 (6th Cir. 1972) (noting that "habeas lies in 'exceptional circumstances,'" such "as when the petitioner's claims suggest that he has been victim of cruel and unusual punishment"); *Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir. 1944) ("A prisoner is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to which he is lawfully entitled even in his confinement, the deprivation of which serves to make his imprisonment more burdensome that the law allows[.]"). And more recent authority confirms that where a claim regarding conditions of confinement ultimately challenges the fact of that confinement itself, it is cognizable in habeas. *See Adams v. Bradshaw,* 644 F.3d 481, 483 (6th Cir. 2011); *Nelson v. Campbell*, 541 U.S. 637, 644–45 (2004).

Specifically, Petitioners seek a process to identify members of the Medically-Vulnerable Subclass, for whom their own health and the COVID-19 outbreak dictates that they should be able to serve their sentences at home or in another facility where there is not an objectively severe risk of serious illness or death. ECF No. 1 at ¶ 96 (Request for Relief); Novisky Decl. ¶ 17 (reduction is the "best line of defense to maintain the public health interests" of prisoners, staff, and community); Goldenson Decl. ¶¶ 21-25 (similar). Petitioners are thus properly "challenging the manner in which the sentence was being executed, rather than the validity of the sentence itself,"

9

under § 2241, in a way that calls into question the fact of their confinement, not merely its conditions. *See Jalili*, 925 F.2d at 893; *Capaldi v. Pontesso*, 135 F.3d 1122, 1123 (6th Cir. 1998).[16]

Respondents' cited authorities are not to the contrary. The Sixth Circuit's memorandum opinion in *Luedtke v. Berkebile*, 704 F.3d 465 (6th Cir. 2013), for example, simply concluded that three claims challenging labor conditions and inmate treatment inside the prison were not properly brought under § 2241, while concluding that a fourth claim challenging his exclusion from a financial-responsibility program *was* cognizable. *Id.* at 466. Petitioners' claims that the Eighth Amendment requires sufficient action to protect them from serious illness or death is, if anything, like the fourth of these claims. Moreover, unlike even this fourth claim, Petitioners seek a pathway to release for at least a subset of vulnerable members from their current manner of confinement.[17]

---

[16] Numerous district courts have concluded that habeas is the appropriate vehicle, and have granted immediate release to detainees to remedy constitutional violations caused by detention during current COVID-19 crisis. *E.g.*, *Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at *11 (E.D. Mich. Apr. 15, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *7 (E.D. Mich. Apr. 5, 2020); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *1 (S.D.N.Y. Mar. 26, 2020); *Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020); *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *8 (N.D. Cal. Apr. 12, 2020); *Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *8 (S.D.N.Y. Mar. 27, 2020); *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020); *Leandro R. P. v. Decker*, No. CV 20-3853 (KM), 2020 WL 1899791, at *9 (D.N.J. Apr. 17, 2020); *Barbecho v. Decker*, 2020 WL 1876328, at *1 (S.D.N.Y. Apr. 15, 2020); *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 1703844, at *9 (D. Mass. Apr. 8, 2020). Other courts have concluded that habeas is the appropriate vehicle to seek immediate detention, but exercised discretion not to grant immediate release for reasons not relevant to the present case, such as where COVID-19 was not present in a facility. *E.g.*, *Awshana v. Adducci*, No. 20-10699, 2020 WL 1808906, at *2 (E.D. Mich. Apr. 9, 2020) (seeking relief from detention due to COVID-10 "falls squarely within the prevue of section 2241"); *Albino-Martinez v. Adducci*, No. 2:20-CV-10893, 2020 WL 1872362, at *2 (E.D. Mich. Apr. 14, 2020) ("§ 2241 is the proper avenue for their claims,"); *Habibi v. Barr*, 2020 WL 1864642, at *2 (S.D. Cal. Apr. 14, 2020) ("[T]he Court does not find persuasive the Government's position that the Petition is an improper vehicle for Petitioner's claims."); *Ousman v. Decker*, 2020 WL 1847704, at *9 (D.N.J. Apr. 13, 2020); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020); Jones v. Wolf, No. 20-CV-361, 2020 WL 1643857, at *14 (W.D.N.Y. Apr. 2, 2020); *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *5 (N.D. Ill. Apr. 9, 2020). The Department of Justice's own manual also observes that prisoners properly challenge the execution of their sentences under § 2241 through, *inter alia*, "complaints about conditions of confinement." DEP'T OF JUSTICE, JUSTICE MANUAL, Federal Habeas Corpus, 9-37.000, https://www.justice.gov/jm/jm-9-37000-federal-habeas-corpus (accessed Apr. 17, 2020).

