UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. 01-cv-01351-JST <br><br> **ORDER DENYING PLAINTIFFS' EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19** <br><br> Re: ECF No. 3266 |

Plaintiffs in this case are the inmates of the California state prison system. They now ask the Court to order the California Department of Corrections and Rehabilitation ("CDCR") to "develop a plan to manage and prevent the further spread of COVID-19 in California state prisons" that includes "reduc[ing] population levels to safe and sustainable levels in light of the COVID-19 pandemic." ECF No. 3266 at 1–2. The State responds that it already has such a plan—one that includes the release of thousands of inmates to reduce the prison population, the cessation of visitation and intake of new prisoners, sharp reductions in inmate transfers to avoid the spread of contagion, detailed protocols for managing symptomatic inmates and staff, increased disinfection efforts, and adjustments to housing and prisoner activities to increase physical distancing. Further, the State asserts that it continues to consider additional measures and to adjust its response to the pandemic based on evolving conditions.

This Court can only order relief if it first finds the violation of a federal right. That, in turn, requires the Court to find that Defendants have been deliberately indifferent to a substantial risk of serious harm to inmate health or safety.[1] The COVID-19 pandemic is "unprecedented,"

---

[1] Defendants are various California state officials, including Governor Gavin Newsom and CDCR Secretary Ralph Diaz.

GOVERNMENT EXHIBIT E

*Coleman v. Newsom*, ___ F. Supp. 3d ___, 2020 WL 1675775, at *1 (E.D. Cal./N.D. Cal. Apr. 4, 2020), and no one questions that it poses a substantial risk of serious harm to Plaintiffs. But given the numerous and significant measures the State of California has taken and continues to take in response to COVID-19, the Court cannot conclude that State officials have been deliberately indifferent. Accordingly, the Court will deny Plaintiffs' motion.

I. **BACKGROUND**

This is not Plaintiffs' first motion requesting emergency relief based on the COVID-19 pandemic. On March 25, 2020, they filed a motion seeking such relief before the three-judge court convened in this case and *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB (E.D. Cal.) ("Three-Judge Court"). ECF No. 3219. To understand the relationship between that proceeding and this one, a brief summary of these related cases is in order.

Plaintiffs filed this *Plata* case in 2001, alleging that Defendants were failing to provide constitutionally adequate medical care. "[T]he State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights . . . . [and] stipulated to a remedial injunction," *Brown v. Plata*, 563 U.S. 493, 507 (2011), which this Court has been enforcing since that time. The *Coleman* case was filed in 1990 and concerns the State's failure to provide constitutionally adequate mental health care to "the class of seriously mentally ill persons in California prisons." *Id.* at 506. Both courts "entered numerous remedial orders, including appointing a Special Master to oversee remedial efforts in *Coleman* and a Receiver to take control of [CDCR's] medical care delivery system."[2] *Coleman*, 2020 WL 1675775, at *2.

These measures proved insufficient to remedy the constitutional deficiencies at issue in either case, and, in 2007, the individual *Plata* and *Coleman* courts "concluded that, absent a reduction in the state prison population—which was then almost double the prison system's design capacity—Defendants would never be able to deliver constitutionally adequate medical and mental health care." *Id.* Because only a three-judge court convened pursuant to 28 U.S.C. § 2284

---

[2] The Receiver possesses "all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system." ECF No. 473 at 4.

2

has "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment," *Plata*, 563 U.S. at 500; 18 U.S.C. § 3626(a)(3)(B), "the *Plata* and *Coleman* courts granted Plaintiffs' separate motions to convene a three-judge court to consider the issue. The Chief Judge of the United States Court of Appeals for the Ninth Circuit appointed [the Three-Judge Court] in both cases to determine whether a release order was appropriate." *Coleman*, 2020 WL 1675775, at *2.

In 2009, after holding a 14-day trial, the Three-Judge Court "ordered Defendants to reduce California's prison population to 137.5% design capacity within two years." *Id.* (citing *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 970 (E.D. Cal./N.D. Cal. 2009)). After the Supreme Court affirmed that order, *Plata*, 563 U.S. 493, the Three-Judge Court ordered Defendants to comply with the systemwide population cap by June 2013. ECF No. 2374. It subsequently extended the deadline to December 2013 and then February 2016. ECF Nos. 2527, 2766. Defendants first came into compliance in February 2015, ECF No. 2838 at 2, and have remained in compliance ever since.

