IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated,<br><br>       Petitioners,<br>v.<br><br>MARK WILLIAMS, warden of Elkton Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities,<br><br>       Respondents. | Case No. 4:20-cv-794<br><br>Judge James S. Gwin |

**BRIEF OF *AMICI CURIAE* PUBLIC HEALTH AND HUMAN RIGHTS EXPERTS**

**TABLE OF CONTENTS**

Page

Table of Authorities .................................................................................................................... ii

I. Introduction ........................................................................................................................1

II. Statement of Interest of Amici Curiae .............................................................................2

III. Factual Background ..........................................................................................................3

IV. Argument ...........................................................................................................................3

      A. The COVID-19 Pandemic Requires Proactive Social Distancing Measures ...........3

      B. Jails and Prisons Are at a Heightened Risk for the Spread of COVID-19 ..............5

      C. Efforts to Combat COVID-19 at Elkton Are Inadequate ..........................................9

V. Conclusion ........................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**AUTHORITIES**

Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/ ................................................................................................5

Andrew Jacobs, et al., *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020) https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html ..............................................................................................................................8

Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, The Marshall Project (Mar. 31, 2020) https://www.themarshallproject.org/2020/03/31/why-jails-are-so-important-in-the-fight-against-coronavirus ...............................................................................................6

Apoora Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020) https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html .......................................................6

Bianca Malcolm, *The Rise of Methicillin-Resistant Staphylococcus aureus in U.S. Correctional Populations*, Journal of Correctional Health Care (May 13, 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3116074/ ..........................................5

Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases and Latest Updates, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ................................................................................................5

Centers for Disease Control and Prevention, Situation Summary (2020), cdc.gov/ https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html ...........................4

David Reuter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/ ...........................5

Fed. Bureau of Prisons, *BOP: About Our Agency*, https://www.bop.gov/about/agency/ (last visited Apr. 16, 2020) .............................................9

Federal Bureau of Prisons Clinical Practice Guidelines, Management of Methicillin-Resistant Staphylococcus aureus (MRSA) Infections, 1-2 (April 2012), https://www.bop.gov/resources/pdfs/mrsa.pdf ....................................................7

Jan Ransom & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Mar. 30, 2020) ................................................................................8

## TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Jo Ann Bobby-Gilbert, *Elkton Correctional Officers Fighting Invisible Enemy*,
   Bus. J. (Apr. 16, 2020), https://businessjournaldaily.com/correctional-officers-
   fighting-invisible-enemy/ ........................................................................................................9

Kenji Mizumoto & Gerardo Chowell, *Estimating Risk of Death from 2019 Novel
   Coronavirus Disease, China, January–February 2020*, 26 Emerging
   Infectious Diseases, no. 6, June 2020, https://doi.org/10.3201/eid2606.200233 .......................3

Kulish et. al, *The U.S. Tried to Build a New Fleet of Ventilators. The Mission
   Failed.*, N.Y. Times (Mar. 29, 2020) https://www.nytimes.com/2020/03/29/
   business/coronavirus-us-ventilator-shortage.html ...................................................................8

Matthew J. Akiyama, et al., *Flattening the Curve for Incarcerated Populations—
   Covid-19 in Jails and Prisons*, New England Journal of Medicine (April 2,
   2020) ........................................................................................................................................8

Meagan Flynn, *Top doctor at Rikers Island calls the jail a 'public health disaster
   unfolding before our eyes'*, Wash. Post (Mar. 31, 2020)
   https://www.washingtonpost.com/nation/2020/03/31/rikers-island-
   coronavirus-spread/ ................................................................................................................10

Neil M. Ferguson et al., Imperial College London, Impact of Non-Pharmaceutical
   Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand
   7 (2020), https://www.imperial.ac.uk/media/imperial-college/
   medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-
   modelling-16-03-2020.pdf ..................................................................................................4, 5

Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay
   Home*, N.Y. Times (Mar. 31, 2020), https:// www.nytimes.com/2020/03/20/
   us/ny-ca-stay-home-order.html ...............................................................................................4

Shane Hoover, *Sixth Inmate Death at Elkton Federal Prison*, Columbus Dispatch
   (Apr. 15, 2020)......................................................................................................................7, 9

Stephanie M. Lee, *Nearly 900 Immigrants Had The Mumps In Detention Centers
   In The Last Year*, Buzzfeed News (Aug. 29, 2019)
   https://www.buzzfeednews.com/article/stephaniemlee/mumps-ice-immigrant-
   detention-cdc ............................................................................................................................5

Timothy Williams, et al., *As Coronavirus Spreads Behind Bars, Should Inmates
   Get Out?*, N.Y. Times (Mar. 30, 2020) https://www.nytimes.com/2020/
   03/30/us/coronavirus-prisons-jails.html ...............................................................................5, 7

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

World Health Organization, *Coronavirus Disease (Covid-19) Pandemic* (2020),
    https://www.who.int/emergencies/diseases/novel-coronavirus-2019.........................................3

Zack Budryk, *DOJ Watchdog to Inspect Federal Prisons After Hundreds
    Diagnosed with Coronavirus*, The Hill (Apr. 15, 2020)..............................................................9

I.      Introduction

*Amici Curiae*, public health officials and human rights experts familiar with the unique dangers associated with infectious diseases in jails and prisons, urge this Court to grant Petitioners' Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief (Dkt. #1), and to order Respondents to work with local health officials to reduce the number of inmates at Elkton Federal Correctional Institution and its satellite prison (collectively, "Elkton"). Reducing the number of inmates at Elkton will minimize not only the public health risk to Petitioners, but also to other inmates, correctional facility staff, visitors and the public at large.

COVID-19 is an extremely infectious disease. It has created an unprecedented global health crisis and led to the adoption and implementation of novel but necessary mitigation strategies around the world, including the canceling of public events, the closing of schools and businesses, and stay-at-home orders to the general public. There is no vaccine or cure for COVID-19. The virus has proven that it can infect, harm and kill anyone. But the risk is particularly acute for people with underlying health conditions that create a high risk for severe illness or death from COVID-19.

Managing the spread of COVID-19 within correctional facilities is critically important because they are enclosed environments, like cruise ships, that are highly susceptible to epidemics. In the case of COVID-19 specifically, the only way to mitigate the risk of serious infection is through hygienic measures like frequent hand washing and social distancing to limit exposure. But those prevention methods are all but impossible in a correctional setting, in which inmates are crowded together, sharing bathroom products, and where sanitizing products are frequently unavailable and infrequently used. Once an outbreak occurs, correctional facilities are rarely equipped to provide the intensive care and support needed to treat patients suffering from a severe COVID-19 infection.

2

Acting quickly to mitigate the enormous risk associated with correctional facilities is not just necessary to protect those who are incarcerated, but also to protect staff and visitors. Moreover, because staff and visitors cycle in and out of these facilities, if appropriate mitigation measures are not taken immediately, those individuals risk spreading the disease to the broader community. Accordingly, the time to act is now, before it is too late.

**II.     Statement of Interest of Amici Curiae**

*Amici curiae* are experts in infectious diseases, healthcare policy, correctional healthcare, human rights and other related fields who have spent decades studying the provision of healthcare in correctional facilities. Based on their experience, and their review of the available information about the COVID-19 pandemic, it is their view that people with conditions like Petitioners' are at high risk of serious, life-threatening COVID-19 infection, and that their continued confinement in DOC facilities subjects them to a heightened risk of contracting and further spreading COVID-19.

