# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG WILSON, et al., | ) | CASE NO.: 4:20cv794 |
| | ) | |
| | ) | |
| Petitioners, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| MARK WILLIAMS, Warden of Elkton | ) | **MEMORANDUM IN SUPPORT OF** |
| Federal Correctional Institution, et al., | ) | **EMERGENCY MOTION TO STAY** |
| | ) | |
| | ) | |
| Respondents. | ) | |

Pursuant to Fed. R. Civ. P. 62(d), Respondents Mark Williams, Warden of Elkton Federal Correctional Institution and Michael Carvajal, Director of Federal Bureau of Prisons ("Respondents") hereby respectfully request that this Court stay its Order and suspend the preliminary injunction contained therein issued on April 22, 2020 [ECF No. 22], pending final resolution of the appeal filed by Respondents on April 27, 2020, including any further requirement to publish the names on the list compiled by BOP.  (Notice of Appeal, ECF No. 26 PageID # 394.)  Respondents further respectfully request that the Court stay the briefing schedule for class certification and any hearing related thereto because it will conserve judicial resources and prevent a ruling in a case in which the court of appeals may determine that this Court lacks jurisdiction.  Respondents submit that a stay is appropriate in this matter because they are likely to succeed on the merits on appeal and because the preliminary injunction inflicts significant harms on the public and the government that greatly outweigh any potential harm to Petitioners from a stay.  Further, Respondents respectfully request an expedited ruling on this motion by 4:00 p.m. on April 30, 2020, because, if this Court does not grant a stay, Respondents will need to seek such relief in the Court of Appeals at that time to ensure meaningful relief in advance of upcoming deadlines and requirements imposed by the Court.

## BACKGROUND

On April 22, 2020, the Court issued a preliminary injunction requiring that Respondents (1) identify within one day all members of a "subclass" that the Court defined to include Elkton inmates who are considered to be at high risk according to guidelines of the Centers for Disease Control and Prevention (CDC), (2) evaluate each subclass member's eligibility for transfer out of Elkton through any means, including, but not limited to, compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two weeks; and (3)

transfer subclass members who are ineligible for compassionate release, home release, or parole or community supervision to another BOP facility where appropriate measures, such as testing and single-cell placement, or social distancing, may be accomplished.  (ECF# 22 PageID # 371-72.)

In compliance with the Court's order, BOP compiled a list of 837 inmates who are over the age of 65 and/or have diagnosed medical conditions identified by the CDC as making an individual at higher risk of complications from COVID-19.  (See, Second Declaration of Kristy Cole ("Cole-2 Decl."), attached hereto as Exhibit A, at ¶ 46.). Compilation of the list satisfied the first requirement of the Court's preliminary injunction. Because inclusion on the list discloses that an inmate has one or more potential risk factors, Respondents moved to seal the list to protect this highly personal and privileged information of hundreds of third-parties.  (Mot. to Seal, ECF No. 24 PageID # 389.)  The Court denied the Motion on April 27, 2020.  (Minutes of Status Conference, ECF No. 27, PageID # 395.)

Under the terms of the Court's preliminary injunction order, BOP estimates that it will take in excess of 418 man-hours to preliminarily evaluate all the inmates on the list for transfer. (Cole-2 Decl. at ¶ 47.)  After the preliminary evaluation, significant work is needed to further evaluate and process each inmate prior to the inmate leaving Elkton.  (Id. at ¶ 48.)  This includes developing a release plan; conducting multiple checks, victim/witness notifications; and considering inmate health issues.  (Id.)  Many other offices within the Department of Justice— who are not named respondents here–would be required to be involved in the transport release process, including United States Probation Offices, United States Attorneys' Offices, sentencing courts, and the United States Marshal Service.  (Id.)  The same BOP staff needed to comply with the Court's Order are currently tasked with considering requests made by inmates across the

country who are not on the newly generated list, their normal operational duties, and additional duties already asked of staff in responding to the COVID-19 pandemic.  (Id. at ¶ 47.)

