**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| WILSON, ET AL, | * | |
| | * | |
| Petitioners | * | CASE NO. 4:20-CV-00794 |
| | * | |
| v. | * | |
| | * | |
| WILLIAMS, ET AL, | * | JUDGE GWIN |
| | * | |
| Respondents | * | |

## DECLARATION OF KRISTY COLE

I, Kristy Cole, do hereby declare, certify and state as follows:

1.      I am employed by the United States Department of Justice, Federal Bureau of Prisons

(BOP).  I currently work as the Case Management Coordinator (CMC) at Federal Correctional

Institution (FCI) Elkton in Lisbon, Ohio.  I have held this position since September, 2007.  I have

been employed by BOP since March, 1997.

2.      The CMC's Office is dedicated to providing oversight of case management activities

within the institution. This office works directly with the unit teams, providing training and

disseminating information to insure that the institution is in compliance with Correctional

Programs' policies and procedures. The CMC provides coordination and oversight of many

programs within the institution, including, but not limited to, Central Inmate Monitoring,

Financial Responsibility, Admission and Orientation, Inmate Performance Pay, Victim/Witness

Program and Adam Walsh Act compliance. The CMC also oversees the Correctional Systems

Department.  The CMC Office at FCI Elkton has two staff members: myself and an Assistant

Case Management Coordinator.

**GOVERNMENT**
**EXHIBIT**

**A**

1

## THE BOP'S DESIGNATION AUTHORITY UNDER 18 U.S.C. §3621(b)

3.      Attached to this declaration is a true and correct copy of BOP Program Statement

5100.08, <u>Inmate Security Designation and Custody Classification</u> (the "Program Statement").

4.      The BOP issued the Program Statement to provide guidance to staff on how to apply

Title 18 United States Code (U.S.C.) § 3621(b), which states in pertinent part:

> **The Bureau of Prisons shall designate the place of the prisoner's imprisonment.** The
> Bureau may designate any available penal or correctional facility that meets minimum
> standards of health and habitability established by the Bureau, whether maintained by the
> Federal Government or otherwise and whether within or without the judicial district in
> which the person was convicted, that the Bureau determines to be appropriate and
> suitable, considering–
>
> > (1) the resources of the facility contemplated;
> > (2) the nature and circumstances of the offense;
> > (3) the history and characteristics of the prisoner;
> > (4) any statement by the court that imposed the sentence –
> > (A) concerning the purposes for which the sentence to imprisonment was
> > determined to be warranted; or
> > (B) recommending a type of penal or correctional facility as appropriate; and
> > (5)   any pertinent policy statement issued by the Sentencing Commission
> > pursuant to section 994(a)(2) of title 28.

*See* 18 U.S.C. § 3621(b) (Emphasis added).

## OVERVIEW OF THE BOP'S DESIGNATION PROCESS

5.      The BOP created the Designation and Sentence Computation Center (DSCC) to

centralize all determinations regarding inmate sentence computations and institution placements.

The DSCC is located in Grand Prairie, Texas.

6.      Decisions regarding initial institution placements are referred to as designations.

7.      DSCC is divided into 18 teams of staff, each identified by a name.  Seventeen of these

teams are organized by sentencing district.  Those 17 teams are responsible for all sentence

computations and classification of defendants from their sentencing districts.  The remaining

team is Hotel Team. It is responsible for designating the facility where those defendants will serve their criminal sentences

8.      Once a defendant is sentenced to a federal term of imprisonment, staff of the United States Probation Office (USPO) upload documents to an electronic system known as "eDesignate". For cases involving original sentencing to a term of imprisonment, these documents typically include the Judgement in a Criminal Case and the Presentence Investigation Report (PSR). For cases involving sentencing to a term of imprisonment based upon revocation of a term of supervised release, these documents typically include the order by which the court revoked supervised release and imposed a term of imprisonment, along with the revocation petition, which BOP staff also refer to as the violation report.

