UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated,<br><br>*Petitioners*,<br><br>v.<br><br>MARK WILLIAMS, warden of Elkton Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities,<br><br>*Respondents.* | Case No. 20-cv-0794<br><br>Judge James Gwin |

**PETITIONERS' EMERGENCY MOTION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION**

**INTRODUCTION AND BACKGROUND**

Prisoners are still dying as the COVID-19 pandemic continues to rage through Elkton. Today, a 70 year-old man whose name appears on Respondents' preliminary list of subclass members passed away.[1] His is the eighth death at Elkton, and the fifth since this case was filed. *See* ECF No. 1 at ¶ 3. Confirmed cases have risen to 99 prisoners and 49 staff.[2] One week ago, those numbers were 49 and 48.[3] The situation remains as dire and urgent as ever, and Respondents' halfhearted response measures have done little or nothing to stem the tide. In the face of a direct

---

[1] WKYC Staff, *8th inmate dies from coronavirus at federal prison in Elkton*, WKYC (May 6, 2020), https://www.wkyc.com/article/news/health/coronavirus/8th-inmate-dies-from-coronavirus-at-federal-prison-in-elkton/95-4d3c0f2e-c648-4e8c-b483-496bc053cd5b.
[2] Federal Bureau of Prisons, *COVID-19: Coronavirus* (May 6, 2020), https://www.bop.gov/coronavirus/.
[3] *See* ECF No. 37 at 1 (citing the BOP website). Upon information and belief, the numbers on the BOP website are currently active cases rather than cumulative, and so not including the dead or recovered.

1

order from this Court to begin moving medically vulnerable prisoners out of Elkton, Respondents have turned to a mixture of stalling tactics and outright defiance.

This Court ordered Respondents to evaluate and transfer vulnerable prisoners out of this epicenter of COVID-19—quickly. *See* ECF No. 22. As the Court reaffirmed yesterday, that Order required Respondents "to identify members of the subclass; evaluate each subclass member's eligibility for transfer within two weeks (by May 6), prioritizing the most medically vulnerable inmates; and transfer inmates ineligible for other forms of release to another BOP facility." ECF No. 45 at 1. Respondents were directed to assess each person's possibility for "transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough[.]" ECF No. 22 at 20.

Respondents have already demonstrated, time and again, that they will not take such action on their own. But under this Court's Order, it is not for Respondents to decide *whether* the subclass should be moved out of Elkton, but only *how*—beginning with the most vulnerable, and keeping in BOP facilities only those who are "ineligible for" release or home confinement. "None of the above" is not an option that Respondents may continue to choose. *See* ECF No. 22 at 9 (injunction issued "ordering Respondents to determine the appropriate means of transferring medically vulnerable subclass members out of Elkton"); *id.* at 20-21 ("Subclass members who are ineligible for [release or home confinement] must be transferred to another BOP facility").

Respondents' Status Report is a damning account of noncompliance with the letter and spirit of the Court's Order. Rather than rebutting the showing of subjective deliberate indifference to the prisoners who are falling ill and dying in Respondents' care, the Report confirms it on multiple levels. *First*, Respondents have refused outright to evaluate prisoners for furlough as they were ordered to do. *Second*, they have refused to conduct or facilitate compassionate release

2

measures unless a prisoner directly applies, but have done nothing to advise them to do so. *Cf.* ECF No. 41 at 15 (Respondents' position that it would be "premature" even to begin measures to fully identify the medically vulnerable subclass). *Third*, they have regarded this Court's Order as a ceiling, not a floor—they have failed to identify any other mechanism for release or transfer. *Fourth*, Respondents' Status Report is silent on any measures of any kind to transfer to another facility individuals who are ineligible for home confinement, or even to prepare to do so. Nor is there any inkling that Respondents' are prioritizing the most pressing cases—or any case.

