UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG WILSON, et al. | ) CASE NO.: 4:20CV794 |
| | ) |
| | ) |
| Petitioners, | ) JUDGE JAMES S. GWIN |
| | ) |
| v. | ) |
| | ) |
| MARK WILLIAMS, Warden of Elkton | ) RESPONDENTS' OPPOSITION TO |
| Federal Correctional Institution, et al., | ) PETITIONERS' EMERGENCY MOTION |
| | ) FOR ENFORCEMENT OF |
| Respondents. | ) PRELIMINARY INJUNCTION |
| | ) |
| | ) |
| | ) |

INTRODUCTION

Now come Respondents Mark Williams, Warden of Elkton Federal Correctional Institution and Michael Carvajal, Director of Federal Bureau of Prisons, in their official capacities ("Respondents"), and hereby respectfully oppose Petitioners' Emergency Motion for Enforcement of Preliminary Injunction.  With no evidentiary support, Petitioners claim BOP has "done little or nothing to stem the tide," while accusing Respondents of "turn[ing] to a mixture of stalling tactics and outright defiance."  (ECF No. 51 PageID #693-94.)  Though sensational, these accusations are simply not true.  On the contrary, BOP continues to work relentlessly to protect Elkton's inmates, prison staff, and the public, and to comply with the Court's rulings under these unprecedented and challenging circumstances.

LAW AND ARGUMENT

I.   EFFORTS AT ELKTON TO CONTAIN THE COVID-19 OUTBREAK

Despite Petitioners' unfounded claims to the contrary, the Health Services staff at Elkton has "worked tirelessly to ensure that every inmate is safe from the effects of this pandemic."

1

(Supplemental Declaration of Sarah Dess ("Supp. Dees Decl."), attached hereto as Exhibit A, at ¶ 83.) The staff are working 12 hour shifts so that the inmates have 24-hour on-site medical coverage. (*Id.*) Even before Petitioners brought this lawsuit, staff identified inmates who were at greater risk for COVID-19 complications. (*Id.* at ¶¶ 32, 85.) These inmates were carefully monitored for symptoms related to COVID-19. (*Id.* at ¶ 33.) Despite staff members being at risk and many of them getting sick themselves, "[c]are for the inmates has not declined during this pandemic." (*Id.* at ¶ 85.)

Along with ongoing reviews by DOJ and BOP executive staff, a number of independent "public health officials have monitored the medical situation at FCI Elkton." (*Id.* at ¶ 79.) This included the Ohio Department of Health, the Columbiana County Health Department, and local hospitals. (*Id.* at ¶¶ 80-82.) Comparing Elkton to nursing homes that house people in similar proximity, health officials have found that Elkton has been more successful at stopping the spread of COVID-19. (*Id.* at ¶ 80.) These health officials were impressed with the planning done at Elkton in response to the pandemic. (*Id.* at ¶ 81.)

The effectiveness of these ongoing efforts is evidenced by the fact that several (and perhaps many) subclass members want to be excluded from this action so they can remain at Elkton. For example, one inmate reported that he is "healthy even during this pandemic" and is "safe and secure at [Elkton]…." (J.S. Letter "Emergency Motion to Be Excluded from Any Subclass in this Suit," attached hereto as Exhibit B; see also, J.B. Letter "Emergency Motion to Withdraw," Ex. B (letter motion from an inmate who wants to withdraw from subclass and stay at Elkton).) Another subclass member wrote to the Court to advise that he does not wish to be transferred out of FCI Elkton. (ECF No. 52, PageID # 705.)

Moreover, Elkton is now in position to begin mass testing of inmates and staff.

Specifically, Elkton has contracted with Quest Diagnostics to test for COVID-19 with a turn-around time of between 24-48 hours. (Supp. Dees Decl. ¶ 46.) On May 7, 2020, Quest provided Elkton with 400 test swabs and BOP anticipates an additional 150-200 tests each day after that. (*Id.*) While the logistics of mass testing are still being finalized, it should only be limited by how often Quest can pick up the tests. (*Id.*) Elkton also has received an Abbott rapid testing machine, 250 test cassettes, and anticipates an additional 432 test cassettes being delivered within the week. (*Id.* at ¶ 44.)

