## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

CRAIG WILSON, et al.,

               Petitioners,

        v.

WARDEN MARK WILLIAMS, et al.,

               Respondents.

Civil No. 4:20-CV-00794

## DECLARATION OF SUKENNA W. STOKES

I, Sukenna W. Stokes, do hereby make the following declaration:

1.        I, Sukenna W. Stokes, am employed by the Federal Bureau of Prisons (BOP) as a Correctional Programs Administrator at the Northeast Regional Office in Philadelphia, Pennsylvania. I have been employed by the BOP since 1999. I have held my current position since 2019. In 1999, I began my BOP career at the Federal Correctional Institution in Talladega, Alabama as a Correctional Officer. In November 2000, I was selected as a Legal Instruments Examiner, and in August 2005, I was temporarily promoted to a Supervisory Correctional Officer (Lieutenant). In December 2005, was selected as a Special Investigative Support Technician. In November 2006, I was again selected as a Legal Instruments Examiner. In July 2008, I was promoted to the position of Correctional Treatment Specialist (Case Manager). In November 2012, I was promoted to the position of Supervisory Correctional Treatment Specialist (Case Management Coordinator). In February 2017, I was promoted to the position of Supervisory Correctional Treatment Specialist (Case Management Coordinator, Complex) at the



1

Federal Correctional Complex in Forrest City, Arkansas, a position I held until I began my role as the Regional Correctional Programs Administrator in February 2019.

2.      The Northeast Regional Correctional Programs Department is comprised of five staff members, who are responsible for providing support and guidance to the 19 institutions located within the Northeast Region. The department develops activities and programs designed to appropriately classify inmates, eliminate inmate idleness, and develop the skills necessary to facilitate the successful reintegration of inmates into their communities upon release. The Correctional Programs staff provides technical assistance on national policy; direction and daily operational oversight of correctional programs; inmate transportation; receiving and discharge, and the processing of inmate mail. The department monitors inmate populations at each institution and assist with facilitating relief when necessary. As the Regional Correctional Programs Administrator, I am responsible for policy implementation, planning, directing and coordinating operations to provide services that meet unit/case management and correctional program requirements to accomplish the institutions' mission.

3.      In this position, I have access to official records compiled and maintained by the BOP, including Program Statements, inmate files, and computerized records.

4.      Some of the BOP's computerized records are maintained in a database named SENTRY. SENTRY is a real-time information system consisting of various applications for processing inmate information. Data collected and stored in the SENTRY system includes information related to the classification, discipline, and programs of federal inmates.

5.      Attachment A to this declaration is a true and correct copy of BOP Program Statement 5100.08, *Inmate Security Designation and Custody Classification*.

6.      The BOP issued the *Inmate Security Designation and Custody Classification* Program Statement to provide policy and procedure regarding the BOP's inmate classification system.

2

The classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society. The BOP's classification, designation and redesignation procedures are consistent with the statutory authority contained in Title 18 United States Code (U.S.C.) § 3621(b), which states in pertinent part:

> **The Bureau of Prisons shall designate the place of the prisoner's imprisonment.** The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering–
>
> > (1)  the resources of the facility contemplated;
> >
> > (2)  the nature and circumstances of the offense;
> >
> > (3)  the history and characteristics of the prisoner;
> >
> > (4)  any statement by the court that imposed the sentence –
> >
> > (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
> >
> > (B) recommending a type of penal or correctional facility as appropriate; and
> >
> > (5)  any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

*See* 18 U.S.C. § 3621(b) (Emphasis added).

7.      The BOP created the Designation and Sentence Computation Center (DSCC) to centralize all determinations regarding inmate sentence computations and institution placements.

8.      Decisions regarding initial institution placements are referred to as designations.

9.      Once a defendant is sentenced to a federal term of imprisonment, staff of the United States Probation Office (USPO) upload documents to an electronic system known as "eDesignate". For cases involving original sentencing to a term of imprisonment, these

documents typically include the Judgement in a Criminal Case and the Presentence Investigation Report (PSR). For cases involving sentencing to a term of imprisonment based upon revocation of a term of supervised release, these documents typically include the order by which the court revoked supervised release and imposed a term of imprisonment, along with the revocation petition, which BOP staff also refer to as the violation report.

10.       Once USPO staff have uploaded the relevant documents, the case is transferred on eDesignate to the United States Marshals Service (USMS). Typically, USMS staff then upload a copy of the defendant's USM-129, *Individual Custody/Detention Report*, to eDesignate and use eDesignate to transfer the case to the BOP and to request that the DSCC either provide a release date for the defendant (in cases where the defendant received a short sentence and there is not sufficient time to transport him to a facility before his release date) or designate the defendant to a facility to serve the term of imprisonment.

