UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and MAXIMINO NIEVES, on behalf of themselves and those similarly situated,<br><br>*Petitioners*,<br><br>v.<br><br>MARK WILLIAMS, warden of Elkton Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities,<br><br>*Respondents*. | Case No. 20-cv-0794<br><br>Judge James Gwin |

**REPLY IN SUPPORT OF PETITIONERS' EMERGENCY MOTION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION**

**INTRODUCTION**

Respondents' Opposition effectively asks this Court to allow them to run out the clock—that is, to allow COVID-19 to run its course within Elkton, even though Respondents cannot and do not dispute that social distancing remains impossible. Armed with a series of self-serving declarations, Respondents argue that they "carefully monitored" vulnerable prisoners, but cannot say that they effectively quarantined them. They stress that a handful of individual prisoners remain healthy, disregarding the dozens—perhaps hundreds—who have fallen ill or died. They state that they are "in a position to begin" mass testing, but do not explain how belated testing alone could do any more than to quantify Respondents' failure to protect those who live at their mercy.

And indeed, Respondents cannot test their way out of the calamity at Elkton. *First*, by Respondents' own account, the majority of tests require a 24-48 hour turnaround. ECF No. 58 at 3. During that time, an individual whose positive test has not yet been revealed—particularly if he

1

is asymptomatic—will continue living in tight quarters with others. *Second*, Respondents' failed remedial measures to date demonstrate their inability to conduct an effective quarantine. This is no surprise, given the clustered dormitory-style layout of Elkton and the crowding within it. Even quarantined housing areas will have staff moving in and out, which will invariably lead to further spread inside Elkton. *Third*, even a negative test can easily be a false negative. The Abbott rapid test that Respondents tout as a solution recently "missed a third of the positive samples found by [a competitor]," according to a recent New York University study.[1] *Fourth*, even infection and recovery does not mean that a person is safe from this deadly illness. The World Health Organization has advised that "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[2]

In any event, the time for that discussion has passed. Respondents are under a clear Order to move people out of Elkton. Instead of complying, they have thrown up a series of roadblocks to every conceivable form of release. Despite guidance from their own agency and an Order from this Court to consider furloughs, they have simply declined or pled an inability to use their own discretion. Though the CARES Act has granted them sweeping authority to move prisoners to home confinement in this national emergency, the results of their review—recently produced at this Court's order—demonstrates an unwillingness to use that authority as the moment demands, instead electing to construe it as tightly as possible. Prisoners' compassionate-release applications are met with strident opposition from the BOP on technical grounds.

---

[1] Carolyn Y. Johnson & Steven Mufson, *Abbott Coronavirus Test Missed a Large Number of Positive Results Caught by a Rival Firm, Preliminary Study Says*, WASH. POST (May 13, 2020), https://www.washingtonpost.com/health/2020/05/13/abbott-test-hailed-by-president-trump-has-been-dogged-by-accuracy-questions/.
[2] WORLD HEALTH ORGANIZATION, *"Immunity passports" in the context of COVID-19* (April 24, 2020), https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19.

Respondents' dogged resistance to life-saving releases cannot continue. Petitioners respectfully submit that further action is needed to enforce this Court's Order.

**ARGUMENT**

I. <u>Respondents Have Failed to Use the Tools at Their Disposal to Alleviate the Outbreak</u>

At conference on May 7, the Court ordered Respondents to "give a more specific delineation as to why each of the reviewed people were designated to be ineligible" for the various forms of enlargement or release, "and then, also, if you have an explanation why they statutorily would not be able to be released, some explanation why you couldn't transfer them[.]" (ECF No. 55 at 12.) The former was provided, in the form of two spreadsheets produced on Monday, May 11. *See* Exhibits A, B.[3] No further information on the latter was provided. On May 13, Respondents finally provided a cursory explanation of the general criteria used for searches in order to compile their preliminary class list. *See* Exhibit C.[4]

A. <u>Respondents Concede That They Have Failed to Evaluate for Furlough</u>

Respondents have not argued—nor can they—that they cannot use emergency furloughs to move people to safety. *See* ECF No. 10-2 (Cole Decl. in Support of Answer) at ¶ 7 ("BOP also has the authority" for furloughs); *see also* ECF No. 58 at 9-10 (similar). By their own account, the buck stops with each of the Respondents. "The issuance of furloughs is within the sole discretion of the BOP and delegated to the Warden of each institution." ECF No. 49 at 4 (status report).

