UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | : | |
|---|---|---|
| CRAIG WILSON, et al., | : | CASE NO. 4:20-cv-00794 |
| Petitioners, | : | ORDER |
| | : | [Resolving Docs. 51, 58, 78] |
| vs. | : | |
| MARK WILLIAMS, et al., | : | |
| Respondents. | : | |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 13, 2020, Petitioners, inmates at Elkton, brought this emergency habeas action seeking modification of their sentences. Mostly, the Petitioners seek release from Elkton due to the spread of COVID-19 within the prison.[1]

On April 22, 2020, this Court granted a preliminary injunction in favor of Petitioners, ordering Respondents to identify members of the subclass; evaluate each subclass member's eligibility for transfer within two weeks (by May 6), prioritizing the most medically vulnerable inmates; and requiring transfer inmates ineligible for other forms of release to different BOP facilities with less contagion factors.[2]

On May 6, 2020, Respondents filed a status report regarding their efforts to comply with the Court's preliminary injunction Order.[3] In response, the Petitioners filed an Emergency Motion to Enforce the Preliminary Injunction the same day.[4] Respondents

---

[1] Doc. 1.
[2] Doc. 22.
[3] Doc. 51.
[4] Doc. 58.

Case No. 4:20-cv-00794
Gwin, J.

opposed the motion and Petitioners filed a reply.[5]

Despite the preliminary injunction, Respondents have made limited efforts to reduce the COVID-19 risks for subclass members within the prison.

To their credit, Respondents represent they are beginning to implement mass testing. However, after little access to COVID-19 tests for months after the February 2020 outbreak, the tests' progress creeps. Although Respondents represented to the Court that it would be receiving test results from its outside labs within 24-48 hours, Respondents appear to not have received test results for tests that were completed more than 96 hours ago.[6] Also, Respondents report that, for reasons unknown to the Court, and despite the obvious need for rapid implementation of mass testing across the entire institution, they are only conducting tests on Mondays and Tuesdays.[7]

As of May 19, 524 total tests have been performed.[8] Elkton houses 2,357 inmates. To date, the test results show how ineffective Respondents have been at stopping the spread. According to the Respondent, the tests have identified 55 positive inmates and 175 negative inmates to date.[9] Respondent have no results for the rest of the tests.

These numbers appear to only account for the Abbot rapid tests performed since May 14 and Quest Diagnostics mass testing efforts that Elkton has undergone since May 11. Presumably, the results do not include the inmates who had previously tested positive.[10] According to BOP, Elkton's *active* cases as of May 19, 2020 include 135

---

[5] Doc. 78.
[6] Doc. 58 at 3.
[7] Doc. 81 at 2.
[8] Doc. 83.
[9] *Id.*
[10] Doc. 81 (reporting that mass testing began on May 11).

Case No. 4:20-cv-00794
Gwin, J.

inmates and 8 staff members.[11] But Respondents have previously stated that as of May 8, 130 inmates and 50 staff members had tested positive.[12]

However, even according to Respondents' testing status report, approximately 24% of tests from the reported Abbott and Quest tests came back COVID-19 positive.[13] In other words, so far the data demonstrates that almost one in four inmates at Elkton has been infected—an unacceptable number.

This percentage could potentially rise as more results come in. Notably, Respondents represented to the Court that their mass testing plan involved testing the inmates in batches according to their housing unit.[14] If Respondents have indeed kept the housing units as separate as they insist,[15] the percentage of infected inmates in each housing unit might vary and could potentially be even higher.

However, while the increased testing goes in the right direction and will help the parties understand the extent of the spread at Elkton, it can only go so far in helping the institution fight the pandemic. Distancing has been, and continues to be, the institution's best hope for sparing medically-vulnerable inmates from the serious medical consequences, and potential death, associated with COVID-19.

Concerningly, Respondents have made poor progress in transferring subclass members out of Elkton through the various means referenced in the Court's preliminary injunction Order.

---

[11] Federal Bureau of Prisons, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited May 19, 2020).
[12] Doc. 58-1 at 14.
[13] Doc. 84.
[14] Doc. 58-1 at 13-14.
[15] *Id.* at 14-15.

Case No. 4:20-cv-00794
Gwin, J.

In considering the adequacy of Respondent's compliance, context is important. Elkton operates as a low security correctional institution with an adjacent low security satellite prison.[16] By its nature, Elkton houses inmates with lower institutional and public risk factors.

