UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG WILSON, et al. ) | CASE NO.: 4:20CV794 |
| ) | |
| ) | |
| Petitioners, ) | JUDGE JAMES S. GWIN |
| ) | |
| v. ) | |
| ) | |
| MARK WILLIAMS, Warden of Elkton ) | |
| Federal Correctional Institution, et al., ) | MEMORANDUM IN SUPPORT OF |
| ) | RESPONDENTS' EMERGENCY |
| Respondents. ) | MOTION TO STAY |
| ) | |

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 62(d), Respondents Mark Williams, Warden of Elkton Federal Correctional Institution and Michael Carvajal, Director of Federal Bureau of Prisons, in their official capacities ("Respondents"), respectfully request that this Court stay its Order issued on May 19, 2020 [ECF No. 85], pending final resolution of the appeal filed by Respondents on May 27, 2020. (Notice of Appeal, ECF No. 95 PageID # 1160.) Respondents also respectfully renew their request for a stay of this Court's Order of April 22. Although the Federal Bureau of Prisons ("BOP") has satisfied several requirements of those orders, it remains under an obligation to 1) release numerous inmates to home confinement under criteria of the Court's creation, which deviate from BOP's expert public-safety judgments about recidivism risks; and 2) transfer hundreds of inmates to other institutions, notwithstanding BOP's careful, expertise-based determination, made unreviewable by statute, placing them at Elkton. Respondents respectfully request an expedited ruling on this motion by 3:00 pm on June 1, 2020.

## BACKGROUND

The COVID-19 pandemic has created unprecedented public health risks in this country and around the world. Recognizing the threat posed by COVID-19, BOP quickly developed and implemented a nationwide multiphase action plan, which has consistently been informed by "the guidance and direction of worldwide health authorities." (Decl. of Sarah Dees, ECF No 10-1 PageID #174 at ¶ 6.) Elkton has implemented BOP's nationwide COVID-19 response and taken numerous precautions according to the facility's needs. (*Id.* at PageID ## 178-179, ¶ 19.) For example, Elkton inmates and staff have been educated about measures to avoid transmitting COVID-19; all common areas are disinfected at least daily; and inmates have personal access to sinks, water, disinfectant, and soap. (*Id.* at PageID ## 179, 183-84, ¶¶ 20-22, 45-46.) Inmates and staff have been provided protective face masks for daily use and appropriate protective equipment for particular tasks. (*Id.* at PageID #184, ¶¶ 48-50.) BOP has also taken steps to reduce inmate contact—requiring inmates to pick up meals and return to their housing units to eat, and staggering mealtimes. (*Id.* ¶¶ 12, 54, PageID ## 176, 185.)

BOP has dramatically increased its testing capacity in recent weeks and expects to have collected samples from all Elkton inmates by May 29 for testing. (Declaration of Andrea Burnside ("Burnside Decl."), attached hereto as Ex. A, at ¶ 14.) Any inmate who has COVID-19 symptoms or tests positive is moved to an isolation area. (*Id.* at ¶¶ 5-6.) Asymptomatic inmates who have been in contact with symptomatic inmates are quarantined for at least 14 days. (*Id.* at ¶ 7.) After 14 days, inmates may be released from quarantine if no one in the cohort has reported symptoms or tested positive for COVID-19. (*Id.*) But if a quarantined inmate presents with symptoms, he is isolated, and the 14-day clock restarts. (*Id.*) If an inmate's condition requires hospitalization, he is transported to a local hospital. (*See id.* ¶ 8.)

