IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| WILSON, ET AL, | * | |
| Petitioners | * | CASE NO. 4:20-CV-00794 |
| v. | * | |
| WILLIAMS, ET AL, | * | JUDGE GWIN |
| Respondents | * | |

DECLARATION OF ANDREA BURNSIDE

I, Andrea Burnside, do hereby declare, certify and state as follows:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons (BOP). I currently work as the Executive Assistant /Acting Associate Warden at Federal Correctional Institution (FCI) Elkton in Lisbon, Ohio. I have held the position of Executive Assistant since November 11, 2019. I have been an Acting Associate Warden since March 2020. I have been employed by BOP since September 18, 2005. Throughout this declaration, when I refer to "FCI Elkton" generally, I am referring to both of the FCI Elkton institutions, the Federal Correctional Institution (FCI) and the Federal Satellite Low (FSL), unless otherwise specified.

2. In my position as an Acting Associate Warden at FCI Elkton, I am responsible for exercising control and supervision of various aspects of the institution's functions such as operations, medical, mental health, custody, transportation, and industries. As Executive Assistant, and under the general direction of the Warden, I work with the Associate Warden(s) and department heads in developing plans, policies and programs for institution management. I help monitor and evaluate institution programs in terms of achievement of overall objectives. I

GOVERNMENT EXHIBIT A

serve as the Warden's representative during investigations of specific inmate management problems. I serve as a liaison between executive staff and department heads insuring a meaningful and consistent flow of communications

3. I have been asked to discuss FCI Elkton's ongoing efforts to combat the Coronavirus Disease 2019 (COVID-19) pandemic, the current state of inmate testing and health, BOP's efforts to implement the District Court's requirement to transfer inmates out of FCI Elkton, and other issues related to those topics.

**COVID-19 Response at FCI Elkton**

4. As explained in previous declarations filed in this case, BOP and FCI Elkton have developed and implemented a multi-phase plan to address and mitigate the risks posed by COVID-19. Notwithstanding extensive mitigation efforts at FCI Elkton, by late March 2020, inmates at Elkton had begun to contract COVID-19. On March 26, 2020, FCI Elkton sent its first inmate to a local hospital for treatment because of COVID-19.

5. Two of the methods that FCI Elkton utilizes to combat the virus's spread are the isolation and quarantine of inmates who may have contracted COVID-19. Isolation is used to separate from others those inmates who either have symptoms consistent with COVID-19 or have tested positive for COVID-19. FCI Elkton has currently designated the FCI Visiting Room, FCI Chapel, and FCI Gym and FSL G-A Housing Unit as isolation areas. As results from mass testing are returned, housing units at the FCI will be used as isolation areas, as needed.

6. Clearance from isolation is based on the CDCs recommendations. Currently, under CDC guidelines, an inmate may be released from isolation after 14 days if he is fever-free for 72 hours prior to his release, and exhibits no other symptoms. The BOP has supplemented that isolation period with an additional period of "post-isolation recovery." There is no clear

guidance about the length of time that the virus remains in the body. BOP has recommended that inmates complete additional time in post-isolation recovery up to 21 days in the hope that the inmate will develop antibodies during that period. Consistent with that recommendation, an inmate who is released from isolation at FCI Elkton is moved to post-isolation recovery in a separately designated area until his total time equals 21 days.

7. "Quarantine" in the context of COVID-19 refers to separating asymptomatic persons who may have been exposed to the virus to (1) observe them for symptoms and signs of the illness during the incubation period and (2) keep them apart from other incarcerated individuals. Inmates are quarantined together for a 14-day period currently in either FCI Elkton's UNICOR area, Special Housing Unit, the FSL visiting room, FSL Psychology Services office, and in clean housing units once mass testing is/was completed. Consistent with CDC guidelines, if no inmate within a quarantined inmate group exhibits symptoms consistent with COVID-19 during the 14-day quarantine period, the group may be released from quarantine. But if an inmate in the group exhibits such symptoms, that inmate is isolated and the 14-day quarantine clock resets for the balance of the group.

