# Exhibit A

**Declaration of Meghan Novisky, PhD**

1. I am an Assistant Professor of Criminology in the Department of Criminology, Anthropology, and Sociology at Cleveland State University.

2. My research investigates the consequences of carceral contact on health, factors related to the conditions of confinement, and the collateral consequences of criminal justice policy. I have worked since 2009 with the University of Cincinnati's Corrections Institute (UCCI) as an evidence based programming consultant and trainer. In this role I have worked with correctional staff in 17 U.S. states and trained them on the implementation of research-informed programs and policies to help lower their recidivism rates. I received my PhD in Sociology from Kent State University, with a joint focus on Criminology and Medical Sociology. The focus of my dissertation involved identifying barriers to health care access that exist in prisons, specifically among older adults.

3. My publications on health and incarcerated people have appeared in numerous peer-reviewed journals, including *Criminology*, *Justice Quarterly, and Victims & Offenders*. I also serve as a regular reviewer for multiple peer-reviewed journals, including *Criminology, Justice Quarterly, the Journal of Criminal Justice, the Journal of Interpersonal Violence,* and *the International Journal of Offender Therapy and Comparative Criminology*. In 2020, I received the Early Career Investigator Award from the Academic Consortium on Criminal Justice Health (ACCJH), and I serve as Chair of the Annual Awards Committee of the American Society of Criminology (ASC), Division of Corrections and Sentencing. Prior to the pandemic, I served the ASC with several other colleagues by organizing a series of research panels focused on the intersection of criminal justice and health for the annual (2020) meeting.

4. The current situation at Elkton FCI is dire. Based on the Federal Bureau of Prison's current estimates, Elkton FCI has a total of 339 active cases of COVID-19, including infections among 332 prisoners and 7 staff.[1] Elkton maintains a current population of 2,295 prisoners.[2] This means at least 14 percent of the current prisoner population, roughly 1 in 7 prisoners, are infected with COVID-19. Importantly, this estimate is conservative considering testing results have either not been completed or have not been released publicly for Elkton's entire population. Elkton is also either not completing or not releasing publicly testing results for their entire population of staff.

5. Only one prison under BOP jurisdiction, Forrest City FCI in Arkansas, has more prisoners infected with COVID-19 than Elkton.[3] Of all 1,610 federal prisoners currently infected with COVID-19 across the United States, 21 percent of them (n = 332) are concentrated at Elkton FCI.[4]

6. Thus far, nine Elkton prisoners have died of COVID-19. All nine deceased men had pre-existing medical conditions that the CDC lists as risk factors for developing more severe COVID-19 disease. The average age of the men who died was 61, with 8 out of 9 men being over the age of 50. All nine men who died were tested and confirmed positive for COVID-19 only upon arrival at a hospital, meaning no proactive testing at Elkton was available or utilized to identify these men prior to their respective hospitalizations. In sum, *these men had multiple identifiable and predictable vulnerabilities for hospitalization and death*, including their pre-existing health conditions, their ages, and the lack of testing they received prior to their conditions worsening to the point they required transfer to a hospital because of inabilities to

---

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/locations/institutions/elk/
[3] https://www.bop.gov/coronavirus/
[4] https://www.bop.gov/coronavirus/

maintain oxygen saturation. This information is available in each of the nine memos released by the BOP detailing each prisoner's death.[5][6][7][8][9][10][11][12][13]

7. There is only one intervention that is likely to effectively lower risks of further deaths of Elkton prisoners: identification and transfer of the medically vulnerable to a non-COVID-19 hotspot. Should the BOP fail to identify and transfer the medically vulnerable, it is likely that additional medical complications, hospitalizations, and deaths of prisoners will follow.

8. Elkton does not have the capacity to sufficiently lower risks for COVID-19 without transfer. It remains physically impossible to maintain 6 feet of physical distance within groups of people who share sleeping areas, showers, and toilets. Personal protective equipment and cleaning supplies only have limited effectiveness under those conditions.

