# Exhibit B

**Declaration of Joe Goldenson, MD**

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3. For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5. On April 11, 2020, I signed a declaration that I understand was submitted in this case. The statements below supplement my April 11 declaration.

6. The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in

prisons than in the community. Close, poorly ventilated, living quarters and often overcrowded conditions in these facilities foster the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing, speaking, or coughing. In these congregate settings, large numbers of people are closely confined and forced to share living spaces, bathrooms, eating areas, and other enclosed spaces. They are physically unable to practice social distancing, which the Centers for Disease Control and Prevention ("CDC") has identified as the "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[1] Because of this, incarcerated individuals are less able to protect themselves from being exposed to and becoming infected with infectious diseases, such as COVID-19.

7. The most commonly used test for the diagnosis of COVID-19 detects viral RNA (RT-PCR). In most individuals with symptomatic COVID-19, the test becomes positive at the time of the onset of symptoms[2] (2-14 days after infection). It does not identify individuals who are infected but presymptomatic. Furthermore, it obviously does not identify those who will become infected. To determine whether an individual is at risk for spreading COVID19, they must be regularly retested.

8. A testing protocol that only applies to prisoners and does not involve the regular (weekly or bi-weekly) testing of other individuals, such as staff, who enter and exit the facility, will not be effective in identifying contagious individuals or preventing further spread of COVID19 within the facility.

9. It is my understanding that Elkton uses open bay / dorm housing units with multiple-occupancy cells, and a limited number of segregation units. It also my understanding

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[2] Sethuraman, et al, *Interpreting Diagnostic Tests for SARS-CoV-2*, JAMA, 5/6/20, https://jamanetwork.com

that Elkton has approximately 2,300 detainees between the Elkton federal correction institution and the low security satellite prison on any given day; that staff that enter and leave the facility regularly; and that detainees share restroom and shower facilities and eat communally prepared food.

10. It is also my understanding that Elkton officials claim that they are providing masks and soap to prisoners. Further, I understand that Elkton officials claim that any prisoner who complains of symptoms is given a test, and will be placed in isolation only if they test positive.

11. However, because prisoners at Elkton continue to live in congregate settings where they cannot stay 6 feet away from others, they remain at high risk of continued infection.

12. I understand that before an individual is moved out of Elkton, they undergo the following procedure: if they test negative, they are placed in quarantine for 14 days, and are tested again 24 hours prior to being moved to another location. If either test is positive, they will be placed in isolation and their movement will be delayed. In addition, I understand that if one prisoner in quarantine tests positive, the 14-day clock resets for the entire cohort of other prisoners quarantined with the person who tested positive. If this procedure is followed, an individual being moved out of Elkton will pose a minimal risk of infecting others.

13. The only way to determine whether a facility's response is effective is to study the rates of new infections over time. This requires longitudinal data and frequent retesting of prisoners who previously tested negative. Without these data, a facility cannot claim that the contagion is under control or that its response has been effective in preventing further spread of the disease. A short-term decline in hospitalizations does not by itself indicate a decline in infections.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of May 2020 in Alameda County, CA

_____

Joe Goldenson, MD

**References**

1. Dolan K, Wirtz A, Maazen B., et al. Global Burdern of HIV, viral hepatitis, and tuberculosis in prisoners and detainees. *The Lancet,* July 14, 2016.

Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. *Proceedings of the National Academy of Science* USA, 2008. 105:13280-85.

2. Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available. PMID: 27427447.

3. Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. *American Journal of Public Health*. 2009 October; 99(Suppl 2): S339–S344.

4. Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

5. Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151.

6. CDC, COVID-19, People Who are at Higher Risk, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html