[17] *Martin v. Overton*, 391 F.3d 710 (6th Cir. 2004), which involved a "pro se petition for medical treatment," is even further afield. *See id.* at 711–12. This Court need not agree that such a request is cognizable under § 2241, because Petitioners are not seeking a particular treatment, but rather action to ensure release of at least a subset of prisoners.

10

Respondents assert that the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626, precludes this Court from granting relief. That is wrong. Section 3626 of the PLRA "does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]" *Id.* § 3626(g)(2); *see also Jones v. Bock*, 549 U.S. 199, 200 (2007). Petitioners have, of course, brought habeas claims under § 2241 that "challeng[e] the fact or duration of [their] confinement." *See id.* That a claim can also be brought outside of habeas does not mean that it cannot be brought *in* habeas. *Adams,* 644 F.3d at 482–83; *Terrell*, 564 F.3d at 448.

Furthermore, even if "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court" with regard to a vast state prison system under the PLRA, *see Brown v. Plata*, 563 U.S. 493, 500-01 (2011), that does not mean that habeas does not allow a District Court to require a warden to move at least some medically-vulnerable prisoners at one federal prison to less restrictive custody to safeguard their rights, *see Terrell*, 564 F.3d at 447; *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1863 (2017) (noting "[a] successful habeas petition would have required [federal] officials to place [a putative class] in less-restrictive conditions immediately" without noting any PLRA problem).[18]

B. *Alternative Authority Under § 1331*

Respondents spend much of their Response arguing, incorrectly, that Petitioners' claims are not cognizable under habeas. Habeas is but one of the routes that this Court has to grant appropriate relief. For example, Petitioners also have pointed 28 U.S.C. § 1331 as an alternate

---

[18] In support of this argument, Respondents cite *Money v. Pritzker*, —F. Supp. 3d—, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), but the breadth and posture of that case is starkly different from this one. The plaintiffs in that case were state prisoners from multiple prisons, suing in federal court on behalf of all Illinois prisoners to ask a federal judge to release at least a third of prisoners (12,000) across the entire Illinois prison system. 2020 WL 1820660, at *1. Here, the plaintiffs are federal prisoners from one prison that has become a COVID-19 hot-spot, suing in federal court—the only court available—to ask for steps to ensure targeted releases from that particular prison. Scope matters, as the *Money* court noted; after all, habeas petitions generally seek "release" from prison. *Id.* at *12.

11

basis of jurisdiction for this Court to address Respondents' ongoing Eighth Amendment violations. Petition ¶ 8, 81, 96. Section 1331 provides for federal district courts to have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." And just like the Eighth Amendment provides an implied damages remedy under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), *see Carlson v. Green*, 446 U.S. 14, 17 (1980), prisoners can seek injunctive relief under the Eighth Amendment and § 1331 directly. *See Abbasi*, 137 S. Ct. at 1862 (noting that plaintiffs were "challeng[ing] large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners" and that, "[t]o address those kinds of decisions, detainees may seek injunctive relief"); *see also Malam*, 2020 WL 1672662, at *4. Indeed, it has been settled law for 200 years that federal courts have authority to enjoin unconstitutional acts by federal (and state) officials. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91 (1949); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 619–21 (1912); *Ex parte Young*, 209 U.S. 123 (1908); *United States v. Lee*, 106 U.S. 196, 219 (1882); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat) 738 (1824). Federal courts have not shied away from using that authority for the protection of prisoners. *See Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974) ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.").[19]