Plaintiffs' recent motion before the Three-Judge Court sought "an order modifying the 2009 population cap and requiring the State to reduce the population in crowded congregate living spaces to a level that will permit social distancing and protect the medically vulnerable by releasing or relocating class members who are at especially high risk of severe illness from COVID-19." ECF No. 3219 at 40. On April 4, 2020, the Three-Judge Court denied Plaintiffs' motion. *Coleman*, 2020 WL 1675775, at *8. The court agreed with Plaintiffs "that the Eighth Amendment requires Defendants to take adequate steps to curb the spread of disease within the prison system." *Id.* at *5. But the court determined that "the impetus for the release order Plaintiffs seek is different from the overarching structural violations underlying the 2009 population reduction order. The specific harm Plaintiffs allege is not caused by constitutional shortcomings in Defendants' ability to provide medical and mental health services." *Id.* Instead:

> While the threat posed by COVID-19 is undoubtedly medical, the particular risks the disease poses to prisoners are primarily a function of the contagiousness of the virus and the nature of incarceration. . . .

3

> [T]o the extent Plaintiffs can establish a constitutional violation based on the threat posed by COVID-19, it must be based on shortcomings in Defendants' response to the virus, not on the longstanding systemic constitutional deficiencies in California's prison health care delivery system.

*Id.* at *5–6. The court determined that its original population reduction order "was never designed to address" the alleged deficiencies in Defendants' response to COVID-19, and that Plaintiffs' request for relief therefore fell "outside the scope of [the court's] equitable modification authority." *Id.* at *7. The court invited Plaintiffs to "go before a single judge to press their claim that Defendants' response to the COVID-19 pandemic is constitutionally inadequate," and explained that:

> If a single-judge court finds a constitutional violation, it may order Defendants to take steps short of release necessary to remedy that violation. And if that less intrusive relief proves inadequate, Plaintiffs may request, or the district may order sua sponte, the convening of a three-judge court to determine whether a release order is appropriate.

*Id.* (citing 18 U.S.C. § 3626(a)(3)). The Three-Judge Court made no determinations on the merits of Plaintiffs' request for relief.

This Court held a case management conference on April 6, 2020, to discuss Defendants' response to COVID-19. ECF No. 3263. At the conference, the Court asked Plaintiffs to identify the information they would need to monitor and respond to Defendants' COVID-19 response. The Court ordered Defendants to provide that information, which Defendants did two days later, and the Court held another case management conference on April 10, 2020. ECF No. 3271. Meanwhile, on April 8, 2020, Plaintiffs filed the motion currently before the Court. ECF No. 3266. They request "an order directing Defendants and [the] Receiver to develop a plan to manage and prevent the further spread of COVID-19 in California state prisons," including "an order from this Court to reduce population levels to safe and sustainable levels in light of the COVID-19 pandemic." *Id.* at 1–2.

## II. DISCUSSION

### A. Whether Plaintiffs Have Demonstrated an Eighth Amendment Violation

The Prison Litigation Reform Act ("PLRA") allows prospective relief only if it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or

4

1 plaintiffs." 18 U.S.C. § 3626(a)(1)(A). Plaintiffs contend that Defendants' response to the threat posed by COVID-19 violates the Eighth Amendment. ECF No. 3266 at 3–5. Because that question is predicate to the consideration of Plaintiffs' request for relief, the Court begins by answering it.

To establish an Eighth Amendment violation "based on a failure to prevent harm, the inmate must [first] show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Court need not analyze this issue in detail because Defendants have already stated before the Three-Judge Court that they "do not dispute the risk of harm that COVID-19 poses to inmates, as well as the community at large. Nor do Defendants dispute that those who are incarcerated may be at a higher risk for contracting COVID-19 given the circumstances of incarceration, including closer living quarters." ECF No. 3235 at 17. Defendants do not attempt to relitigate the issue here, and the Court finds that this element has been established.

The Court therefore turns to the second prong of the Eighth Amendment analysis: whether Plaintiffs have demonstrated that Defendants "have a 'sufficiently culpable state of mind,'" which in this case requires "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 302–03 (1991)). Under this standard, a prison official must "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* at 847. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety," and "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 844–45 (internal quotation marks and citations omitted). There is no Eighth Amendment violation, for example, where prison officials "did not know of the underlying facts indicating a sufficiently substantial danger . . . were therefore unaware of a danger," or where "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844. Likewise, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* In determining whether officials have been

deliberately indifferent, courts must give "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" *id.* at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)), and "consider arguments regarding the realities of prison administration," *Helling v. McKinney*, 509 U.S. 25, 37 (1993).