*Amici* are committed to ensuring correctional facilities provide quality healthcare to inmates, and that correctional facilities do not exacerbate the health risks of their inmates, their staff or the public at large. They understand the COVID-19 pandemic has placed enormous strains on society, and are committed to doing their part to ensure that correctional facilities take a prudent, science-based approach to addressing the virus. They respectfully submit this brief to offer their view that Respondents should work with state and local health officials to release individuals such as Petitioners, to whom COVID-19 poses a high risk of serious infection.

*Amici* are the following:

Kathryn Hampton is Senior Officer of the Asylum Program at Physicians for Human Rights. In that capacity, she coordinates Physicians for Human Rights' Asylum Network Program, an initiative that recruits, trains and supports a network of clinicians to provide forensic

2

evaluations for asylum seekers and to advocate for human rights-based immigration policies. She has over 10 years of experience in human rights monitoring, analysis and reporting.

Brie Williams, M.D., M.S., is a Professor of Medicine in the University of California San Francisco Division of Geriatrics, where she collaborates with colleagues from criminal justice, public safety, and the law to integrate a healthcare perspective into criminal justice reform. She also co-directs the ARCH (Aging Research in Criminal Justice Health) Network, funded by the National Institute on Aging, which is a national group of researchers across multiple disciplines focused on developing evidence to better understand the health and healthcare needs of older adults and people with serious illness who reside in prisons and jails.

### III. Factual Background

*Amici* adopt and incorporate by reference the factual background set forth in Petitioners' Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief (Dkt. #1).

### IV. Argument

#### A. The COVID-19 Pandemic Requires Proactive Social Distancing Measures

The COVID-19 pandemic is an ongoing pandemic of coronavirus disease 2019 that is caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The novel coronavirus that causes COVID-19 first emerged in the province of Hubei, China in December 2019.[1] As of April 15, 2020, there were 1,995,983 confirmed cases and 131,037 deaths in 213 countries, areas or territories worldwide.[2] Due to the apparent ease with which the virus

---

[1] Kenji Mizumoto & Gerardo Chowell, *Estimating Risk of Death from 2019 Novel Coronavirus Disease, China, January–February 2020*, 26 Emerging Infectious Diseases, no. 6, June 2020, https://doi.org/10.3201/eid2606.200233.

[2] World Health Organization, Coronavirus Disease (Covid-19) Pandemic (2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

3

spreads, these numbers have risen and will continue to rise exponentially without drastic government action.[3]

The consensus of doctors and epidemiologists since the emergence of COVID-19 as a global pandemic has been that the only way to gird against spread of the virus is to take proactive and early action to "flatten the curve."[4] Accordingly, a leading and frequently cited report from the Imperial College London has suggested that "suppression will minimally require a combination of social distancing of the entire population, home isolation of cases and household quarantine of their family members," in addition to school and university closures.[5] In other words, social distancing is necessary at every level, including the institutional level. Given the speed with which the virus spreads, such social distancing measures may have to last as long as 18 months until a vaccine is successfully developed.[6] It is for precisely this reason that dozens of state governments, including Washington, have instituted mandatory social distancing policies; indeed, roughly three in four Americans is now under orders to stay home.[7]

Although these measures are welcomed and necessary, they would have been more effective if governments had acted proactively, rather than merely prescriptively.[8] The United

---

[3] *See* Centers for Disease Control and Prevention, Situation Summary (2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.

[4] *See, e.g.*, Neil M. Ferguson et al., Imperial College London, Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand 7 (2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

[5] *Id.* at 1.

[6] *Id.* at 15.

[7] Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay Home*, N.Y. Times (Mar. 31, 2020), https:// www.nytimes.com/2020/03/20/us/ny-ca-stay-home-order.html.