Even before the Petitioners brought this action and before the Court issued a preliminary injunction, the BOP was acting urgently to mitigate the risks of COVID-19 within its facilities and to reduce prison populations, to the extent possible and authorized by Congress.  The BOP was, for example, already prioritizing the use of home confinement as a tool for combatting the dangers that COVID-19 poses to vulnerable inmates pursuant to the Attorney General's March 26, 2020 and April 3, 2020 Memoranda. (ECF No. 10-2 PageID # 192 at ¶ 17.)  The BOP has also been assessing and, in appropriate instances, recommending that an inmate's sentencing court reduce a term of imprisonment under 18 U.S.C. § 4205.

In addition to reducing prison populations, BOP has taken extensive measures to reduce the spread of COVID-19 among the inmates at Elkton, including providing inmate and staff education; conducting inmate and staff screening; testing, quarantine, and isolation procedures; enhanced cleaning and sanitization protocols; providing soap, cleaning supplies, and personal protective equipment (PPE) to inmates; and restricting inmates to their residential area with only one pod moving at a time.  (ECF# 10-1 PageID # 178-185 at ¶¶ 19-54).  These efforts have been working as the number of new cases has been reduced.

On April 27, 2020, Respondents filed a Notice of Appeal to the Sixth Circuit from the Court's preliminary injunction, including the Court's determination that it has jurisdiction over this case.  (Not. of Appeal, ECF No. 26 PageID # 394.)  For the reasons discussed below, Respondents respectfully request this Court to stay its Order and suspend the preliminary injunction contained therein issued on April 22, 2020 [ECF No. 22].  On addition, Respondents further request that the Court stay its instruction to file the names of inmates identified by BOP

4

on the public docket and also stay briefing on class certification.

## ARGUMENT

This Court has discretion to stay execution of its judgment pending resolution of an appeal. Fed. R. Civ. P. 62(d). *A. Philip Randolph Institute v. Husted*, 907 F.3d 913, 917 (6th Cir. 2018). Courts consider four factors when determining if a stay is warranted: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Id.*; *Hilton v. Braunskill*, 481 U.S. 870, 867-77 (1987); *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 548 (6th Cir. 2016). "These four factors 'are not prerequisites that must be met, but are interrelated considerations that must be balanced' together." *Khouri,* 844 F.3d at 548 (quoting *In re EPA*, 803 F.3d 804, 806 (6th Cir. 2015).  As demonstrated below, Respondents have met their burden of showing that this Court should exercise its discretion to stay its order pending appellate review, *Nken v. Holder*, 556 U.S. 418, 433–34 (2008), because a balancing of the factors supports the issuance of a stay pending appeal. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 156 (6th Cir. 1991).

I.     <u>RESPONDENTS ARE LIKELY TO SUCCEED ON APPEAL</u>

Respondents are likely to succeed on the merits of the appeal because binding Circuit precedent precludes habeas relief in these circumstances, the Prison Litigation Reform Act (PLRA) prohibits the Court from requiring transfer or release of prisoners, and the Petitioners have failed to establish an Eighth Amendment violation.  Success on the merits is supported by other courts who have rejected arguments like those made by Petitioners.  *See, e.g. Livas v. Myers*, No. 2:20-cv-00422-TAD-KK, 2020 WL 1939583 (W.D. La. Apr. 22, 2020) (Doughty, J.)