9.      Once USPO staff have uploaded the relevant documents, the case is transferred on eDesignate to the United States Marshals Service (USMS). Typically, USMS staff then upload a copy of the defendant's USM-129, *Individual Custody/Detention Report*, to eDesignate and then use eDesignate to transfer the case to the BOP and to request that the DSCC either provide a release date for the defendant (in cases where the defendant received a short sentence and there is not sufficient time to transport him to a facility before his release date) or designate the defendant to a facility to serve the term of imprisonment.

10.      Once a case has been transferred from the USMS to the BOP, staff of the DSCC team assigned to the defendant's sentencing district will open the case and begin the designation process. When the process has been completed, DSCC staff respond to the USMS request through eDesignate, usually by notifying the USMS where the inmate will serve the term of imprisonment. The USMS then transports the inmate to the designated facility or, if the

3

defendant has been allowed to voluntarily surrender, the USMS will notify the defendant of the
facility at which he must appear on the scheduled date.

## FACTORS IN THE DESIGNATION PROCESS

11.     When making designations about inmate designations, the BOP follows the guidance

contained in the Program Statement which provides:

> This Program Statement provides policy and procedure regarding the Bureau of Prisons
> inmate classification system. The classification of inmates is necessary to place each
> inmate in the most appropriate security level institution that also meets their program
> needs and is consistent with the Bureau's mission to protect society.
> The Bureau's classification, designation and redesignation procedures are consistent with
> the statutory authority contained in 18 U.S.C. § 3621(b).  All classification, designation
> and redesignation decisions are made without favoritism given to an inmate's social or
> economic status.

*PS 5100.08 at page 1.*

12.     Consistent with the Program Statement, DSCC staff on the team assigned to the

defendant's sentencing district consider the following primary factors when making a

designation decision: (1) the level of security and supervision the inmate requires; (2) the level of

security and staff supervision the institution is able to provide; and (3) the inmate's program

needs. *PS 5100.08 at Chapter 1, page 1.*

13.     DSCC staff also consider additional factors including, but not limited to:

- The inmate's release residence;

- The level of overcrowding at an institution;

- Any security, location or program recommendation made by the
  sentencing court;

- Any Central Inmate Monitoring issues (see Program Statement <u>Central
  Inmate Monitoring Program</u>);

4

- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and,

- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

*PS 5100.08 at Chapter 1, pages 1-2.*

14.     The designation process involves two parts.  First, DSCC staff on the team responsible for the inmate's sentencing district classify the inmate according to a security level (minimum, low, medium or high) and assign the inmate a custody level (community, out, in, or maximum). Second, DSCC staff on Hotel Team designate the inmate to a particular facility commensurate with their security level and custody level and the factors identified below.

15.     An inmate's security level represents the level of security the inmate requires.  It is based on the Criminal History Points as noted in the Presentence Investigation Report, and, if these points are contested, as ruled upon by the Court in the Statement of Reasons.  The BOP has created Public Safety Factors and Management Variables which may adjust the inmate's security level up or down depending on the BOP's professional judgment. *PS 5100.08 at Chapter 5.*

16.     An inmate's custody classification represents the amount of staff supervision the inmate requires.  It is tied to an inmate's security level. *PS 5100.08 at Chapter 1, page 2 and Chapter 2, page 2.*

### THE REDESIGNATION PROCESS

17.     Under some circumstances, the BOP may transfer an inmate to a different institution following initial designation. This is referred to as a redesignation.  Reasons for requesting redesignation include, but are not limited to disciplinary or closer supervision reasons, institution

5

classification reasons, institution adjustment reasons, medical/psychological reasons, programming or training reasons, or because an inmate is nearing release. *PS 5100.08 at Chapter 7, pages 1-12.*

18.     If institution staff believe an inmate is no longer appropriate for his current institution based on any of the factors identified in Chapter 7 of the Program Statement, they submit a redesignation request to the DSCC. Ordinarily, the DSCC will decide whether to grant or deny the request. DSCC staff will consider redesignation requests using the same factors outlined in paragraphs 24-26. In deciding whether to grant or deny a redesignation request, DSCC staff also carefully review the inmate's institutional adjustment and program performance. *PS 5100.08 at Chapter 1, page 3 and Chapter 7.*

19.     If the request is granted, the DSCC will designate the inmate to another facility. If the request is denied, the inmate will remain at the same facility.