The paltry results of Respondents' evaluations speak for themselves. Out of 837 medically vulnerable class members, which must be reduced by those who have *already died while awaiting release*, five are "pending community placement." ECF No. 49 at 2. Only one has "met the criteria" for compassionate release, and the BOP is "working on" a release plan. *Id.* at 3. Zero have been approved, or apparently considered, for furlough. *Id.* at 4. In passing, Respondents have even rewritten the Court's instruction to consider "all Elkton inmates 65 years or older" into a list of those "over the age of 65." *Id.* at 1.[4]

Meanwhile, the stalling continues. Having already delayed production of their preliminary class list until more than a week after the Court's Order, Respondents argue today that their requests to stay that Order—none of which have been granted by any Court, for any period of time—should somehow justify delays in producing a proposed protective order that would enable emergency discovery. ECF No. 48 at 3-4. Even relevant discovery about the class list itself is described as "unnecessarily divert[ing] BOP resources away from the health and security of the

---

[4] Respondents' admission explains why at least two, and possibly more, 65 year-old prisoners were left off the list, as noted in Petitioners' Emergency Motion for Expedited Discovery. *See* ECF No. 44 at 2 n. 1.

3

inmates." ECF No. 48 at 2. On the contrary, given Respondents' abject failure to protect their charges' health to date, rapid discovery is rendered all the more necessary.

Federal courts are "not reduced to issuing injunctions against [government actors] and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). This Court's Order was not an advisory opinion, and it did not merely suggest that Respondents keep the parties and the Court informed while they continue their present, demonstrably failed course. Social distancing remains impossible at Elkton, and the death toll continues to rise. Respondents' defiant response to this Court's Order—coupled with stalling tactics that threaten to run out the clock while the disease runs its course—is manifestly inadequate. Absent the Court's intervention, more people will die while Respondents continue their incessant delays and deflections.

## ARGUMENT

### I. Respondents Have Failed To Conduct the Required Evaluations

#### A. Respondents Refuse To Conduct Any Review for Furloughs

By statute, the Bureau of Prisons may release a prisoner from his place of imprisonment for a limited period, if the release is consistent with "the purpose for which the sentence was imposed" and any pertinent policy statement issued by the Sentencing Commission, if it is "otherwise consistent with the public interest," and if there is "reasonable cause to believe that a prisoner will honor the trust to be imposed in him[.]" 18 U.S.C. § 3622. Purposes of such release may include, among others, obtaining medical treatment. § 3622(a)(3). Sentenced prisoners housed in BOP facilities are eligible. *See* 28 C.F.R. § 570.31. Among other possibilities, emergency non-transfer furloughs are available to "address a family crisis or other urgent situation." 28 C.F.R. § 570.32(b)(1).

Respondents have conceded that BOP already has the authority to temporarily release individuals from custody. *See* ECF No. 10-2 at p. 3 ¶ 7. They simply refuse to use it, as it is "only being used for those individuals who have been medically screened, considered to be at risk, and on the advice of medical professionals." *Id.* ("No FCI Elkton resident has met this criterion."). The entire medically-vulnerable subclass matches that description, rendering this mechanism an excellent fit under the Court's instruction to "evaluate each subclass member's eligibility [for] transfer furlough, or non-transfer furlough[.]" ECF No. 22 at 20.

But faced with that direct order, Respondents have responded with outright defiance—no one, in their unilateral view, will receive furlough "as a stand-alone basis for release from an institution." ECF No. 49 at 4. No one, by their own account, has been evaluated for a furlough under the Court's Order, much less granted one. On its face, Respondents' Status Report appears to recount a brazen repudiation of this Court's Order as to furloughs.

> B. <u>Respondents Have Evaluated Only a Fraction of the Medically Vulnerable Subclass for Compassionate Release and Their Explanations Why Are Unavailing</u>

The Court's April 22 ruling ordered Respondents to "evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release," among other measures. ECF No. 22 at 20. In response, BOP attempts to offload its responsibility to comply onto the prisoners themselves. Arguing that BOP lacks standalone "authority to grant 'compassionate release,'" Respondents' Status Report states that they have evaluated only 243 of the prisoners on their own privately generated list of medically vulnerable subclass members because those were the only subclass members who had "submitted a request for compassionate release." ECF No. 49 at 3. They argue that the lack of a proposed "release plan" is a barrier to considering subclass members who have not yet made a request, as is not knowing "whether a particular inmate even desires to seek compassionate release." *Id.* at 4. Thus far, they

5

report that only 1 of those 243 prisoners "met the criteria for compassionate release," and it appears that even that prisoner has not yet actually been released. *Id.* at 3.