Importantly, the data shows that these efforts have been effective in containing COVID-19. (Supp. Dees Decl. at ¶ 66, attachment A.) As the chart below illustrates, the number of inmates being hospitalized per day has dropped substantially; only one inmate has been sent to the hospital for COVID-19 since April 17, 2020:



Similarly, the numbers of hospitalized and intubated inmates are both trending down:

3





Additionally, the total number of staff members who have tested positive for COVID-19 has remained nearly unchanged for more than two weeks:



Finally, though it has fluctuated, the number of inmates in isolation has never exceeded more than 0.5% of the inmate population:



(*Id.* at ¶ 66, attachment A.)

This is not to minimize the gravit of the COVID-19 pandemic that has affected Elkton and the nation as a whole. The novel coronavirus hs had severe consequences, but the Elkton

5

staff and the BOP as a whole has worked diligently to minimize those consequences. And the current evidence and data above suggests that they are succeeding.

II.     <u>BOP HAS EVALUATED ALL MEDICALLY VULNERABLE INMATES</u>

    A.     <u>Home Confinement</u>

In compliance with the Court's Order, BOP has evaluated <u>every</u> <u>inmate</u> on the subclass list for eligibility for home confinement. Generally, BOP may place a prisoner in home confinement only for the shorter of 10 percent of the term of imprisonment or 6 months. 18 U.S.C. § 3624(c)(2). Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, however, "if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020). On April 3, 2020, the Attorney General made that finding and authorized the BOP Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at Elkton. (Cole Decl. ECF 10-2 PageID # 192 at ¶ 18.) Contrary to Petitioners' arguments, the factors for eligibility for home confinement are clearly set forth in the regulations and the guidance issued by the Attorney General. Pursuant to BOP Program Statement 7320.01, *Home Confinement*, Sec. 12, an inmate is eligible for home confinement only if the inmate: (1) has no public safety factors; (2) had excellent institutional adjustment; (3) has a stable residence with a supportive family; (4) has confirmed employment (if employable); and (5) has little or no need for the services of a CCC. Further, under the Attorney General's guidance, BOP must consider the totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and a number of discretionary factors.

(*Attorney General Memorandum*, dated March 23, 2020, ECF No. 10-3 PageID # 195.) Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. (*Id.*)

The specific criteria that an inmate should meet to be eligible for home confinement are: (1) primary or prior offense is not violent; (2) primary or prior offense is not a sex offense; (3) primary or prior offense is not terrorism; (4) no detainer; (5) Mental Health Care Level is less than CARE- MH 4; (6) PATTERN risk score is Minimum (R- MIN); (7) no incident reports in the past 12 months (regardless of severity level); (8) U. S . citizen; and (9) a viable release plan. (*Bureau of Prisons' Guidance*, ECF No. 10-3 PageID # 200-201.)

Even before the Court issued its preliminary injunction, BOP had begun evaluating the eligibility for home confinement of all inmates throughout the United States. BOP assigned additional staff to assist in the reviews for the inmates at Elkton. As of May 5, 2020, BOP completed these the eligibility for home confinement of all of the subclass members on the list. Five inmates are pending community placement. The remaining inmates identified on the list are not eligible for home confinement, in part because many are sex offenders who the Attorney General has deemed ineligible for home confinement. Respondents have complied fully with this aspect of the Court's Order.

B. <u>Compassionate Release</u>

Petitioners also accuse Respondents of failing to evaluate subclass members for "Compassionate Release." This is incorrect. As an initial matter, an inmate's federal sentence can only be ordered reduced by the inmate's sentencing judge. The authority to grant "Compassionate Release" derives from 18 U.S.C. § 4205(g) and 18 U.S.C. § 3582(c)(1)(A). The First Step Act, codified at 18 U.S.C. § 3582, and the applicable regulations, 28 C.F.R § 571.61, specify that an inmate may file a Motion for Reduction of Sentence directly with the sentencing court after

7

exhausting administrative remedies, or 30 days from the date the Warden receives such a request from the inmate, whichever is earlier. The sentencing court decides whether to grant such a motion.