11.       Once a case has been transferred from the USMS to the BOP, staff of the DSCC team assigned to the defendant's sentencing district will open the case and begin the designation process. When the process has been completed, DSCC staff respond to the USMS request through eDesignate, usually by notifying the USMS where the inmate will serve the term of imprisonment. The USMS then transports the inmate to the designated facility or, if the defendant has been allowed to voluntarily surrender, the USMS will notify the defendant of the facility at which he must appear on the scheduled date.

12.       When making decisions about inmate designations, the BOP follows the guidance contained in the *Inmate Security Designation and Custody Classification* Program Statement which provides:

> This Program Statement provides policy and procedure regarding the Bureau of Prisons inmate classification system. The classification of inmates is necessary to

4

place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society.

The Bureau's classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. § 3621(b). All classification, designation and redesignation decisions are made without favoritism given to an inmate's social or economic status.

*Attachment A, PS 5100.08 at page 1.*

13.     Consistent with the Inmate Security Designation and Custody Classification Program Statement, DSCC staff on the team assigned to the defendant's sentencing district consider the following primary factors when making a designation decision: (1) the level of security and supervision the inmate requires; (2) the level of security and staff supervision the institution is able to provide; and (3) the inmate's program needs. *Attachment A, PS 5100.08 at Chapter 1, page 1.*

14.      DSCC staff also consider additional factors including, but not limited to:

- The inmate's release residence;
- The level of overcrowding at an institution;
- Any security, location or program recommendation made by the sentencing court;
- Any Central Inmate Monitoring issues (see Program Statement <u>Central Inmate Monitoring Program</u>);
- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and,
- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

*Attachment A, PS 5100.08 at Chapter 1, pages 1-2.*

15.     The designation process involves two parts. First, DSCC staff on the team responsible for the inmate's sentencing district classify the inmate according to a security level (minimum, low, medium or high) and assign the inmate a custody level (community, out, in, or maximum).

Second, DSCC staff on Hotel Team designate the inmate to a particular facility commensurate with their security level and custody level and the factors identified below.

16.      Minimum security institutions, also known as Federal Prison Camps (FPCs), have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing. These institutions are work- and program-oriented. A number of BOP institutions have a small, minimum security camp adjacent to the main facility. These camps, often referred to as Satellite Prison Camps (SCPs), provide inmate labor to the main institution and to off-site work programs.

17.      Low security Federal Correctional Institutions (FCIs) have double-fenced perimeters, mostly dormitory or cubicle housing, and strong work and program components. The staff-to-inmate ratio in these institutions is higher than in minimum security facilities.

18.      Medium security FCIs (and USPs designated to house medium security inmates) have strengthened perimeters (often double fences with electronic detection systems), mostly cell-type housing, a wide variety of work and treatment programs, an even higher staff-to-inmate ratio than low security FCIs, and even greater internal controls.

19.      High security institutions, also known as United States Penitentiaries (USPs), have highly secured perimeters (featuring walls or reinforced fences), multiple- and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement.

20.      Administrative facilities are institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates. Administrative facilities include Metropolitan Correctional Centers (MCCs), Metropolitan Detention Centers (MDCs), Federal Detention Centers (FDCs), Federal Medical Centers (FMCs),the Federal Transfer Center (FTC), the Medical Center for Federal Prisoners (MCFP), and the Administrative-Maximum Security Penitentiary

(ADX). Administrative facilities, except the ADX, are capable of holding inmates in all security categories.

21.     An inmate's security level represents the level of security the inmate requires. It is based on the Criminal History Points as noted in the Presentence Investigation Report, and, if these points are contested, as ruled upon by the Court in the Statement of Reasons. The BOP has created Public Safety Factors and Management Variables which may adjust the inmate's security level up or down depending on the BOP's professional judgment. *Attachment A, PS 5100.08 at Chapter 5.*

22.     An inmate's custody classification represents the amount of staff supervision the inmate requires. It is tied to an inmate's security level. *Attachment A, PS 5100.08 at Chapter 1, page 2 and Chapter 2, page 2.*

23.     Under some circumstances, the BOP may transfer an inmate to a different institution following initial designation. This is referred to as a redesignation. Reasons for requesting redesignation include, but are not limited to disciplinary or closer supervision reasons, institution classification reasons, institution adjustment reasons, medical/psychological reasons, programming or training reasons, or because an inmate is nearing release. *Attachment A, PS 5100.08 at Chapter 7, pages 1-12.*

24.     If institution staff believe an inmate is no longer appropriate for his current institution based on any of the factors identified in Chapter 7 of the *Inmate Security Designation and Custody Classification* Program Statement, they submit a redesignation request to the DSCC. Ordinarily, the DSCC will decide whether to grant or deny the request. DSCC staff will consider redesignation requests using the same factors outlined in paragraphs 24-26. In deciding whether to grant or deny a redesignation request, DSCC staff also carefully review the inmate's institutional adjustment and program performance. *Attachment A, PS 5100.08 at Chapter 1, page 3 and Chapter 7.*

25.     If the redesignation request is granted, the DSCC will designate the inmate to another facility. If the request is denied, the inmate will remain at the same facility.