---

[3] Petitioners have redacted names and other personally identifying information, in part on the basis that the subject of the present Motion is Respondents' lack of compliance rather than the merits of individual cases. Should the Court instruct otherwise, Petitioners will file supplemental copies of these exhibits without redaction.
[4] Respondents initially designated this exhibit "Attorneys' Eyes Only." By email late in the evening on May 13, Petitioners requested that Respondents withdraw that classification. Per the discussion at conference on May 14, that dispute is moot and Exhibit C is filed without redaction.

Nor can they argue that furloughs are an inappropriate mechanism here. As noted previously, they are designed in part to address medical emergencies. *See* ECF No. 51 at 5. Respondents have said as much. *See* ECF No. 10-2 at ¶ 7. Indeed, the same internal guidance that they cite as a basis to refuse home confinement expressly calls for their use:

> The current pandemic is considered an urgent situation that may warrant an emergency furlough under 570.32(b) (1) and 570.33(b). These regulations authorize a non-transfer emergency furlough if the inmate is otherwise deemed appropriate, even if he/she has been submitted for Home Confinement (HC).

ECF No. 10-3 at 6 (BOP Memorandum for Correctional Program Administrators).

In their status report, Respondents presented the tautology that that they are not using furloughs because furloughs are not being used—and this Court's Order apparently notwithstanding, they offered no plans to do so. *See* ECF No. 49 at 4 ("Furloughs are not being used as a stand-alone basis for release from an institution"); *see also* ECF No. 10-2. They have backpedaled in more recent briefing, instead claiming that prisoners are "generally" ineligible under regulatory criteria, and stating without citation or explanation that "none" of the subclass members "satisfy the criteria." ECF No. 58 at 11. They have not provided any case-by-case review for furloughs, as they have for compassionate release and home confinement.[5]

Respondents' new position is at odds with their earlier avoval of "sole discretion." They were right the first time. The regulation that they now cite is not an inflexible limitation, but rather provides that "[o]rdinarily, Wardens will not grant a furlough to an inmate if" the cited criteria are met. 28 C.F.R. § 570.36(b). Respondents ask the Court to simply take their word for it, without evidence or detail, that these criteria are met for each and every member of the 837-person Medically-Vulnerable Subclass. But even if that were true, it would not justify a wholesale denial

---

[5] Respondents' list of home confinement results, however, notes two furloughs—contradicting their claim that no one in the class could be furloughed. *See* Exhibit A at Row 439; Row 677.

4

of furloughs. Nothing about this pandemic is ordinary, which is why BOP guidance encourages furloughs to counteract its effects in prisons. *See* ECF No. 10-3 at 6. Whatever form of systemic review is being conducted for furloughs in Elkton—if any at all—is insufficient to meet either the Court's Order or the needs of the moment.

> B. <u>Respondents' Produced Information Confirms a Failure To Use Home Confinement as This Crisis and the Eighth Amendment Mandate</u>

Respondents' spreadsheet of home confinement findings confirm that they have applied an impossibly stringent inquiry, with self-evidently disastrous results. Of 837 medically-vulnerable prisoners, only *five* are approved for transfer to home confinement, *see* ECF No. 58 at 7, which is the most effective means of ensuring a prisoner's safety, *see* ECF No. 1-3 at ¶¶ 17-20 (Novisky Decl.); *see also* ECF No. 1-4 at ¶ 33 (Goldenson Decl.).