Respondents' say that they have evaluated all subclass members for home release, compassionate release, and furlough under the applicable BOP program statements.[17] Respondent identifies 837 inmates as being over 65 years old or as having significant pretexting health conditions making them especially vulnerable to COVID-19.[18]

Of this 837 vulnerable population, Respondents have made only minimal effort to get at-risk inmates out of harm's way. As of May 8, 2020, five subclass members were "pending [home confinement] community placement."[19] Six inmates were identified as *maybe* qualifying for home confinement.[20] No inmates were deemed eligible for furlough transfer.[21] But to date, Respondents have not identified any inmates whose confinement has actually been enlarged as a consequence of the preliminary injunction.

Such results do not comply with this Courts' previous Order.

In order to alleviate the spread of COVID-19 within the prison the Court describes the available avenues of relief and directs the Respondent to comply with further standards enforcing the preliminary injunction.

A. Home Confinement

---

[16] *Id.* at 2.
[17] Doc. 58 at 6-10.
[18] Doc. 51 at 3.
[19] *Id.* at 7.
[20] *Id.* at 8-9.
[21] *Id.* at 10.

Case No. 4:20-cv-00794
Gwin, J.

"The Bureau of Prisons has statutory authority to transfer prisoners to home confinement under 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541."[22] Earlier, the Bureau of Prisons could assign home confinement for the shorter of 10 percent of the imprisonment term or 6 months.[23] Under 34 U.S.C. § 60541, the BOP can release elderly offenders and terminally ill offenders to home detention.

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").[24] The CARES Act lifted home confinement's 10 percent of sentence or 6 months requirement if the Attorney General made an emergency conditions finding.[25]

On April 3, 2020, the Attorney General endorsed a memo that made the emergency conditions finding and expanded home confinement eligibility.[26] The 10% of sentence limitation and the six-month limitation went away.

The April 3 memo followed up on Barr's earlier March 26, memo which stated that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP Facilities."[27] The Attorney General told the Bureau to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in

---

[22] *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 2405350, at *10 (D. Conn. May 12, 2020).
[23] 18 U.S.C. § 3624(c)(2).
[24] *Martinez-Brooks*, 2020 WL 2405350 at *10.
[25] CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020).
[26] Attorney General William P. Barr, *Memorandum for Director of Bureau of Prisons, Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Office of the Attorney General (Apr. 3, 2020) https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf [hereinafter "Apr. 3 Memo"].
[27] Attorney General William P. Barr, *Memorandum for Director of Bureau of Prisons, Re: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic*, Office of the Attorney General (Mar. 26, 2020) https://www.justice.gov/file/1262731/download.

Case No. 4:20-cv-00794
Gwin, J.

connection with the ongoing COVID-19 pandemic."[28]

Barr's directive gave a non-exhaustive list of discretionary factors to be used for evaluating inmates for confinement. The Attorney General directed the BOP to consider the "age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines."[29] The other factors in the memo included: 1) The <u>security level of the facility currently holding the inmate, with priority given to low security and minimum security facilities</u>; 2) The inmate's prison conduct especially violent or gang-related prison activity; 3) The inmate's PATTERN score; 4) Whether the inmate has a re-entry plan; 5) The inmate's conviction crime and danger to the public.[30] The Attorney General said that some offenses, including sex offenses, should generally make the offender ineligible for home detention.[31]

In using the CARES Act to expand home confinement availability, the Attorney General's April 3, 2020, memo admitted that the Bureau of Prisons was "experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and <u>FCI Elkton</u>."[32] The memo acknowledged the BOP's duty to protect inmates and told BOP to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions."[33] The Attorney General told the BOP to "begin implementing this directive immediately" and "as quickly as possible."[34]

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* (emphasis added).
[32] Apr. 3 Memo.
[33] *Id.*
[34] *Id.*

-6-

Case No. 4:20-cv-00794
Gwin, J.

The Attorney General went on to authorize home confinement transfers "even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety."[35]

Against a backdrop where approximately one out of every four Elkton inmates have tested positive for COVID-19, the Respondent must move inmates out. By thumbing their nose at their authority to authorize home confinement, Respondents threaten staff and they threaten low security inmates.

The Court orders Respondents to make full use of the home confinement authority beyond the paltry grants of home confinement it has already issued. The Court orders Respondents to (a) eliminate all requirements that the inmate have served some part of his sentence to be eligible for home confinement; (b) disregard any incident reports at the low or moderate severity levels (300 or 400 levels); (c) disregard the violence offense restriction for any inmate whose underlying conviction involved an offense that occurred more than 5 years ago or for which the only basis or denial is a prior violent offense; (d) grant home confinement to inmates who were previously deemed ineligible solely on the basis of a Low PATTERN risk score; and (e) eliminate the requirement that the inmate be a U.S. citizen.