Although Elkton continues to experience inmate infections, the efforts by staff appear to have significantly mitigated the risks of COVID-19. (*Id.* at ¶ 10.) Since early April 2020, the number of hospitalized inmates has been in decline from its April 8 peak of 46 inmates. (*Id.* at ¶ 9.) From April 12 through May 2 only four inmates were hospitalized for COVID-19 related illness. (*Id.*) In nearly four weeks since May 2, no other Elkton inmate has been hospitalized for COVID-19-related illness. (*Id.*)

Despite BOP's sustained response to the COVID-19 crisis and the progress on the ground at Elkton, this Court has imposed a series of orders upon Respondents. On April 22, 2020, the Court entered a preliminary injunction granting relief to a conditionally certified subclass of older and medically vulnerable inmates on the theory that the conditions at Elkton violated the Eighth Amendment. (Order, ECF No. 22, PageID ##371-72.) Rejecting the government's arguments that this suit could not proceed under section 2241 and was barred by the Prison Litigation Reform Act (PLRA), and invoking the court's purported "inherent authority" over inmates' confinement, the Court ordered Respondents to "determine the appropriate means of transferring" all subclass members "out of Elkton." (*Id.* at PageID ## 360-361.)

Respondents filed a notice of appeal to the Sixth Circuit Court of Appeals on April 27, 2020. (Not. of Appeal, ECF No. 26 PageID # 394.) Respondents then requested a stay pending appeal. (Em. Mot. for Stay Pending Appeal, ECF No. 29 PageID # 397.) On May 8, 2020, the Court denied Respondents' stay motion. (Order, ECF No. 57 PageID ##744-48.) By that time, BOP had satisfied the injunction's first two requirements. (Status Report, ECF No. 49 PageID ## 678-682.) Petitioners nonetheless filed an emergency motion to enforce the injunction. (Mot. to Enforce, ECF No. 51 PageID ## 693-701.) In response, BOP explained that it had evaluated all inmates in the subclass for the Court's specified forms of relief, and BOP explained why

inmates had been deemed ineligible—including because many are sex offenders. (Opp'n to Mot. to Enforce, ECF No. 58 PageID ## 754-758.) BOP further explained that it had begun evaluating inmates who were ineligible for other forms of relief for transfer to other BOP facilities, and it documented numerous impediments to transferring inmates. (*Id.* at PageID ## 758-762.)

On May 19, the Court granted Petitioners' motion to enforce the injunction. (Order, ECF No. 85 PageID ## 1124, 1126.) The Court ordered BOP "to make full use of the home confinement authority" and revised the Attorney General's criteria for home confinement. (*Id.* at PageID ## 1128-1129.) The Court announced, for example, that BOP must "disregard" consideration of a violent offense if it occurred "more than 5 years ago"; and BOP must disregard certain categories of prison disciplinary violations if they constitute the only basis for denial. (*Id.* at PageID # 1129.)

The Court ordered BOP to reevaluate every subclass member under the Court's criteria and provide "detailed description[s]" regarding one-third of the subclass every 48 hours, [Order, ECF No 85 PageID # 1129-1130], a requirement BOP has now satisfied, (Burnside Decl. at ¶ 29.) The Court also ordered BOP, within 48 hours, to "clarify" the reasons for any denial of compassionate release, [Order, ECF No. 85 PageID # 1131], a requirement that BOP has likewise satisfied, (Resps.' First Response, ECF No. 89 PageID # 1142.) And the Court ordered BOP to adjudicate any new applications in just seven days. (Order, ECF No. 85 PageID # 1131.) The order also gave BOP just seven days to "show cause" why any inmate ineligible for home confinement or compassionate release "cannot be transferred to another BOP facility where social distancing is possible." (*Id.* at PageID # 1132.)

On May 20, 2020, Respondents filed an application with the Supreme Court to stay the April 22 order pending completion of proceedings in the Sixth Circuit Court of Appeals and, if

necessary, the Supreme Court. (Not. of Filing Resps.' Application for Stay, ECF No. 87 PageID # 1136.) The Supreme Court denied the application without prejudice on May 26, 2020. The Supreme Court noted that, although Respondents had sought a stay only of the April 22 order, this Court's May 19 order "enforc[ed] the preliminary injunction and impos[ed] additional measures," and Respondents had not yet asked for review or stay of the May 19 order. "Particularly in light of that procedural posture," the Supreme Court "decline[d] to stay the District Court's April 22 preliminary injunction without prejudice to the Government seeking a new stay if circumstances warrant." *Wilson v. Williams*, No. 19A1041, 2020 WL 2644305 (U.S. May 26, 2020). Justices Thomas, Alito, and Gorsuch would have granted the stay application. *Id.* On May 27, 2020, Respondents appealed to the United States Court of Appeals for the Sixth Circuit from the Order of this Court entered on May 19, 2020. (Notice of Appeal, ECF No. 95 PageID # 1160.)

On May 22, 2020, Elkton staff placed 128 inmates who the Court has deemed to be "medically vulnerable" into quarantine to enable their transfer out of Elkton. (Burnside Decl. at ¶ 19.) Senior BOP officials believe the transfer of inmates out of Elkton is not necessary to protect inmates and may contribute to disease spread to other areas. (Declaration of Andre Matevousian ("Matevousian Decl."), attached as Exhibit B, at ¶ 14.) Further, BOP officials are also reviewing dozens of inmates who Elkton officials had determined were not suitable for home confinement under criteria established by the Attorney General but now 17 such inmates have been approved for home confinement "[i]n order to comply with" the May 19 order and more may be approved as the review continues. (Declaration of Hugh J. Hurwitz ("Hurwitz Decl."), attached as Exhibit C, at ¶¶ 27-28.)

## ARGUMENT

This Court has discretion to stay execution of its judgment pending resolution of an

appeal. Fed. R. Civ. P. 62(d). *A. Philip Randolph Institute v. Husted*, 907 F.3d 913, 917 (6th Cir. 2018). Courts consider four factors when determining if a stay is warranted: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Id.*; *Hilton v. Braunskill*, 481 U.S. 870, 867-77 (1987); *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 548 (6th Cir. 2016). "These four factors 'are not prerequisites that must be met, but are interrelated considerations that must be balanced' together." *Khouri*, 844 F.3d at 548 (quoting *In re EPA*, 803 F.3d 804, 806 (6th Cir. 2015). As demonstrated below, Respondents have met their burden of showing that this Court should exercise its discretion to stay its order pending appellate review, *Nken v. Holder*, 556 U.S. 418, 433–34 (2008), because a balancing of the factors supports the issuance of a stay pending appeal. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 156 (6th Cir. 1991).

I. **RESPONDENTS ARE LIKELY TO SUCCEED ON APPEAL**

    A. **The Court exceeded its authority under 28 U.S.C. § 2241 and the PLRA**

Petitioners bring this suit as a putative class action under 28 U.S.C. § 2241, challenging the conditions of their confinement at Elkton. They seek relief based on their theory that "incarceration amid the COVID-19 outbreak in Elkton violates their rights to constitutional *conditions of confinement*" in violation of the Eighth Amendment. (Pet., ECF No. 1 PageID ## 31, 35 (emphasis added; capitalization omitted).) As the Supreme Court has explained, claims for injunctive relief "challenging the fact of [an inmate's] conviction or the duration of his sentence . . . fall within the core of federal habeas corpus," but "claims that merely challenge the conditions of a prisoner's confinement . . . fall outside that core." *Nelson v. Campbell*, 541 U.S.

6

637, 643 (2004). Accordingly, the Sixth Circuit has recognized that a habeas petition under section 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013); *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004).

This Court acknowledged the Sixth Circuit precedent but held that Petitioners' suit was better characterized as a challenge to the "execution or manner" of Petitioners' sentences. (Order, ECF No. 22 PageID # 362.) However, the Court's orders expressly contemplate that inmates may be transferred to another prison, even though such relief is unavailable in habeas. (*Id.*; *see also,* Order, ECF No. 85 PageID # 1123.) Relief that addresses whether a federal prisoner temporarily serves his sentence in a particular federal prison or elsewhere does not alter the "fact or duration of [his] confinement," *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973), or "the execution or manner in which the sentence is served," *United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001), nor does it change the court-imposed sentence—the hallmark of habeas relief. *See* 18 U.S.C. § 3621(b) (BOP, not the sentencing court, "designate[s] the place of the prisoner's imprisonment").

Because Petitioners' suit is not properly cognizable in habeas, Respondents are likely to succeed on the merits that it is inappropriate to rely on "inherent authority" "to 'enlarge' the custody of a defendant pending the outcome of a habeas action." (Order, ECF No. 22 PageID # 359.) The injunctive relief ordered by this Court also looks nothing like the relief in the only cases that support this novel theory, *see, e.g.*, *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990). En masse transfer of hundreds of inmates to other places of confinement is not a preliminary form of the relief that is available in habeas. *Cf. De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945).

7

Further, Petitioners' requested relief contravenes the strict limits of the Prison Litigation Reform Act. The PLRA creates a carefully reticulated scheme for "the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331 (2000). It applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2).

Under the PLRA, BOP's decisions concerning an inmate's "designation of a place of imprisonment . . . [are] not reviewable by any court." 18 U.S.C. § 3621(b). BOP's administrative judgment about where a prisoner should be housed balances multiple factors within BOP's unique expertise, including the prisoner's "history and characteristics," the "nature and circumstances of [his] offense," his "security designation," his "programmatic" and "mental and medical health needs," and the "resources of [each] facility." *Id.* The decision is thus vested in expert prison officials, and "any approach that puts the judicial branch in charge of designating the place of confinement . . . —no matter how well justified on utilitarian grounds— collides with . . . the Attorney General['s] unfettered authority to decide where to house federal prisoners." *In re Gee*, 815 F.2d 41, 42 (7th Cir. 1987). Yet the May 19 order overtly overrules BOP's determination regarding home-confinement placement and orders transfer of inmates to different facilities.

The PLRA also requires that any "prisoner release order" be "entered only by a three-judge court," only after specific requirements are met. 18 U.S.C. § 3626(a)(3)(A), (B). The April 22 and May 19 orders are "prisoner release orders," as they have the "purpose" or "effect" to "reduc[e] or limit[] the prison population." *Id.* § 3626(g)(4); *Brown v. Plata*, 563 U.S. 493, 511 (2011). And even if the orders were not "prisoner release order[s]," they would violate other

8

PLRA restrictions on "civil action[s] with respect to prison conditions." 18 U.S.C. § 3626(a).

### B. Respondents have not violated the Eighth Amendment

Respondents are likely to succeed on the merits because Petitioners have failed to establish an Eighth Amendement violation. To succeed on their conditions-of-confinement claim, Petitioners must demonstrate that BOP has violated the prohibition against "cruel and unusual punishments," U.S. Const. Amend. VIII, by meeting "two requirements," one objective, the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834, 846 (1994).

On the first, objective requirement, Petitioners must demonstrate that the conditions at Elkton pose "'sufficiently serious'" health risks that they deny "'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (citations omitted). Although COVID-19 poses significant health risks, BOP has assiduously mitigated the risk of serious injuries at Elkton with numerous (and increasing) responses. Petitioners fail to show that the risks at Elkton are "so grave that it [would] violate[] contemporary standards of decency to expose anyone unwillingly to [them]." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The risks posed by COVID-19 confront not only prisoners but citizens nationwide, including others who live or work in confined locations. Data bears out BOP's extensive efforts to address the risks at Elkton: even before the Court entered its April 22 injunction, the number of hospitalized inmates had already peaked and has subsequently declined significantly. (Burnside Decl. at ¶ 9, Ex. A; *see also*, Dees Decl., ECF No. 58-1 PageID ## 788-790.)

Petitioners have also failed to demonstrate that BOP has acted with "deliberate indifference to inmate health or safety," "know[ing] of and disregard[ing] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834, 837. The COVID-19 pandemic has created unprecedented and rapidly evolving risks throughout the world, and the Eighth Amendment's

9

deliberate-indifference standard does not license a court to second-guess prison officials' policy judgments in response. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-408 (1989) (courts must provide "considerable deference" to prison administrators given their "expertise," and "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management"). BOP has not been even arguably "deliberately indifferent" to the evolving COVID-19 pandemic. To the contrary, officials have deliberately confronted the risks posed by this public-health crisis. (Dees Decl., ECF No 10-1 PageID ## 174-84 at ¶¶ 6, 12, 19-22. 45-50, 54.)

In its May 19 order, the Court concluded that BOP's efforts were insufficient and criticized the pace of mass testing BOP had begun to undertake. (Order, ECF No. 85 PageID # 1124.) In fact, BOP has made substantial progress fighting the virus. (Burnside Decl. at ¶ 9, Ex. A; *see also*, Dees Decl., ECF No. 58-1 PageID ## 788-89.)

In any event, the record does not support a finding of an Eighth Amendment violation: nothing in the record suggests that BOP officials subjectively doubted that their extensive efforts, which track CDC guidance, were a reasonable and appropriate response to the threat posed by COVID-19; and these extensive efforts take into account the practical constraints facing officials trying to run a prison. Numerous courts of appeals have been staying orders like the orders in this case finding that district courts should not assume the role of prison administrator. *See, e.g.*, *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (per curiam), *mot. to vacate stay denied*, No. 19A1034, 2020 WL 2497541 (U.S. May 14, 2020); *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020); *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020); *see also Roman v. Wolf*, No. 20-55436, 2020 WL 2188048 (9th Cir. May 5, 2020).

At minimum, transfer to home confinement is an improper remedy for any alleged Eighth

Amendment violation. Because Petitioners challenge the conditions of their confinement, the only potential relief would be improvement in the conditions at Elkton or, if absolutely necessary, transfer to another facility. If those remedies are available—and they are—there is no basis to mandate home confinement.

### C. The Court Improperly Conditionally Certified the Subclass

The Respondents are further likely to succeed on the merits because the "conditional class" of more than 800 additional inmates is improper under Federal Rule of Civil Procedure 23(b)(2). The subclass does not satisfy Rule 23's commonality and typicality requirements—neither the merits nor the requested relief is susceptible to classwide disposition. And although this Court has stated that "the defining characteristic" of mandatory class actions under Rule 23(b)(2) "is the homogeneity of the interests of the members of the class," *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 649 (6th Cir. 2006), the interests of the subclass here are anything but homogeneous, as underscored by the individualized evaluation that the preliminary injunction requires, as well as the futile attempt numerous inmates have made to "opt out" of the relief ordered by the Court.

## II. THE BALANCE OF EQUITIES WARRANT A STAY

Harms to BOP and to the public interest "merge," *Nken*, 556 U.S. at 435, and if the orders are not stayed, they will continue to inflict irreparable harm on BOP, other BOP inmates, and the public.

To begin, the April 22 and May 19 orders usurp BOP's statutory authority to designate appropriate placements for every inmate, *see* 18 U.S.C. § 3621(b). As the Supreme Court has recognized, "irreparable harm" occurs when the government "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 133 S. Ct. 1, 3

11

(2012). Here, duly enacted statutes give BOP unreviewable discretion to determine where inmates should be placed, 18 U.S.C. § 3621, and to determine (according to the Attorney General's guidance) when it is appropriate to place a particular inmate in home confinement.

Section 3621 reflects the self-evident point that expertise to run a prison lies with BOP— *not* an individual federal judge. The Supreme Court has emphasized: "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). The Supreme Court has instructed courts to provide "considerable deference" to prison administrators in light of that "expertise" and cautioned that "the judiciary is ill equipped to deal with the difficult and delicate problems of prison management." *Thornburgh*, 490 U.S. at 407-08.

The Court's May 19 order runs afoul of these principles by requiring that BOP move numerous inmates to home confinement under criteria of the Court's creation that depart from BOP's expert-driven, public-safety judgments. The April 22 order likewise mandates that BOP transfer hundreds of inmates to other institutions, notwithstanding BOP's unreviewable determinations under section 3621 that Elkton is the facility best suited for them. This harm is alone sufficient to justify a stay.

Even if this were not the case, the orders impose several additional irreparable harms on the public, inmates, and BOP. The public may be harmed in at least two ways. First, it may be exposed to additional public safety risks if BOP is forced to place inmates in home confinement that have not been deemed appropriate. Although public safety is a key consideration in BOP's analysis of home confinement eligibility, *see, e.g.*, Hurwitz Decl. at ¶ 6., the Court's order requires BOP to "disregard" some of the key factors that might indicate that an inmate poses a threat to public safety, such as the fact that he has a history of violent offenses. (Order, ECF No.

85 PageID # 1129.) Second, BOP has explained that there is a risk that COVID-19 may be transmitted to new areas if inmate transfers occur. (Matevousian Decl. at ¶ 14.)

Inmates, too, may be harmed. Transfers could inadvertently spread COVID-19 to new facilities, despite BOP's best efforts to the contrary. Class members also may be placed in new facilities that do not suit their needs as well as Elkton. To determine the correct placement for a particular inmate, BOP carefully weighs numerous statutory factors, designed to ensure that each inmate is incarcerated in a location that will maximize public safety and inmate wellbeing. *See* 18 U.S.C. § 3621(b). BOP can, for example, ensure that an inmate who needs sex-offense or drug-rehabilitation programs be placed at a facility that has them, a reasonable distance from his home, at an appropriate security level, and with available space. (Declaration of Shannon Robbins ("Robbins Decl.") attached as Exhibit D, at ¶¶ 42-45.) Overriding BOP's careful inmate placement decisions for the subclass thus threatens inmates' well-being. (Matevousian Decl. at ¶¶ 12-13 (citing inmates' security and mental health concerns).) Indeed, when all Elkton inmates were surveyed about their desire to participate in this class-action suit, over 900 inmates responded, and more than 100 inmates specifically indicated that they did *not* wish to be transferred from Elkton; yet they remain covered by the Court's injunctive orders, which provide no formal opt-out mechanism (and which cannot do so due to the injunctive-relief-only mandatory nature of the class). Fed. R. Civ. P. 23(b)(2); *see also* (Respondents' Opposition to Petitioners' Emergency Motion to Circulate Notice, ECF No. 60 PageID # 846-847.)

In addition, BOP has been diverted from full implementation of its strategic plan and forced to devote tremendous resources to comply with the Court's numerous orders requiring status reports on everything from the daily number of tests to the precise nature of inmate separation within the facility. And these orders are in addition to the Court's mandate to transfer

800 inmates, which is forcing BOP to reallocate resources it would otherwise use to move the thousands of inmates it has a statutory mandate to receive from custody of the U.S. Marshal's Service to allow inmates to begin serving their sentences. 18 U.S.C. § 4042; (Robbins Decl. at ¶ 38.)

These harms are irreparable if the Court's orders are not stayed. Some inmates will have been inappropriately placed in the community through home confinement; inmates will have been moved from their statutorily designated locations, perhaps to higher security institutions; COVID-19 will have potentially spread; inmate treatment programs will have been interrupted; and BOP will have diverted its resources to effectuate judicial orders rather than its strategic response plan for COVID-19.

Moreover, this Court's Orders ignore the improving condition at Elkton. (Order, ECF No. 22 PageID # 368.) But, even when the Court issued the April 22 order, inmate hospitalizations for COVID-19 had sharply decreased. (Opp'n to Mot. to Enforce, ECF No. 58 PageID #752.) From April 12 to May 2, only four inmates were hospitalized for COVID-19-related illnesses, and since May 2, no other Elkton inmate has been hospitalized for COVID-19-related illnesses. (Burnside Decl. at ¶ 9.) Moreover, although nine inmates have died from COVID-19, each death resulted from an infection that occurred before April 6. (*Id.* at ¶ 8.) There have been *no* deaths based on infections occurring since the district court entered its April 22 Order. Although mass testing at Elkton has revealed the extent of COVID-19 at the facility, BOP has made significant process containing COVID-19 and mitigating the risks.

## CONCLUSION

For the foregoing reasons, Respondents respectfully urge this Court to stay its May 19 and April 22 orders pending appeal.

                Respectfully submitted,

                JUSTIN E. HERDMAN
                United States Attorney

By:  /s/ James R. Bennett II
       James R. Bennett II (OH #0071663)
       Sara DeCaro (OH #0072485)
       David M. DeVito (CA #243695)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Ave., Suite 400
       Cleveland, Ohio 44113
       216-622-3988 - Bennett
       216-522-4982 - Fax
       James.Bennett4@usdoj.gov
       Sara.DeCaro@usdoj.gov
       David.DeVito@usdoj.gov

       *Attorneys for Respondents*