8. In late March and early April 2020, a significant number of inmates at FCI Elkton contracted COVID-19 and required hospitalization. The number of inmates admitted to the local hospital due to COVID-19 increased from one on March 26 to a peak of 46 on April 8. Several hospitalized inmates required intubation for ventilation. And regrettably, notwithstanding BOP's efforts, a total of nine Elkton inmates, each of whom was hospitalized after reporting sick between March 26 and April 7, subsequently died in the hospital due to complications from COVID-19. Contemporaneous BOP press releases, as reflected in the footnotes to the following table, publicly announced the circumstances surrounding each inmate's death.

|   | Inmate | Reported Sick | Admitted to Hospital | Intubated / Ventilated | Died |
|---|---|---|---|---|---|
| 1 | Frank McCoy[1] | Mar. 26, 2020 | Mar. 26, 2020 | Mar. 27, 2020 | Apr. 2, 2020 |
| 2 | Margarito Garcia-Fragoso[2] | Mar. 27, 2020 | Mar. 27, 2020 | Mar. 28, 2020 | Apr. 2, 2020 |
| 3 | Woodrow Taylor[3] | Mar. 28, 2020 | Mar. 31, 2020 | Apr. 1, 2020 | Apr. 2, 2020 |
| 4 | Alvin Turner[4] | Apr. 1, 2020 | Apr. 3, 2020 | Apr. 6, 2020 | Apr. 13, 2020 |
| 5 | David Ehle[5] | Apr. 2, 2020 | Apr. 3, 2020 | Apr. 3, 2020 | Apr. 14, 2020 |
| 6 | William Hutsell[6] | Apr. 3, 2020 | Apr. 7, 2020 | Refused[7] | Apr. 16, 2020 |
| 7 | Richard Nesby[8] | Apr. 4, 2020 | Apr. 4, 2020 | Apr. 10, 2020 | Apr. 26, 2020 |
| 8 | James Druggan[9] | Apr. 5, 2020 | Apr. 5, 2020 | Apr. 6, 2020 | May 6, 2020 |
| 9 | Michael Brookwalter[10] | Apr. 6, 2020 | Apr. 6, 2020 | Apr. 8, 2020 | May 8, 2020 |

9. Staff at FCI Elkton continued to take numerous actions to mitigate the spread and effect of COVID-19 in the face of those hospitalizations. As noted in prior declarations in this case, numerous steps have been taken to prevent the spread of the virus and increase social distancing throughout FCI Elkton. These include, but are not limited to, wearing of masks and personal protective equipment (where appropriate), frequent washing of surfaces, cohorting of inmate groups, and limited movement outside of housing units, in addition to frequent notifications to the inmate population via TRULINCS[11] on COVID-19 updates to include, proper

---

[1] https://www.bop.gov/resources/news/pdfs/20200404_press_release_elk.pdf
[2] https://www.bop.gov/resources/news/pdfs/20200403_press_release_elk.pdf
[3] https://www.bop.gov/resources/news/pdfs/20200402_press_release_elk.pdf
[4] https://www.bop.gov/resources/news/pdfs/20200414_press_release_elkton.pdf
[5] https://www.bop.gov/resources/news/pdfs/20200414_press_release_elk.pdf
[6] https://www.bop.gov/resources/news/pdfs/20200416_press_release_elk.pdf
[7] Inmate Hutsell refused to be intubated at the hospital.
[8] https://www.bop.gov/resources/news/pdfs/20200426_press_release_elk.pdf
[9] https://www.bop.gov/resources/news/pdfs/20200509_press_release_elk.pdf
[10] https://www.bop.gov/resources/news/pdfs/20200509_pres_rel_elk.pdf
[11] TRULINCS is the Trust Fund Limited Inmate Computer System. TRULINCS is comprised of two main components: an Administrative web-based application used by the local Institution staff, regional Trust Fund offices, and the Trust Fund Central Office Staff; and a client-based inmate application used solely by the inmates.

PPE, prevention, and reporting of illness. Since early April 2020, the number of hospitalized inmates has been in decline from its April 8 peak of 46 inmates. From April 12 through May 2, only four inmates were hospitalized for COVID-19-related illness, and, in the nearly four weeks since May 2, no other Elkton inmate has been hospitalized for COVID-19-related illness. As of May 27, 2020, only eight inmates remain in the hospital with COVID-related illnesses. And as noted in the table above, the last inmate who died from complications from COVID-19 died on May 8, after contracting the virus in early April.

10. Although FCI Elkton continues to experience inmate infections, the mitigation efforts by staff appear to have significantly mitigated the risks of COVID-19, as reflected by decreasing hospitalizations since April 8.

11. The charts attached to this declaration provide graphical illustrations of the number of inmate hospitalizations, total number of inmates in the hospital, inmate deaths, intubations, staff confirmed positive COVID-19 tests, and total inmates in isolation from late March/early April to the present. See Exhibit A.

**COVID-19 Testing**

12. Although FCI Elkton was initially able to procure only limited COVID-19 testing capabilities, it has since been able to significantly expand that capability, as explained in prior declarations. FCI Elkton is now testing inmates for COVID-19 with both the Abbott Labs rapid test and with test swabs sent to Quest Diagnostics laboratory. Both tests are viral tests that detect whether the virus is present in the testee as of the time the test sample is collected.

13. Quest examines the test swabs that Elkton submits for viral RNA. As such, the accuracy rate of Quest's analysis is estimated to be 95% or higher. Abbott tests are known to be less reliable because the test looks for any remnants of RNA from the coronavirus, which yields

5

a higher rate of positive results. Health Services staff have informed me that, based on the information now available, the Abbott test appears to have a false negative rate of 20%. FCI Elkton uses the Abbott test, in addition to other diagnostic techniques, in those situations where an inmate is symptomatic and/or to screen the inmate is set to release.

14. Staff at FCI Elkton devised a plan for mass testing all inmates in the institution. Initially, all inmates in isolation were tested. Staff then tested all quarantined inmates who were releasing from the institution, all inmates at the FSL, and then all inmates who are essential workers (food service, orderlies, etc.). Staff then proceeded to test all the inmates in each housing unit at the FCI. They started with the FSL both because it is smaller and would provide a snap shot of what is going on in the institution as a whole. Once the FSL was completed, staff began testing essential workers at the FCI and moved through the various housing units. As of May 27, 2020, approximately 1,550 inmates have been tested. All of the inmates on the "medically vulnerable" list have been tested. My understanding is that there are approximately 775 additional inmates from whom staff expect to collect test swabs before Friday, May 29, 2020. At that time, all inmates at FCI Elkton will have been tested for COVID-19, pending results from Quest.

15. Inmates on the "medically vulnerable" list were also prioritized for testing. Any inmate who tested positive was placed into the isolation unit. Any inmate who tested negative was cohorted with other inmates who tested negative.

16. With the Abbott rapid test available to us, all inmates who complain of symptoms are tested prior to being placed in isolation.

17. As of May 27, 2020, FCI Elkton has tested all inmates who have exhibited symptoms. All such inmates who exhibit symptoms are immediately tested.

18. As of May 27, 2020, a total of 484 FCI Elkton inmates have tested positive for COVID-19. Test results are still pending for a significant number of inmates who have been tested en mass with test swabs sent to Quest for analysis.

**Implementation of the District Court's Release Order**

19. Based on the District Court's order requiring BOP to transfer out of FCI Elkton inmates who the Court has deemed to be "medically vulnerable," on Friday, May 22, 2020, Elkton staff placed 128 of those inmates into quarantine at the FSL to enable their transfer out of FCI Elkton. Those inmates were selected to be the first group quarantined for such Court-ordered transfer because they have medical conditions that would likely put them at higher risk of serious problems from contracting COVID-19 as defined by the Court and CDC and had previously been tested.

20. Inmates are tested for COVID-19 prior to their placement in quarantine. If an inmate tests negative, he is placed in quarantine for 14 days to facilitate his anticipated release/transfer. The inmate is tested again 24 hours before his release from FCI Elkton. If the inmate tests negative the inmate will continue on with the transfer. If the inmate tests positive, he is placed in isolation and his transfer will necessarily be delayed. In addition, if an inmate tests positive, the 14-day quarantine clock is reset for the remainder of the inmates in his cohort in that quarantine area. FCI Elkton quarantines cohorts of inmates before those inmates are released or transferred.

21. If no positive COVID-19 tests reset the quarantine period for the first batch of inmates quarantined for Court-ordered release or transfer, those inmates will be transferred out of FCI Elkton, as required by the District Court, on June 5, 2020.

22. After the first group of "medically vulnerable" inmates have been transferred out of FCI Elkton, staff at FCI Elkton will process the remaining "medically vulnerable" inmates for

7

similar transfer as expeditiously as possible. At this rate, and barring something unexpected, we anticipate finishing the transfer of the members of the "medically vulnerable" list out of FCI Elkton by late August 2020.

**Home Confinement Efforts**

23. Since March 26, 2020, the Attorney General of the United States directed BOP to begin immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement. The eligibility requirements for an inmate to be considered for Home Confinement were set forth by two memoranda. The first memorandum was dated March 26, 2020. See Exhibit B. The Attorney General sent a second memorandum to the Director of the BOP to provide additional guidance on April 3, 2020. See Exhibit C.

24. BOP has been prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. In accordance with the Attorney General's Memoranda, the BOP has promulgated guidance for staff to use when determining whether an inmate can be considered for home confinement placement. Factors to be considered include, but are not limited to:

   a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;
   b. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

c. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need),[12] with inmates who have anything above a minimum score not receiving priority treatment;

d. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety; and

e. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.

25. Some offenses, such as sex offenses, generally rendered an inmate ineligible for home confinement. Other serious offenses weighed heavily against consideration for home confinement.

26. In response to the Court's April 22, 2020, Order, FCI Elkton case management staff, as well as case management staff from the Northeast Regional Office, the Federal Correctional Complex Allenwood in White Deer, Pennsylvania, and the Correctional Programs Division in Washington, DC, among others, conducted a review of the 837 inmates on the "medically vulnerable" list.

27. This review occurred over seven days and consisted of case management staff reviewing each inmate to determine whether that inmate was eligible for consideration of home confinement placement under the Attorney General's memoranda and BOP guidance. As a result of that review, five of the 837 inmates were deemed eligible for consideration of home confinement placement. At the time, eighty-nine (89) inmates on the "medically vulnerable" list had or were awaiting halfway-house dates, were designated for transfer to another BOP location,

---

[12] For more information on PATTERN, please visit www.bop.gov via Inmates/First Step Act tab.

or had been released from BOP custody as a result of standard processes and procedures separate and distinct from the court order.

28. On May 19, 2020, the Court ordered another review of the "medically vulnerable" list, which now totaled 846 inmates, for consideration of home confinement placement. The Court ordered FCI Elkton to utilize the Court's criteria in place of some of the Attorney General's memoranda and BOP guidance when conducting the reviews, and to provide rolling reports on the results of the reviews every 48 hours, with the first report due by the close of business on May 21, 2020. Specifically, the Court ordered FCI Elkton

> to (a) eliminate all requirements that the inmate have served some part of his sentence to be eligible for home confinement; (b) disregard any incident reports at the low or moderate severity levels (300 or 400 levels); (c) disregard the violence offense restriction for any inmate whose underlying conviction involved an offense that occurred more than 5 years ago or for which the only basis or denial is a prior violent offense; (d) grant home confinement to inmates who were previously deemed ineligible solely on the basis of a Low PATTERN risk score; and (e) eliminate the requirement that the inmate be a U.S. citizen.

May 19, 2020, Court Order.

29. In accordance with the Court's Order, FCI Elkton case management staff, as well as case management staff from the Northeast, Mid-Atlantic and Western Regional Offices, the Federal Prison Camp in Duluth, Minnesota, and the Correctional Programs Division in Washington, DC, conducted reviews of 846 inmates who were on the "medically vulnerable" list on the rolling, 48-hour basis under the criteria set by the Court. The results of these reviews were provided to the United States Attorney's Office for the Northern District of Ohio to produce to the ACLU.

30. Of the 846 inmates reviewed, 80 were referred based on the District Court's criteria to the Correctional Programs Division for further review for home confinement placement. FCI

Elkton did not deem any of these 80 inmates eligible for consideration of home confinement based on the application of the criteria identified by the Attorney General and BOP.

31. As of today, the Correctional Programs Division has completed its review of twenty-five of those inmates, with eight approved for transfer to another BOP institution and 17 approved for home confinement placement.

32. A review of the "medically vulnerable" list reveals that only one of the named Petitioners, Kendal Nelson, Federal Register No. 64823-060, is included.

I declare that the foregoing is true and correct to the best of my knowledge and belief, and is given under penalty of perjury pursuant to 28 U.S.C. § 1746 this May 28, 2020.

RESPECTFULLY SUBMITTED,

*Andrea Burnside*
ANDREA BURNSIDE
Executive Assistant/Acting AW
FCI Elkton