9. BOP has also not claimed that it is regularly or consistently testing staff. Rather, "enhanced screening of staff" at BOP locations includes "self-reporting and temperature checks,"[14] both of which are insufficient for detecting asymptomatic or pre-symptomatic positive cases of COVID-19 among staff. Without mass testing of staff, Elkton is not even capable of knowing the scope of infection among its staff, who continue to filter in and out of the facility each day and bring anything they are exposed to in the community back into the prison and vice versa. Considering that correctional staff must be in close contact with prisoners in the course of their regular jobs to enforce security protocols, escort prisoners across cell blocks and units,

---

[5] https://www.bop.gov/resources/news/pdfs/20200402_press_release_elk.pdf
[6] https://www.bop.gov/resources/news/pdfs/20200403_press_release_elk.pdf
[7] https://www.bop.gov/resources/news/pdfs/20200404_press_release_elk.pdf
[8] https://www.bop.gov/resources/news/pdfs/20200414_press_release_elkton.pdf
[9] https://www.bop.gov/resources/news/pdfs/20200414_press_release_elk.pdf
[10] https://www.bop.gov/resources/news/pdfs/20200416_press_release_elk.pdf
[11] https://www.bop.gov/resources/news/pdfs/20200426_press_release_elk.pdf
[12] https://www.bop.gov/resources/news/pdfs/20200509_press_release_elk.pdf
[13] https://www.bop.gov/resources/news/pdfs/20200509_pres_rel_elk.pdf
[14] https://www.bop.gov/coronavirus/covid19_status.jsp

administer medications, and supervise meal distribution, for example, not knowing COVID-19 statuses of Elkton's staff represents a significant oversight as far as the safety risks posed to the institution. Unless Elkton staff are quarantined and prevented from continuing to cycle in and out of the prison to return to the community following each shift, risks for COVID-19 transmission must be assumed to remain without testing to confirm otherwise.

10. Although CDC recommends against unnecessary transfers between prisons, movement can be done safety and is often necessary. The BOP continues to transfer for various reasons, including continued processing of criminal cases, forensic studies, writs, interstate agreements on detainers (IAD), RRC placements, and management of overcrowding.[15]

11. As far as risks for recidivism, Elkton maintains a low security custody level, meaning that individuals placed at Elkton are already classified as lower risk individuals. The most common reason for which people are incarcerated within the BOP (46 percent of all convicting offenses) is drug activity[16], which is a non-violent crime. In total, at least 62% of convicting offenses within the BOP are non-violent (Drugs = 45.8%; Extortion, Fraud, Bribery = 5.7%; Property crimes = 5%; Immigration = 5.3%; Banking and Insurance, Counterfeit, and Embezzlement = .2%)[17]. Though 10.5% of those under BOP custody are convicted of sex offenses, research shows that these individuals have generally low risks for recidivism, especially when convicted of no-contact sex offenses. For example, a 2012 report to Congress by the U.S. Sentencing Commission[18] found that only 7 percent of individuals convicted of possession or distribution of child pornography went on to be arrested or convicted of a new sex offense after being released from BOP custody, despite people in the study being out of prison

---

[15] https://www.bop.gov/coronavirus/covid19_status.jsp
[16] https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp
[17] https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp
[18] https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

for an average of 8 years.[19] Combined with the fact that recidivism declines exponentially with age, these factors make the subclass identified in this case a low public safety threat. This is especially the case considering that BOP will maintain correctional supervision of these individuals, either at another prison or through community supervision.

   12. In sum, it is essential for BOP to identify and transfer those prisoners with medical vulnerabilities immediately so as to avoid additional medical complications, hospitalizations, and death. With BOP's available resources and ability to maintain continued custody of the prisoners in question, this can be accomplished without imposing undue safety risks to the community.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Meghan Novisky, PhD

Date: 5/30/2020

---

[19] https://www.ned.uscourts.gov/internetDocs/jpar/RGK-FSR2014-Recidivism%20By%20Child%20Pornography%20Offenders.pdf