---

[19] To the extent that the PLRA applies to this alternative route to relief, this Court has numerous options to proceed without convening a three-judge court. *See* 18 U.S.C. § 3626(g)(2) (requiring a three-judge court only in the context of a "prisoner release order"); *id.* § 3626(a)(1)–(2) (allowing for prospective and preliminary injunctive relief); *see also Money v. Pritzker*, —F. Supp. 3d—, 2020 WL 1820660, at *12 (N.D. Ill. Apr. 10, 2020) (indicating that the PLRA may not be implicated when release orders do not diminish "a prison population in any meaningful way"). Should the Court conclude that PLRA applies but release is the appropriate remedy, the Court may, in light of its prior order, "request the convening of a three-judge court to determine whether a prisoner release order should be entered." 18 U.S.C. § 3626(a)(3)(D).

IV.    A Categorical Release Process Is an Essential and Appropriate Measure

The Medically-Vulnerable Subclass within Elkton faces a looming threat of serious illness and death. Individuals with pre-existing heart disease, like Petitioners Bellamy and Nelson, "may suffer a heart attack or develop congestive heart failure," and considerably higher case fatality rates (CFR) as a result.[20] Where the overall CFR for COVID-19 ranges from 0.3–3.5%, *see* Goldenson Decl. ¶ 7, the death rate rises as high as 7–10% among those suffering from cardiovascular disease. *See id.* at ¶ 10.[21] Individuals over the age of fifty, or those with certain medical conditions, also face an elevated CFR. *Id.* at ¶ 8. Many with pre-existing health conditions will "suffer[] tremendously leading up to their deaths." Novisky Decl. at ¶ 8; *see supra* Section I.

Respondents' laborious approach to prisoner release is a self-evident failure. Elkton continues to maintain a perfect storm of factors aggravating the disease's spread: inability to practice social distancing, a concentration of immunocompromised or otherwise vulnerable people, and lack of basic sanitation. *See* Novisky Decl. at ¶ 8. By Respondents' own admission, a mere six of the 2,400 prisoners at Elkton are being prepared for release. Such a pace is manifestly insufficient to allow social distancing among those who remain inside Elkton, and so does little or nothing to remedy the threat facing the Medically-Vulnerable Subclass.

Moreover, as Respondents cannot dispute, releasing the Medically-Vulnerable Subclass would directly advance the public health. As public-health experts note, "[d]ue to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities." Goldenson Decl. ¶ 23. Elkton's outbreak

---

[20] Dara K. Lee Lewis, MD, *How Does Cardiovascular Disease Increase The Risk Of Severe Illness And Death From COVID-19?*, HARVARD HEALTH BLOG (April 2, 2020), https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401.
[21] *See also* Kevin J. Clerkin, MD et al., *COVID-19 and Cardiovascular Disease*, CIRCULATION (Mar. 21, 2020) https://www.ahajournals.org/doi/pdf/10.1161/ CIRCULATIONAHA.120.046941 (estimating a 10.5% death rate).

13

will not remain in Elkton, but will "worsen infection rates in the broader community." *Id.* at ¶ 32; *see also* Novisky Decl. ¶ 13 (similar). Releasing at-risk individuals to environments where they can practice social distancing will eliminate these sources and vectors of infection, thus reducing the danger that local ICUs will be overwhelmed. *See* Novisky Decl. ¶ 17; Goldenson Decl. ¶ 33; Petition ¶ 54 (collecting sources). Elkton's surrounding hospitals have fewer approximately 80 ICU beds to serve two counties, and statewide shortages of both ventilators and beds are anticipated. Petition ¶ 54. Similar considerations have led detention systems around the world to release or transfer thousands of prisoners. *See* Goldenson Decl. ¶ 27; *see also Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020) ("Petitioner's release will protect public health."); *Castillo v. Barr*, No. CV 20-00605 TJH, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020) (releasing a civil detainee "is absolutely in the public's best interest . . . in preventing the further spread of the coronavirus"); *Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020) (both petitioners and the public health and safety benefit from releasing immigration detainees).

Respondents cite only generalized risks to justify the continuation of their failed approach. They argue, primarily, that categorical release of prisoners presents a danger to public safety. Elkton is already a low-security facility, one specifically identified by the Attorney General as suitable for expanded and expedited transfers. *See* Petition ¶ 64 & n. 139, ¶ 68 & n. 146. In addition, 316 million Americans across 42 states—plus several more municipalities and territories—are under stay-at-home and travel restrictions.[22] Any prisoners released, even aside from home-confinement restrictions and security measures, would be subject to those same orders,

---

[22] Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (April 7, 2020), *available at* https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

14

in addition to severe sanctions for violating terms of home confinement, furlough, or other forms of release. And indeed, having watched fellow prisoners at Elkton grow sick and die of COVID-19, each prisoner is well aware that to refrain from social distancing is to endanger his own life.

Respondents' unspecific and speculative fears cannot outweigh the tangible and immediate threat to prisoners' lives—or for that matter, the threat to public health that will only be exacerbated if FCI Elkton continues to be a COVID-19 breeding ground. *See* Goldenson Decl. ¶¶ 23, 32–33; Novisky Decl. ¶ 17; *cf. Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020) (balance of equities favored release of detainees in light of COVID-19, in part because failure to appear already carries grave consequences and travel is restricted). Core constitutional protections—and the public health interest—should not be sacrificed for speculative gain. *See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (observing that "it is always in the public interest to prevent the violation of a party's constitutional rights" and noting that the burden on the state's interest was "unclear").

V. <u>Class-Wide Adjudication Is Appropriate and Necessary</u>

For similar reasons, proceeding on a class-wide basis, rather than via individual petitions, is appropriate. Time is of the essence. With regard to commonality, Fed. R. Civ. P. 23(a)(2), Petitioners' claims do "depend upon a common contention … of such a nature that it is capable of classwide resolution," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011): the question whether Respondents' failure adequately to protect prisoners at Elkton in violation of the Eighth Amendment is shared by all members the class. *Cf. Farmer*, 511 U.S. at 843–44 (prison officials cannot "escape liability for deliberate indifference" simply because they cannot "guess beforehand precisely who" might be harmed); *Greene*, 361 F.3d at 294 (similar). Further, under Fed. R. Civ. P. 23(a)(3), because Petitioners' claim "arises from the same . . . practice or course of conduct that

15

gives rise to the claims of other class members" and is "based on the same legal theory," Petitioners satisfy typicality. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (citation omitted). Last, contrary to Respondents' misguided assertions, Petitioners satisfy adequacy. Fed. R. Civ. P. 23(a)(4). They are "part of the class and possess the same interest and suffer the injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (quotation marks omitted); *see* Part II, *supra*. All prisoners in Elkton face a common harm, caused by Respondents' deliberate indifference, and all have a common interest in seeing that harm remedied.

Dated: April 18, 2020

Respectfully submitted,

/s/ David J. Carey

| | |
|---|---|
| David J. Carey (0088787) | David A. Singleton (0074556) |
| ACLU of Ohio Foundation | Mark A. Vander Laan (0013297) |
| 1108 City Park Avenue, Ste. 203 | Michael L. Zuckerman (0097194) |
| Columbus, OH 43206 | Ohio Justice & Policy Center |
| Phone: (614) 586-1972 | 915 East Ninth Street, Suite 601 |
| Fax: (614) 586-1974 | Cincinnati, OH 45202 |
| dcarey@acluohio.org | Phone: (513) 421-1108 |
| | mvanderlaan@ohiojpc.org |
| Joseph Mead (0091903) | dsingleton@ohiojpc.org |
| Freda J. Levenson (0045916) | mzuckerman@ohiojpc.org |
| ACLU of Ohio Foundation | |
| 4506 Chester Avenue | |
| Cleveland, OH 44102 | |
| Phone: (614) 586-1972 | |
| Fax: (614) 586-1974 | |
| attyjmead@gmail.com | |
| flevenson@acluohio.org | |

*Counsel for Petitioners*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2020, the foregoing was filed with the Court's CM/ECF system. Notice of this filing will be sent by operation of that system to all counsel of record.

/s/ David J. Carey
David J. Carey (0088787)