The Three-Judge Court previously described some of the efforts Defendants had taken at the time that court was considering Plaintiffs' motion:

> Although the current record is unclear as to when Defendants began planning a response to COVID-19, they started implementing preventive measures at least as of March 11, 2020, when normal visiting at CDCR institutions was canceled statewide, fact sheets and posters on the pandemic were delivered to the inmate population, and additional hand-sanitizing dispenser stations were ordered. CDCR has activated "a centrally-located command center where CDCR and CCHCS [California Correctional Health Care Services] experts monitor information, prepare for known and unknown events, and exchange information centrally in order to make decisions and provide guidance quickly." The center's "goal is to implement measures and strategies to protect inmates and staff during the COVID-19 pandemic and to enhance social distancing and housing options during this time."
>
> On March 24, 2020, California Governor Gavin Newsom issued an executive order directing CDCR to suspend admission of inmates to state custody for 30 days, with the possibility that the suspension would be extended for an additional 30 days. On March 30, 2020, CDCR Secretary Ralph Diaz announced that release would be accelerated for inmates who have less than sixty days remaining on their sentence, are not serving a term of incarceration for a violent felony or a domestic violence offense, and are not required to register as a sex offender. These last two measures are expected to result in an approximately 6,500-person reduction in the prison population over the coming weeks.[FN8]
>
> [FN8: Defendants have also taken additional steps to combat COVID-19, including but not limited to transferring approximately 500 inmates out of dorm housing, suspending transfers between facilities, and conducting temperature checks and symptom screenings of all individuals entering the prisons.]

*Coleman*, 2020 WL 1675775, at *3–4 (citations omitted).

Since that time, Defendants have taken further steps to manage the virus's spread.[3] For

---

[3] Defendants also continue to revise treatment protocols. For example, on April 3, 2020, CCHCS issued Version 2.0 of its comprehensive "COVID-19: Interim Guidance for Health Care and Public Health Providers," a 68-page document designed "to provide INTERIM guidance for the clinical management of [the] SARS-CoCV-2 virus pandemic at CDCR facilities." ECF No. 3274-6 at 6. The document recognizes that "information may change rapidly" due to "quickly

example, the California Prison Industry Authority "has begun producing hand sanitizer for use by both staff and the incarcerated population, both [with] alcohol and alcohol-free." ECF No. 3275 ¶ 4(h) (Gipson Decl.). It is now also "producing about 22,000 [cloth] barrier masks per day, and has begun distributing the masks to the institutions for both staff and inmate use." *Id.* Defendants have provided additional education to staff and inmates; have "sharply reduced [inmate transfers] to only allow essential movement in and out of the institutions"; and "have placed markings on the floor in communal areas marking six feet between each space . . . [to] serve as prompts and reminders for inmates to maintain physical distance from others as they wait for services," such as using kiosks or telephones or waiting for medication. *Id.* ¶¶ 4(c), (d), (g); ECF No. 3275-3. Beginning on April 8, 2020, Defendants put into place a 14-day modified program that restricts movement, including by "not mix[ing] inmates from one housing unit with another housing unit"; increases physical distancing, including by requiring "[c]ell feeding or [feeding of] one housing unit at a time" and restricting the number of inmates allowed in dayrooms at any one time; and increases sanitation by requiring disinfection of tables used for meals, showers, and telephones between each use. ECF No. 3575-2.

Further, approximately 800 additional inmates—for a total of 1,300—have been moved out of dormitory housing "to available space in other prison[s] to create more space and to allow greater physical distancing in the dorms." ECF No. 3275 ¶¶ 5–7. Plaintiffs criticize Defendants' failure to transfer more inmates out of dormitory housing, particularly at the California Institution for Men ("CIM"), where the largest number of inmates have tested positive for COVID-19, including 22 in a single dormitory.[4] ECF No. 3284 at 9. But Plaintiffs do not explain why it would be unreasonable for Defendants to attempt to contain the spread of disease by *not* transferring inmates who may have already been exposed to the virus. That a large percentage of confirmed cases are in a single housing unit is actually some evidence that Defendants'

---

changing guidelines from the Centers for Disease Control (CDC), the World Health Organization (WHO), and other scientific bodies," and states that "[s]ubstantive changes will be posted to the website if occurring before release of updated versions." *Id.*

[4] At oral argument, Defendants represented that some inmates have now been moved out of dormitory housing and into the gymnasium at CIM.

7

containment policies are having their intended effect.

Since March 11, 2020, Defendants have reduced the population by 3,973 inmates. ECF No. 3213 at 2 (114,318 inmates as of March 11, 2020); CDCR, *Weekly Report of Population* (Apr. 15, 2020), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/04/Tpop1d200415.pdf (110,345 inmates as of April 15, 2020). This number reflects the completion of the early release of 3,500 inmates with 60 days or fewer remaining on their sentences as of March 30, 2020. ECF No. 3274 ¶ 7 (Diaz Decl.). The CDCR Secretary also intends to extend the suspension of intake for another 30 days. *Id.* ¶ 6. "In a typical month, CDCR accepts approximately 3,000 new inmates from county jails or other jurisdictions," *id.* ¶ 5, so the suspension of intake for 60 days is expected to result in approximately 6,000 inmates not entering the prison system.[5] These population reductions are not insignificant, and they will allow increased physical distancing among inmates who remain in the institutions.

The question is whether Plaintiffs have demonstrated that Defendants' response to the COVID-19 epidemic is unreasonable. Plaintiffs do not contend that Defendants' response has been entirely inadequate. For example, they acknowledged in their portion of the April 10, 2020 joint case management statement that "CCHCS' clinical and public health guidance, including regarding testing, treatment, and public health measures to slow the spread of coronavirus, are largely consistent with national Centers for Disease Control and Prevention (CDC) and California Department of Public Health guidelines." ECF No. 3269 at 2. Plaintiffs do, however, criticize "Defendants' management plan" as having "a gaping and obvious hole: the lack of a plan to facilitate physical distancing." ECF No. 3284 at 7.

While the Court might adopt additional distancing measures if it were solely responsible for prison health care, the Court cannot conclude that Defendants' actions are constitutionally deficient. As discussed above, Defendants have implemented several measures to promote increased physical distancing, including reducing the population, transferring inmates out of

---

[5] As the CDCR Secretary correctly observes, in addition to reducing population density, suspending intake also helps prevent the spread of disease by "eliminat[ing] one of the paths for the introduction of the virus." ECF No. 3274 ¶ 5.

8

dormitory housing to less crowded spaces, restricting movement, eliminating mixing of inmates from different housing units, and placing six-foot markers in communal areas. Plaintiffs believe that these measures are inadequate, but their motion is notably silent regarding the amount of physical distancing they believe is required before Defendants' response could be considered reasonable. For example, they criticize Defendants for failing "to ensure that at least those people most at risk of serious complications from COVID-19 are safely housed." *Id.* at 8. But their motion does not propose a constitutional standard for "safe" housing.

At oral argument before the Three-Judge Court, Plaintiffs asserted that the Eighth Amendment requires six-foot physical distancing. ECF No. 3265 at 19 (Apr. 2, 2020 hr'g tr.). Similarly, Plaintiffs have presented supplemental authority to this Court in which another district court asked whether Riverside County had the "ability to maintain 6 feet distance between all prisoners in the jail, at all times" and subsequently ordered the county "to submit a plan to the Court to implement the Governor's order for physical distancing for all Californians housed in the jails." ECF No. 3286 at 7–8 (Plaintiffs' notice of supplemental authority, attaching *Gray v. County of Riverside*, No. 5:13-cv-0444-VAP-OPx (C.D. Cal.), ECF No. 191, Apr. 14, 2020 Minute Order). But it is not clear whether the *Gray* court intends for the county to produce a plan that requires six-foot distancing for all inmates at all times.

In any event, Plaintiffs do not seek that relief here, and there is no basis in the record to conclude that planning for anything less than six-foot distancing between all prisoners (and staff) at all times constitutes deliberate indifference. Such a requirement would likely require changes not just in dormitory housing but also, for example, in any cells housing more than one inmate— an area in which Plaintiffs have never asked for relief. It might prove impossible to implement given the need for inmate-staff interactions and in light of security concerns. Perhaps most significantly, although CDC guidance notes that social distancing strategies would "ideally" provide "6 feet between all individuals," the same guidance recognizes that "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff. *Not all strategies will be feasible in all facilities.*" ECF No. 3277-1 at 12 (emphasis added). As another district court recently concluded:

9

> It is less clear . . . that the Sheriff's existing housing arrangements for admitted detainees may be considered objectively unreasonable. In this regard, the CDC's guidance is not as definitive as plaintiffs suggest; it acknowledges that space limitations may require a departure from better social-distancing practices. Though the existing situation likely increases the risk to detainees, the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail. Space constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large. The Court concludes that plaintiffs have [failed] to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing. This is particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees.

*Mays v. Dart*, ___ F. Supp. 3d ___, 2020 WL 1812381, at *10 (N.D. Ill. Apr. 9, 2020).

On April 10, 2020, the Receiver issued "Guidelines for Achieving and Maintaining Social Distancing in California Prisons," in which he set forth his views based on "the developing scientific and medical consensus regarding social distancing in correctional settings." ECF No. 3283-7 at 2. In addition to requiring that inter-institution transfers be approved by the "Health Care Placement Oversight Program (HCPOP) in consultation with the CCHCS public health team" because such transfers "risk carrying the virus from one institution to another," the Receiver explained the amount of physical distancing that he believes is required:

> Necessary social distancing is already being achieved in both single- and double-celled units. In double cells, cell mates constitute one another's "social distancing cohort" for correctional purposes and are analogous to a family unit in the free world. With respect to housing in dorm settings, the Receiver has determined that necessary social distancing can be achieved by creating 8-person housing cohorts. Each cohort is to be separated from the others by a distance of at least six feet in all directions.

*Id.*[6] The CDCR Secretary "intend[s] to comply with [the Receiver's] directive" and has "already been collaborating with the Receiver on how to implement this plan." ECF No. 3274 ¶ 20. As of April 13, 2020, "nineteen potential sites [for alternative housing within CDCR institutions] have

---

[6] The Receiver issued a supplemental memo on April 12, 2020, clarifying that his April 10 directive was not intended "to affect any inter-institution transfers that are to address either medical, mental health, or dental treatment needs that are not available at the sending institution, such as to provide a higher level of care or to reduce or prevent morbidity or mortality, or a safety or security issue that cannot be managed by the sending institution." ECF No. 3283-8 at 2.

10

been identified and about 600 cots have already been procured. To date, the State Fire Marshal has approved occupancy for twelve gymnasiums and two visiting rooms located at" a number of prisons. ECF No. 3275 ¶ 4(f).

Plaintiffs do not argue that housing in compliance with the Receiver's directive would be constitutionally inadequate. In fact, at oral argument, Plaintiffs acknowledged that "the Receiver's directive could well be the key to Defendants' plan . . . if it is properly executed." Apr. 16, 2020 Hr'g Tr. at ___. Defendants responded with an unqualified commitment to implementing the Receiver's directive and explained that they have already moved some individuals from dormitory housing into gymnasiums to increase physical distancing in the dorms. Plaintiffs correctly observe that Defendants have yet to inform the Court of when they expect to achieve full compliance. But the Receiver's directive was issued only one week ago, and it is not unreasonable for Defendants still to be in the process of implementation. Determining how to decrease population density to allow for increased physical distancing, while at the same time considering how to conduct movement in a way that "does not cause, contribute to or exacerbate the potential spread of the disease," ECF No. 3283-7 at 2–3, is not a simple matter.

The court in *Gray*, on which Plaintiffs rely, faced a very different set of circumstances than the one presented here. The County of Riverside "did not have information regarding conditions in [its] existing county jail facilities." ECF No. 3286 at 6. The county "conceded that it ha[d] not conducted an analysis of its own records to identify particularly vulnerable prisoners." *Id.* It lacked even basic information regarding "the size of cells and dormitories, and the number of prisoners per room." *Id.* at 7. "It also ha[d] not conducted an analysis of its jail population to determine whether there [were] any low-level offenders who might be eligible for early release." *Id.* at 6. On this record, the *Gray* court concluded that the county had "failed to demonstrate that it is currently taking adequate precautions to protect the health of the prisoners in the county jails." *Id.* at 8. Accordingly, the court ordered the county "to submit a plan to the Court to implement the Governor's order for physical distancing for all Californians housed in the jails." *Id*.

The case now before the Court is not *Gray*. Unlike the defendant there, Defendants here have produced a comprehensive, manipulable spreadsheet containing detailed information on over

11

1 50,000 inmates "(1) who have medical classifications as High Risk 1, High Risk 2, or Pregnant,
2 (2) . . . who are currently assigned to the Mental Health Delivery System and or (3) who have been
3 admitted to the Mental Health Delivery System in the past year." ECF No. 3284-5 ¶¶ 6, 10
4 (Austin Reply Decl.).[7] And, as discussed above, the State has already released 3,500 inmates prior
5 to their scheduled release dates. More significantly, the *Gray* court observed that none of the steps
6 in "the County's recitation of 'aggressive and swift' measures it has taken in response to
7 COVID-19 . . . concern[s] jails." ECF No. 3286 at 8. Those facts are a far cry from the list of
8 measures Defendants have specifically taken to address both the potential spread and treatment of
9 COVID-19 in California's prisons.

10 This Court would likely find an Eighth Amendment violation if, as in *Gray*, Defendants
11 had taken no steps to encourage physical distancing in California's prisons or otherwise respond to
12 COVID-19. But Defendants have already relocated inmates within and, in some cases, between
13 facilities to increase space, and they have committed to implementing the amount of physical
14 distancing that the Receiver has directed. Defendants have also taken steps to reduce the prison
15 population and implemented a number of policies and practices that comply with the CDC's
16 recommendations. It would be difficult to conclude that such responses are not "reasonable
17 measures to abate" the risk of COVID-19. *Farmer*, 511 U.S. at 847.

18 In their reply, Plaintiffs identify alternative housing placements that Defendants might
19 consider, as well as several other measures Defendants might take to reduce the prison population
20 to allow for greater physical distancing.[8] ECF No. 3284 at 10–16. As to the former suggestions,
21 the Court agrees that Defendants have not exhausted the list of potential space outside of existing

---

[7] Notably, Defendants produced this information voluntarily in response to Plaintiffs' request as part of the case management process, and they did so in less than 48 hours.

[8] Much of Plaintiffs' voluminous reply evidence could have been submitted with their moving papers or, in any event, at some point before Defendants' opposition was due. The Court would ordinarily either strike such evidence or allow Defendants an opportunity to respond. *See, e.g., Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief."). Because the Court's consideration of the evidence has not prejudiced Defendants, however, the Court takes no further action.

12

CDCR institutions that they might use to house inmates. The Court suggested one such alternative at the April 10, 2020 case management conference: the private prison facilities that Defendants previously used to house inmates when doing so was necessary to comply with the Three-Judge Court's systemwide population cap. The CDCR Secretary states that he is "not currently considering transferring inmates to private prisons," ECF No. 3274 ¶ 23, but a different person in his position might well consider that to be a reasonable measure to increase physical distancing in prisons. However, the Court cannot conclude on the record before it that the use of such facilities is required to avoid a finding of deliberate indifference, particularly when Plaintiffs have provided no standard by which to determine how much physical distance is required "to ensure reasonable safety." *Farmer*, 511 U.S. at 844 (internal quotation marks and citation omitted).

As to Plaintiffs' other suggestions to reduce the prison population, Defendants need not consider all of the early release or furlough measures being adopted in other jurisdictions to avoid a finding of deliberate indifference. The record contains no information concerning how the numbers of inmates being released in other jurisdictions compare to those being released in California, nor any evidence of comparative housing density. Additionally, that other jurisdictions are using different criteria to release inmates, or that Plaintiffs' experts propose releasing additional inmates based on what they believe can be safely done within California, does not mean that such releases are required to comply with the Eighth Amendment.[9] As was true before the Three-Judge Court, Plaintiffs' motion before this Court has specified neither a number of inmates whom they contend must be released nor a population density that they believe would be constitutionally acceptable. No one questions the magnitude of the challenge that COVID-19 presents in a prison setting, and if the Court were in the Governor's or the Secretary's position, it might adopt additional or different measures. But the question before the Court is not what it thinks is the best possible solution. Rather, the question is whether Defendants' actions to date are

---

[9] Plaintiffs also do not appear to have considered questions surrounding the potential impact on public health if inmates who might have been exposed to the virus while incarcerated are released without any testing or quarantine measures in place, or whether such measures are feasible. Nor do Plaintiffs appear to have considered whether individuals whom they contend should be released would have at least the same access to health care services that they do in prison.

13

reasonable. On the record before the Court, the answer to that question is yes.

No bright line divides a reasonable response from one that is deliberately indifferent in violation of the Eighth Amendment. In this case, however, the Court concludes without difficulty that Defendants' response has been reasonable. Plaintiffs identify other steps Defendants might take to provide for greater physical distancing, but they cite no authority for the proposition that Defendants' failure to consider or adopt these potential alternatives constitutes deliberate indifference within the meaning of the Eighth Amendment. As another court, considering a similar request for relief in the Illinois prison system, wrote last week:

> Clearly Defendants are trying, very hard, to protect inmates against the virus and to treat those who have contracted it. The record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate "total unconcern" for the inmates' welfare. . . . [Defendants' plan] may not be the plan that Plaintiffs think best; it may not even be the plan that the Court would choose, if it were sufficiently informed to offer an opinion on the subject. But the Eighth Amendment does not afford litigants and courts an avenue for *de novo* review of the decisions of prison officials, and the actions of Defendants here in the face of the COVID-19 outbreak easily pass constitutional muster.

*Money v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020) (citation omitted).

Similarly here, the Court finds that Plaintiffs have not demonstrated that Defendants' actions have been so deficient as to constitute a violation of the Eighth Amendment. Because Plaintiffs have failed to establish the violation of a federal right, the Court cannot issue any orders that are narrowly drawn to correct such a violation. *See* 18 U.S.C. § 3626(a)(1)(A) ("The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."). Plaintiffs' motion will therefore be denied.

This holding does not mean that the Court will cease its efforts to oversee Defendants' response to COVID-19. The pandemic presents an ongoing public health emergency, and the virus's presence within the prisons requires continuous, evolving efforts by Defendants, as well as

14

ongoing monitoring by the Court. The Court convened a case management conference immediately following the Three-Judge Court's ruling, and it will continue both to monitor Defendants' progress in responding to COVID-19 and to ensure Plaintiffs' counsel's ability to represent their clients. As an example, while the Court does not now find that Defendants have been deliberately indifferent because they have failed to implement the Receiver's directive regarding eight-person cohorts in the dorms, this does not preclude a finding of deliberate indifference at a later time. *See*, *e.g.*, *Plata v. Brown*, ___ F. Supp. 3d ___, 2013 WL 12436093, at *13 (N.D. Cal. June 24, 2013) ("Perhaps at one point, Defendants' wait-and-see approach might have been reasonable. Under current conditions, however, [it is] not."). And with regard not only to physical distancing, but to the medical response to COVID-19 generally, Defendants unquestionably have the power to take additional actions, and this Court strongly encourages them to do so.

### B. Whether the Requested Relief Is a "Prisoner Release Order"

Portions of Plaintiffs' requested relief must be denied for an additional reason: This Court lacks the authority to order it. Plaintiffs "seek an order from this Court *to reduce population levels* to safe and sustainable levels in light of the COVID-19 pandemic." ECF No. 3266 at 2 (emphasis added). Their proposed order includes some steps short of a population reduction—for example, "[i]dentification of those incarcerated people who are at the highest risk for severe complications from the virus"—but it also includes clear requests for "releasing" inmates and "to downsize the population in state prisons to the lowest number possible consistent with public safety at each prison by release or transfer to a safe alternative." ECF No. 3266-4 at 1–2.

To the extent Plaintiffs seek an order requiring inmate releases or an order requiring transfer of inmates to non-CDCR facilities, this Court lacks authority to grant that relief. A "prisoner release order" may be issued only by a three-judge court. 18 U.S.C. § 3626(a)(3)(B). This restriction applies not only to an order "that directs the release from or nonadmission of prisoners to a prison," but also to "any order . . . that has the purpose or effect of reducing or limiting the prison population." 18 U.S.C. § 3262(g)(4). The Supreme Court has held that orders requiring transfers to out-of-state or county facilities fall within this second category of prisoner

15

release order. *Plata*, 563 U.S. at 527.

Plaintiffs attempt to rely on Judge Henderson's 2013 order regarding inmates with Valley Fever as establishing, as law of the case, "that an order to transfer a group of people out of a prison where they were at undue risk of serious harm [is] not a 'prisoner release order' under the [PLRA]." ECF No. 3266 at 11. However, that order considered only "transfers of inmates between prisons"; neither releases nor transfers to any facility other than an existing CDCR institution were at issue. *Plata*, 2013 WL 12436093, at *10. Judge Henderson concluded that a single-judge court had the authority to enter an order requiring transfer of inmates between CDCR facilities when such transfer was not required to correct the violation of a constitutional right caused by crowding. *Id.* at *9-10. This case presents different questions on both fronts: Plaintiffs request an order requiring release or transfer to non-CDCR facilities, and they do so because they believe population density must be reduced to alleviate crowding in dormitory housing. Thus, Judge Henderson's Valley Fever order is neither controlling nor persuasive on the jurisdictional question here. *See Money*, 2020 WL 1820660, at *12 n.11 (drawing a distinction between "orders entered [by single-judge courts] not infrequently in cases involving inmate medical problems that may require hospitalization" and orders intended to relieve crowding).

Nor is *Reaves v. Department of Correction*, 404 F. Supp. 3d 520 (D. Mass. 2019) ("*Reaves II*"), cited by Plaintiffs on reply, persuasive. ECF No. 3284 at 6–7. In that case, the district court ordered that an individual inmate be transferred to a non-correctional facility so that he could receive necessary medical treatment for his spinal cord injuries. *Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 210 (D. Mass. 2019). The court subsequently concluded that its order was not a prisoner release order, in part because it "did not release Mr. Reaves from incarceration, it transferred him." *Reaves II*, 404 F. Supp. 3d at 522. But crowding was not a factor in that case, as it is here. In addition, whether an inmate remains in Defendants' custody is not dispositive:

> [T]he PLRA does not focus on custodial status under state law, nor does it say anything about whether the reduction of population is temporary or permanent. The question is not whether Plaintiffs would remain in custody under state law. The question is whether the requested relief would have the "purpose" or the "effect" of "reducing or limiting the prison population," or whether it would "direct[ ] the release from * * * a prison."

16

*Money*, 2020 WL 1820660, at *12 (quoting 18 U.S.C. § 3626(g)(4)). In the context of the three-judge court's population reduction order, for example, inmates housed in out-of-state and county facilities remained—and remain—in CDCR custody, but the Supreme Court nonetheless concluded that orders requiring transfers to such facilities meet the PLRA's definition of a "prisoner release order." *Plata*, 563 U.S. at 527.

*Gray* is also not persuasive. In concluding that a transfer order of the type at issue here was not a prisoner release order, the *Gray* court appears to have considered neither the Supreme Court's decision in *Plata*, 563 U.S. at 527, nor the statutory definition of a prisoner release order, 18 U.S.C. § 3626(g)(4). *See* ECF No. 3286 at 7–8.

Based on all of the above, the Court concludes that it lacks authority to require Defendants to release any inmates or transfer them to non-CDCR institutions. Because the Court has found no constitutional violation, the Court also finds it inappropriate to "sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered."[10] 18 U.S.C. § 3626(a)(3)(D).

## CONCLUSION

Like the Three-Judge Court, this Court "emphasize[s] that Defendants have broad authority to voluntarily take steps that may prevent the life-threatening spread of COVID-19 within their prisons" and "urge[s] them to leave no stone unturned." *Coleman*, 2020 WL 1675775, at *8. Although it is undisputed that the risks of COVID-19 are substantial, and the Court believes that Defendants have the ability to take additional steps to decrease the risk of spreading the disease, Plaintiffs have not demonstrated that Defendants' response at this time is constitutionally deficient. Accordingly, Plaintiffs' emergency motion regarding prevention and management of COVID-19 is denied.

---

[10] As the Three-Judge Court observed, Plaintiffs are also not "likely . . . [to] satisfy the prior order requirement at this point because there have not yet been any orders requiring Defendants to take measures short of release to address the threat of the virus; nor have Defendants had a reasonable time in which to comply." *Coleman*, 2020 WL 1675775, at *4 (referring to requirements of 18 U.S.C. § 3626(a)(3)(A), which, pursuant to 18 U.S.C. § 3626(a)(3)(D), this Court must find satisfied before requesting the convening of a three-judge court).

1    The April 20, 2020 case management conference remains on calendar.  At that time,

2 Defendants shall be prepared to discuss the steps they have taken to comply with the Receiver's

3 directive to create eight-person housing cohorts and a timeline for completing implementation.

4    **IT IS SO ORDERED.**

5 Dated:  April 17, 2020



JON S. TIGAR
United States District Judge

18