[8] *See* Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality at 3 ("Cities in which these interventions were implemented early in the epidemic were successful

4

States now has over 632,548 cases and over 27,012 fatalities.[9] Indeed, the COVID-19 virus has wreaked havoc all over the United States, jeopardizing both the health and economic wellbeing of millions of Americans.[10] The worst-case scenario in the Imperial College study above suggests that the United States could suffer up to 2.2 million deaths as a result of the COVID-19 crisis.[11]

### B. Jails and Prisons Are at a Heightened Risk for the Spread of COVID-19

Jails and prisons, such as Elkton, are closed environments in which it is impossible to implement and enforce social distancing guidelines, and are thus at a heightened risk for the spread of COVID-19. It is common knowledge that outbreaks of contagious diseases are more common in correctional settings than in communities at large.[12] COVID-19 has proven to be no exception. Over the past several weeks, hundreds of COVID-19 diagnoses have been confirmed at local, state and federal correctional facilities.[13] Given the dearth of testing, these numbers

---

at reducing case numbers while the interventions remained in place and experienced lower mortality overall.").

[9] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases and Latest Updates, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Apr. 14, 2020).

[10] *See generally* Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/.

[11] Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality at 7.

[12] *See* David Reuter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/; *see also* Bianca Malcolm, *The Rise of Methicillin-Resistant Staphylococcus aureus in U.S. Correctional Populations*, Journal of Correctional Health Care (May 13, 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3116074/; Stephanie M. Lee, *Nearly 900 Immigrants Had The Mumps In Detention Centers In The Last Year*, Buzzfeed News (Aug. 29, 2019) https://www.buzzfeednews.com/article/stephaniemlee/mumps-ice-immigrant-detention-cdc.

[13] Timothy Williams, et al., *As Coronavirus Spreads Behind Bars, Should Inmates Get Out?*, N.Y. Times (Mar. 30, 2020) https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

5

understate (and likely dramatically understate) the problem.[14] Indeed, in some areas, jails have seen infection rates *nine* times higher than the broader community.[15]

The enormity of the problem is exacerbated by the fact that staff, visitors, contractors and vendors all pass between communities and correctional facilities, and each group can bring infectious diseases into and out of those facilities. Moreover, inmates themselves often have to make court appearances and, each time they appear, they risk contracting infections and introducing them into the facility upon return. Additionally, correctional facility populations are constantly turning over, with about 200,000 people nationwide flowing into and out of jails every week. Each entrant potentially carries COVID-19 and introduces it into the facility's population.[16]

These factors, all of which make it effectively impossible for correctional facilities to protect themselves from outbreaks outside their walls, are made worse by the fact that it is difficult to identify and isolate those individuals who are infected with COVID-19, who may suffer from only mild symptoms or even be entirely asymptomatic, but still be carrying and spreading the disease. In fact, recent estimates suggest that as many as 1 in 4 cases of coronavirus will not present symptoms and yet remain contagious.[17] Unfortunately, correctional facilities typically do not have the ability to perform the kind of systematic testing that would be required to ensure that the virus does not enter the facility.

---

[14] *Id.*

[15] Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, The Marshall Project (Mar. 31, 2020) https://www.themarshallproject.org/2020/03/31/why-jails-are-so-important-in-the-fight-against-coronavirus.

[16] *Id.*

[17] Apoora Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020) https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

The unique attributes of correctional facilities also make it impossible for those facilities to adopt and implement the mitigation efforts that have become a necessary safeguard of life outside those facilities.  That is because these facilities are enclosed environments, much like the cruise lines that have proven susceptible to COVID-19 outbreaks.  The social distancing that has been the hallmark of the United States' COVID-19 prevention efforts is simply not possible in such a setting.  Incarcerated people share close quarters, including dining halls, bathrooms, showers and other common areas, each presenting dangerous opportunities for transmission.[18]  Additionally, spaces within correctional facilities often are poorly ventilated, which promotes the spread of diseases.  Other hygiene-based prevention strategies are similarly ineffective in a correctional setting.  Inmates will not typically have access to sufficient soap and alcohol-based sanitizers to engage in the kind of frequent hand washing encouraged throughout the rest of the country.[19]  And staff often do not clean or sanitize high-touch surfaces like door handles or light switches.

For facilities like Elkton, where COVID-19 has already infected at least sixty inmates and killed six,[20] it will be extremely difficult to properly treat those who have been infected or limit the spread of the virus.  COVID-19's most common symptoms are fever, cough and

---

[18] Poor inmate hygiene has in previous years led to staph infection outbreaks, spread by, *inter alia*, the shared use of soap and towels and person-to-person contact via contaminated hands. *See* Federal Bureau of Prisons Clinical Practice Guidelines, Management of Methicillin-Resistant Staphylococcus aureus (MRSA) Infections, 1-2 (April 2012), https://www.bop.gov/resources/pdfs/mrsa.pdf.

[19] *See* Timothy Williams, et al., *As Coronavirus Spreads Behind Bars, Should Inmates Get Out?*, N.Y. Times (Mar. 30, 2020) https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (explaining that in some correctional facilities "Even as a visitor . . . if you want to wash your hands, you've got to walk out and go into another building to do it.").

[20] Shane Hoover, *Sixth Inmate Death at Elkton Federal Prison*, Columbus Dispatch (Apr. 15, 2020), https://www.dispatch.com/news/20200415/sixth-inmate-death-at-elkton-federal-prison/1.

shortness of breath. Serious cases can develop that require invasive measures to improve respiratory function, such as intubation. Appropriate care for such cases almost always includes the use of highly specialized equipment like ventilators. The COVID-19 virus has put ventilators in high demand and short supply around the world.[21] The virus even has led to shortages of less specialized equipment such as face masks, gloves and gowns.[22]

The necessary treatment for those infected with COVID-19, especially those in high-risk populations, is labor-intensive. It requires that nurses tend to a limited number of patients at a time, and often requires physicians with specialized backgrounds in respiratory care. Correctional facilities are unable to address these needs. Correctional facilities often employ nurses who practice beyond the scope of their licenses, and part-time physicians who have limited availability to be on-site. The novel coronavirus outbreak is already straining hospital capacity across the country. Correctional medical facilities, already underequipped, will be even more strained as staff members themselves become ill.[23] Thus, the problem will be dangerously exacerbated if jails and prisons do not act immediately to reduce their prison populations and contain the spread of the virus.[24]

---

[21] Kulish et. al, *The U.S. Tried to Build a New Fleet of Ventilators. The Mission Failed.*, N.Y. Times (Mar. 29, 2020) https://www.nytimes.com/2020/03/29/business/coronavirus-us-ventilator-shortage.html.

[22] *See* Andrew Jacobs, et al., *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020) https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

[23] *See, e.g.*, Jan Ransom & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html ("[T]he rate of infection in city jails has continued to climb, and by Monday, 167 inmates, 114 correctional staff and 23 health workers had test positive.").

[24] Matthew J. Akiyama, et al., *Flattening the Curve for Incarcerated Populations—Covid-19 in Jails and Prisons*, New England Journal of Medicine (April 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687.

## C. Efforts to Combat COVID-19 at Elkton Are Inadequate

Elkton is already proving incapable of protecting its inmates from COVID-19. So far at Elkton, sixty inmates have tested positive and six inmates have already died from the coronavirus.[25] Many more may already be infected. Releasing Petitioners and other medically vulnerable inmates before it is too late is the safest approach for inmates, staff and the public. Release not only removes those most at risk from a life-threatening environment, but will also allow for Elkton to implement better social distancing and hygiene policies, protecting those who remain in the prison. Slowing the spread of the virus in the prison will likewise slow the spread of the virus in the broader community. And release will lower the risk that already-burdened healthcare infrastructure will be overwhelmed by the additional care required by infected inmates.

The Federal Bureau of Prisons ("BOP") is the Department of Justice agency responsible for the custody and care of federal inmates, including at Elkton.[26] BOP has proven unable to institute solutions up to the task of protecting inmates and staff from the spread of the virus. As of April 15th, 451 federal inmates and 280 BOP workers have tested positive for coronavirus, with 17 inmate deaths since late March.[27] Thirty prison employees at Elkton have tested positive for the coronavirus.[28] BOP's failure to provide testing, failure to order employee

---

[25] Shane Hoover, *Sixth Inmate Death at Elkton Federal Prison*, Columbus Dispatch (Apr. 15, 2020), https://www.dispatch.com/news/20200415/sixth-inmate-death-at-elkton-federal-prison/1.

[26] Fed. Bureau of Prisons, *BOP: About Our Agency*, https://www.bop.gov/about/agency/ (last visited Apr. 16, 2020).

[27] Zack Budryk, *DOJ Watchdog to Inspect Federal Prisons After Hundreds Diagnosed with Coronavirus*, The Hill (Apr. 15, 2020), https://thehill.com/policy/healthcare/493065-doj-watchdog-to-inspect-federal-prisons-after-hundreds-diagnosed-with.

[28] Jo Ann Bobby-Gilbert, *Elkton Correctional Officers Fighting Invisible Enemy*, Bus. J. (Apr. 16, 2020), https://businessjournaldaily.com/correctional-officers-fighting-invisible-enemy/.

9

quarantines, and policy of asking employees not to work only if they have a fever will inevitably endanger more inmates, staff, and the community at large.[29]

Governor Mike DeWine's deployment of Ohio National Guard members to Elkton and other facilities is encouraging, but is itself a symptom of a belated response and is inadequate to protect prisons and jails from COVID-19. The virus will continue to ravage these facilities. Elkton, a BOP Medical Care Level 2 facility where about half of the inmates have pre-existing medical conditions, is particularly at risk.[30]

Other correctional facilities have attempted measures to mitigate against the introduction and spread of COVID-19, but they have been thwarted by the realities of correctional life. In the face of rising infection numbers, the top doctor at New York's Rikers Island was forced to conclude that mitigation efforts in such facilities cannot be successful unless paired with substantial inmate population reductions.[31] BOP must likewise embrace that conclusion before it is too late.

**V.     Conclusion**

*Amici* urge the Court to consider this information when assessing whether to grant Petitioners' Emergency Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief (Dkt. #1). In particular, *amici* urge the Court to grant the Petition and order Respondents to release inmates, including Petitioners, thereby reducing overcrowding and mitigating the public health

---

[29]  *See id.*

[30]  *See* Corr. Info. Council – CIC Info Sheet, *BOP – MEDICAL CARE LEVELS*, https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Medical%20Care%20Levels%205.17.17.pdf (last visited Apr. 16, 2020).

[31]  Meagan Flynn, *Top doctor at Rikers Island calls the jail a 'public health disaster unfolding before our eyes'*, Wash. Post (Mar. 31, 2020) https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

effects to those individuals, facility staff and the public at large. Release should be coordinated with local public health authorities, in accordance with the most recent CDC guidance on personal protection equipment, quarantine and isolation protocols, so as to ensure the safety of the released individuals and the community.

Dated: April 22, 2020

**FRIEDMAN & GILBERT**

By: */s/ Jacqueline Greene*

Jacqueline Greene, OH 0092733
**FRIEDMAN & GILBERT**
441 Vine Street, Ste. 3400
Cincinnati, Ohio 45202
T: (513) 572-4200
F: (216) 621-0427
jgreene@f-glaw.com

Sarah Gelsomino, OH 0084340
**FRIEDMAN & GILBERT**
50 Public Square, Ste. 1900
Cleveland, OH 44113
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com

Susanna M. Buergel, *pro hac vice*
Darren W. Johnson, *pro hac vice*
David C. Kimball-Stanley, *pro hac vice*
**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
sbuergel@paulweiss.com
djohnson@paulweiss.com
dkimball-stanley@paulweiss.com

*Attorneys for Amici Curiae*

11