(dismissing complaint with prejudice for lack of subject-matter jurisdiction, explaining that designation and classification decisions "fall[] squarely within BOP's authority and outside the purview of this Court," and noting that a contrary reading would make the court a "de facto 'super' warden of Oakdale") *Furando v. Ortiz*, No. 1:20-cv-03739-RMB, 2020 WL 1922357 (D.N.J. Apr. 20, 2020) (Bumb, J.) (dismissing habeas petition for failure to exhaust administrative remedies as set forth in 28 CFR §§ 542.10 to 542.19); *Plata v. Newsom*, No. 01-cv-01351, 2020 WL 1908776 (N.D. Cal. Apr. 17, 2020) (Tigar, J.) (holding that the State of California, which had taken measures similar to BOP, had not exhibited "deliberate indifference" even though it could not provide for social distancing and holding that the court would lack authority to release prisoners in any event because only a three-judge court can release prisoners to cure a systemic violation of the Eighth Amendment) A movant "need not always establish a high probability of success on the merits" and a stay is granted with a showing of "serious questions going to the merits" when the movant demonstrates irreparable harm that decidedly outweighs harm to Petitioners. *Griepentrog*, 945 F.2d at 153-54.

  A.  <u>Habeas Relief Is Improper</u>

 As this Court recognized in its April 22, 2020 order, it is well-settled in the Sixth Circuit that a habeas petition under 28 U.S.C. § 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013). It is plain that Petitioners here challenge the conditions of their confinement at Elkton. Indeed, Petitioners' own characterization of their claim is that "incarceration amid the COVID-19 outbreak at Elkton violates their rights to constitutional *conditions of confinement*." (Pet., ECF No. 1 PageID # 31 (emphasis added; capitalization omitted). The theory of relief is not that there is a defect in Petitioners' convictions or sentences or that they are entitled to release from

Case: 4:20-cv-00794-JG  Doc #: 29-1  Filed: 04/28/20  7 of 18.  PageID #: 405

BOP custody, but rather that they should be allowed to complete their terms of custody in a different setting because they believe the *conditions* at the facility where they are currently being held are unconstitutional.  These claims are no different from a suit brought under 42 U.S.C. § 1983 alleging that an inmate's conditions of confinement violate the Eighth Amendment because the inmate is not receiving necessary medical care.

The Sixth Circuit held as much in *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), where an inmate "sought a transfer to a different prison facility for the purpose of medical treatment."  The court noted that the inmate had improperly asserted that claim under section 2241 because he "did not challenge the terms or validity of his state prison term," and held that "the district court should have dismissed the petition without prejudice to allow [the inmate] to raise his potential civil rights claim properly as a § 1983 action."  *Id.*

This Court has acknowledged that "[i]nmates challenging BOP's COVID-19 response challenge the dangerous *conditions* within the prison created by the virus."  Order, ECF No. 22 PageID # 361 (emphasis added).  The Court's decision to grant habeas relief to allegedly medically-vulnerable inmates and require transfer to a different facility directly conflicts with the reasoning in *Martin* that habeas relief is not available—the claims of the subclass here are indistinguishable from the claim in *Martin*.  Respondents are therefore likely to establish on appeal that this Court lacks jurisdiction to grant relief under § 2241.

B.    The PLRA Precludes the Relief Ordered

Respondents are also likely to succeed in establishing that the preliminary injunction contravenes the Prison Litigation Reform Act's ("PLRA") strict limits on the release of prisoners and litigation designed to reduce prison populations or challenge conditions of confinement.  The PLRA applies to "any civil proceeding arising under Federal law with respect to the conditions

7

of confinement or the effects of actions by government officials on the lives of persons confined in prison, but . . . not . . . habeas corpus proceedings challenging the fact or duration of confinement in prison."  18 U.S.C. § 3626(a)(2).  This suit challenging health conditions at Elkton plainly falls within this broad provision.

Because the PLRA applies to this suit, any preliminary injunction must "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2). This Court made no finding that its broad preliminary injunction satisfies those requirements. Nor did the Court comply with the PLRA's requirements that a "prisoner release order"—that is, "any order . . . that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison"—may "be entered only by a three-judge court," and only after "a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation . . . sought to be remedied" and "the defendant has had a reasonable amount of time to comply with the previous court orders."  *Id.* § 3626(a)(3)(A), (B), (g)(4).

In this case, the Court has required BOP to either release subclass members or transfer them to another BOP facility, (Order, ECF No. 22 PageID # 371-72.)—an order that clearly seeks to "limit[]the prison population" at Elkton without satisfying the PLRA's requirements. The Court has also directed the "nonadmission of prisoners" to Elkton by ordering that "[a]ny subclass members transferred out of Elkton may not return until the threat of the virus is abated or until a vaccine is available," making the PLRA's applicability even clearer.

The Court's only justification for disregarding the PLRA was its conclusion that "the subclass's claims are properly before the Court as a habeas action."  Dkt. 22 at 19-20.  As

explained, however, petitioners' claims are not cognizable in habeas, and even if they were, they do not "challeng[e] the fact or duration of confinement," as is necessary to avoid the PLRA's requirements.  18 U.S.C. § 3626(g)(2).[1]  This is no mere technicality: by failing to abide by the PLRA's restrictions in order to superintend BOP's response at Elkton to COVID-19, the Court's order violated Congress's intent "to oust the federal judiciary from day-to-day prison management."  *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997).  As the Supreme Court has emphasized, "[c]ourts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

It should be noted that the Court justifies its order in this case based on  its belief that "[d]istrict courts have inherent authority to grant enlargement to a defendant…." (ECF No. 22 PageID # 359.)  The Court explained that when "a court exercises its power to 'enlarge' the custody of a defendant pending the outcome of a habeas action, the BOP maintains custody over the defendant, but the place of custody is altered by the court."  (Id.)  However, the Court lacks authority to alter the place of custody because BOP has the sole discretion to determine where to confine inmates.  18 U.S.C § 3621. In fact, the Court's concept of enlargement whereby it can alter the place of custody is specifically rejected by 18 U.S.C. § 3621(b) which provides *"[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court*." 18 U.S.C § 3621(b)(emphasis added). S*ee also Livas*, 2020 WL 1935583, at \*8 ("[D]esignation and/or classification falls squarely within BOP's

---

[1] As we have demonstrated, this suit concerns prison "conditions" and therefore cannot be brought as a habeas action, but must be brought as a civil rights action.  Such civil rights actions require exhaustion of administrative remedies under 42 U.S.C. § 1997e.  *See Lavista v. Beeler*, 195 F.3d 254, 256-57 (6th Cir. 1999).

authority and outside the purview of this Court. To rule otherwise would make this Court a de facto "super" warden of Oakdale."); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Fullenwiley v. Wiley*, No. 98-CV-1698, 1999 WL 33504428, at *1 (N.D.N.Y. Oct. 5, 1999) ("[D]iscretionary decisions by the BOP made pursuant to its authority under § 3621(b) are not subject to judicial review"); *see also* 18 U.S.C. § 3625. Although the Court relied on the concept of "enlargement" of a sentence to construe the relief requested by Petitioners as falling within § 2241, that concept is inapplicable here.  "Enlargement" is essentially bail pending the adjudication of a habeas petition, but the Sixth Circuit has made clear that "there will be few occasions where a prisoner will meet th[e] standard" for that relief.  *Dotson v.* Clark, 900 F.2d 77, 79 (6th Cir. 1990).

## C.  BOP Has Not Violated the Eighth Amendment

Petitioners are also unlikely to prevail on appeal because the BOP has not violated the Eighth Amendment—the only basis for Petitioners' claims for relief.  To succeed on their Eighth Amendment claims, petitioners must satisfy two requirements.  First, they must show that they suffer a deprivation that is, "objectively, sufficiently serious," "result[ing] in the denial of the minimal civilized measure of life's necessities."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, they must show that BOP is acting with "deliberate indifference to inmate health or safety," "know[ing] of and disregard[ing] an excessive risk to inmate health or safety."  *Id.* at 834, 837; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("[O]nly the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.").

As to the first, objective requirement, Petitioners are not being denied the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834.  Respondents are acutely aware of the dangers that COVID-19 creates around the world.  But risk of exposure to a communicable disease in prison raises Eighth Amendment concerns only if the threat is so severe that it would be "contrary to current standards of decency for anyone to be so exposed." *Helling v. McKinney,* 509 U.S. 25, 35 (1993).  COVID-19 puts prisoners and all other members of the public at unfortunate risk, and the record reflects the numerous steps that BOP has taken and continues to take to protect inmates from those risks to the extent possible.  The record establishes that, among other things, BOP has implemented measures for screening inmates for the virus; isolating and quarantining inmates who may have contracted it; conducting testing in accordance with CDC guidelines; limiting and screening staff and visitors; cleaning common areas and giving inmates disinfectant to clean their cells; giving inmates continuous access to sinks, water, and soap; educating staff and inmates about ways to avoid contracting the virus; providing masks to inmates and various other PPE to staff; and limiting inmates' movement from their residential areas (Cole Decl. ¶ 38; Dees Decl. ¶¶ 19-54, ).  COVID-19 can have tragic effects both within and outside prisons, and "[u]nless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk society would not tolerate." *Hines v. Youssef*, No. 13-cv-357, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015).  Petitioners are thus unlikely to establish that they have been deprived of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834.

As to the second, subjective requirement, the Respondents have not acted with deliberate

indifference to inmates' health and safety.  BOP has taken numerous steps to protect inmate health. More specifically, Elkton implemented each of the six phases of the BOP's national Action Plan (Dees Decl. ¶ 7-18), provides inmate and staff education; conducts inmate and staff screening; put into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; and obtained enhanced cleaning and medical supplies.  (*Id*. at ¶ 19.)  Additionally, Elkton implemented the "modified operations" in a number of ways, including: "grab and go" meals for inmates, meaning that inmates are permitted to pick up pre-packaged meals at designated times, but must return to their housing units in order to eat; scheduled staggered mealtimes, so that only a single housing unit (approximately 150 inmates) are moving within the facility at any particular time, controlled medication dispensing and commissary are accomplished during these times as well.  (*Id*. at ¶ 12.)  In addition to the measures BOP is taking to prevent, identify, and treat COVID-19 at Elkton, the BOP is diligently reviewing Elkton inmates' motions for compassionate release and is undertaking, consistent with the Attorney General's directives, identification of inmates who may be transferred to home confinement.  (Cole Decl. ¶ 21-37).  The record shows the agency's extensive efforts to protect inmates given the inherent constraints of a prison setting and available resources. (Cole Decl. ¶ 38;Dees Decl. ¶ 19-54).

And, as the Supreme Court explained in *Wilson v. Seiter,* 501 U.S. 294, 302-303 (1991), the Eighth Amendment inquiry "depends upon the constraints facing the official"; as demonstrated here, BOP is faced with unprecedented constraints on its resources in responding to the COVID-19 crisis.  In light of those constraints, BOP cannot be said to have acted with anything approaching deliberate indifference.

D.    The Court Improperly Conditionally Certified the Subclass

The Court recognized that petitioners' definition of a subclass of medically vulnerable inmates "is likely too broad" and limited the subclass to "those identified by the CDC as being at higher risk."  Dkt. 22 at 12 & n.50.  But the court erred in ordering class-wide relief even on that narrower subclass definition.

To qualify as a class, the members of petitioners' subclass must have met the requirements of Federal Rule of Civil Procedure 23(a) for commonality and typicality.  To satisfy the commonality requirement, petitioners must "demonstrate that the class members have suffered the same injury" and assert claims that "depend upon a common contention . . . of such a nature that it is capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  And to satisfy the typicality requirement, petitioners must demonstrate that "a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).  Whether an inmate is entitled to release or transfer is inherently individualized, requiring consideration of the inmate's history and circumstances.  *See* Money, 2020 WL 1820660, at *14-15; *see also* Cole Decl. ¶¶ XX [CITE].  Members of the subclass have been convicted of different offenses, have different disciplinary histories, present different safety risks, have different medical concerns, and have different resources and supports available if they are released from prison.  Indeed, the Court acknowledged that "the [p]etitioners seek varied relief that allows the BOP to make individualized determination as to where each subclass member should be" and that "'release' might look different for different inmates."  Dkt. 22 at 14.  Although the Court attempted to frame the case as raising the common question "whether the BOP's failure to create safe conditions for inmates with especially vulnerable health has violated those inmates' rights," *id.* at

13

13, the Court ignored that both the objective-risk and subjective-indifference prongs of the Eighth Amendment inquiry may differ among subclass members.

## II.     THE EQUITIES AND PUBLIC INTEREST WARRANT A STAY PENDING APPEAL

A consideration of the equities also supports a stay of the preliminary injunction.  In cases involving the government, the harms to the BOP and to the public interest "merge," *Nken*, 556 U.S. at 435, as demonstrated by the widespread harms to the public and inmates at other institutions if respondents must comply with the Court's order.

In this case, Respondents and the public will be greatly harmed without a stay.  As explained above, in order to comply with the terms of the preliminary injunction, BOP estimates that it will take in excess of 418 man-hours to preliminarily evaluate all the inmates on the list for transfer.  (Cole-2 Decl. at ¶ 47.) This is the equivalent of more than five staff members of Elkton's Case Management Coordinator office working full time to comply with the Court's order for two weeks.  (*Id.*)  After the preliminary evaluation, significant work is needed to further evaluate and process each inmate prior to the inmate leaving the institution.  (*Id.* at ¶ 48.)  This includes developing a release plan conducting multiple checks, notifying victims and witnesses, and considering inmate health issues.  (Id.)  Many other offices who are not are before the Court would necessarily be involved in that transport-release process, including United States Probation Offices, United States Attorneys' Offices, sentencing courts, and the United States Marshal Service.  (*Id.*)  The same BOP staff needed to comply with the Court's Order are also currently tasked with considering requests made by inmates who are not on the list, normal operational duties, and additional duties already asked of staff in responding to the COVID-19 pandemic.  (*Id.* at ¶ 47.)  BOP lacks the resources to both comply with the order, as well as fulfill its mission-critical functions. BOP further lacks the ability to compel other federal offices to

comply with the Court's mandates.

The preliminary injunction further requires transferring potentially hundreds of inmates who are ineligible for release to other BOP facilities. Transferring (or redesignation) of an inmate is, even under normal circumstances, an extremely burdensome process.  The BOP must consider, *inter alia*, level of security the inmate requires, the level of security and staff supervision the institution is able to provide, the inmate's program needs, safe and orderly management of the facilities, and protection of the inmate, victims, prison officials, and the public in general.  (Cole-2 Decl. at ¶ 11-19; *see also,* Exhibit B, Declaration of Cory Clark ("Clark Decl.") at ¶¶ 9-17.)  As explained in Mr. Cole's declaration, transferring so many inmates to comply with the Court's order is virtually impossible.  (Clark Decl. at ¶¶ 19-22.) Redesignating so many inmates at once would create a cascade of concerns and threats at exponentially more BOP facilities across the country that would irreparably harm the BOP's nationwide operations, and disrupt its ongoing response to the COVID-19 pandemic.

Further, the mechanics and costs of complying with the Court's preliminary injunction order creates great harm to the BOP.  (Exhibit C, Declaration of Peter Pottios ("Pottios Decl."),at ¶¶ 4-10.)  As Mr. Pottios explains, it :would be exceptionally difficult if not impossible" to comply with the order.  (Id. at ¶ 4.)  All of the inmates could not be sent to one facilty.  (Id. at ¶ 5.)  Further, there would be a limited number of facilities with space, programing needs, and the ability to separate inmates.  (Id. at ¶ 6.)  Even transporting the inmates creates risk of the spread of COVID-19.  (Id. at ¶ 7.)  Not only does this create enormous practical problems, it also would be cost prohibitive.  (Id. at ¶ 8-10.)

The preliminary injunction, coupled with the Court's instruction on the record to publish the list of inmates, further causes irreparable harm by requiring the names of medically

vulnerable inmates to be published publicly.  The preliminary injunction requires BOP to identify inmates who are at higher risk for serious complications from COVID-19 due to age and/or underlying medical conditions.  BOP did so.  The Court then ordered public filing of the names on that list.  The Court has explained that this "includes all Elkton inmates 65 or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher)."  (Order, ECF No, 22 PageID # 363.)  This list is therefore made up of the highly personal and privileged information of hundreds of inmates who are not before the Court.  Without a stay of any requirement to publish the list, an inmate's name on a list of medically-vulnerable inmates will always be public and, even if the appeal is successful, there will be no way to retroactively protect their privacy. A stay is appropriate to prevent great and irreparable harm to their privacy.  Moreover, inmates on the list may wish to opt out of the class action and may well object to a transfer from a minimum security facility like Elkton to a "single cell" facility.

Those harms to the public and to third parties outweigh any harms a stay would inflict on Petitioners.  Even before Petitioners brought this action and before the Court issued a preliminary injunction, the BOP was acting urgently to mitigate the risks of COVID-19 within its facilities and to reduce prison populations, to the extent possible.  The BOP was, for example, already prioritizing the use of home confinement as a tool for combatting the dangers that COVID-19 poses to vulnerable inmates pursuant to the Attorney General's March 26, 2020 and April 3, 2020 Memoranda. (ECF No. 10-2 PageID # 192 at ¶ 17.)  The BOP has also been assessing and, in appropriate instances, recommending to an inmate's sentencing court to reduce

a term of imprisonment under 18 U.S.C. § 4205.

In addition to reducing prison populations, BOP has been taking extensive measures to reduce the spread of COVID-19 among the inmates at Elkton, including providing inmate and staff education; conducting inmate and staff screening; testing, quarantine, and isolation procedures; enhanced cleaning and sanitization protocols; providing soap, cleaning supplies, and personal protective equipment (PPE) to inmates; and restricting inmates to their residential area with only one pod moving at a time.  (ECF# 10-1 PageID # 178-185 at ¶¶  19-54).  These efforts have been working as the number of new cases has been reduced.  BOP is committed to inmate safety and, even with a stay, will continue its efforts to reduce the inmate population at Elkton and to take measures to prevent the spread of COVID-19 within Elkton.

Further, Respondents submit that staying the brief schedule for class certification and any hearing or decision related thereto is in the public interest.  A stay will conserve judicial resources and prevent a ruling in a case in which the Sixth Circuit may soon determine that this Court lacks jurisdiction.  It would also prevent confusion among class members regarding whether they need to file their own requests under appropriate administrative procedures or whether their requests are governed by the orders of this Court.

## CONCLUSION

For the foregoing reasons, Respondents respectfully urge this Court to grant the Motion to Stay and suspend the preliminary injunction pending appeal.

(Signatures on the following page.)

17

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   */s/ James R. Bennett II*
James R. Bennett II (OH #0071663)
Sara DeCaro (OH #0072485)
Assistant United States Attorneys
United States Courthouse
801 West Superior Ave., Suite 400
Cleveland, Ohio 44113
216-622-3988 - Bennett
216-522-4982 - Fax
James.Bennett4@usdoj.gov
Sara.DeCaro@usdoj.gov

*Attorneys for Respondents*

## CERTIFICATE OF COMPLIANCE

Pursuant to Loc. R. 7.1(f), undersigned counsel certifies that the foregoing memorandum is 16 pages and within the limits of an unassigned matter.

*/s/ James R. Bennett II*
James R. Bennett II (OH #0071663)
Assistant United States Attorney