**THE BOP'S AUTHORITY TO PLACE INMATES ON HOME CONFINEMENT**

20.     The BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. The BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, *Home Confinement* and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources tab. Both statutes set forth certain limitations with respect to the BOP's transfer authority. *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. However, pursuant to the Attorney General's directives in light of the COVID-19 pandemic, dated March 26, 2020, and April 3, 2020, *infra*, and given the surge in positive cases at select sites, the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as

described by the Centers for Disease Control and Prevention (CDC), to determine which inmates are suitable for home confinement. Since the release of the Attorney General's original memorandum dated March 26, 2020, the BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic.

**The Attorney General's Memorandum for the Director of the Bureau of Prisons, dated March 26, 2020**

21.     On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020, Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody. Pursuant to the March 26, 2020, Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. It was noted in the March 26, 2020, Memorandum that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

22.     In assessing whether home confinement should be granted pursuant to the March 26, 2020, Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

      a.  The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need),[1] with inmates who have anything above a minimum score not receiving priority treatment;

e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

23.     In addition to setting forth these factors, the March 26, 2020 Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement. The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting

---

[1] For more information on PATTERN, please visit www.bop.gov via Inmates/ First Step Act tab.

COVID-19. The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

24. Moreover, the March 26, 2020 Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

**The CARES Act and the Attorney General's Memorandum for the Director of the Bureau of Prisons, dated April 3, 2020**

25. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020 Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

26. The April 3, 2020 Memorandum specifically stated that the BOP must move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others

9

similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

27. The April 3, 2020 Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020 Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

28. For inmates deemed suitable candidates for home confinement, the April 3, 2020 Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility. The April 3, 2020 Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred. The assessment of all inmates remains guided by the factors in the March 26, 2020 Memorandum.

29. The April 3, 2020 Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

30.     Lastly, the April 3, 2020 Memorandum stated that it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

**The BOP's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda**

31.     The BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country.  The BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program.  The BOP is then processing those inmates for transfer as expeditiously as possible.

32.     The BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives.

33.     The BOP has increased home confinement by 55.2% since March 2020, and is continuing to screen inmates for home confinement.  Since the March 26, 2020 Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 1,576 inmates on home confinement.  *See* www.bop.gov (last viewed on April 27, 2020).

34.     Inmates do not need to apply to be considered for home confinement.  BOP staff are reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be reviewed for home confinement and provide a release plan to his or her Case Manager.

35.     It should be noted that for public safety reasons, in accordance with the March 26, 2020 Memorandum, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary or prior offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

36.     In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences. As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

37.     If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.

### Measures to Protect Inmate and Staff Safety

38.     In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. These steps include, but are not limited to the following:

a.  Beginning April 13, 2020, BOP implemented Phase VI of the Action Plan,
    which currently governs operations. The current modified operations plan
    requires that all inmates in every BOP institution be secured in their assigned
    cells/quarters for a period of at least 14 days, in order to stop any spread of the
    disease. Only limited group gathering is afforded, with attention to social
    distancing to the extent possible, to facilitate commissary, laundry, showers,
    telephone, and computer access. Further, BOP has severely limited the
    movement of inmates and detainees among its facilities. Though there will be
    exceptions for medical treatment and similar exigencies, this step as well will
    limit transmissions.

b.  All staff and inmates have been and will continue to be issued an appropriate
    face covering and strongly encouraged to wear the face covering when in public
    areas when social distancing cannot be achieved.

c.  Every newly admitted inmate is screened for COVID-19 exposure risk factors
    and symptoms. Asymptomatic inmates with risk of exposure are placed in
    quarantine. Symptomatic inmates are placed in isolation until they test negative
    for COVID-19 or are cleared by medical staff as meeting CDC criteria for
    release from isolation. In addition, in areas with sustained community
    transmission and at medical centers, all staff are screened for symptoms. Staff
    registering a temperature of 100.4 degrees Fahrenheit or higher are barred from
    the facility on that basis alone. A staff member with a stuffy or runny nose can
    be placed on leave by a medical officer.

d. Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

e. Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

f. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp

### Compassionate Release / Reduction in Sentence Procedures

44.     The BOP lacks the authority to provide inmates with a reduction in sentence through compassionate or "early release." Rather, only an Article III judge—specifically, the inmate's sentencing judge—may authorize such a reduction of an inmate's federal sentence. However, on an inmate's request, the Director of the BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment under 18 U.S.C. § 4205(g) and 18 U.S.C. §

14

3582(c)(1)(A). The BOP uses these statutory authorities in "extraordinary or compelling circumstances" which could not reasonably have been foreseen by the court at the time of sentencing. This process is outlined in BOP Program Statement 5050.50, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g).* (This BOP program statement is available at www.bop.gov via the Resources tab).

45.     Additionally, the First Step Act specifies that an inmate may file a Motion for Reduction of Sentence directly in the sentencing court after exhaustion of administrative remedies, or 30 days from the date the warden receives such a request from the inmate, whichever is earlier. *See* 18 U.S.C. § 3582(c)(1)(A).

### REQUIREMENTS OF THE PRELIMINARY INJUNCTION

46.     I understand BOP has been ordered by the Court in *Wilson, et al. v. Williams, et al.*, No. 4:20-cv-00794 (N.D. Ohio Apr. 22, 2020), to create a list of inmates at FCI Elkton identified by the CDC as being at higher risk of complications from COVID-19. I further understand that BOP has been ordered to evaluate each inmate that is identified for transfer out of FCI-Elkton through any means, including but, not limited to, compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two weeks. I further understand that BOP has been ordered to transfer any identified inmate who is ineligible for compassionate release, home release, parole, or community supervision to another BOP facility. I further understand that BOP has compiled a list of 837 inmates who are over the age 65 and/or have diagnosed medical conditions that are identified by the CDC as making an individual at higher risk of complications from COVID-19.

47.     The CMC Office's preliminary evaluation of each inmate on the list of 837 inmates for transfer would likely take in excess of 418 man-hours—the equivalent of more than five CMC

staff members working full time on compliance with this aspect of the district court's order for two weeks. This dedication of work does not include consideration of requests made by the other roughly 1,700 inmates not included on the list. This also does not include the normal operations of the CMC Office nor does this include the additional duties asked of each staff member across all BOP institutions during this world-wide pandemic.

48.     Significant work is needed in order to further evaluate and process each inmate prior to the inmate leaving the institution. Importantly, this includes developing a release plan, and having an officer with the United States Probation Office investigate that plan. Moreover, BOP conducts multiple checks at a variety of levels, for example, N.C.I.C. checks for warrants, victim/witness notifications, and health issues to ensure the continuing safety of the inmate and of the community, before the inmate's release date. Finally, in the case of a request for Compassionate Release, coordination with the U.S. Attorney's Office in the district where the inmate was sentenced is necessary so that a motion could be filed before the sentencing judge for Compassionate Release. Each of these stages with various entities makes it impossible to predict how many man-hours this would require and/or how long this process would take per inmate.


        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

                                    Executed on this 27th day of April 2020.


                                    Kristy Cole
                                    Case Manager Coordinator
                                    Federal Correctional Institution
                                    Elkton, Ohio