Respondents' lack of action amounts to abdication of their responsibility to follow the Order. The Court "order[ed] Respondents to evaluate each subclass member's eligibility for," among other avenues, "compassionate release." ECF No. 22 at 20. The Order did not say anything about evaluating only those inmates who took the threshold step of making a request. *See id.* Furthermore, Respondents' own report demonstrates that they are perfectly capable of evaluating inmates who have not made requests: they note that "BOP has identified six inmates on the list who, although they have not formally requested compassionate release, BOP is currently considering." Status Report, ECF No. 49 at 3.[5] Yet Respondents leave unexplained why the 588 other prisoners on BOP's list of 837 prisoners were not similarly evaluated. More generally, and self-evidently, that Respondents have thus far identified only one qualifying prisoner at a low-security facility like Elkton calls into the question the vigor of their efforts.[6]

---

[5] Indeed, some courts are waiving compassionate-release exhaustion requirements altogether in light of the pandemic. *E.g.*, *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) ("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."). Moreover, there is certainly no reason to believe that a prisoner must consent to be evaluated for compassionate release. Even assuming for argument's sake that some prisoners would object to compassionate release, those prisoners would surely have a chance to voice their objections before being forcibly compassionately released by Respondents.

[6] Respondents' ambivalence may also be reflected in their opposition to at least one compassionate-release petition brought in this District by an Elkton prisoner, who supplemented his motion based on COVID-19. *See United States v. Smith*, No. 4:15-CR-19, 2020 WL 2063417, at *2, 4 (N.D. Ohio Apr. 29, 2020) (noting that Government opposed the prisoner's supplemental motion on exhaustion grounds and denying relief while observing that the prisoner "may be a member of the subclass" involved in this habeas litigation).

### C. Respondents Have Failed to Explain Why They Have Not Considered Other Means to Comply with the Court's Order

The Court directed the Bureau of Prisons to determine eligibility "through any means, including but not limited to … parole or community supervision… " Order, ECF No. 22 at 20. The Respondents have opted to interpret the order quite narrowly, and then not to comply with even that. To begin, Respondents argue that "BOP has no legal authority to 'release' inmates via parole or community supervision," because "a term of supervised release does not replace a portion of the sentence of imprisonment." Status Report, ECF 49 at 4. As Respondents well know, the Court was not suggesting that an *additional* punishment should be imposed on the prisoners, but that BOP should use community-based placements, with conditions, as necessary to implement the Court's order. Further, the Government's terse defiance fails to explain why it is refusing to use Bureau of Prison's significant authority to transfer people to alternative forms of confinement, including home detention, while imposing conditions. That BOP is again choosing not to take necessary steps only underscores the necessity of further action by this Court.

## II. Respondents Have Failed To Describe Any Action To Transfer Prisoners

As noted above, this Court's Order requires that those individuals who are "ineligible for compassionate release, home release, or parole or community supervision must be transferred to another BOP facility where appropriate measures … may be accomplished." ECF No. 22 at 20–21. Respondents acknowledged as much in seeking a stay from this Court. Stay Mem., ECF No. 30-1 at 2–3, 8, 15. And the Court's May 5 Order reiterated that Respondents must "evaluate each subclass member's eligibility for transfer within two weeks (by May 6), prioritizing the most medically vulnerable inmates; and transfer inmates ineligible for other forms of release to another BOP facility." Order, ECF 45 at 1; *accord* Sixth Circuit Order, App. ECF 23-2 at 1–2.

Despite this unambiguous instruction, Respondents' Status Report says nothing about transferring any prisoners to any other facility, having plans in place to do so, or in fact doing anything at all to begin these urgent transfers—for the most medically vulnerable, or for anyone else. Respondents argued, in pursuing a stay, that transferring inmates is "an extremely burdensome process," Stay Mem., ECF 30-1 at 15, but that is all the more reason to begin the process, and it certainly does not excuse them from compliance. That there is no indication that they have initiated, let alone effected, even a single transfer flies directly in the face of what Respondents were ordered to do.

### III. Respondents' Efforts To Shield This Process from Discovery Renders the Full Extent of Their Noncompliance Unknown

Even those evaluations that Respondents have actually undertaken have resulted in absurdly low numbers of individuals approved for release. *See* Status Report, ECF No. 49. Of the 837 known subclass members—a number that is known to be underinclusive, *e.g.*, *supra* n. 4—Respondents have approved *six people*, or 0.7% of the subclass, for some form of release. That is equal to the number that had already been approved for home confinement transfers before Respondents answered the Petition in this case. *See* ECF No. 10-2 at ¶ 20. Respondents have not, in other words, stepped up their pace in response to this Court's Order.

Instead, they appear to be applying a set of unattainable filtering criteria. The reasoning for each rejection remains known only to Respondents, as they refuse to answer discovery about the conditional class. *See* Opp., ECF No. 48, at 2-3. Across multiple cases, the BOP has taken contradictory and shifting views on what criteria apply for home confinement, for example.[7]

---

[7] Neena Satija & Matt Zapotosky, *Amid coronavirus pandemic, federal inmates get mixed signals about home-confinement releases*, WASHINGTON POST (April 24, 2020), https://www.washingtonpost.com/investigations/amid-coronavirus-pandemic-federal-inmates-get-mixed-signals-about-home-confinement-releases/2020/04/24/0bbc5458-84de-11ea-a3eb-e9fc93160703_story.html.

Indeed, BOP's approach to home confinement in the COVID-19 crisis has been described as "Kafkaesque" and "an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General, ungrounded in science, and a danger to both [the prisoner] and the public health of the community." *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020). Furloughs, according to Respondents, are at the Warden's discretion, applying wholly unknown criteria within the statutory boundaries of that discretion. *See* Status Report, ECF No. 49 at 4. The results, however, speak for themselves. Respondents' glacial pace and minuscule scope of releases to date simply underscores the need for expedited discovery and enforcement of this Court's Order. Respondents have proven that left to proceed at their own discretion, they will do little or nothing to expedite releases or transfers.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court take appropriate measures to enforce compliance with its April 22, 2020 Order.

Dated: May 6, 2020

Respectfully submitted,

| | |
|---|---|
| /s/ David J. Carey<br>David J. Carey (0088787)<br>ACLU of Ohio Foundation<br>1108 City Park Avenue, Ste. 203<br>Columbus, OH 43206<br>Phone: (614) 586-1972<br>Fax: (614) 586-1974<br>dcarey@acluohio.org<br><br>Joseph Mead (0091903)<br>Freda J. Levenson (0045916)<br>ACLU of Ohio Foundation<br>4506 Chester Avenue<br>Cleveland, OH 44102<br>Phone: (614) 586-1972<br>Fax: (614) 586-1974<br>attyjmead@gmail.com<br>flevenson@acluohio.org | David A. Singleton (0074556)<br>Mark A. Vander Laan (0013297)<br>Michael L. Zuckerman (0097194)<br>Ohio Justice & Policy Center<br>915 East Ninth Street, Suite 601<br>Cincinnati, OH 45202<br>Phone: (513) 421-1108<br>dsingleton@ohiojpc.org<br>mvanderlaan@ohiojpc.org<br>mzuckerman@ohiojpc.org |

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2020, the foregoing was filed with the Court's CM/ECF system. Notice of this filing will be sent by operation of that system to all counsel of record.

/s/ David J. Carey
David J. Carey (0088787)

*Counsel for Petitioners*