The process of applying for Compassionate Release is outlined in the U.S. Dep't of Justice Fed. Bureau of Prisons, *Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Program Statement 5050.50 (Jan. 17, 2019), http://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Generally, the process begins with a request by the inmate to the Warden accompanied by the necessary information.  Upon receiving an application, BOP must consider: (1) nature and circumstances of the inmate's offense; (2) criminal history; (3) comments from victims; (4) unresolved detainers; (5) supervised release violations; (6) institutional adjustment; (7) disciplinary infractions; (8) personal history derived from the PSR; (9) length of sentence and amount of time served; (10) inmate's current age; (11) imate's age at the time of offense and sentencing; (12) inmate's release plans (employment, medical, financial); and (13) whether release would minimize the severity of the offense.  *BOP Program Statement 5050.50*, Sec. 7.  Under BOP regulations, these factors are neither exclusive nor weighted.  *Id.*  Rather, BOP considers these factors and any other relevant information to determine whether the inmate's release would pose a danger to the safety of any other person or the community. *Id.*

To date, 243 subclass members have filed requests for compassionate release with the Warden.  All 243 applications have been evaluated and decided by BOP.  However, it is ultimately up to the sentencing judge to determine whether to grant compassionate release.  For the remaining subclass members, while they have not submitted requests and therefore Elkton lacks information to complete an assessment, Elkton nevertheless evaluated their potential eligibility as well.  Six subclass members who have not applied for compassionate release may qualify, and BOP is further

8

reviewing those inmates and asking them for additional necessary information such as a release plan. The remaining subclass members do not appear to be appropriate candidates for Compassionate Release under the applicable factors.

It should be noted, contrary to Petitioners' suggestion that exhaustion may not be required for Compassionate Release (ECF No. 51 at 6 n.5), the majority of courts that have considered whether a district court may waive the exhaustion and 30-day requirements of the First Step Act, 18 U.S.C. § 3582(c)(1)(a) and the BOP's regulatory provision, 28 C.F.R. § 571.61, due to the exigent circumstances presented by COVID-19, have held that the exhaustion requirements are mandatory. *E.g. United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (finding exhaustion requirement in § 3582 mandatory); *United States v. Smith*, No. 4:15-cr-19, 2020 WL 2063417, at *3 (N.D. Ohio Apr. 29, 2020) ("the Court will not read an exception into § 3582(c)(1) which does not exist, and Smith's motions are denied for failure to exhaust his administrative remedies"); *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 (E.D. Mich. Apr. 8, 2020) (collecting cases). The only court of appeals that has addressed this issue so far is the Third Circuit which held that an inmate's failure to wait the requisite 30-day period before seeking a compassionate release from the district court "present[ed] a glaring roadblock foreclosing compassionate release[.]" *Raia,* 954 F.3d at 597.

C. <u>Furloughs</u>

The BOP has the authority to temporarily release from custody (i.e. "furlough") an inmate pursuant to 18 U.S.C. § 3622 and BOP Program Statement 5280.09, *Inmate Furloughs*. That statute requires any furlough to be "consistent with the purpose for which the sentence was imposed" and may only be granted for an authorized purpose. 18 U.S.C. § 3622. As relevant here, the regulations permit BOP to grant emergency furloughs to allow an inmate to address a

family crisis or other urgent situation. 28 C.F.R. § 570.32(b)(1). Effective April 16, 2020, BOP issued guidance that the COVID-19 pandemic "is considered an urgent situation that may warrant an emergency furlough…." (ECF No. 10-3 PageID # 200.) However, inmates are generally ineligible for furlough if: (1) convicted of a serious crime against a person; (2) their presence in the community could attract undue public attention, create unusual concern, or diminish the seriousness of the offense; or (3) granted a furlough in the past 90 days. 28 C.F.R. § 570.36(b). Further, BOP guidance provides that furloughs are to be considered for inmates who are within 12 months of projected release or who have received home confinement with a projected release date exceeding one year. (ECF No. 10-3 PageID # 200.) BOP staff have examined the subclass members eleigibility for furlough under these authorities on several occasions.. In short, none satisfy the criteria for furlough eligibility

D. <u>No Other Basis for Release or Transfer Exists that Elkton Has Not Considered</u>

In their Motion, Petitioners accuse Respondents of failing "to identify any other mechanism for release or transfer," but fail to identify any mechanism that Respondents failed to consider. In reality, no other legal mechanism exists for the release or transfer of prisoners other than those that already considered.

III. <u>TRANSFER OF SUBCLASS MEMBERS</u>

Petitioners complain that Respondents failed to describe any action regarding the transfer of prisoners. (Mot. to Enforce, ECF No. 51 PageID # 699.) While not specifically addressed in the status report, as described below, BOP has began the process of investigating and planning for possible transfers of inmates.

A. <u>Procedure for Designation of Place of Imprisonment</u>

Pursuant to 18 U.S.C. § 3621(b), BOP is required to designate the place of a prisoner's

imprisonment. Once an inmate has been transferred to BOP after sentencing, BOP considers the following primary factors when making a designation decision: (1) the level of security and supervision the inmate requires; (2) the level of security and staff supervision the institution is able to provide; and (3) the inmate's program needs. (Declaration of Sukenna W. Stokes ("Stokes Decl."), attached as Exhbit C, at ¶ 13, see also, attachment A, PS 5100.08 at page 1.) BOP alos considers additional factors including, but not limited to:

- The inmate's release residence;
- The level of overcrowding at an institution;
- Any security, location or program recommendation made by the sentencing court;
- Any Central Inmate Monitoring issues (see Program Statement Central Inmate Monitoring Program);
- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and,
- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

(*Id.* at ¶ 14, see also, attachment A, PS 5100.08 at Chapter 1, pages 1-2.)

The designation process involves two parts. (*Id.* at ¶ 15.) First, BOP classifies the inmate according to a security level (minimum, low, medium or high) and assigns the inmate a custody level (community, out, in, or maximum). (*Id.*) Second, BOP designates the inmate to a particular facility commensurate with their security level and custody level and the identified factors. (*Id.* at ¶ 15.)

Under some circumstances, the BOP may transfer an inmate to a different institution following initial designation which is referred to as redesignation. (*Id.* at ¶ 23.) Reasons for requesting redesignation include, but are not limited to disciplinary or closer supervision reasons, institution classification reasons, institution adjustment reasons, medical/psychological reasons, programming or training reasons, or because an inmate is nearing release. (*Id.*, see also,

11

Attachment A, PS 5100.08 at Chapter 7, pages 1-12.)

      B.      <u>Efforts to Transfer Subclass Members</u>

In compliance with the Court's April 22, 2020, Order in this matter, the Northeast Regional Correctional Programs Department has been reviewing BOP records concerning available bed space at institutions located throughout the Northeast Region, as well as nationwide. (Stokes Decl. at ¶ 26.) This review has focused on determining whether sufficient and available space exists to transfer and house for an extended period of time those identified inmates deemed inappropriate or otherwise ineligible for release via compassionate release or reduction in sentence, furlough, home confinement, parole, or community supervision. (*Id.*) The review has considered the capability of affording these inmates appropriate measures, such as testing, single-cell placement, and social distancing opportunities, as well as the BOP's suspension of inmate internal movement, programming and security concerns. (*Id.* at ¶ 27.) Because the inmates at Elkton would be transferred from a low security institution, the assessment must account for each institution's physical structure, layout, custody, and security level. (*Id.* at ¶ 28.) To comply with the Court's requirement to place subclass memebers in single-cells, BOP would likely need to transfer inmates to higher security institutions that contain cell-type housing, while simultaneously transferring those higher security inmates to other institutions in order to prevent the two groups from intermingling. (*Id.* at ¶ 29.)

Higher security institutions, including medium Federal Correctional Institutions, and United States Penitentiaries, have cells with typically two beds per cell. (*Id.* at ¶ 30.) As such, a medium or high security institution that reports it has, for example, 500 empty beds, would most likely only be able to accommodate at most 250 inmates in single-cell status, further limiting BOP's options. (*Id.*) Moreover, given the limited available single cell bed space, the majority of

the inmates would likely have to be transferred to institutions outside of 500 driving miles of their primary residences. (*Id.* at ¶ 36.)

In addition to the available bed space issues raised by transferring these inmates to higher security institution, such transfers would raise serious security concerns. (*Id.* at ¶ 37.) BOP reviews many factors to see if a particular institution is appropriate for an inmate, including the inmate's criminal history, programing needs, release residence, level of security and supervision needed, and and, any other factor(s) which may involve the inmate's confinement, the protection of society, and/or the safe and orderly management of a BOP facility. (*Id.*)

Many of the subclass members at Elkton receive various mental health services, including assessment, individual and group counseling, and crisis intervention functions. (*Id.* at ¶ 38.) A non-residential sex offender treatment program is available to inmates housed in the federal satellite low attached to FCI Elkton. (*Id.*) Further, substance abuse services including the Residential Drug Abuse Program (RDAP), nonresidential treatment, and a drug abuse education course are also available at Elkton. (*Id.*) However, these important drug and sex offender treatment programs are not available at many other institutions. (*Id.* at ¶ 39.) Disrupting inmate participation in these programs may cause significant lapses in treatment, which may impact an inmate's recovery, ability to continue with a program, and his eligibility for an early release pursuant to 18 U.S.C. § 3621(e) through completion of RDAP. (*Id.*)

Further, BOP is highly concerned about avoiding the risk of COVID-19 transmission that the CDC has suggested may occur if detained individuals are transferred between facilities during the COVID19 crisis. (See, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/ 2019-ncov/downloads/guidance-correctional-detention.pdf, last access on May 8, 2020, attached

as Exhibit D.) In fact, the CDC recommends that a correctional institution suspend all transfers unless absolutely necessary if there is a suspected or confirmed case of COVID-19 at the institution. (*Id.* at 13.) It is because of these risks that BOP has a policy against most transfers during the pandemic. (Supp. Dees Decl. at ¶ 10.) This policy is well-founded, as demonstrated by what happened during the recent transfer of 124 inmates to FCI-Gilmer.[1] Inmates were screened prior to being transferred and upon arrival at FCI-Gilmer. (*Id.*) None of the inmates were symptomatic. (*Id.*) Nevertheless, three days after arriving at FCI-Gilmer, one inmate developed symptoms, was sent to a local hospital, and tested positive for COVID-19. (*Id.*) As a result, the prison staff unions and elected leaders have urged BOP not to transfer prisoners during the COVID-19 pandemic. (*Id.*)

In attempting to comply with the court's order, BOP must carefully evaluate the statutorily mandated factors governing the designation of appropriate facilities for particular inmates, availability of alternative spaces that meet the requirements of the court's order, the problems that may arise based on alternative placements, and the best ways to mitigate any risk of spreading COVID-19 through transfers. These evaluations obviously take time, but BOP is moving as quickly as possible.

---

[1] See, http://wvmetronews.com/2020/05/04/bureau-of-prisons-confirms-positive-test-at-gilmer-prison-came-from-inmate-who-was-transferred-there/ (last visited May 9, 2020).

CONCLUSION

This Court should deny Petitioner's Emergency Motion for Enforcement of Preliminary Injunction. The BOP is working hard to comply with the Court's Order within the limits of the law, controlling regulations and policies, and the best interest, safety and security of its inmates during the COVID Pandemic.

                Respectfully submitted,

                JUSTIN E. HERDMAN
                United States Attorney

By:  /s/ James R. Bennett II
       James R. Bennett II (OH #0071663)
       Sara E. DeCaro (OH #0072485)
       David M. DeVito (CA #243695)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Ave., Suite 400
       Cleveland, Ohio 44113
       216-622-3988 - Bennett
       216-522-4982 - Fax
       James.Bennett4@usdoj.gov
       Sara.DeCaro@usdoj.gov
       David.DeVito@usdoj.gov

*Attorneys for Respondents*