26.     In compliance with the Court's April 22, 2020, Order in this matter, my office has been reviewing BOP records concerning available bed space at institutions located throughout the Northeast Region, as well as nationwide. Specifically, the review is focused on determining whether there is sufficient and available space to transfer and house for an extended period of time those identified inmates who were deemed inappropriate or otherwise ineligible for release consideration via compassionate release or reduction in sentence, furlough, home confinement, parole, or community supervision.

27.     This review has taken into consideration the capabilities at different institutions of affording these inmates appropriate measures, such as testing, single-cell placement, and social distancing opportunities, as well as the BOP's suspension of inmate internal movement, programming and security concerns.

28.     FCI Elkton is a low security institution with an adjacent Federal Satellite Low located in Columbiana County in Northeastern Ohio. As these inmates potentially subject to transfer under the Court's Order would be transferred from a low security institution, the BOP has had to account for each potential transferee institution's physical structure, layout, custody, and security level.

29.     As stated above, low security institutions predominantly consist of dormitory or cubicle housing. As such, the Court's Order to place these inmates in single-cells will likely require transferring these inmates to higher security institutions that contain cell-type housing, where they will intermingle with higher security inmates.

30.      Higher security institutions, including medium Federal Correctional Institutions and United States Penitentiaries, have cells with typically two beds per cell. As such, a medium or high security institution that reports to my office that it has, for example, 500 empty beds, would most likely only be able to accommodate no more than 250 inmates in single-cell status, further limiting the range of potential transferee available institutions.

31.      The BOP would not house these inmates at a high security level institutions with maximum custody inmates. They would be most likely housed with inmates at medium security level institutions if a management variable is applied. *Attachment A, PS 5100.08 at Chapter 5, pages 1-6.*

32.      Ordinarily, an inmate's transfer to a higher security institution is triggered by an increase in custody needs, such as the inmate is an escape risk, has pending charges, or a detainer. The BOP would apply a management variable to account for the inmate's custody needs and allow the inmate to be placed in the most appropriate level institution, even if that institution is inconsistent with the inmate's security level.

33.      In order to house these inmates at a medium security level institution, the BOP would have to locate sufficient vacant cells or housing units to permit them to be single cell, and have the ability to practice social distancing. As the BOP's medium security level institutions are at capacity, vacating cells or housing units would entail relocating inmates to other cells within the institution or transferring them to another institution.

34.      The modified operations which BOP is presently operating are intended to maximize social distancing as much as practicable. This includes consideration of staggered meal times and staggered recreation times in order to limit congregate gatherings.

35.     Another factor my office has to consider is the First Step Act of 2018 (FSA). Section 601 of the FSA requires the BOP to place inmate in facilities as close as practicable to their primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. Specifically, the FSA amended 18 U.S.C. § 3621(b) to state:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence."

36.     Given the limited availability of single-cell bed space, the majority of the inmates potentially subject to transfer under the Court's Order would likely have to be transferred to institutions outside of 500 driving miles of their primary residences, which may posed additional problems for their families and friends to visit.

37.     In addition to the available bed space issues raised by transferring inmates to higher security institutions, the transfers process itself raises significant security concerns. As previously indicated, the BOP reviews several factors to see if a particular institution is appropriate for an inmate, including the inmate's current offense; past criminal history; cooperation with the government; the level of security and supervision the inmate requires; the inmate's programming needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc.; the level of security and staff supervision the institution is able to provide; the inmate's release residence; the level of overcrowding at an institution; any security, location or program recommendation made by the sentencing court; Central

Inmate Monitoring issues (witness security cases, threats to government officials, broad publicity, disruptive group or gang affiliation, separations, special supervision); any additional security measures to ensure the protection of victims/witnesses and the public in general; and, any other factor(s) which may involve the inmate's confinement, the protection of society, and/or the safe and orderly management of a BOP facility. *Attachment A, PS 5100.08 at Chapter 1, pages 1-2.*

38.     As previously indicated, the BOP considers the sentencing court's order for an inmate to participate in drug or sex offender treatment programs. FCI Elkton provides various mental health services to the inmate population including assessment, individual and group counseling, and crisis intervention functions. A non-residential sex offender treatment program is available to inmates housed in the Federal Satellite Low attached to FCI Elkton. And substance abuse services provided at FCI Elkton include the Residential Drug Abuse Program (RDAP), nonresidential treatment, and a drug abuse education course.

39.     These drug and sex offender treatment programs are not available at most institutions. The disruption of these treatment programs may cause significant lapses in treatment, which may, among other potential consequences, impact an inmate's ability to continue with a program, and his eligibility for an early release pursuant to 18 U.S.C. § 3621(e) through completion of RDAP.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Executed on this 08<u>TH</u> day of May 2020.

*Sukenna W. Stokes*
_____
Sukenna W. Stokes
Regional Correctional Programs
Administrator Northeast Regional Office
Philadelphia, Pennsylvania