Nothing in the law requires that Elkton approach home confinement in this manner. On the contrary, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") authorizes Respondent Carvajal to lengthen the amount of time that prisoners can be placed on home confinement, provided that the Attorney General makes a finding that "emergency conditions will materially affect the functioning of the Bureau." CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020). That finding has been made. *See* ECF No. 10-3 (Attorney General's April 3, 2020 Memorandum). And indeed, Attorney General Barr exhorted Respondent Carvajal to "give priority to" Elkton based on the severity of the infection there, and to "give priority in implementing" the new CARES Act standards to "the most vulnerable inmates at the most affected facilities" by "immediately maximiz[ing] appropriate transfers to home confinement." ECF No. 10-3 at 3.

Underlying BOP's position in this action is the presumption that its own informal guidance and discretionary factors for what "should" be demonstrated to merit home confinement, *see* ECF No. 10-3 at 6, is immovable and unreviewable, such that each individual criterion may be treated

as an absolute requirement for a grant of home confinement. This absolute approach is not even consistent with the Attorney General's memoranda to the Bureau, which emphasize that the factors are "discretionary" and the decision must be "individualized" and "based on the totality of the circumstances." ECF No. 10-3 at 1 (March 26 memo) ("In assessing which inmates should be granted home confinement pursuant to this memorandum, you are to consider the totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors."); ECF No. 10-3 at 3 (April 3 memo) ("Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context."). Under Respondents' absolutist view, a single failed element—for example, an incident report of even the mildest nature in the past 12 months, *see* ECF No. 10-3 at 6—would be enough to deny home confinement outright. Of course, such an unyielding approach is particularly inapposite given that Elkton itself is a low-security facility, where Respondents have already determined each prisoner not to present serious safety risks. *See* ECF No. 1 at ¶ 68.

Yet as another district court recently observed, a single failed element cannot always be enough to deny home confinement outright. Merely adhering to a list of criteria for home confinement does not absolve BOP and its wardens of their overriding constitutional obligation to preserve the lives of their charges. *See Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 2405350, at *22 (D. Conn. May 12, 2020) ("the criteria apparently being used by the Respondents to evaluate inmates for home confinement evidence a disregard for the seriousness

6

of the health risk faced by vulnerable inmates").[6] To be sure, BOP is vested with general discretion over individuals' place of imprisonment, *see* 18 U.S.C. § 3621(b), but Respondents' expanded authority under the CARES Act to place prisoners on home confinement must still be exercised in a manner consistent with the Constitution. And as the *Martinez-Brooks* court noted, district courts retain jurisdiction to determine that BOP has failed to do so:

> Petitioners are not challenging their designation to FCI Danbury. Rather, they are challenging Respondents' failure adequately to exercise their separate, recently expanded statutory authority under subsection 3624(c)(2) to place inmates on home confinement. While subsection 3621(b) gives the BOP broad, general authority over designations of and transfers to "places of imprisonment" … subsection 3624(c)(2) provides specific, independent authority to place inmates in home confinement. So in finding preliminarily that Respondents are not exercising their authority under subsection 3624(c)(2) in a constitutionally adequate manner, I am not "review[ing]" the BOP's "designation of a place of imprisonment" under subsection 3621(b). Second, to the extent there is any ambiguity about whether Section 3621(b) or any other statute bars judicial review of the Respondents' failures to exercise their authority under Section 3624, I would construe it not to do so to avoid the constitutional question that would arise from a wholesale bar on judicial review in the circumstances of this case.

*Id.* at \*15.

Upon such a finding, the Court may take appropriate action to remedy the defective use of BOP's authority—including by entry of an order determining that the BOP's applied criteria for home confinement must be revised. *See id.* at 33. For instance, the *Martinez-Brooks* court instructed that the BOP and FCI Danbury follow the Attorney General's directive to maximize home confinement by, *inter alia*, eliminating the prohibitions on home confinement for any individual who has either a prior violent offense or an incident report in the prior 12 months. *Id.*

---

[6] Notably, in *Martinez-Brooks*, the respondents disclosed by declaration specific criteria being used at FCI Danbury for home confinement assessment. *See* 2020 WL 2405350, at \*22 & n.23. Here, Respondents have refused, pointing simply to broad governing statutes while refusing to disclose criteria. *See* ECF No. 48 at 2. While broad statutory authority may set outer boundaries for Respondents' discretion, it cannot be an exhaustive list of criteria actually in use.

Respondents' own produced account of their use, or nonuse, of home confinement confirms their failure to deploy the most powerful tool at their disposal to save the lives of the Medically-Vulnerable Subclass. Indeed, Respondents appear to have seized upon any reason for denial—even reasons *not* listed in their draconian internal guidelines—rendering the resulting cascade of denials inevitable. For example:

- Numerous entries note a percentage of time served that is less than 50%. That is not a proper basis for denial, even under BOP's internal guidelines. *See* ECF No. 10-3 at 7 (percentage of time served is "not a reason for denial"). Respondent Williams, however, has expressly taken the position even during the pendency of this case that where a prisoner "has served less than 50% of his court ordered sentence, he is not eligible for placement on Home Confinement[.]" *See* Exhibit D (April 21 letter to counsel for an Elkton prisoner).
- Several individuals, many highlighted in orange as "later determined to be ineligible," appear to have been denied based on vague criteria that are not listed in BOP guidelines. *See, e.g.*, Exhibit A, Row 230 (noting minimal risk, low health care needs, but 40% completion of sentence); Row 316 ("Possible PC for failing to pay child sup"); Row 339 ("Criminal History"); Row 493 (noting a number of victims of the individual's fraud offense and dollar value in loss, neither of which are factors); Row 642 ("Covid Deny CMA; 29%"); Row 686 ("COVID Deny CMA; "21%"; "Local Fraud Case with 623 Victims").
- Numerous individuals appear to have been rejected solely based on a "low" risk assessment, rather than "minimal." *See, e.g.*, Row 290; Row 442; Row 586; Row 600; Row 605; Row 635; Row 644; Row 708; Row 734.

8

- Incident reports within the past 12 months appear to suffice for denial. Consistent with Respondents' position in this case, the severity of the incident appears not to matter. *See, e.g.*, Row 138 (300-level[7] incident report only); Row 142 (200-level incident report only); Row 154 (low risk, 74% sentence completion, 300-series incident report); Row 250 (noting pending charges but minimal risk and 300-series incident report).

- Prior violence, a factor dispensed with in *Martinez-Brooks*, is repeatedly noted and appears to be a dispositive factor. *See* Row 52 (low risk, but notes robbery from 35 years ago); Row 55 (low risk, but unspecified "history of violence" from 23 years ago); Row 105 (battery charges from 20 years ago); Row 486 (low risk but "prior violence"); Row 489 (same).

- Hundreds of prisoners were denied home confinement simply because they were identified as a "sex offender" without further analysis, including some people who have served over 95% of their sentence. *See, e.g.*, Row 759 (served 97.7% of sentence), 764 (96.8%), 819 (95.3%).

- Some rows simply have no listed rationale. *E.g.*, *id.* at Row 427; Row 475; Row 480; Row 563; Row 565; Row 627.

Respondents' rigid, blinkered approach to home confinement review has resulted in near-universal rejection. Petitioners respectfully submit that such an exercise is equivalent to no review at all, and certainly fails to address adequately the crisis in Elkton. Respondents' approach also fails to serve the ends articulated by this Court in its Order—that is, to prioritize home confinement and similar measures. *See* ECF No. 22 at 11 ("Petitioners do not seek a commutation of their

---

[7] Incident reports are categorized by severity: greatest (100 level), high (200 level), moderate (300 level), and low (400 level). Moderate and low severity incidents may be resolved informally without being referred to the Discipline Hearing Officer. *See* Department of Justice, Inmate Discipline Program (Aug. 1, 2011) at 20, https://www.bop.gov/policy/progstat/5270_009.pdf.

sentences, but rather to serve their sentences in home confinement, parole, or in half-way houses"); *id.* at 20 (Respondents must "evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough").

### C. Respondents Have Consistently Fought Compassionate Releases on Technical Grounds

The discovery provided by Respondents also demonstrates that they have utterly failed to comply with the Court's order to consider compassionate release for prisoners at risk of COVID-19. Only 7 subclass members are even "being considered" by BOP for compassionate release, and a side-by-side review of Respondents' (unredacted) lists indicates that each of these people is simultaneously being considered for home confinement. In contrast, Respondents have denied 232 prisoners compassionate release, stating simply "Does not meet medical criteria," plus an additional 13 for the cryptic rational "COVID19 only." *See* Exhibit B. The remaining nearly 600 prisoners apparently have not been considered at all for compassionate release. As best Petitioners can decipher Respondents' spreadsheet, it appears not a single subclass member has been approved by the BOP for compassionate release, though they have claimed that one person is awaiting a release plan. *See* ECF No. 49 at 3.

Respondents' court filings elsewhere similarly highlight their obstinacy. When a prisoner at Elkton files a motion with a judge seeking a remedy, the Government consistently and reflexively opposes the motion. The Respondents' position—which has been rejected by several other courts—is that high risk of exposure COVID-19 is simply not grounds for compassionate release. *E.g.*, *United States v. Singleton*, No. CR 5:13-8-KKC, 2020 WL 2319694, at *2 (E.D. Ky. May 11, 2020). Consistently and automatically denying virtually all subclass members consideration for compassionate release is not consistent with either the statutory guidelines or the

10

Court's order.[8] Particularly troubling about Respondents' wholesale denial is its rationale that these class members "Do[] not meet medical criteria," *even though* the BOP has determined that they are members of this subclass in putting them on its list, *see* ECF No. 35-1; Exhibit C, and thus are *by definition* at heightened risk for serious complications from COVID-19.[9]

Respondents' arguments against compassionate release of class members in courts across the country have led these courts to conclude that these individuals will have a remedy in this Court.[10] Yet information from Respondents confirms that they also are not granting relief to the class as directed by this Court.

---

[8] Neither the statute nor the sentencing guidelines require a defendant to have any particular illness to be eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. 1B1.13, application notes ("there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C) [such as having a terminal illness]"). As numerous courts have concluded, reducing the exposure prisoners at high risk to COVID19 is an extraordinary and compelling reason justifying compassionate release. *United States v. Ben-Yhwh*, No. 15-830, 2020 WL 1874125, at *5 (D. Haw. Apr. 13, 2020) (collecting cases and concluding, despite government opposition, that prisoner's advanced age and serious medical conditions, "taken in concert with the COVID-19 public health crisis," constituted extraordinary and compelling reason to reduce sentence); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (collecting cases and concluding, "The defendant's age and medical condition, taken in concert taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce McCarthy's sentence.").

[9] Other courts have also assumed that BOP is undertaking a careful consideration of individual cases, rather than dismissing them en masse. *See, e.g., United States v. Davis*, No. 19-CR-64-F, 2020 WL 2465264, at *3 (D. Wyo. May 13, 2020) (discussing a subclass member, "the Court would wish to know the warden's conclusions based on his or her superior knowledge of Defendant's behavior in custody, risk to society, and health conditions relative to the rest of FCI Elkton's inmate population.")

[10] *E.g., United States v. Numann*, No. 3:16-CR-00025-TMB, 2020 WL 1977117, at *4 (D. Alaska Apr. 24, 2020) (denying compassionate release because it is better brought as a habeas action, and cites this case to advice that "Defendant may file or join a petition challenging the same in the district of his confinement"); *United States v. Rodriguez-Collazo*, No. 14-CR-00378-JMY, 2020 WL 2126756, at *3 (E.D. Pa. May 4, 2020) ("Such claims must be brought as ones for habeas corpus relief in the jurisdiction where he is confined."); *United States v. Smith*, No. 4:15-CR-19, 2020 WL 2063417, at *4 (N.D. Ohio Apr. 29, 2020) ("it appears Smith may be a member of the subclass identified by Judge James S. Gwin in the emergency habeas action of *Wilson v. Williams*,

### D. Respondents' Proposal of Transfers to Higher-Security Is Problematic and Will Serve as a Disincentive

The Court's preliminary injunction requires Respondents (1) to evaluate medically vulnerable prisoners for types of release such as compassionate release, home confinement, furlough, and parole or community supervision, and then (2) to transfer those prisoners who are ineligible for those types of release to other BOP facilities where testing, single-cell placement, or social distancing are possible. ECF No. 22 at 20–21; *see also* ECF No. 45 at 1. But Respondents' apparent unwillingness to take anything but the most grudging steps on any change in custody other than transfer, *see supra* sections I(A)-(C); Mot. to Enforce, ECF No. 51 at 1–7, are effectively converting the measured relief prescribed by the Court into a false and potentially cruel dilemma: accept a transfer to a higher-security prison, presumably to be treated as a higher-security prisoner, or take your chances with COVID-19 at Elkton. This artificial dichotomy puts prisoners to an unfair choice and undermines the terms of this Court's order.

The Order for good reason treats transfers only as a final outlet for those who could not be given another route out of Elkton. In effect, treating a lower-security prisoner like a higher-security one metes out undeserved punishment: it subjects him to harsher conditions, and a great risk of physical danger, than (by definition) the BOP believes is appropriate in light of his own behavior and history. *Cf.* 18 U.S.C. § 3621(b) (factors governing designation of prisoner's placement). This risk becomes especially stark if the prisoner is to be subjected to solitary, near-solitary, or other forms of severely restricted confinement—steps that many prisons have taken in the face of COVID-19. *See* Cole Decl., ECF 30-2 at 13 ("BOP has severely limited the movement of inmates and detainees among its facilities"); *see also* May 7 Hearing, ECF No. 55 at 27–28. Such

---

No. 4:20-cv-794… Smith may secure a compassionate release or transfer to another facility in the near future via the pending habeas action.").

conditions, research has made clear, "exact a terrible price." *See Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring); *see also, e.g.*, *In re Medley*, 134 U.S. 160, 168 (1890) ("A considerable number of the prisoners fell, after even a short [period of solitary] confinement, into a semi-fatuous condition … and others became violently insane; others, still, committed suicide."); Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement & Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & L. 104, 104 (2010) ("[I]solation can be as clinically distressing as physical torture."); David Cloud et al., *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings*, AMEND (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf (noting problems with using isolation to combat COVID-19 in prisons, including dangers of inappropriate treatment of medically isolated prisoners, harms to those prisoners' health, and failures to detect symptoms).

Respondents' intractable refusal to consider other forms of release threatens to render these last-resort options only-resort options for the Medically-Vulnerable Subclass. Such a result would be plainly inconsistent with the Court's order, ECF No. 22 at 20–21; legally uncalled-for, *see* supra sections I(A)-(C); and in some extreme cases might even risk trading one set of Eighth Amendment problems for another. This Court should make clear that Respondents cannot simply fall back on this last-resort option indiscriminately.

## II. Respondents' Search Criteria Demonstrate That Their List of Class Members is Underinclusive

This Court's preliminary-injunction order required Respondents to evaluate Elkton prisoners who are "65 years or older" or have "documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS,

13

or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher)." ECF No. 22 at 12. Respondents filed a list of 837 prisoners. ECF No. 35-1. While further information from Elkton prisoners themselves will provide deeper insight, Respondents' search criteria already shows that their initial list was facially underinclusive in several ways.

On May 13, Respondents provided Petitioners with an emailed paragraph listing the criteria that BOP used to compile its initial list of 837 prisoners. Those search criteria are:

> (1) over the age of 65; (2) inmates receiving cardiac chronic care; (3) inmates receiving pulmonary chronic care; (4) inmates who are diabetic; (5) inmates with cirrhosis; (6) inmates with Hepatitis B; (7) inmates with Hepatitis C; (8) inmates on dialysis; (9) inmates with a transplant diagnosis; (10) inmates with HIV; (11) inmates prescribed a chemotherapy drug; and/or (12) inmates prescribed an immunosuppressant.

*See* Exhibit C. These criteria were underinclusive for a few reasons, one of which Respondents acknowledged in the same message will require supplementation: their initial list omitted prisoners who are 65 years old.

Beyond that oversight, Respondents appear to have searched for "inmates receiving cardiac chronic care" and "pulmonary chronic care" to cover heart and lung disease. These searches ignore the fact that there are prisoners who have "documented, pre-existing medical conditions" of these kinds, *see* ECF No. 22 at 12, who do not receive "chronic care." Indeed, two such people are named Petitioners in this case. Petitioner Eric Bellamy, for example, has "a history of heart problems, including one enlarged heart valve and two valves that are regurgitating," which a doctor has said will require "a stent within a year." ECF No. 1-7 at 2. He also has hypertension that is serious enough to be causing him to go blind in one eye. *Id.* Respondents' presumably missed Mr.

14

Bellamy—and many other at-risk prisoners—because such cardiovascular conditions do not entail "cardiac chronic care."[11]

Likewise, Petitioner Craig Wilson has "suffered from chronic asthma since childhood, and ha[s] had to use inhalers, steroids, and breathing machines at various times in order to breathe properly." ECF No. 1-10 at 2. He "use[s] a rescue inhaler regularly" and takes albuterol. *Id.* Respondents presumably missed Mr. Wilson—and many other at-risk prisoners—because this pulmonary condition (like others) does not entail "pulmonary chronic care."

Furthermore, Respondents' search does not appear to have sought to identify prisoners with "[s]evere obesity (body mass index of 40 or higher)," ECF No. 22 at 12, at all. Their list of criteria makes no reference to that condition or anything that appears to be a proxy for it. *See* Exhibit C. Respondents have offered no explanation as to why they excluded an entire category of medically vulnerable prisoners specified by this Court's order from their search.[12]

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court take appropriate measures to enforce compliance with its April 22, 2020 Order.

---

[11] Data compiled by New York State show hypertension, hyperlipidemia (high cholesterol), coronary artery disease, and atrial fibrillation to be among the top 10 comorbidities for COVID-19 deaths. *See* N.Y. STATE DEP'T OF HEALTH, *Fatalities*, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (last visited May 14, 2020).

[12] Respondents' search may also have been underinclusive for liver diseases and kidney diseases, given that they searched for only three liver diseases and for only those prisoners with kidney diseases that specifically required dialysis. These and other potential gaps highlight the importance of surveying prisoners directly.

Dated: May 14, 2020

Respectfully submitted,

/s/ David J. Carey
David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Ste. 203
Columbus, OH 43206
Phone: (614) 586-1972
Fax: (614) 586-1974
dcarey@acluohio.org

Joseph Mead (0091903)
Freda J. Levenson (0045916)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44102
Phone: (614) 586-1972
Fax: (614) 586-1974
attyjmead@gmail.com
flevenson@acluohio.org

David A. Singleton (0074556)
Mark A. Vander Laan (0013297)
Michael L. Zuckerman (0097194)
Ohio Justice & Policy Center
915 East Ninth Street, Suite 601
Cincinnati, OH 45202
Phone: (513) 421-1108
dsingleton@ohiojpc.org
mvanderlaan@ohiojpc.org
mzuckerman@ohiojpc.org

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2020, the foregoing was filed with the Court's CM/ECF system. Notice of this filing will be sent by operation of that system to all counsel of record.

/s/ David J. Carey
David J. Carey (0088787)

*Counsel for Petitioners*