For any inmate on the subclass list that Respondents continue to find does not meet the home confinement requirements, Respondents are ordered to provide a detailed description of the basis for the denial. Such descriptions are to be submitted on a rolling basis. Respondents must produce the information for at least one-third of the subclass

---

[35] *Id.*

Case No. 4:20-cv-00794
Gwin, J.

every 48 hours. The first report is due by the May 21, 2020, close of business.

In addition to the detailed denial explanation, the explanations should also include the following:

(a) Date inmate entered BOP custody;

(b) Inmate's criminal history category and criminal history points;

(c) The underlying crime. For drug crimes, the Respondent will state whether the conviction was under 21 U.S.C. § 841(b)(1)(A), (B), or (C);

(d) Any statutory or mandatory minimums;

(e) The educational or training programs completed by the inmate;

(f) Any intra-institution discipline involving the inmate, including the dates and a specific factual description of each;

(g) Inmate's expected release date; and

(h) The percentage of the sentence the inmate has completed.

### B. Compassionate Release

Another avenue of relief for the subclass is compassionate release. The compassionate release statute requires inmates to apply to BOP to request a favorable compassionate release recommendation.[36] After 30 days or the exhaustion of administrative remedies, whichever is earlier, inmates may directly petition their sentencing court for compassionate release.[37] Even if the BOP deems an inmate eligible for compassionate release, it falls to the sentencing court to grant the actual reduction of sentence.[38]

According to Respondents, BOP considers the following factors, though they are not exclusive or weighted: "(1) nature and circumstances of the inmate's offense; (2) criminal

---

[36] 18 U.S.C. § 3582(c)(1).
[37] *Id.*
[38] *Id.*

-8-

Case No. 4:20-cv-00794
Gwin, J.

history; (3) comments from victims; (4) unresolved detainers; (5) supervised release violations; (6) institutional adjustment; (7) disciplinary infractions; (8) personal history derived from the PSR; (9) length of sentence and amount of time served; (10) inmate's current age; (11) inmate's age at the time of offense and sentencing; (12) inmate's release plans (employment, medical, financial); and (13) whether release would minimize the severity of the offense."[39]

Despite the above-listed criteria, Respondents have listed their rationale for denying certain compassionate release petitions as: "does not meet medical criteria" or "COVID 19 only."[40] Within 48 hours of this Order, Respondents are ordered to clarify these descriptions with individual explanations for each inmate. The Court also orders Respondents to explain why a member of the subclass who, by definition, meets the CDC's criteria for having a medical complication high risk do not qualify for compassionate release based on his medical conditions.

The Respondents must provide each subclass member who has requested compassionate release, a written approval of the request,[41] or a written denial of the request, together with the appropriate appeal form.[42] Any compassionate release petitions filed by subclass members must be adjudicated within 7 days on a continuing basis.

Nothing in the Court's prior Order granting the preliminary injunction or this Order should be construed by either party to limit a sentencing court's ability to grant compassionate release or any other form of relief to subclass members.

---

[39] Doc. 58 at 8.
[40] Doc. 78, Ex. B.
[41] 28 C.F.R. § 571.62.
[42] 28 C.F.R. §§ 571.63, 542.15.

-9-

Case No. 4:20-cv-00794
Gwin, J.

### C. Transfer

In the Court's earlier Order it instructed Respondents to move subclass members out of Elkton through furloughs or transfers. This has not been done. Within 7 days of this Order, for each inmate Respondents continue to deem ineligible for home confinement or compassionate release, Respondents are ordered to show cause in the form of an individualized determination for why that inmate cannot be transferred to another BOP facility where social distancing is possible in compliance with the Court's preliminary injunction Order.

Some inmates eligible for transfer may ask to accept the risks of remaining at Elkton for family proximity or other reasons. If Respondents receive such requests, the Respondents will consider those requests.

### D. Subclass List

Respondents produced the search criteria used to compile the subclass member list and admit that the list was underinclusive by at least nine inmates who are 65 years old.[43] Additionally, Respondents appear not to have searched for or included inmates who are at a higher risk for COVID-19-related medical complications due to obesity. This does not comply with this Court's preliminary injunction order.[44] Respondents are to identify all such inmates who are not already on the list within 48 hours.

The Court requires Respondents to evaluate the nine additional inmates and any others identified for inclusion due to obesity for relief as outlined the Court's preliminary injunction Order immediately. To the extent Respondents deem the additional nine

---

[43] Doc. 78, Ex. C.
[44] *Id.*

-10-

Case No. 4:20-cv-00794
Gwin, J.

subclass members to be ineligible for enlargement, Respondents are to provide explanations for such findings consistent with this Order and this Court's previous orders to that effect.

IT IS SO ORDERED.

Dated: May 19, 2020  *s/ James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE